# EXHIBIT A

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SCHAWBEL TECHNOLOGIES, LLC, a Massachusetts limited
liability company; and DOES 1 through 50

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/18/2018** at 03:27:57 PM

Clerk of the Superior Court
By Veronica Navarro, Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
HEAT FACTORY USA, INC., a California corporation

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

37-2018-00002727-CU-BC-NC

North County Division
Vista Regional Center
325 S. Melrose Drive
Vista, CA 92081

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert T. Lemen (SBN 94111)/Thomas N. Fay (SBN 290907)   (949) 794-4000   (949) 794-4099
Murtaugh Treglia Stern & Deily LLP
2603 Main Street, Penthouse
Irvine, CA 92614

*V. Navarro*
V. Navarro

DATE: 01/18/2018                    Clerk, by _____ , Deputy
*(Fecha)*                              *(Secretario)*                         *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**


Legal
Solutions
& Plus

Code of Civil Procedure §§ 412.20, 465

1  Robert T. Lemen (Bar No. 94111)
   Thomas N. Fay (Bar No. 290907)
2  MURTAUGH TREGLIA STERN & DEILY LLP
   2603 Main Street, Penthouse
3  Irvine, California 92614-6232
   (949) 794-4000 / Fax (949) 794-4099
4  rlemen@murtaughlaw.com
   tfay@murtaughlaw.com
5
   Attorneys for Plaintiff
6  HEAT FACTORY USA, INC.

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/18/2018** at 03:27:57 PM

Clerk of the Superior Court
By Veronica Navarro,Deputy Clerk

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SAN DIEGO, NORTH DISTRICT

10

| | |
|---|---|
| 11  HEAT FACTORY USA, INC., a California corporation, | CASE NO. 37-2018-00002727-CU-BC-NC |
| 12 | |
| 13                Plaintiff, | **COMPLAINT FOR:** |
|    | **1) BREACH OF CONTRACT** |
| 14       v. | **2) FRAUD** |
|    | **3) NEGLIGENT MISREPRESENTATION** |
| 15  SCHAWBEL TECHNOLOGIES, LLC, a | **4) EXPRESS INDEMNITY** |
|    Massachusetts limited liability company; | **5) INTENTIONAL INTERFERENCE** |
|    and DOES 1 through 50, | **WITH PROSPECTIVE ECONOMIC** |
| 16 | **ADVANTAGE** |
|               Defendants. | **6) DECLARATORY RELIEF** |
| 17 | |
| 18 | |
|    | TRIAL DATE:  None set |
| 19 | |

20       Plaintiff HEAT FACTORY USA, INC. ("HFUSA" or "Plaintiff") alleges as follows:

21       1.       HFUSA is and was at all times relevant hereto a corporation organized under

22  the laws of the State of Nevada, authorized to do business and doing business in California.

23  HFUSA is headquartered in Carlsbad, California.  HFUSA is in the business of selling hand

24  warmers and other heating products.

25       2.       HFUSA is informed and believes and thereon alleges that Defendant Schawbel

26  Technologies, LLC ("Schawbel") is and was at all times relevant hereto a limited liability

27  company organized under the laws of the State of Massachusetts.

28       3.       The true names and capacities of Defendants sued herein as DOES 1 through

MURTAUGH TREGLIA
STERN & DEILY LLP

2016261                                    - 1 -

                                                              COMPLAINT

1   50, inclusive, are presently unknown to HFUSA, who therefore sues these Defendants by such

2   fictitious names.  HFUSA will seek leave to amend this Complaint and include these Doe

3   Defendants' true names and capacities when they are ascertained.  Each of the fictitiously-

4   named Defendants is responsible in some manner for the conduct alleged herein and for the

5   damages suffered by HFUSA.

6                    **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

7        4.      HFUSA and Schawbel were competitors in the business of manufacturing and

8   selling heated insoles, hand warmers, and related heating products.  Schawbel sold its products

9   under a trademarked brand name:  ThermaCELL.

10       5.      On or about July 18, 2017, HFUSA and Schawbel entered into an Asset

11  Purchase Agreement and an Exclusive Patent License Agreement (the "Agreements").  Under

12  the Agreements, in addition to other terms, HFUSA would take all of Schawbel's existing

13  inventory and resell it, as well as receiving an exclusive license to use and license certain

14  patents and related know-how.

15       6.      In exchange for these rights, HFUSA would make certain specified payments

16  (some under the Asset Purchase Agreement and some under the License Agreement).  The

17  payments under the Asset Purchase Agreement were to be adjusted downward by the amount

18  of any credit balances, defect deductions, and cash rebates resulting from Schawbel's previous

19  sales (the "Offsets").

20       7.      As a part of the negotiation and due diligence for the Agreements, Schawbel

21  provided certain financial information, and represented and warranted that the information

22  provided was accurate, and that nothing was omitted that would render the information false or

23  misleading.  Schawbel further represented that there was no fact that it had not disclosed that

24  would materially adversely affect Schawbel.

25       8.      With respect to the Offsets, Schawbel has repeatedly refused to acknowledge

26  the existence of various credits and offsets owed to various vendors, and has demanded

27  payments above the amount actually owed.

28       9.      Additionally, the financial information provided by Schawbel to HFUSA was

MURTAUGH TREGLIA
STERN & DEILY LLP

2016261                                  - 2 -

1  false and/or misleading, in that it omitted substantial amounts of rebates for Schawbel's sales

2  in 2016 by recording them in 2017.  As a result, the financial information provided by

3  Schawbel did not provide an accurate picture of the true sales of the Company at the time of

4  the asset purchase.  Further, with respect to certain Canadian accounts, Schawbel provided

5  sales figures in Canadian dollars, without denoting that fact, inflating the apparent sales

6  numbers.

7      10.    Schawbel also failed to honor its obligations to Big Rock Canada, causing

8  HFUSA to be expelled from this important industry trade show, and forcing HFUSA to pay

9  Schawbel's debts to redeem its standing with the organization.

10     11.    Schawbel also provided sales forecasts for 2017 that were grossly overstated,

11  and bore no connection with reality.  Schawbel knew or should have known that many of its

12  existing major accounts had over-purchased in 2016 ("stuffing the channel"), and would

13  accordingly reduce their purchases in 2017.  Schawbel failed to disclose this fact.  Schawbel's

14  sales projections, of roughly $5.2 million across roughly 15 of its largest accounts, were met

15  by actual sales of just over $1,000,000, accompanied by credits of nearly $300,000, leading to

16  a net sales figure of approximately $750,000, less than 15% of Schawbel's estimates.

17     12.    Prior to the sale, Schawbel, through its principal Bill Schawbel, represented to

18  HFUSA that:

19         • Schawbel did not sell its products below the wholesale price (an important

20            measure of product value);

21         • The batteries in Schawbel's products would not expire;

22         • Only a small amount of money was owed by Schawbel to its independent sales

23            representatives.

24  None of these representations were true or accurate.

25     13.    Instead, Schawbel actually sold many of its products at a deep discount and

26  provided its customers with extensive sales credits to reduce the net price.  Similarly, the

27  lithium ion batteries in Schawbel's products do appear to have a limited shelf life, contrary to

28  Schawbel's representations – many customers have reported problems with the products that

MURTAUGH TREGLIA
STERN & DEILY LLP

2016261                                    - 3 -

1    can be traced back to dead batteries.  Last, at the time of the sale, Schawbel owed money to

2    almost all of its sales representatives, many of whom still have not been paid, months later.  To

3    add insult to injury, Schawbel's personnel have repeatedly (and without any factual basis)

4    attempted to blame HFUSA for the delay in payment.  HFUSA planned to use these existing

5    sales representatives to continue in Schawbel's existing sales channels, but HFUSA's plans

6    were disrupted and compromised by Schawbel's non-payment.

7         14.    In addition to the items discussed above, HFUSA has discovered that Schawbel

8    owes $1,200,000 to its manufacturer for the inventory HFUSA purchased from Schawbel.

9    This unpaid sum may disrupt HFUSA's ability to continue producing and selling products

10   using the intellectual property HFUSA licensed from Schawbel.

11        15.    Collectively, Schawbel's many unpaid and undisclosed obligations,

12   misrepresentations of its sales and the quality of its products, grossly exaggerated and

13   unreasonable sales projections, unwillingness to honor proper offsets, and related conduct have

14   harmed HFUSA by impeding HFUSA's ability to sell the inventory it purchased from

15   Schawbel, and to profit from HFUSA's licensing of Schawbel's intellectual property.

16                                 **FIRST CAUSE OF ACTION**

17                        **(Breach of Contract – Against All Defendants)**

18        16.    HFUSA realleges and incorporates by reference herein the allegations set forth

19   above.

20        17.    On or about July 18, 2017, HFUSA and Schawbel entered into the Agreements.

21        18.    Under the terms of the Agreements, HFUSA would take all of Schawbel's

22   existing inventory and resell it, as well as receiving an exclusive license to use and license

23   certain patents and related know-how.  In exchange for these rights, HFUSA would make

24   certain specified payments (some under the Asset Purchase Agreement and some under the

25   License Agreement).  The payments under the Asset Purchase Agreement were to be adjusted

26   downward by the amount of any credit balances, defect deductions, and cash rebates resulting

27   from Schawbel's previous sales.

28        19.    As a part of the negotiation and due diligence for the Agreements, Schawbel

MURTAUGH TREGLIA
STERN & DELY LLP     2016261                        - 4 -

                                                                              COMPLAINT

1  provided certain financial information, and represented and warranted that the information

2  provided was accurate, and that nothing was omitted that would render the information false or

3  misleading.  Schawbel further represented that there was no fact that it had not disclosed that

4  would materially adversely affect Schawbel.

5        20.      By the acts and conduct set forth above, Schawbel breached the Asset Purchase

6  Agreement, damaging HFUSA in an amount to be proven at trial.  Schawbel's breaches of the

7  Asset Purchase Agreement were the proximate cause of the damages suffered by HFUSA.

8        21.      HFUSA has performed all acts required of it under the Agreements, and/or its

9  performance was excused.

10        22.      The Asset Purchase Agreement provides for an award of attorneys' fees to the

11  prevailing party in any litigation related thereto.

12        23.      As a result of the foregoing, HFUSA is entitled to recover damages and

13  attorneys' fees from Schawbel in an amount to be proven at trial.

14                    **SECOND CAUSE OF ACTION**

15                  **(Fraud – Against All Defendants)**

16        24.      HFUSA realleges and incorporates by reference herein the allegations set forth

17  above.

18        25.      As set forth above, in connection with the Agreements and the negotiation

19  thereof, Schawbel made a number of representations to HFUSA, including representations

20  that:

21        •  Schawbel did not sell its products below the wholesale price (an important

22            measure of product value);

23        •  The batteries in Schawbel's products would not expire;

24        •  Only a small amount of money was owed by Schawbel to its independent sales

25            representatives.

26    None of these representations were true or accurate.  HFUSA is informed and believes

27  and thereon alleges that Schawbel knew that these representations were not true or accurate,

28  but nonetheless made them, intending that HFUSA rely upon them.

MURTAUGH TREGLIA
STERN & DUFLY LLP    2016261                    - 5 -

                                        COMPLAINT

26.   HFUSA justifiably and reasonably relied upon these representations by Schawbel in entering into the Agreements, and was damaged thereby in an amount to be proven at trial.

27.   As a result, HFUSA is entitled to recover compensatory damages from Schawbel in an amount to be proven at trial.

28.   HFUSA is informed and believes and thereon alleges that Schawbel acted with malice, fraud, and oppression in making the various deliberate misrepresentations alleged above.  HFUSA is therefore entitled to an award of punitive damages to deter such conduct in the future.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation – Against All Defendants)

29.   HFUSA realleges and incorporates by reference herein the allegations set forth above.

30.   As set forth above, in connection with the Agreements and the negotiation thereof, Schawbel made a number of representations to HFUSA, including representations that:

- Schawbel did not sell its products below the wholesale price (an important measure of product value);

- The batteries in Schawbel's products would not expire;

- Only a small amount of money was owed by Schawbel to its independent sales representatives.

None of these representations were true or accurate.  HFUSA is informed and believes and thereon alleges that Schawbel should have known that these representations were not true or accurate and/or had no reasonable basis for believing them to be true, but nonetheless made the representations, intending that HFUSA rely upon them.

31.   HFUSA justifiably and reasonably relied upon these representations by Schawbel in entering into the Agreements, and was damaged thereby in an amount to be proven at trial.

MURTAUGH TREGLIA
STERN & DELY LLP
2016261

- 6 -

COMPLAINT

Exhibit A, Page 14

1      32.    As a result, HFUSA is entitled to recover compensatory damages from

2  Schawbel in an amount to be proven at trial.

3      **FOURTH CAUSE OF ACTION**

4      **(Express Indemnity – Against All Defendants)**

5      33.    HFUSA realleges and incorporates by reference herein the allegations set forth

6  above.

7      34.    In addition to the provisions set forth above, the Asset Purchase Agreement

8  provides for indemnity by Schawbel in favor of HFUSA with respect to "(i) any inaccuracy of

9  any of the representations and warranties as of the date when made, or (ii) the breach of any of

10  the covenants or agreements of [Schawbel] contained in [the Agreements]; (iii) Claims arising

11  from any manufacturing or product defects regarding the Inventory; . . . (v) Liabilities [of

12  Schawbel]."

13      35.    Subject to those provisions, and as a result of the facts set forth above, HFUSA

14  is entitled to indemnity from Schawbel in an amount to be proven at trial.

15      **FIFTH CAUSE OF ACTION**

16      **(Intentional Interference with Prospective Economic Advantage – Against All**

17      **Defendants)**

18      36.    HFUSA realleges and incorporates by reference herein the allegations set forth

19  above.

20      37.    HFUSA has and had substantial economic relationships with Big Rock Canada,

21  various shared customers of HFUSA and Schawbel, and with certain sales representatives.

22  These relationships all carried a substantial probability of significant future economic benefit

23  to HFUSA.

24      38.    HFUSA is informed and believes and thereon alleges that Schawbel was aware

25  of the existence and nature of these relationships.

26      39.    As set forth above, Schawbel engaged in various intentional acts designed to

27  disrupt these relationships, including but not limited to, Schawbel's failure to honor its

28  obligations to Big Rock Canada and to the sales representatives, Schawbel's "stuffing the

1   channel" with respect to its existing customers, and Schawbel's representations to its sales

2   representatives that they should look to HFUSA for payment.  As discussed above, these acts

3   were in violation of Schawbel's contract obligations, and were otherwise wrongful.

4       40.     These acts on the part of Schawbel disrupted HFUSA's relationships with Big

5   Rock Canada, the sales representatives, and customers.

6       41.     As a result of this disruption, HFUSA has suffered significant economic harm.

7       42.     HFUSA is therefore entitled to an award of damages from Schawbel in an

8   amount to be proven at trial.

9                           **SIXTH CAUSE OF ACTION**

10                      **(Declaratory Relief – Against All Defendants)**

11      43.     HFUSA realleges and incorporates by reference herein the allegations set forth

12  above.

13      44.     As set forth above, there exists an actual controversy between HFUSA and

14  Schawbel over HFUSA's rights to certain assess offsets against the purchase price set forth in

15  the Asset Purchase Agreement.  Specifically, the parties disagree over how much, if any,

16  money is owed by HFUSA to Schawbel on the remaining payments due under the Asset

17  Purchase Agreement.

18      45.     HFUSA seeks a judicial declaration as to the parties' rights and obligations

19  under the Asset Purchase Agreement as a result of Schawbel's various breaches of the contract

20  and misrepresentations.

21                           **PRAYER FOR RELIEF**

22      **WHEREFORE**, HFUSA prays for judgment against Defendants as follows:

23      1.      For damages according to proof in favor of HFUSA and against Defendants;

24      2.      For attorneys' fees incurred in pursuing this action;

25      3.      For a judicial declaration specifying HFUSA's offset rights against Schawbel

26  under the Asset Purchase Agreement;

27      4.      For punitive damages against Schawbel;

28      5.      For prejudgment interest at the statutory rate of 10% per annum;

MURTAUGH TREGLIA
STERN & DEILY LLP
2016261                                        - 8 -

COMPLAINT

1    6.    For costs of suit incurred herein; and

2    7.    For such other and further relief as the Court may deem just and proper.

3    Dated: January 18, 2018                    MURTAUGH TREGLIA STERN & DEILY LLP

4

5                                          By: _____

6                                               Robert T. Lemen
                                                 Thomas N. Fay
7                                               Attorneys for Plaintiff
                                                 HEAT FACTORY USA, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MURTAUGH TREGLIA
STERN & DEILY LLP       2016261                          - 9 -

                                                                         COMPLAINT

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Robert T. Lemen (SBN 94111)<br>Thomas N. Fay (SBN 290907)<br>Murtaugh Treglia Stern & Deily LLP<br>2603 Main Street, Penthouse<br>Irvine, CA 92614<br>TELEPHONE NO.: (949) 794-4000   FAX NO.: (949) 794-4099<br>ATTORNEY FOR *(Name)*: Heat Factory USA, Inc. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**01/18/2018** at 03:27:57 PM<br>Clerk of the Superior Court<br>By Veronica Navarro,Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 325 S. Melrose Drive
MAILING ADDRESS: -Same as above-
CITY AND ZIP CODE: Vista, CA 92081
BRANCH NAME: Vista Regional Center

CASE NAME: HEAT FACTORY USA v. SCHWABEL TECHNOLOGIES

| CIVIL CASE COVER SHEET<br>[X] Unlimited   [ ] Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: 37-2018-00002727-CU-BC-NC<br><br>JUDGE: Judge Ronald F. Frazier |
|---|---|---|

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [X] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400-3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve   in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: 6
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: January 1 , 2018

Thomas N. Fay, Esq.
   (TYPE OR PRINT NAME)   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>ℒ Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|---|

Exhibit A, Page 18

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach—Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case—Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief from Late
Claim
Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2018-00002727-CU-BC-NC     CASE TITLE: HEAT FACTORY USA vs SCHAWBEL TECHNOLOGIES [IN

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
   (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
   (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), *and*
   (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

### Potential Advantages and Disadvantages of ADR

ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

**Potential Advantages**
- Saves time
- Saves money
- Gives parties more control over the dispute resolution process and outcome
- Preserves or improves relationships

**Potential Disadvantages**
- May take more time and money if ADR does not resolve the dispute
- Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable

### Most Common Types of ADR

You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

Exhibit A, Page 20

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | |
| --- | --- |
| STREET ADDRESS: 325 S Melrose DRIVE | |
| MAILING ADDRESS: 325 S Melrose DRIVE | |
| CITY AND ZIP CODE: Vista, CA 92081-6695 | |
| BRANCH NAME: North County | |
| TELEPHONE NUMBER: (760) 201-8029 | |

| PLAINTIFF(S) / PETITIONER(S): Heat Factory USA, Inc. |
| --- |
| DEFENDANT(S) / RESPONDENT(S): Schawbel Technologies, LLC |

| HEAT FACTORY USA VS SCHAWBEL TECHNOLOGIES [IMAGED] | |
| --- | --- |
| **NOTICE OF CASE ASSIGNMENT**<br>**and CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>37-2018-00002727-CU-BC-NC |

**CASE ASSIGNMENT**

Judge: Ronald F. Frazier                    Department: N-29

**COMPLAINT/PETITION FILED:** 01/18/2018

| **TYPE OF HEARING SCHEDULED** | **DATE** | **TIME** | **DEPT** | **JUDGE** |
| --- | --- | --- | --- | --- |
| Civil Case Management Conference | 06/22/2018 | 09:30 am | N-29 | Ronald F. Frazier |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

---

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

---

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

---

Exhibit A, Page 22



# Superior Court of California
# County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed.  Original documents should not be filed with pleadings.  If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program").  As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file.  The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150.  The paper filing will be imaged and held for 30 days.  After that time it will be destroyed and recycled.  **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.**  Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

1  Robert T. Lemen (Bar No. 94111)
   Thomas N. Fay (Bar No. 290907)
2  MURTAUGH TREGLIA STERN & DEILY LLP
   2603 Main Street, Penthouse
3  Irvine, California  92614-6232
   (949) 794-4000 / Fax (949) 794-4099
4  rlemen@murtaughlaw.com
   tfay@murtaughlaw.com
5
   Attorneys for Plaintiff
6  **HEAT FACTORY USA, INC.**

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   COUNTY OF SAN DIEGO, NORTH DISTRICT

10

11  HEAT FACTORY USA, INC., a California      Case No. 37-2018-00002727-CU-BC-NC
    corporation,
12                                            **Assigned For All Purposes To:**
                  Plaintiff,                  Judge: Hon. Ronald F. Frazier
13                                            Dept:  N-29
          v.
14
    SCHAWBEL TECHNOLOGIES, LLC, a             **PROOF OF SERVICE OF SUMMONS**
15  Massachusetts limited liability company;  **AND COMPLAINT TO OUT OF STATE**
    and DOES 1 through 50,                    **DEFENDANT**
16
                  Defendants.
17                                            DATE OF FILING: January 18, 2018
                                              TRIAL DATE:      None set
18

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

MURTAUGH TREGLIA   2038150
STERN & DEILY LLP                                  - 1 -
        **PROOF OF SERVICE OF SUMMONS AND COMPLAINT TO OUT OF STATE DEFENDANT**

1

## PROOF OF SERVICE

2

I, the undersigned, declare as follows:

3

I am employed in the County of Orange, State of California.  I am over the age of 18 years, and not a party to the within action.  I am an employee of or agent for MURTAUGH TREGLIA STERN & DEILY LLP, whose business address is 2603 Main Street, Penthouse, Irvine, California  92614-6232.

4

5

On **March 21, 2018**, I served the foregoing document(s):

6

7

- • **PLAINTIFF'S SUMMONS**

- • **PLAINTIFF'S COMPLAINT**

8

- • **PLAINTIFF'S CIVIL CASE COVER SHEET**

9

- • **SUPERIOR COURT OF SAN DIEGO'S ALTERNATIVE DISPUTE RESOLUTION INFORMATION**

10

- • **NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE**

11

on the following parties in this action addressed as follows:

12

### SEE ATTACHED SERVICE LIST

13

☒  *(BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED)* I served by placing a true copy of each document in a sealed envelope affixing a green certified return receipt card and a certified mail sticker with postage fully paid in the United States mail at Irvine, California.  I am "readily familiar" with this firm's business practice for collection and processing of mail, that in the ordinary course of business said document(s) would be deposited with the U.S. Postal Service on that same day.  I understand that the service shall be presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained on this affidavit.

14

15

16

17

18

19

Executed on **March 21, 2018**, at Irvine, California.

20

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

21

22

23

*Brooke Cheney*

**BROOKE CHENEY**

24

25

26

27

28

MURTAUGH TREGLIA STERN & DEILY LLP

2038150

- 2 -

PROOF OF SERVICE OF SUMMONS AND COMPLAINT TO OUT OF STATE DEFENDANT

Exhibit A, Page 25

1

## SERVICE LIST
HEAT FACTORY USA, INC. V. SCHAWBEL TECHNOLOGIES, LLC

2
San Diego Superior Court
CASE NO.: 37-2018-00002727-CU-BC-NC

3
Our File No.: 575-17581

4

5
William Schawbel

6
**Schawbel Technologies LLC**
2400 District Avenue, Suite 150
Burlington, MA 01803

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MURTAUGH TREGLIA
STERN & DEILY LLP

2038150

- 3 -

**PROOF OF SERVICE OF SUMMONS AND COMPLAINT TO OUT OF STATE DEFENDANT**

1   ALLEN MATKINS LECK GAMBLE
      MALLORY & NATSIS LLP
2   TIMOTHY M. HUTTER (BAR NO. 267949)
    DAVID E. ARON (BAR NO. 306419)
3   One America Plaza
    600 West Broadway, 27th Floor
4   San Diego, California 92101-0903
    Phone:  (619) 233-1155
5   Fax:  (619) 233-1158
    E-Mail:  thutter@allenmatkins.com
6            daron@allenmatkins.com

7   Attorneys for Defendant
    SCHAWBEL TECHNOLOGIES LLC,
8   a Massachusetts limited liability company

9

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/14/2018** at 02:45:00 PM

Clerk of the Superior Court
By Veronica Navarro,Deputy Clerk

10          **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

11                      **NORTH COUNTY DIVISION**

12   HEAT FACTORY USA, INC., a California
     corporation,
13
                    Plaintiff,
14
            v.
15
     SCHAWBEL TECHNOLOGIES, LLC, a
16   Massachusetts limited liability company;
     and DOES 1 through 50,
17
                    Defendants.
18

Case No. 37-2018-00002727-CU-BC-NC

Judge Ronald F. Frazier
Department N-29

Complaint Filed January 18, 2018

**NOTICE OF MOTION AND MOTION TO
STAY PROCEEDINGS BY DEFENDANT
SCHAWBEL TECHNOLOGIES LLC**

**IMAGED FILE**

DATE:       August 3, 2018
TIME:       1:30 p.m.
DEPT:       N-29
TRIAL:      None Set

19
20
21
22
23
24
25
26
27
28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

870025.01/SD

NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS
BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 27

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2  PLEASE TAKE NOTICE that on August 3, 2018, at 1:30 p.m., or as soon thereafter as the

3  matter may be heard in Department N-29 of the above-entitled court, located at 325 South Melrose

4  Drive, Vista, California, Defendant Schawbel Technologies LLC ("Defendant") will and hereby

5  does move this Court for an order to stay proceedings in the above-captioned matter.

6  This Motion is made pursuant to California Code of Civil Procedure sections 410.30(a)

7  and 418.10 on the grounds that this action is duplicative of an action currently pending in federal

8  court in the District of Massachusetts between the two parties to this action, which is based upon

9  the same issues, facts, and parties.  A stay of this action is appropriate to avoid the risk of

10  conflicting judgments, judicial inefficiencies, and unnecessarily duplicative efforts of the parties.

11  This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities

12  filed concurrently herewith, the Declaration of Michael P. Connolly, as well as on all the papers,

13  pleadings, and records on file in this action.

14  Tentative rulings are generally posted on the San Diego Superior Court website before the

15  hearing.  The Court will not post a tentative ruling if the Court has not completed its analysis of

16  the motion in time to post a tentative ruling or if other circumstances make it impractical or

17  imprudent to post a tentative ruling.

18

19  Dated:  May 11, 2018                          ALLEN MATKINS LECK GAMBLE
                                                   MALLORY & NATSIS LLP
20

21                                                 By: _____

22                                                 TIMOTHY M. HUTTER
                                                   DAVID E. ARON
23                                                 Attorneys for Defendant
                                                   SCHAWBEL TECHNOLOGIES LLC,
24                                                 a Massachusetts limited liability company

25

26

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870025.01/SD

-2-
NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS
BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 28

ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
TIMOTHY M. HUTTER (BAR NO. 267949)
DAVID E. ARON (BAR NO. 306419)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158
E-Mail:  thutter@allenmatkins.com
          daron@allenmatkins.com

Attorneys for Defendant
SCHAWBEL TECHNOLOGIES LLC,
a Massachusetts limited liability company

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## NORTH COUNTY DIVISION

| HEAT FACTORY USA, INC., a California corporation,<br><br>                      Plaintiff,<br><br>     v.<br><br>SCHAWBEL TECHNOLOGIES, LLC, a Massachusetts limited liability company; and DOES 1 through 50,<br><br>                      Defendants. | Case No. 37-2018-00002727-CU-BC-NC<br><br>Judge Ronald F. Frazier<br>Department N-29<br><br>Complaint Filed January 18, 2018<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STAY PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC**<br><br>**IMAGED FILE**<br><br>DATE:      August 3, 2018<br>TIME:      1:30 p.m.<br>DEPT:      N-29<br>TRIAL:     None Set |

## I.   INTRODUCTION

The Defendant, Schawbel Technologies LLC ("Schawbel"), submits this memorandum in support of its Motion to Stay this proceeding.  The Court should stay this action because there is a substantially identical action currently proceeding between Schawbel and Heat Factory USA, Inc. ("Heat Factory"), in the United States District Court for the District of Massachusetts (the "Massachusetts Action") [*Schawbel Technologies LLC v. The Heat Factory USA, Inc.*, Docket No.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 29

1   1:18-cv-10227-LTS].[1]  Both the Massachusetts Action and this action concern a dispute over the

2   parties' rights and obligations under an asset purchase agreement (the "APA") and patent licensing

3   agreement (the "License Agreement") entered into by Schawbel and Heat Factory.  As discussed

4   in detail below, the Massachusetts Action is already well underway, with Heat Factory having

5   filed its answer in the Massachusetts Action before serving its complaint in this action.  The

6   Massachusetts Court is also set to hold an initial scheduling conference pursuant to Fed. R. Civ. P.

7   16 on May 23, 2018.  A stay of this action is therefore appropriate to avoid the risk of conflicting

8   judgments, to prevent a waste of this Court's resources and to avoid unnecessarily duplicative

9   efforts by the parties.

10          In the Massachusetts Action, Schawbel also has asserted claims under the federal patent

11   statute and the federal declaratory judgment statute.  As a federal district court, the Massachusetts

12   Court has original jurisdiction over those federal claims.  This Court does not have such

13   jurisdiction.  As a result, a stay of this action also is appropriate to allow the parties' competing

14   claims to proceed in a more appropriate forum, and before a Court which has the power to

15   adjudicate all of the parties' claims.

16   **II.      STATEMENT OF FACTS**

17          Schawbel, located in Massachusetts, is the owner of certain United States and international

18   patents related to the design of heated insoles and related heating products.  (Connolly Decl., ¶ 2,

19   Ex. A ["MA Compl."] at ¶ 6.)  Schawbel was in the business of manufacturing, marketing,

20   distributing and selling heated insoles and related heating products under the trademarked business

21   name of ThermaCELL. (MA Compl., ¶ 7; Connolly Decl., ¶ 3, Ex. B ("CA Compl.") at ¶ 4.)  On

22   or about July 18, 2017, Schawbel and Heat Factory executed the APA, through which Schawbel

23   agreed to sell to Heat Factory certain heated insoles, battery packs, and related heating products it

24   had in inventory in exchange for a total payment in the amount of $3,700,000, payable on a

25   schedule set forth in the APA.  (MA Compl. ¶¶ 10-12; CA Compl. ¶ 5.)

26

27   _____

28   [1]   A copy of Schawbel's Complaint in the Massachusetts Action is attached to the accompanying
       Declaration of Michael P. Connolly ("Connolly Decl.") as Exhibit A.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
920880741

-2-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 30

1    In connection with the APA, the parties also executed the License Agreement, through

2    which Schawbel agreed to provide an exclusive license to Heat Factory of certain patents,

3    technological information, and general know-how concerning the inventory.  (MA Compl. ¶ 19;

4    CA Compl. ¶ 5.)  According to the terms of the License Agreement, Heat Factory was required to

5    remit monthly royalty payments to Schawbel.  (MA Compl. ¶ 20; CA Compl. ¶ 6.)  Schawbel and

6    Heat Factory agreed that both the APA and the License Agreement would be governed by the laws

7    of the Commonwealth of Massachusetts. (MA Compl. ¶ 5.)

8    Schawbel filed its complaint in the Massachusetts Action on February 6, 2018, and served

9    it that same day.  (Connolly Decl., ¶ 2.)  Schawbel asserted counts for breach of contract (the

10   APA), patent infringement pursuant to 35 U.S.C. § 281 *et seq.*, and declaratory relief pursuant to

11   28 U.S.C. § 2201.  In particular, Schawbel alleged that Heat Factory breached the APA by failing

12   to pay all amounts due under the APA.  (MA Compl. ¶¶ 35, 40.)  As a result of Heat Factory's

13   failure to pay the amounts due under the APA, Schawbel had the right to terminate the License

14   Agreement between the parties and did so on January 31, 2018.  (MA Compl. ¶ 52.)  Schawbel

15   further alleged that Heat Factory continues to violate Schawbel's patent rights through its

16   continued use of Schawbel's intellectual property following the termination of the License

17   Agreement with respect to 19 U.S. Patents owned by Schawbel.  (MA Compl. ¶¶ 53-60.)  Finally,

18   Schawbel seeks a declaration that the License Agreement has been terminated, that Heat Factory

19   no longer has any rights to use or sell Schawbel products or intellectual property, and that Heat

20   Factory owes outstanding royalties in connection with the License Agreement.  (MA Compl.

21   ¶ 74.)

22   The Massachusetts Action also has advanced procedurally beyond this action.  On

23   February 6, 2018, Schawbel served the Massachusetts Action.  On March 12, 2018, Heat Factory

24   filed its Answer to the Massachusetts Complaint.  (Connolly Decl., ¶¶ 4-5, and Ex. C ("MA

25   Docket") at No. 9, and Ex. D.)  On March 15, 2018, the Massachusetts Court issued a Notice of

26   Scheduling Conference.  (MA Docket, No. 11; Connolly Decl., ¶ 6, and Ex. E.)  On March 20,

27   2018, the parties conducted a telephonic conference, as required by the Notice of Scheduling

28   Conference, to begin to discuss preliminary case matters.  (Connolly Decl., ¶ 6.)  The parties

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

-3-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 31

1  thereafter, on March 30 and April 24, 2018, filed two joint motions for brief continuances of the

2  Scheduling Conference, based upon certain settlement discussions that were ongoing at the time of

3  those motions.  (MA Docket, Nos. 13 & 15.)  A scheduling conference pursuant to Fed. R. Civ. P.

4  16 is currently set for May 23, 2018, in the Massachusetts Action.  (MA Docket, No. 16.)

5      For its part, Heat Factory filed this action on January 18, 2018.  (CA Compl.)  It then

6  waited over two months, until March 21, 2018, to serve Schawbel with the summons and

7  complaint in this action via U.S. Mail.  During this two month period, Heat Factory actively

8  participated in the Massachusetts Action by filing its Answer and participating in the preparation

9  for, and scheduling of, the Fed. R. Civ. P. 16(b) case conference in the Massachusetts Action.

10  (Connolly Decl., ¶ 6.)

11  **III.   ARGUMENT**

12      This action should be stayed pursuant to Section 410.30 of the California Code of Civil

13  Procedure.  That section provides, "[w]hen a court upon motion of a party or its own motion finds

14  that in the interest of substantial justice an action should be heard in a forum outside this state, the

15  court shall stay or dismiss the action in whole or in part on any conditions that may be just."  (Cal.

16  Civ. Proc. Code § 410.30.)

17      As the California Supreme Court has explained:

18          Granting a stay in a case where the issues in two actions are substantially
            identical is a matter addressed to the sound discretion of the trial court.
19          "In exercising its discretion the court should consider the importance of
            discouraging multiple litigation designed solely to harass an adverse
20          party, and of avoiding unseemly conflicts with the courts of other
            jurisdictions. It should also consider whether the rights of the parties can
21          best be determined by the court of the other jurisdiction because of the
            nature of the subject matter, the availability of witnesses, or the stage to
22          which the proceedings in the other court have already advanced."

23  (*Thomson v. Cont'l Ins. Co.* (1967) 66 Cal. 2d 738, 746, quoting *Farmland Irr. Co. v.*

24  *Dopplmaier* (1957) 48 Cal. 2d 208, 215.)  Despite identifying itself as a California corporation in

25  its pleading caption, Heat Factory is incorporated in Nevada.  (CA Compl. ¶ 1.)  A plaintiff's

26  residence, let alone office location in California, is not a determinative factor when the court is

27  asked to exercise its discretion to stay the action.  As noted in *National Football League v.*

28  *Fireman's Fund Ins. Co.* (2013) 216 Cal. App. 4th 902, 925, "[t]he plaintiff's residence is but one

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

-4-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 32

1   of many factors which the court may consider. The court can also take into account the

2   amenability of the defendants to personal jurisdiction, the convenience of witnesses, the expense

3   of trial, the choice of law, and indeed any consideration which legitimately bears upon the relative

4   suitability or convenience of the alternative forums."  These factors weigh heavily in favor of

5   Schawbel's request to stay this action.

6       **A.      A Stay of This Action is Appropriate Given the Substantially Identical Action**

7               **Currently Proceeding in Massachusetts**

8           In the Massachusetts Action, Schawbel has alleged that Heat Factory has breached its

9   obligations under the terms of the APA and License Agreement and has infringed upon

10  Schawbel's patent rights following the termination of the License Agreement.  (MA Compl.)  Heat

11  Factory's complaint in this action arises from and relates to the same agreements between the

12  parties – the APA and the License Agreement – and likewise seeks adjudication of the parties'

13  rights and obligations under those agreements.  (CA Compl.)  In particular, Heat Factory alleges

14  that Schawbel breached the APA and License Agreement and committed other torts[2] in connection

15  with the sale of inventory and license of intellectual property.

16          While it is Heat Factory that is alleging breach and entitlement to damages in this action,

17  its claims will nonetheless involve the same core factual allegations, documents and witnesses as

18  the Massachusetts Action.  Indeed, Heat Factory itself has guaranteed this to be the case by

19  asserting numerous affirmative defenses in its Answer in the Massachusetts Action that mirror its

20  claims in this action.[3]  Even though Heat Factory did not assert these affirmative defenses as

21  counterclaims in the Massachusetts Action, it certainly could have done so under Fed. R. Civ. P.

22

23  _____

24  [2]   Heat Factory has asserted counts for (1) Breach of Contract, (2) Fraud, (3) Negligent
      Misrepresentation, (4) Express Indemnity, (5) Intentional Interference with Prospective
25    Economic Advantage, and (6) Declaratory Relief.  (CA Compl.)

26  [3]   *See* Affirmative Defense No. 6 (performance excused under the APA due to Schawbel's
      alleged misconduct); No. 8 (asserting that Schawbel breached the APA and License
27    Agreement); No. 10 (alleged failure of Schawbel to provide the consideration promised to
      Heat Factory); No. 11 (claimed right to offset amounts Schawbel allegedly owed to Heat
28    Factory); and No. 14 (claimed fraudulent, intentional, or negligent misrepresentations in
      connection with APA and License Agreement).  (Connolly Decl., Ex. D.)

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

-5-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 33

1  13, and the Massachusetts Court also has the authority to treat Heat Factory's substantive defenses

2  as though they were asserted as counterclaims "if justice requires" and "may impose terms for

3  doing so."  (Fed. R. Civ. P. 8(c)(2).)  At a minimum, by filing its Answer in response to

4  Schawbel's complaint, Heat Factory has plainly acknowledged that the Massachusetts Court is a

5  proper forum to litigate its factual and legal defenses to Schawbel's claims.

6      Where both parties have fully raised all the issues between them in the Massachusetts

7  Action, the parties' claims should proceed in Massachusetts.  There is no reason for this action to

8  proceed simultaneously as the issues are "substantially identical."  The identity between the two

9  actions would only become more pronounced as the parties move into the discovery phase, where

10  there will be near uniformity in the discoverable facts and documents, as well as testimony from

11  the same witnesses.

12      Because of the substantial overlap between the two actions, the existence of two identical

13  lawsuits in two separate courts is likely to present unnecessary, though avoidable, conflicts. If this

14  action proceeded at the same time as the Massachusetts Action, there would be a serious risk that

15  the two Courts could issue conflicting orders and potentially conflicting judgments.  A stay of this

16  action will eliminate that risk.

17      **B.**      **The Massachusetts Action Is More Advanced**

18      Unlike Schawbel, Heat Factory did not serve its complaint immediately upon filing.

19  (Connolly Decl., ¶ 3.)  Even if Heat Factory initially believed that having a "placeholder" or

20  "anticipatory" complaint on file would somehow benefit it,[4] Heat Factory nonetheless turned away

21  from its own action in this Court right after filing its complaint.  Instead of attempting to

22  immediately serve its own complaint in this action, Heat Factory began to participate fully in the

23  Massachusetts Action by filing its Answer and affirmative defenses on March 12, 2018,

24  participating in a Rule 26(f) telephonic conference on March 20, 2018, and joining in the filing of

25

26  ──────────────

27  [4]   Such preemptive forum shopping in and of itself would constitute grounds for this Court to exercise its discretion to stay this action.  (*Thomson v. Cont'l Ins. Co.* (1967) 66 Cal. 2d 738, 746 ["In exercising its discretion the court should consider the importance of discouraging multiple litigation designed solely to harass an adverse party . . ."].)

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD

-6-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 34

1   two motions to reschedule the Initial Scheduling Conference.  By agreement of the parties, that

2   Scheduling Conference is currently set for May 23, 2018.  It was not until March 21, 2018, that

3   Heat Factory attempted to restart its litigation efforts in this Court, through its belated service of

4   its complaint upon Schawbel.  Heat Factory should not be allowed now to continue to pursue this

5   action after having joined in the litigation of all issues in the Massachusetts Action.  That is

6   precisely the type of burdensome litigation tactic this Court should exercise its discretion to

7   prevent.

8          As explained above, the Massachusetts Action is already well underway, with Heat

9   Factory having filed its Answer and an Initial Case Scheduling Conference set for May 23, 2018.

10  By comparison, a case management conference is set in this action on June 22, 2018 -- nearly a

11  month behind the current conference set by the Massachusetts Court.  With a hearing date of

12  August 3, 2018, in this Court on the present motion, the schedule for this case will likely begin to

13  lag even further behind the schedule in the Massachusetts Action, and at least 3 months remain

14  before this case could potentially be at issue.  Overall, it is expected that the case schedule set in

15  the Massachusetts Action will be far more accelerated compared to the schedule in this action.[5]

16  (Connolly Decl., ¶ 7.)  Considering the efficient use of judicial and party resources, it simply

17  makes no sense to have two substantially identical cases moving along two separate schedules in

18  two separate courts, particularly when the Massachusetts Court has already begun to actively

19  oversee all of the parties' claims, consistent with its complete jurisdiction to do so.

20         **C.**      **The Massachusetts Court Can Best Determine all of the Parties' Claims,**

21                 **Including Schawbel's Federal Patent and Declaratory Judgment Claims**

22         Finally, Heat Factory itself has acknowledged through its Answer and Affirmative

23  Defenses that the rights of the parties can be fully adjudicated in the Massachusetts Action.

24

25  _____

26  [5]  The Massachusetts Court's Notice of Scheduling Order itself provides:  "In a case of ordinary
     complexity, the parties should propose a schedule that calls for the completion of fact

27  discovery, expert discovery, and motion practice within one calendar year from the date of the
     scheduling conference."  (MA Docket No. 11.)  Thus, if the Massachusetts Court adopts a

28  schedule consistent with the foregoing terms of the Notice of Scheduling Order, the
     Massachusetts Action can be trial-ready by late May 2019 at the latest.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

-7-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 35

1    Indeed, given the nature of all the claims between the parties, the Massachusetts Court is in a

2    position to provide the most comprehensive relief. As a federal court, the Massachusetts Court

3    has subject matter jurisdiction over Schawbel's patent and declaratory judgment claims under the

4    relevant federal statutes (35 U.S.C. § 281 *et seq.*, and 28 U.S.C. § 2201). Original jurisdiction for

5    those claims does not exist with this Court. As to the parties' competing breach of contract claims,

6    aside from the possibility of conflicting judgments and waste of judicial and parties resources, it is

7    important to note that the parties' agreements here are expressly governed by Massachusetts law

8    (*see* MA Compl., Exs. 1 and 2), which Massachusetts federal district courts routinely apply.

9    **IV.**    **CONCLUSION**

10        This Court should stay this action based upon the substantially similar Massachusetts

11    Action involving the same contractual relationships between Heat Factory and Schawbel. The

12    Massachusetts Action was served before this action and is progressing on a faster track.

13    Furthermore, the Massachusetts Action and this action will involve nearly uniform facts and

14    documents, as well as testimony from the same witnesses. A stay of this action will avoid wasting

15    judicial and party resources and will avoid potentially conflicting judgments. Finally, the

16    Massachusetts Court has subject matter jurisdiction over Schawbel's patent infringement claims

17    and federal declaratory judgment counts, whereas this Court does not. For all the foregoing

18    reasons, Defendant Schawbel Technologies LLC respectfully requests that the Court grant its

19    Motion to Stay Proceedings.

20

21    Dated: May 11, 2018             ALLEN MATKINS LECK GAMBLE
                                       MALLORY & NATSIS LLP

22

23                      By: _____

24                          TIMOTHY M. HUTTER
                         DAVID E. ARON

25                          Attorneys for Defendant
                         SCHAWBEL TECHNOLOGIES LLC,

26                          a Massachusetts limited liability company

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870026.04/SD
9208807v1

-8-

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STAY
PROCEEDINGS BY DEFENDANT SCHAWBEL TECHNOLOGIES LLC

Exhibit A, Page 36

1   ALLEN MATKINS LECK GAMBLE
2       MALLORY & NATSIS LLP
    TIMOTHY M. HUTTER (BAR NO. 267949)
3   DAVID E. ARON (BAR NO. 306419)
    One America Plaza
4   600 West Broadway, 27th Floor
    San Diego, California 92101-0903
5   Phone: (619) 233-1155
    Fax: (619) 233-1158
6   E-Mail: thutter@allenmatkins.com
            daron@allenmatkins.com

7   Attorneys for Defendant
8   SCHAWBEL TECHNOLOGIES LLC,
    a Massachusetts limited liability company

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/14/2018** at 02:45:00 PM

Clerk of the Superior Court
By Veronica Navarro,Deputy Clerk

9

10          **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

11                          **NORTH COUNTY DIVISION**

12   HEAT FACTORY USA, INC., a California
     corporation,
13
                   Plaintiff,
14
          v.
15
     SCHAWBEL TECHNOLOGIES, LLC, a
16   Massachusetts limited liability company;
     and DOES 1 through 50,
17
                   Defendants.
18

19

20

21

22

23

24

25

26

27

28

Case No. 37-2018-00002727-CU-BC-NC

Judge Ronald F. Frazier
Department N-29

Complaint Filed January 18, 2018

**DECLARATION OF MICHAEL P.
CONNOLLY IN SUPPORT OF MOTION
TO STAY PROCEEDINGS BY
DEFENDANT SCHAWBEL
TECHNOLOGIES LLC**

**IMAGED FILE**

DATE:      August 3, 2018
TIME:      1:30 p.m.
DEPT:      N-29
TRIAL:     None Set

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870031.01/SD
9210249v1

DECLARATION OF MICHAEL P. CONNOLLY

Exhibit A, Page 37

**DECLARATION OF MICHAEL P. CONNOLLY**

I, Michael P. Connolly, declare as follows:

1.      I am a partner at the law firm of Murtha Cullina LLP, counsel of record for Schawbel Technologies LLC ("Schawbel") in the action captioned *Schawbel Technologies LLC v. The Heat Factory USA, Inc.*, Case 1:18-cv-10227-LTS, which is currently pending in the United States District Court in the District of Massachusetts (the "Massachusetts Action"). I am a member in good standing of the Bar of the Commonwealth of Massachusetts and am admitted to practice in the United States District Court in the District of Massachusetts. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the complaint (the "MA Compl.") my firm filed on behalf of Schawbel in the Massachusetts Action. The MA Compl. was filed on February 6, 2018, and was served upon The Heat Factory USA, Inc. ("Heat Factory"), the same day.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the complaint and related documents included in the service package mailed to Schawbel from the above-captioned action in California (collectively, the "CA Compl."). The CA Compl. was served by mail on March 21, 2018.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the docket (the "MA Docket") from the Massachusetts Action as of the date of this Declaration.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the answer filed by Heat Factory in the Massachusetts Action on March 12, 2018.

6.      After Heat Factory filed its Answer, I participated in a telephonic conference with Heat Factory's counsel on March 20, 2018, to begin to discuss preliminary case matters in the Massachusetts Action, as required by the Massachusetts Court through a Notice of Scheduling Conference, dated March 15, 2018. Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Notice of Scheduling Conference. By joint motions dated March 30 and April 24, 2018, the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870031.01/SD
9210249v1

-2-
DECLARATION OF MICHAEL P. CONNOLLY

Exhibit A, Page 38

1  parties agreed to continue the Scheduling Conference based upon settlement discussions which

2  were ongoing as of the dates of those motions. (*See* Exhibit C, Nos. 13 & 15.)

3       7.      The Scheduling Conference in the Massachusetts Action is currently scheduled for

4  May 23, 2018. (*See* Exhibit C, Nos. 16 & 17.) Based upon the terms of the Notice of Scheduling

5  Conference, the Massachusetts Action could be ready for trial as early as May 23, 2019, one

6  calendar year from the date of the Scheduling Conference. (*See* Exhibit E, par. 2.)

7       I declare under penalty of perjury under the laws of the state of California that the

8  foregoing is true and correct.

9       Executed on May 11, 2018, at Boston, Massachusetts.

10

11

12                                          MICHAEL P. CONNOLLY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870031.01/SD
9210249v1

-3-
DECLARATION OF MICHAEL P. CONNOLLY

Exhibit A, Page 39

## TABLE OF EXHIBITS

| **Exhibit** | **Description** | **Page No.** |
|---|---|---|
| Exhibit A | Complaint in United States District Court, District of Massachusetts, Civil Action No. 1:18-CV-10227-LTS | 5 - 493 |
| Exhibit B | Complaint and related documents included in the service package mailed to Schawbel from the above-captioned action in California | 494 - 512 |
| Exhibit C | Docket from the Massachusetts Action as of May 11, 2018 | 513 - 515 |
| Exhibit D | Answer filed by Heat Factory in the Massachusetts Action on March 12, 2018 | 516 - 528 |
| Exhibit E | Notice of Scheduling Conference | 529 - 536 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

870031.01/SD
9210249v1

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|                                              |   |                              |
|----------------------------------------------|---|------------------------------|
| SCHAWBEL TECHNOLOGIES LLC                    | ] |                              |
|     Plaintiff            | ] |                              |
|                                              | ] |                              |
| v.                                           | ] | C.A. NO. _____    |
|                                              | ] |                              |
| THE HEAT FACTORY USA, INC.                   | ] |                              |
|     Defendant            | ] |                              |
|                                              | ] |                              |

## COMPLAINT

### Introduction

Plaintiff, Schawbel Technologies LLC ("Schawbel") brings this action against defendant, The Heat Factory USA, Inc. ("Heat Factory") to recover money damages resulting from Heat Factory's failure to pay all amounts owed pursuant to an Asset Purchase Agreement (the "APA") between the parties. As a result of Heat Factory's failure to pay the amounts due under the APA, Schawbel had the right to terminate a separate Exclusive Patent License Agreement (the "License Agreement") between the parties. Schawbel terminated the License Agreement on January 31, 2018. Because Heat Factory disputes that the conditions necessary for termination of the License Agreement have been satisfied, Schawbel further seeks a declaration from this Court that the License Agreement is terminated. Finally, Schawbel seeks monetary and injunctive relief against Heat Factory arising from Heat Factory's continued violation of Schawbel's patent rights following the termination of the License Agreement with respect to 19 U.S. Patents owned by Schawbel, as set forth further below.

## THE PARTIES

1.      Plaintiff Schawbel Technologies LLC is a Massachusetts limited liability company with a principal place of business located at 67 South Bedford Street, Suite 400W, Burlington, Massachusetts.[1]

2.      Defendant The Heat Factory USA, Inc. is a Nevada corporation with a principal place of business at 1958 Kellogg Avenue, Carlsbad, California.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), which confers subject matter jurisdiction upon this Court over claims relating to patents and pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between the parties and because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.  In addition, this Court has jurisdiction over Schawbel's claim for declaratory relief pursuant to 28 U.S.C. § 2201.

4.      This Court may exercise personal jurisdiction over Heat Factory because, as described in further detail below, the APA and License Agreement were negotiated in Massachusetts, Heat Factory contracted to do business in Massachusetts, and Heat Factory sells goods in Massachusetts.

5.      Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Schawbel's claims occurred in this District.  In addition, pursuant to Section 8.05 of the APA, and Section 12.8 of the License Agreement, the parties agreed that both agreements are governed by the laws of the Commonwealth of Massachusetts.

---

[1] Schawbel had a previous principal place of business located at 2400 District Avenue, Burlington, Massachusetts as referenced in the APA and License Agreement.

2

## THE ASSET PURCHASE AGREEMENT

6.      Schawbel is the owner of certain United States and international patents related to the design of heated insoles and related heating products.

7.      Previously, Schawbel was in the business of manufacturing, marketing, distributing and selling heated insoles and related heating products under the trademarked business name of ThermaCELL.  These products incorporate patented technology set forth in the claims of a series of patents issued to Schawbel in the United States and internationally.

8.      Heat Factory is in the business of warmer technology, accessories, and manufacturing, marketing, and sale of hand warmers, body warmers, foot warmers, and other heated products.

9.      Upon information and belief, Heat Factory products, including products which incorporate the patented technology referenced herein, are sold in Massachusetts.

10.     On July 18, 2017, Schawbel and Heat Factory executed the APA.

11.     Pursuant to the terms of the APA, Schawbel agreed to sell to Heat Factory certain heated insoles, battery packs, and related heating products it had in inventory as further detailed on Schedule A of the APA (the "Inventory").  Included in the Inventory are products which incorporate, *inter alia*, the technology claimed in the Patents.  A true and accurate copy of the APA and Schedule A is attached as Exhibit 1 hereto.

8973698v1

12.     Pursuant to Section 2.02 of the APA, Heat Factory agreed to pay Schawbel

$3,700,000 (the "Purchase Price") for the Inventory according to the following schedule:

| (i)     | $300,000 | Payable on or before October 10, 2017  |
|---------|----------|----------------------------------------|
| (ii)    | $450,000 | Payable on or before November 10, 2017 |
| (iii)   | $500,000 | Payable on or before December 10, 2017 |
| (iv)    | $600,000 | Payable on or before January 10, 2018  |
| (v)     | $600,000 | Payable on or before February 10, 2018 |
| (vi)    | $550,000 | Payable on or before March 10, 2018    |
| (vii)   | $550,000 | Payable on or before April 10, 2018    |
| (viii)  | $150,000 | Payable on or before May 10, 2018      |

13.     Heat Factory failed to make timely or complete payment on December 10, 2017

and failed to make any payment on January 10, 2018 pursuant to the terms of the APA.

14.     As of the date of this complaint, there remains an additional $1,850,000 in

scheduled payments due to Schawbel.

15.     Pursuant to Section 8.10 of the APA, the prevailing party in any lawsuit arising

under the APA is entitled to recover its attorneys' fees and costs from the other party.

## THE EXCLUSIVE PATENT LICENSE AGREEMENT

16.     On July 18, 2017, Schawbel and Heat Factory also executed the License

Agreement.

17.     Pursuant to the terms of the License Agreement, Schawbel agreed to provide an

exclusive license to Heat Factory of certain patents, technological information, and general

know-how (the "Patents").[2]

---

[2] The Schawbel patents at issue in this matter include the following U.S. Patents:  8,850,716, 8,869,428, 8,869,429, 9,101,177, 9,179,734, 9,314,064, 9,538,806, 9,538,807, 9,548,618, 9,549,586, and 9,572,397, and the following U.S. design patents:  D717504, D722222, D724013, D734012, D737769, D772546, D794813 and D801624.  Each of these patents is included in the subject transaction, as referenced on Exhibit C to the License Agreement. Throughout this complaint, wherever the term "Patent" is used, it shall refer to each of these U.S. Patents.  *See also* Tables 1 and 2, *supra.*

4

18. The parties specifically identified the Patents in Exhibit C to the License Agreement. The series of Patent claims relates to heated insole technology for footwear, including the heated insoles, heated shoes incorporating the insoles, battery packs, Wifi and Bluetooth technology to be utilized in conjunction with and as part of the heated insoles and other related technology. A true and accurate copy of the License Agreement and Exhibit C is attached hereto as Exhibit 2.

19. According to Section 2.1(a)(i) of the License Agreement, Schawbel also granted Heat Factory the exclusive right to make and sell so-called "Products," which, "absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents."

20. According to Section 3.1 of the License Agreement, beginning on January 1, 2018, Heat Factory was required to remit monthly royalty payments to Schawbel, which were calculated as a percentage of net sales of Inventory and new products using the technology claimed in the Patents.

21. According to Section 3.2 of the License Agreement, Heat Factory guaranteed an aggregate minimum royalty payment totaling $300,000 to be payable monthly, commencing on January 15, 2018 and continuing until June 15, 2018 (the "Minimum Royalty").

22. Heat Factory agreed to pay Schawbel the Minimum Royalty according to the following schedule:

| $50,000 | Payable on January 15, 2018 |
|---|---|
| $100,000 | Payable on February 15, 2018 |
| $150,000 | Payable on March 15, 2018 |
| $200,000 | Payable on April 15, 2018 |
| $250,000 | Payable on May 15, 2018 |
| $300,000 | Payable on June 15, 2018 |

5

23.     In addition to the Minimum Royalty payment, pursuant to the terms of the License Agreement, Heat Factory was required to remain current in its payments to Schawbel under the terms of the APA.

24.     Pursuant to Section 9.4(a) of the License Agreement, Schawbel may terminate the License Agreement as a result of Heat Factory's failure to pay pursuant to the terms of the APA.

25.     Section 9.4(a) provides, "if [Heat Factory] has two (2) or more Overdue Payments and/or APA Nonpayments within any consecutive twelve (12) months period, [Schawbel] shall be entitled to terminate [the License Agreement] effective immediately upon written notice . . . ."

26.     Pursuant to Section 9.6 of the License Agreement, "upon termination . . . all Royalties and other payments accrued and due to [Schawbel] as of the termination date shall become immediately due and payable within thirty (30) calendar days."

27.     Also pursuant to Section 9.6, upon termination of the License Agreement, Heat Factory "shall cease, and shall cause its Affiliates to cease, all production, use and Sales of Productions upon such termination," except as set forth in Section 9.7.

28.     Section 9.7 permits Heat Factory to "complete and sell any work-in-progress and [I]nventory of Products on hand or ordered that exist as of the effective date of termination," however, this right is expressly conditioned upon Heat Factory's agreement to pay Schawbel "the applicable Royalty or other amounts due on such Net Sales in accordance with the terms and conditions" of the License Agreement.  In short, if Heat Factory fails to pay all amounts due under the License Agreement, then the License Agreement is not only automatically terminated, but Heat Factory also forfeits the right to complete and sell any new products or Inventory.

29.     The Parties also agreed that the prevailing party in any lawsuit arising under the License Agreement is entitled to recover its attorneys' fees and costs from the other party.

8973698v1

Exhibit A, Page 47

## COUNT ONE
### (Breach of Contract – The Asset Purchase Agreement)

30.     Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

31.     Heat Factory entered into the APA with Schawbel to purchase the Inventory.

32.     Schawbel delivered the Inventory to Heat Factory in accordance with the terms of the APA.

33.     According to the terms of the APA, Heat Factory was required to pay the Purchase Price according to the schedule of payments as set forth in Section 2.02.

34.     Heat Factory was required to pay Schawbel $500,000 on or before December 10, 2017 (the "December Payment").

35.     Heat Factory failed to remit the entire December Payment to Schawbel pursuant to the terms of the APA.

36.     Instead, Heat Factory untimely paid only $352,477.

37.     On December 11, 2017, Schawbel demanded payment for the December Payment.

38.     As of the date of this filing, Schawbel has not received the December Payment as required under the terms of the APA.

39.     Heat Factory was required to pay Schawbel $600,000 on or before January 10, 2018 (the "January Payment").

40.     Heat Factory failed to remit the January Payment to Schawbel on January 10, 2018.

41.     On January 13, 2018, Schawbel demanded the January Payment.

42.     As of the date of this filing, Schawbel has not received the January Payment.

7

43.     As a result of Heat Factory's failure to make full payment according to the terms of the APA, Heat Factory owes Schawbel approximately $747,000 as of the date of this complaint (the "Current Outstanding Amount"), plus interest, costs, and attorneys' fees.

44.     Heat Factory has breached the APA by failing and refusing to pay to Schawbel the current Outstanding Amount.

45.     According to Section 2.02 of the APA, additional Purchase Price payments are due on February 10, 2018; March 10, 2018; April 10, 2018; and May 10, 2018 (the "Additional Payments Due").

46.     Heat Factory's failure to pay all or any of the Additional Payments Due will result in additional breaches of the APA, for which Schawbel will be entitled to recovery.

47.     As a result of Heat Factory's non-payment and breaches of the terms of the APA, Schawbel has suffered damages and will continue to suffer damages in an amount to be determined at trial.

## COUNT TWO
### (Patent Infringement – 35 U.S.C. § 281– The License Agreement)

48.     Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

49.     As the parties acknowledged and agreed in the License Agreement, Schawbel is the owner of the Patents.

50.     As set forth above, pursuant to the transfer provisions of the APA, Heat Factory acquired from Schawbel a substantial amount of Inventory, including thousands of ThermaCELL heated insoles and related products that incorporate the technology claimed in the Patents, including: (1) Heated Insoles; (2) Heated Insoles ProFLEX; (3) ProFLEX Replacement Batteries; (4) Heated Insoles ProFLEX HD (Heavy Duty); (5) ProFLEX XB Battery Packs, (6)

8

Hand Warmers; and (7) Pocket Warmers (*see* APA Schedules A and A-1 for these and other

infringing products).  Each of these products is the subject matter of one or more claims of the

Patents, as listed in Tables 1 and 2.  True and accurate copies of the 19 patents referenced in

Tables 1 and 2 are attached hereto as Exhibits 3-21.

<u>Table 1</u>

| U.S. Patent No. | Title | Claims Asserted | Infringing Product |
|---|---|---|---|
| 8,850,716 | Heated Insole Remote Control System | 1-16 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br><br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 8,869,428 | Heated Insole with Removable and Rechargeable Battery | 1-25 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 8,869,429 | Heated Insole with Removable and Rechargeable Battery | 1-12 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 9,101,177 | Remove Control Wireless Heated Insole Systems | 1-15 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 9,179,734 | Heated Insole with Removable and Rechargeable Battery | 1-28 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 9,314,064 | Heated Insole with Removable Heating | 1-15 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles |

9

| | Assembly (continuation of No. 8,869,428) | | 3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| 9,538,806 | Shoe with Heated Insole | 1-21 | 1. Heated Insoles ProFLEX |
| 9,538,807 | Assembly for Inclusion in a Heated Insole | 1-17 | 1. Heated Insoles ProFLEX |
| 9,548,618 | Heated Insoles | 1-14 | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| 9,549,586 | Battery for use with Heated Insole | 1-14 | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| 9,572,397 | Heated Insoles with Removable Assembly (continuation of No. 8,869,428) | 1-11 | 1. Heated Insoles ProFLEX<br>2. ProFLEX XB Battery Pack<br>3. ProFLEX Replacement Battery |

Table 2

| U.S. Patent No. | Title | Claims Asserted | Infringing Product |
| --- | --- | --- | --- |
| D719,504 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D722,222 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D724,013 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D734,012 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D737,769 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D772,546 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D794,813 | Heat Pack | Claim | 6. Hand Warmers<br>7. Pocket Warmers |
| D801,624 | Heat Pack | Claim | 6. Hand Warmers<br>7. Pocket Warmers |

10

51.     According to Section 9.4(a) of the License Agreement, because Heat Factory failed to make two required payments under the APA within the previous 12 months, Schawbel was entitled to immediately terminate the License Agreement.

52.     On January 31, 2018, Schawbel delivered a letter to Heat Factory exercising its rights to terminate the License Agreement pursuant to Section 9.4(a) (the "Termination Notice"). A true and accurate copy of the Termination Notice is attached hereto as Exhibit 22.

53.     As a result of the termination, Heat Factory was required to cease all use of the Patents.  Further, as a result of the termination, pursuant to Section 9.6 of the License Agreement, Heat Factory also was obligated to "cease . . . all production, use and Sales of Products. . . . ."

54.     As a result of the termination of the License Agreement, pursuant to Section 9.6, all outstanding royalties and other payments became immediately due and payable within thirty days.

55.     Upon information and belief, Heat Factory has no intention of paying the royalties due Schawbel under the License Agreement and, as such, Heat Factory has forfeited any right it may have had under Section 9.7 of the License Agreement to continue sales of work-in-progress and Inventory on hand upon termination of the agreement.

56.     As a result of the termination of the License Agreement, Heat Factory no longer has any right or authority to use any of the Patents, including the right to continue selling any of the above-referenced products from Inventory that are clearly covered by one or more of the Patents.

57.     Nevertheless, despite the termination of the License Agreement and its refusal to remit the requisite royalties as required under Section 9.7 of the License Agreement to continue

8973698v1

Exhibit A, Page 52

sales, on information and belief, Heat Factory continues to sell and to offer to sell, without limitation and at the very least, the following products: (1) ProFLEX Heated Insoles; (2) ProFLEX XB Battery Packs; and (3) ProFLEX Replacement Batteries, as indicated in advertisements on the internet, including at the following links:

https://www.zulily.com/search?q=Heat+Factory&ref=brandex and

https://www.zulily.com/p/thermacell-hand-warmer-heat-packs-5675-51872038.html.  A true and accurate copy of the website print outs as accessed on February 5, 2018 are attached hereto as Exhibit 23.

58.     Upon information and belief, Heat Factory infringes the claims of the Patents listed in Table 1, by virtue of the manufacture, sale and/or offer for sale of the products listed in Table 1.

59.     Upon information and belief, Heat Factory infringes the claims of Schawbel's U.S. design patents listed in Table 2, by virtue of the manufacture, sale and/or offer for sale of the products listed in Table 2.

60.     Through its conduct, Heat Factory has infringed upon and continues to infringe one or more of the Patents and Schawbel's rights therein.

61.     Pursuant to 35 U.S.C. § 283, Schawbel is entitled to an injunction to prevent Heat Factory's continued violation of Schawbel's rights under the Patents.

62.     Pursuant to 35 U.S.C. § 284, Schawbel is entitled to an award of damages adequate to compensate it for Heat Factory's infringement, but in no event less than a reasonable royalty for Heat Factory's infringing use of the Patents, together with interest and costs.

63.     Heat Factory's infringement of the Patents is knowing, deliberate, willful and without justification in that Heat Factory has been notified by Schawbel of the termination of the

License Agreement, but Heat Factory nevertheless continues to cause to be manufactured, and to sell or offer for sale, infringing Products and Inventory which incorporate the patented technology.  Schawbel is therefore entitled to recover up to three times the amount found or assessed as damages.  Schawbel is also entitled to recover its reasonable attorneys' fees.

## COUNT THREE
### (Declaratory Judgment – The License Agreement)

64.     Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

65.     According to the terms of the License Agreement, Heat Factory was required to remain current on payments required by APA.

66.     As set forth above, Heat Factory failed to make required payments pursuant to the terms of the APA on December 10, 2017 and January 10, 2018.

67.     As a result of the Termination Notice sent to Heat Factory on January 31, 2018, the License Agreement was terminated by Schawbel.

68.     As a result of the termination, Heat Factory was required to cease all use of the Patents.

69.     As a result of the termination of the License Agreement, pursuant to Section 9.6, all outstanding royalties and other payments became immediately due and payable within thirty days.

70.     Heat Factory disputes that the conditions necessary for termination of the License Agreement have been satisfied.

71.     Heat Factory also continues to use Schawbel's Patents and continues to cause to be manufactured and/or to sell Products and Inventory incorporating the patented technology without authorization to do so, as set forth above.

13

72.     Schawbel has been harmed will continue to be harmed by Heat Factory's continued use of the Patents granted pursuant to the License Agreement, and by Heat Factory's continued unauthorized manufacture and/or sale of Products and Inventory incorporating the patented technology.

73.     An actual controversy exists between Schawbel and Heat Factory concerning the termination of the License Agreement and the parties' rights and obligations upon such termination.

74.     For these reasons, Schawbel requests that the Court issue a declaratory judgment (a) that the License Agreement is terminated, (b) that Heat Factory no longer has any right to use Schawbel's Patents, (c) that Heat Factory no longer has any right to use or sell any Products and Inventory incorporating the patented technology, and (4) that all outstanding royalty amounts as of January 31. 2018 are immediately due and payable within thirty (30) days from the Termination Notice.

8973698v1

WHEREFORE, Plaintiff Schawbel Technologies LLC requests that this Court:

A.      On Count I, enter judgment in the total amount due to Schawbel as a result of Heat Factory's breach of the APA, plus such amounts as the Court determines that Schawbel is owed for interest, reasonable attorneys' fees and costs;

B.      On Count II, enter judgment in an amount sufficient to compensate Schawbel for the damages it has suffered as a result of Heat Factory's patent infringement, with such amount being no less than a reasonable royalty for Heat Factory's infringing use of the Patents, an award of up to three times the amount assessed as damages, plus such amounts as the Court determines that Plaintiff is owed for interest, reasonable attorneys' fees and costs;

C.      On Count II, enter an order preliminarily and permanently enjoining Heat Factory from continuing to infringe upon Schawbel's patent rights and from continuing to sell or offer for sale any Product and Inventory;

D.      On Count II, award Schawbel its reasonable attorneys' fees and costs pursuant to the prevailing parties provision in the License Agreement; and

E.      On Count III, enter a declaratory judgment that (1) the License Agreement has been terminated, (2) that Heat Factory no longer has any right to use the Patents, (3) that Heat Factory no longer has any right to use or sell any Products or Inventory, and (4) that all outstanding royalty amounts as of January 31, 2018 are due and payable within thirty (30) days from the Termination Notice; and

F.      Award Schawbel any further relief as the Court deems just and equitable.


**SCHAWBEL TECHNOLOGIES LLC**

By its attorneys,


_____/s/ Anthony R. Leone_____
Michael P. Connolly, BBO #637642
mconnolly@murthalaw.com
Anthony R. Leone, BBO #681760
aleone@murthalaw.com
Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
617.457.4000

DATED:  February 6, 2018

8973698v1

JS 44 (Rev. 08/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS<br>Schawbel Technologies LLC | DEFENDANTS<br>Heat Factory, USA, Inc. |
|---|---|
| (b) County of Residence of First Listed Plaintiff    Middlesex County, MA<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant    San Diego County, CA<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>        THE TRACT OF LAND INVOLVED. |
| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br>Michael P. Connolly, Anthony R. Leone (Murtha Cullina, 99 High Street,<br>20th Floor, Boston, MA, 02110 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. Section 281

Brief description of cause:
Defendant infringed upon Plaintiff's patents in violation of 35 U.S.C. 281 and breached APA and license agreement.

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☐ Yes  ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE<br>02/06/2018 | SIGNATURE OF ATTORNEY OF RECORD<br>/s/ Anthony R.Leone |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Schawbel Technologies LLC v. Heat Factory, USA, Inc.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   [✔] **I.**      410, 441, 470, 535, 830*, 835*, 891, 893, 895, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ] **II.**     110, 130, 140, 160, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 430, 440, 442, 443, 445, 446, 448, 710, 720, 740, 790, 820*, 840*,  850, 870,  871.

   [ ] **III.**    120, 150, 151, 152, 153, 195, 210, 220, 245, 310, 315,  330, 340, 345, 350, 355, 360, 365, 367, 368, 375, 376, 385, 400, 422, 423, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555,  625, 690, 751, 791, 861-865,  890, 896, 899, 950.

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

   YES [ ]      NO [✔]

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)**

   YES [ ]      NO [✔]

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

   YES [ ]      NO [ ]

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

   YES [ ]      NO [✔]

7. **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**

   YES [✔]      NO [ ]

   **A.**      **If yes, in which division do all of the non-governmental parties reside?**

   Eastern Division [✔]      Central Division [ ]      Western Division [ ]

   **B.**      **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

   Eastern Division [ ]      Central Division [ ]      Western Division [ ]

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**

   YES [ ]      NO [ ]

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Anthony R. Leone

**ADDRESS** Murtha Cullina LLP, 99 High Street, Boston, MA 02110

**TELEPHONE NO.** 617-457-4000

**(CategoryForm6-2017.wpd )**

AO 120 (Rev. 3/04)

| TO: Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court ____Massachusetts____ on the following ☒ Patents or ☐ Trademarks:

| DOCKET NO. | DATE FILED 2/6/2018 | U.S. DISTRICT COURT Massachusetts |
|---|---|---|
| PLAINTIFF<br>Schawbel Technologies LLC | | DEFENDANT<br>Heat Factory, USA, Inc. |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1  See Exhibit A | | See Exhibit A Attached. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading | |
|---|---|---|
| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

Copy 1—Upon initiation of action, mail this copy to Director    Copy 3—Upon termination of action, mail this copy to Director
Copy 2—Upon filing document adding patent(s), mail this copy to Director    Copy 4—Case file copy

Exhibit A, Page 59

<u>EXHIBIT A</u>

| U.S. Patent No. | Date | Holder of Patent |
| --- | --- | --- |
| 8,850,716 | 10/7/14 | Schawbel Technologies LLC |
| 8,869,428 | 10/28/14 | Schawbel Technologies LLC |
| 8,869,429 | 10/28/14 | Schawbel Technologies LLC |
| 9,101,177 | 8/11/15 | Schawbel Technologies LLC |
| 9,179,734 | 11/10/15 | Schawbel Technologies LLC |
| 9,314,064 | 05/19/16 | Schawbel Technologies LLC |
| 9,538,806 | 1/10/17 | Schawbel Technologies LLC |
| 9,538,807 | 1/10/17 | Schawbel Technologies LLC |
| 9,548,618 | 1/17/17 | Schawbel Technologies LLC |
| 9,549,586 | 1/24/17 | Schawbel Technologies LLC |
| 9,572,397 | 2/21/17 | Schawbel Technologies LLC |
| D719,504 | 12/16/14 | Schawbel Technologies LLC |
| D722,222 | 2/10/15 | Schawbel Technologies LLC |
| D724,013 | 3/10/15 | Schawbel Technologies LLC |
| D734,012 | 7/14/15 | Schawbel Technologies LLC |
| D737,769 | 9/1/15 | Schawbel Technologies LLC |
| D772,546 | 11/29/16 | Schawbel Technologies LLC |
| D794,813 | 8/15/17 | Schawbel Technologies LLC |
| D801,624 | 11/7/17 | Schawbel Technologies LLC |

**ASSET PURCHASE AGREEMENT**

by and between

**Schawbel Technologies LLC.**

as Seller

and

**Heat Factory, USA, Inc.**

as Purchaser

dated as of July <u>18</u> , 2017

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") dated as of July __18__, 2017 (the "**Effective Date**") is made and entered into by and between Schawbel Technologies LLC, a Massachusetts limited liability company ("**Seller**") on one hand, and Heat Factory, USA, Inc., a Nevada corporation ("**Purchaser**") on the other hand. The Seller and Purchaser are collectively referred to as "**Parties**" and individually referred to as a "**Party**."

## RECITALS

Seller is in the business ("**Business**") of manufacturing, marketing, distributing and selling certain heated insoles, hand warmers, and related heating products (collectively "**Heating Products**") under the trademarked brand name of ThermaCELL ("**Brand**").

Seller is the owner of certain patents, technological information, and general know-how used in the manufacturing of the Heating Products.

Seller's rights to use and market the Heating Products under the Brand derive from that certain Transitional Trademark License dated July 2, 2014, by and between Seller and Schawbel Corporation, a Massachusetts corporation ("**Brand License**")

Seller has certain Heating Products in inventory, as set forth in **Schedule A** attached hereto and incorporated herein by reference ("**Inventory**").

Seller owns one hundred percent (100%) of the Inventory. The Inventory is currently stored by Seller in warehouses located in 6975 Pacific Circle Mississauga, ON L5T 2H3 Canada and 1100 Thorndale Ave, Elk Grove Village, IL 60007 (collectively "**Seller's Warehouses**").

Seller also owns certain Universal Product Codes associated with the Heating Products, as set forth in **Schedule B** attached hereto and incorporated herein by reference ("**UPC Codes**").

Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Inventory, UPC Codes and other related assets on the terms and subject to the conditions as provided in this Agreement;

Purchaser will market, distribute, and resell the Inventory under the Brand.

Additionally, Seller desires to license to Purchaser, and Purchaser desires to license from Seller, the above referenced patents, technological information, and general know-how so that Purchaser can manufacture, market, distribute, and sell additional heating products under Purchaser's own brand name. The Parties agreement regarding the license is fully set forth in that certain licensing agreement of even date ("**License**").

Accordingly, in consideration of the foregoing and the mutual promises made in this Agreement and of the mutual benefits to be derived from such promises, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION

Section 1.01    Definitions.    For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"**Affiliate**" with respect to either Party shall mean any corporation or other legal entity other than that Party in whatever country organized, controlling, controlled by or under common control with that

Party.  The term "control" shall mean (i) in the case of Licensee, direct or indirect ownership by Licensee or a relative of Licensee of fifty percent (50%) or more of the voting securities or membership interests having the right to elect directors or otherwise direct management and policies, and (ii) in the case of Licensor, the power, direct or indirect, to elect or appoint fifty percent (50%) or more of the directors or trustees, or to cause direction of management and policies, whether through the ownership of voting securities, by contract or otherwise

"**Agreement**" means this Asset Purchase Agreement.

"**Allocation Statement**" has the meaning set forth in Section 2.10.

"**Authorizations**" has the meaning set forth in 3.10.

"**Brand**" has the meaning set forth in the recitals.

"**Brand License**" has the meaning set forth in the recitals.

"**Bulk Sale Claims**" has the meaning set forth in Section 3.14.

"**Bulk Sale Notice**" has the meaning set forth in 2.15.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York or in the city of New York are authorized or required by Law or other governmental action to close.

"**Cash Purchase Price**" has the meaning set forth in Section 2.02.

"**Certifications**" refer to those certifications identified on **Schedule C**.

"**Charter Documents**" means with respect to any Person, the certificate or articles of incorporation, organization or formation and by-laws, the limited partnership agreement, the partnership agreement or the operating or limited liability company agreement, equity holder agreements and other organizational and governance documents of such Person.

"**Claim**" means any demand, claim, action, legal proceeding (whether at Law or in equity) or arbitration, obligations, or reckonings of any kind or nature whatsoever, for compensatory or exemplary and punitive damages, or declaratory, equitable or injunctive relief, whether based on contract, tort, or other theories of recovery provided for by the common or statutory law, ascertained or unascertained, known or unknown, patent or latent, suspected or claimed.

"**Closing**" has the meaning set forth in Section 2.07.

"**Closing Date**" means the date on which the Closing occurs.

"**Code**" means the Internal Revenue Code of 1986.

"**Confidential Information**" has the meaning set forth in Section 5.05.

"**Contract**" means any contract, lease, option (including any option to purchase real property), license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other legally binding arrangement.

"**Delivery Date**" has the meaning set forth in Section 2.12.

"**Effective Date**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, Canada, or any state, county, city, province or other political subdivision or similar governing entity where the Heating Products are sold.



"**Governmental Authority Approvals**" means a permit, certification, order, decree or any other form of approval issued by a Governmental Authority.

"**Heating Products**" has the meaning set forth in the recitals.

"**Indemnified Party**" has the meaning set forth in Section 7.05(a).

"**Indemnifying Party**" has the meaning set forth in Section 7.05(a).

"**Inspection Period**" has the meaning set forth in Section 2.14(a).

"**Inventory**" has the meaning set forth in the recitals.

"**Inventory Secured Taxes**" has the meaning set forth in 3.11(a).

"**Laws**" means all laws, statutes, rules, regulations and ordinances, and any other pronouncements having the effect of law, of any Governmental Authority.

"**Liabilities**" has the meaning set forth in Section 2.05.

"**License**" means the Exclusive License Patent Agreement between the Seller and the Purchaser of even date.

"**Lien**" means any security interest, pledge, mortgage, lien, charge, encumbrance, conditional sale agreement, title retention contract, right of first refusal, option to purchase, proxy, voting trust or voting agreement or any similar interest.

"**Loss**" or "**Losses**" means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, Taxes, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any Claim, default or assessment).

"**Party**" or "**Parties**" means Purchaser, on the one hand, and Seller, on the other hand.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"**Pre-Closing Orders**" has the meaning set forth in Section 2.13.

"**Purchase Price**" has the meaning set forth in Section 2.02.

"**Purchaser**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Purchaser's Warehouse**" has the meaning set forth in Section 2.11.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, Representatives, attorneys, accountants, investment bankers, Affiliates or Representatives of (i) any such Person or (ii) any Affiliate of such Person.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, counsel, accountants, financial advisers or consultants of such Person.

"**Restrictive Period**" has the meaning set forth in Section 5.07.

"**Schedule A-1 Value**" has the meaning set forth in 2.14(a).

"**Seller**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Seller's Insurance**" has the meaning set forth in Section 3.12.

"**Seller's Warehouses**" has the meaning set forth in the recitals.



"**Senior Financing**" has the meaning set forth in Section 2.03.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, profits, franchise, withholding, franchise, margin, environmental (including taxes under Code Section 59A), documentary, stamp, transfer, ad valorem, personal property (tangible and intangible), real property, employment, payroll, sales and use, social security, disability, occupation, property, severance, excise and other taxes (or other charges, fees, levies or other assessments in the nature of a tax), including any interest, penalty or addition thereto whether disputed or not.

"**Tax Return**" means any return, report, declaration, information return, statement or other document filed or required to be filed with any Taxing Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

"**Taxing Authority**" means, with respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

"**Territory**" has the meaning set forth in Section 5.07.

"**Third Party Purchaser**" has the meaning set forth in Section 5.07.

"**Transfer Taxes**" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, gross receipts, excise, and conveyance Taxes and other similar Taxes, duties, fees or charges.

"**Transferred Assets**" has the meaning set forth in Section 2.01.

"**UPC Codes**" has the meaning set forth in the recitals.

Section 1.02   Construction.

(a) All Article, Section, Subsection, Schedule and Exhibit references used in this Agreement are to Articles, Sections, Subsections, Schedules and Exhibits to this Agreement unless otherwise specified.   The Exhibits and Schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b) If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).   Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.   The words "includes" or "including" shall mean "includes without limitation" or "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular Section or Article in which such words appear.   Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder.   Unless this context otherwise requires, any reference to an agreement or contract shall include any amendment, supplement or other modification thereto.   Any reference to any Governmental Authority shall include any successor in function to such Governmental Authority.   Currency amounts referenced herein are solely in U.S. Dollars.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.   Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d) Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that in the event an ambiguity of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and



no presumption shall arise favoring any Party by virtue of the authorship of any provisions of this Agreement.

## ARTICLE II.
## PURCHASE AND SALE AND CLOSING

Section 2.01   Purchase and Sale. Effective as of the Closing Date, Seller sells, assigns, and transfers to Purchaser, and Purchaser purchases from Seller, on the terms and conditions specified in this Agreement, all of Seller's rights, title, and interest in and to only the following (collectively the "**Transferred Assets**"):

    (a)  One hundred percent (100%) of all direct and indirect right and title to and in the Inventory, free and clear of all Liens, Claims, encumbrances and other interests; and

    (b)  One hundred percent (100%) of all direct and indirect right and title to and in the UPC Codes, free and clear of all Liens, Claims, encumbrances and other interests.

Section 2.02   Purchase Price. The purchase price for the Transferred Assets to be paid by Purchaser to Seller shall be $3,700,000 (the "**Purchase Price**"). The Purchase Price shall be payable by Purchaser to Seller as follows:

    (i)      $300,000 payable on or before October 10, 2017;

    (ii)     $450,000 payable on or before November 10, 2017;

    (iii)    $500,000 payable on or before December 10, 2017;

    (iv)    $600,000 payable on or before January 10, 2018;

    (v)     $600,000 payable on or before February 10, 2018;

    (vi)    $550,000 payable on or before March 10, 2018;

    (vii)   $550,000 payable on or before April 10, 2018; and

    (viii)  $150,000 payable on or before May 10, 2018

Section 2.03   Security. To secure Purchaser's payment of the Purchase Price Purchaser grants to Seller as of the Closing Date a perfected lien on (a) the Inventory and (b) all accounts receivable arising from sales of the Inventory. Seller's liens on the Inventory and accounts receivable shall be subordinate and junior only to any liens held by any third party lender that has lent money to Purchaser, directly or in-directly, in relation to the purchase, handling and sale of the Inventory, including a business line-of-credit, which may also be used for other legitimate business purposes ("**Senior Financing**"). Notwithstanding the foregoing, the value of the Senior Financing shall not exceed the Purchase Price. Purchaser and Seller shall execute all instruments and documents reasonably required to evidence such liens and the perfection thereof and the subordination of such liens as provided immediately above no later than thirty (30) days after the Effective Date. Purchaser shall provide notice to Seller of any default on the Senior Financing.

Section 2.04   Retained Assets. The Transferred Assets shall not include, and Purchaser shall not acquire an interest in, any and all assets not specified in Section 2.01, including but not limited to the assets of Seller listed below ("**Retained Assets**"):

    (a)  All of Seller's cash or cash equivalents existing as of the Closing Date, including any line(s) of credit;

    (b)  Prepaid taxes, refunds, and deposits and earned revenue;

    (c)  All accounts receivable existing as of the Closing Date, but excluding an accounts receivable for Pre-Closing Orders (as further described in Section 2.13);

Section 2.05    No Assumption of Liabilities. Subject to the terms and conditions of Section 2.12, Purchaser does not assume and will not become responsible for any liability of Seller of any kind, character or description whatsoever, whether actual or contingent, known or unknown, intentional or unintentional, and whether statutory, in contract, tort, warranty or otherwise and whether with respect to the Business, the Transferred Assets, or otherwise arising prior to the Closing Date (collectively "**Liabilities**").

Section 2.06    Taxes.  Seller shall pay in a timely manner all sales and other Transfer Taxes, if any, levied on the Transferred Assets due to the sale to Purchaser under this Agreement, and shall release, indemnify, defend, and hold harmless Purchaser with respect to such Taxes. Seller shall file all necessary documentation and Tax Returns with respect to such Taxes.

Section 2.07    Closing.   The Closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Seller at 10:00 A.M. local time, on the Effective Date, or on such other date and at such other time and place as the Parties mutually agree in writing.  All actions listed in Section 2.08, 2.09 or Section 2.10 that occur on the Closing Date shall be deemed to occur simultaneously at the Closing.

Section 2.08    Closing Deliveries by Seller to Purchaser.  At the Closing, Seller shall deliver, or shall cause to be delivered, to Purchaser the following:

(a)  a duly executed assignment of the intangible portion of the Transferred Assets by Seller to Purchaser, in form attached and incorporated as **Exhibit 2.08(a)**, together with such documents endorsed for transfer or executed in blank as are necessary to transfer the Transferred Assets;

(b)  a certificate of good standing with respect to Seller dated no more than three (3) days before the Closing, issued by the Secretary of State of Seller's formation;

(c)  a duly executed certificate in form attached and incorporated as **Exhibit 2.08(c)** by a manager of Seller, (i) certifying due authorization of the resolutions granting authority to execute and deliver this Agreement and the other agreements and instruments contemplated hereby and authorizing the consummation of the transactions contemplated hereby; and (ii) identifying the name and title and bearing the signatures of the officers of Seller authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby, duly executed by Seller;

(d)  Recorded UCC-3s, mortgage releases and termination statements or any other documents necessary to deliver the Transferred Assets to Purchaser free and clear of all Liens, Claims, encumbrances and other interests;

(e)  a duly executed Bill of Sale selling the tangible portion of the Transferred Assets to Purchaser in the form attached and incorporated as **Exhibit 2.08(e)**;

(f)  the letters from the President of Schawbel Corporation, attached as Exhibit 2.08(f); and

(g)  any other agreement or instrument reasonably requested by Purchaser that is required to effect the transactions contemplated by this Agreement.

Section 2.09    Closing Deliveries by Purchaser to Seller.  At the Closing, Purchaser shall deliver, or shall cause to be delivered, to Seller the following:

(a)  a duly executed assignment of the Transferred Assets by Seller to Purchaser, referred to in Section 2.08(a);

(b)  a certificate of good standing with respect to Purchaser dated no more than three (3) days before the Closing, issued by the Secretary of State of Purchaser's incorporation;



(c) a true and correct copy of the resolutions of Purchaser's Board of Directors in form attached hereto and incorporated as **Exhibit 2.09(c)** granting authority to execute and deliver this Agreement and instruments contemplated hereby and authorizing the consummation of the transactions contemplated hereby; and

(d) any other agreement or instrument reasonably requested by Seller that is required to effect the transactions contemplated by this Agreement.

Section 2.10    Purchase Price Allocation.

(a) Within ninety (90) days after the Closing Date, Purchaser shall prepare and deliver to Seller a draft of a statement (the "**Allocation Statement**") setting forth its proposed allocation of the Purchase Price among the Transferred Assets. If within fifteen (15) days after Seller's receipt of the draft Allocation Statement, Seller shall not have objected in writing to such draft Allocation Statement, the draft Allocation Statement shall become the Allocation Statement. In the event that Seller objects in writing within such 15-day period, Seller and Purchaser shall negotiate in good faith to resolve the dispute. If Seller and Purchaser are unable to reach an agreement within thirty (30) days after Purchaser's receipt of Seller's written objection, the dispute shall be resolved and the Allocation Statement shall be determined by an independent, nationally recognized accounting firm mutually selected by the Parties. The Allocation Statement, as agreed upon by Purchaser and Seller and/or determined under this Section 2.10, shall be final and binding upon the Parties. Each of Seller and Purchaser shall bear all fees and costs incurred by it in connection with the determination of the Allocation Statement, except that the Parties shall each pay one-half (50%) of the fees and expenses of the accounting firm.

(b) The Allocation Statement will be prepared in accordance with Section 1060 of the Code and the rules and Treasury Regulations promulgated thereunder. Purchaser and Seller also shall allocate and report any adjustments to the Purchase Price (including any adjustment to the Purchase Price under the true-up process set forth in Section 2.14) in accordance with Treasury Regulations Section 1.1060-1(e), and any allocations made as a result of such adjustments shall become part of the Allocation Statement.

(c) The Parties agree to report the allocation of the Purchase Price (including the amount of any assumed liabilities) among the Transferred Assets in a manner consistent with the Allocation Statement and agree to act in accordance with the Allocation Statement in the preparation and filing of all Tax returns (including filing Form 8594 with their respective federal income tax returns for the taxable year that includes the Closing Date and any other forms or statements required by the Code, Treasury Regulations, the Internal Revenue Service or any applicable state or local Governmental Authority) and in the course of any Tax audit, Tax review or Tax litigation relating thereto; provided, however, that (i) Purchaser's cost for such assets may differ from the total amount allocated hereunder to reflect the inclusion in the total cost of items (for example, capitalized acquisition costs) not included in the amount so allocated, and (ii) the amount realized by Seller may differ from the total amount allocated hereunder to reflect transaction costs that reduce the amount realized for federal income tax purposes.

(d) The Parties will promptly inform one another of any challenge by any Governmental Authority to any allocation made pursuant to this Section 2.10 and agree to consult and keep one another informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.11    Transportation of Inventory After Closing. Purchaser shall be responsible for arranging transportation of the Inventory from Seller's Warehouses to Purchaser's warehouses ("**Purchaser's Warehouse**"), and shall be solely responsible for all costs and expenses associated therewith.



(a)   For purposes of removing and transporting the Inventory from Seller's Warehouses, Seller shall grant Purchaser and/or Purchaser's moving company with sufficient access to Seller's Warehouses to inspect, pack and remove the Inventory, provided that Purchaser shall provide at least 24 hours verbal or written notice in advance of any visit.

(b)   Purchaser shall have all Inventory removed from Seller's Warehouses within 20 Business Days after the Closing Date.

Section 2.12      Risk of Loss. Seller has all risk of loss or damage to the Transferred Assets prior to Purchaser commencing the packing of the Inventory for removal at Seller's Warehouses ("**Delivery Date**"). From and after the Delivery Date, Purchaser has all risk of loss and damage to the Transferred Assets.

Section 2.13      Pre-Closing Orders.

(a)   Prior to Closing, Seller has taken certain orders for some of the items in the Inventory, but has not shipped the items or billed the order ("**Pre-Closing Orders**"). Following Closing Seller shall use reasonable efforts to provide Purchaser with a list of Pre-Closing Orders and whatever relevant information is in the possession of Seller regarding the customers and Pre-Closing Orders.

(b)   Purchaser may, but is not obligated to, fulfill any of the Pre-Closing Orders. Purchaser shall notify Seller in writing of which Pre-Closing Order Purchaser will fulfill. All accounts receivable arising from any of the Pre-Closing Orders that Purchaser fulfills shall be belong solely to Purchaser.

(c)   Purchaser shall have no liability for any of Seller's Pre-Closing Orders which Purchaser is unable to fulfill as a result of insufficient information from Seller, or which Purchaser chooses, in its sole and absolute discretion, not to fulfill. For any such orders Seller agrees to release, indemnify, and hold Purchaser harmless for any liability related to or arising from such Pre-Closing Orders.

Section 2.14      True-Up.

(a)   Purchaser shall have forty-five (45) days from the Closing Date ("**Inspection Period**") to fully inspect the delivered Inventory. Within such forty-five days period, Purchaser shall provide written notice to Seller of any items of Inventory that either: 1) were not delivered, or 2) were delivered but arrived damaged and such damage was incurred prior to the Delivery Date. "Damage" shall be assessed in Purchaser's reasonably exercised discretion. To the extent such undelivered/damaged items have an aggregate value, based on Schedule A-1 ("**Schedule A-1 Value**"), of $67,000 or more, the Purchase Price shall be adjusted downward by such aggregate value, and the Purchaser shall be entitled to offset such aggregate value against any payments due on the Purchase Price.

(b)   The Purchase Price shall be further adjusted downward by, and Purchaser may deduct from the payments otherwise due pursuant to Section 2.02, all credit balances and defect deductions attributable to the sale of Heating Products by Seller prior to the Effective Date and all cash rebates awarded by Seller in relation to sale of Heating Products consummated prior to the Effective Date to the extent Purchaser is required to honor such items.

Section 2.15      Purchaser shall comply, at its sole cost and expense, with the provisions of any applicable "bulk sales," bulk transfer" or similar Laws in connection with the consummation of the transactions contemplated by this Agreement ("**Bulk Sale Notice**"), including the provisions set forth in Illinois Administrative Code Section 130.1701 and Illinois Unemployment Insurance Act, Section 2600.



## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser that the following representations and warranties are true and correct as of the Closing Date:

Section 3.01    Organization and Qualification.  Seller is a limited liability company duly formed, validly existing and in good standing under the laws of Massachusetts.  Seller is duly qualified or licensed to carry on the Business as now conducted and duly qualified to conduct business in each other jurisdiction or country where the actions required to be performed by it under this Agreement makes such qualification or licensing necessary.

Section 3.02    Authority.  Seller has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized by all necessary proceedings on the part of Seller.  This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles regardless of whether considered in a proceeding at Law or in equity.

Section 3.03    No Conflicts: Consents and Approvals.  The execution and delivery by Seller of this Agreement does not, and the performance by Seller of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

    (a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Charter Documents of Seller;

    (b)    violate or result in a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which Seller is a party or by which it is bound, or to which any of its assets are subject;

    (c)    (i) violate or breach any writ, judgment, order or decree applicable to Seller, (ii) violate any Law, (iii) require any consent, approval or clearance by, or any filing or registration with, any Governmental Authority or (iv) require the consent or approval of any third party; and

    (d)    violate the Brand License.

Section 3.04    Ownership of Transferred Assets.  Seller owns one hundred percent (100%) of the Transferred Assets directly, free and clear of all Liens, Claims, encumbrances and other interests.

Section 3.05    Transferred Assets.

    (a)    Seller has good and marketable title to the Transferred Assets and will convey the same to Purchaser free and clear of all Liens, Claims, interests and encumbrances.

    (b)    Purchaser's use of the Brand and the resale of the Inventory under the Brand will not violate the Brand License.

Section 3.06    Inventory. Except as set forth in **Schedule 3.06**, there have been no manufacturing or product defect Claims made or pending or, to Seller's actual knowledge, threatened (whether or not covered by insurance), related to the Heating Products or the items of the Inventory. Except as set forth in Schedule 3.06, none of the Claims set forth in **Schedule 3.06** resulted in Seller paying any sums, or otherwise settling with, the respective claimant. None of the Claims were tendered to any of Seller's insurers. To the actual knowledge of Seller, each item of Inventory was manufactured or made in compliance will all applicable Laws and the Certifications, as such Laws and Certifications were in effect



as of the time of manufacture. Each item of the Inventory was in Seller's inventory or in transit as of the effective date of the termination of the Brand License.

Section 3.07     Intellectual Property.

(a)   The Transferred Assets and Inventory, as used by Seller, do not infringe, misappropriate or otherwise violate the intellectual property rights of any third party.

(b)   Seller has not received any written charge, complaint, Claim, demand or notice alleging any such infringement, misappropriation or other violation (including any Claim that Seller must license or refrain from using any intellectual property of any third party).

(c)   To the actual knowledge of Seller, no third party has infringed upon, misappropriated or otherwise violated any Intellectual Property of Seller.

Section 3.08     No Brokers.  Seller does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Purchaser or any of its Affiliates are or could become liable or obligated. Seller will indemnify and hold Purchaser harmless from any and all Claims, suits, and actions for brokerage or other commissions, and from and against all expenses of any character, including reasonable attorney fees incurred by the other by reason of any Claim by any finder, broker, or other person claiming to have been engaged by, or on behalf of, Seller, or with whom Seller is claimed to have made any agreement for compensation

Section 3.09     Compliance with Laws; Litigation.  The Transferred Assets are in conformity with all applicable federal, state and local laws, ordinances and regulations, and Seller has received no notice of alleged noncompliance. There is no litigation pending or threatened (whether or not covered by insurance), nor any order, injunction, or decree outstanding nor any proceeding, or governmental investigation existing or pending, involving Transferred Assets or the Heating Products, nor is there any basis for any such litigation. No event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any complaint, Claim, action, suit, litigation, proceeding or governmental or administrative investigation involving or relating to the Transferred Assets.

Section 3.10     Licenses and Rights.  Seller possesses all franchises, licenses, easements, permits and other authorizations (collectively, "**Authorizations**") from all Governmental Authority or regulatory authorities and from all other persons or entities that are necessary to use the Transferred Assets in the manner presently done by Seller in and at all locations and places where it is presently operating, and Seller has not received any notice that any Governmental Authority or regulatory authority is considering or intends to cancel, terminate, modify or not renew such Authorizations

Section 3.11     Tax Matters As to the Transferred Assets.

(a)   All Taxes due and owing by Seller or its Affiliates (whether or not shown on any tax return), that if unpaid could be secured against the Transferred Assets ("**Inventory Secured Taxes**"), have been paid and Seller does not have any liability for such Inventory Secured Taxes.

(b)   As of the date of the Closing Date, there is no written Claim or assessment pending or, threatened against Seller or its Affiliates for any alleged deficiency in Inventory Secured Taxes, and there is no audit or investigation with respect to any liability of Seller or its Affiliates for Inventory Secured Taxes. Neither Seller nor or its Affiliates have waived any statute of limitations with respect to Inventory Secured Taxes or agreed to any extension of time with respect to any Inventory Secured Tax assessment or deficiency.

(c)   With respect to Inventory Secured Taxes, Seller has withheld (and timely paid to the appropriate Governmental Authority) proper and accurate amounts for all periods through the date hereof in compliance with all Tax withholding provisions of applicable federal, state, local and foreign Laws .

Section 3.12    Insurance. Seller maintains the policies of insurance identified on **Schedule 3.12** (collectively "**Seller's Insurance**"). Seller has provided Purchaser with complete copies of the policies for Seller's Insurance. There is no Claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed. There is no threatened termination of, or announced pending material premium increase with respect to, any such policies or bonds. Seller shall maintain such insurance through the Delivery Date. For a period of twelve (12) months following the Closing Date, Seller will maintain the CGL coverage, and associated umbrella, in an amount and substantially similar to the policies identified in Section 3.12, and which shall each continue to provide coverage for Products-Completed Operations Liability.

Section 3.13    Solvency. Immediately after giving effect to all of the transactions contemplated by this Agreement, Seller will be able to pay all its debts and will own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities). No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Seller.

Section 3.14    Bulk Sale Claims: There exist no actual third party Claims and, to the actual knowledge of Seller, Seller has not been made aware of any third party Claims which could be made in response to the Bulk Sales Notice ("**Bulk Sale Claims**").

Section 3.15    Disclosure. No representation or warranty of the Seller in this Agreement (including the exhibits and schedules hereto) or in any other agreement, instrument, certificate, or other document delivered by the Seller in connection with this Agreement or any of the other transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not false or misleading. There is no fact that Seller has not disclosed to the Purchaser in writing that materially adversely affects, or (so far as Seller can now foresee) is reasonably likely to affect materially and adversely, the Transferred Assets or the ability of Seller to perform its obligations under this Agreement or to consummate any of the transactions contemplated hereby.

Section 3.16    No Material Change. There has been no material adverse change in the Transferred Assets since April 15, 2017 through Closing.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants that the following representations and warranties are true and correct as of the Closing Date:

Section 4.01    Organization and Qualification. Purchaser is a corporation company duly formed, validly existing and in good standing under the Laws of the State of Nevada. Purchaser is duly qualified or licensed to do business in each other jurisdiction where the actions required to be performed by it hereunder makes such qualification or licensing necessary, except as would not, in the aggregate, have a material adverse effect on its ability to consummate the transactions hereunder or otherwise perform its obligations hereunder.

Section 4.02    Authority. Purchaser has all requisite corporate power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Purchaser of this Agreement and the performance by Purchaser of its obligations hereunder have been duly and validly authorized by all corporate action on behalf of Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable against Purchaser in



accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

Section 4.03    No Conflicts; Consents and Approvals.  The execution and delivery by Purchaser of this Agreement does not, and the performance by Purchaser of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

    (a)  conflict with or result in a violation or breach of any of the terms, conditions or provisions of its Charter Documents;

    (b)  violate or result in a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which Purchaser is a party, except for any such violations or defaults (or rights of termination, cancellation or acceleration) which would not, impair Purchaser's ability to perform its obligations hereunder; and

    (c)  assuming all required filings, approvals, consents, authorizations, clearances and notices set forth in Schedule 4.03(c) (collectively, the "**Purchaser Governmental Approvals**") have been made, obtained or given, (i) violate any Law applicable to Purchaser, (ii) violate or breach any writ, judgment, order or decree applicable to Purchaser, (iii) require the consent, clearance or approval of any Governmental Authority under any applicable Law, except where any such violation or breach or the failure to obtain any such consent, clearance or approval would not impair Purchaser's ability to perform its obligations hereunder or (iv) to the knowledge of Purchaser require the consent or approval of any other third party.

Section 4.04    Litigation.    There are no Claims pending or threatened in writing, before any Governmental Authority or any arbitrator, that would, in the aggregate, impair Purchaser's ability to perform its obligations hereunder.  Purchaser is not subject to any judgment, decree, injunction, rule or order of any Governmental Authority or any arbitrator that prohibits the consummation of the transactions contemplated by this Agreement or would impair Purchaser's ability to perform its obligations hereunder.

Section 4.05    Compliance with Laws.  Purchaser is not in violation of any Law, except for violations that would not, in the aggregate, impair Purchaser's ability to perform its obligations hereunder.

Section 4.06    Brokers.  Purchaser does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or its Affiliates could become liable or obligated. Purchaser will indemnify and hold Seller harmless from any and all Claims, suits, and actions for brokerage or other commissions, and from and against all expenses of any character, including reasonable attorney fees incurred by the other by reason of any Claim by any finder, broker, or other person claiming to have been engaged by, or on behalf of, Purchaser, or with whom Purchaser is claimed to have made any agreement for compensation.

Section 4.07    Disclosure.  No representation or warranty of the Purchaser in this Agreement (including the exhibits and schedules hereto) or in any other agreement, instrument, certificate, or other document delivered by the Purchaser in connection with this Agreement or any of the other transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not false or misleading. As it concerns the Transferred Assets, there is no fact that the Purchaser has not disclosed to the Seller in writing that materially adversely affects, or (so far as Purchaser can now foresee) is reasonably likely to affect materially and adversely, the business or condition (financial or otherwise) of Purchaser or the ability of Purchaser to perform its obligations under this Agreement or to consummate any of the transactions contemplated hereby.

Section 4.08    Sawyer Termination. As of Closing, and until termination of the Agreement, Purchaser shall have no business relationship with Sawyer Products, Inc., other than in the normal course of business of selling



Heat Factory USA, Inc. branded products. To Purchaser's actual knowledge, as of the Closing, Sawyer Products, Inc. has no claims against Purchaser.

## ARTICLE V.
## COVENANTS

Section 5.01   Public Announcements.  Prior to the Closing Date, neither Party shall issue any press release, disclose the Purchase Price or make any public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party, except as may be required by applicable Law or any listing agreement with a national securities exchange or quotation system. Notwithstanding the foregoing, Purchaser may disclose the Purchase Price and this Agreement for purposes of complying with the Bulks Sales Notice or to secure commercial financing secured by the Inventory. After the Closing Date, the Parties may issue a press release or make a public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party provided, however, that neither Party shall, without the prior written consent of the other Party, disclose publicly any of the financial terms of this Agreement.

Section 5.02   Expenses and Fees.  Except as expressly provided otherwise in this Agreement, all costs and expenses, including attorney's fees, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.

Section 5.03   Further Assurances.  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at any Party's request and without further consideration, the other Party shall execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such information and take such other actions and execute and deliver such other documents as such Party may reasonably request in order to consummate the transaction contemplated in this Agreement, including but not limited to the transfer, registration, or assignment of the UPC Codes. As it regards the transfer, registration, or assignment of the UPC Codes, Purchaser shall be solely responsible for any expense or costs incurred. For all other further assurances, neither Seller nor Purchaser shall be required to undertake any action that is likely to result in a material expense for Party unless the requesting Party agrees to reimburse the Party for such expense.

Section 5.04   Financing Cooperation:  Seller shall provide Purchaser with such cooperation and information as Purchaser reasonably may request, from time to time, in refinancing or modifying any Senior Financing that is secured against the Transferred Assets provided, however, that to the extent such cooperation requires Seller to incur out of pocket costs, including without limitation compensation of employees and/or consultants, Purchaser shall promptly reimburse Seller for such reasonable costs upon receipt of an invoice requesting such reimbursement.

Section 5.05   Confidentiality.  Each Party has furnished and will continue to furnish to the other Party certain information relating, directly or indirectly, to Purchaser, Seller and Transferred Assets, which is either non-public, confidential or proprietary in nature.  Such information, together with all analyses, compilations, data, studies or other documents containing or based in whole or in part on any such furnished information is hereinafter referred to as "**Confidential Information**." The terms of this Agreement shall be deemed to be Confidential Information.  Subject to the requirements of applicable Laws or any order of a Governmental Authority, each of the Parties hereby agrees to (i) treat the Confidential Information as confidential and use the same standard of care in handling such information as they use with respect to their own confidential information, but in no event less than a reasonable standard of care, (ii) prior to Closing, use the Confidential Information solely in connection with the consummation of the transactions contemplated by this Agreement, and (iii) transmit the Confidential Information only to those Representatives who need to know the Confidential Information; provided that each Party may use Confidential Information, as required, in filings, submissions and other



correspondence to obtain Seller Governmental Approvals, Seller Third Party Consents, Purchaser Government Approvals and Purchaser Third Party Consents. Notwithstanding any other provisions hereof, after the Closing, (x) each Party agrees to maintain the confidentiality of and not to disclose to any other Person any of the Confidential Information it received from the other Party, and (y) each Party may disclose Confidential Information pursuant to its obligations under Law for purposes of filing tax returns, financial reporting, as required in connection with regulatory compliance, or in any action a Party may have to enforce its rights against the other Party relating to the transactions contemplated by this Agreement,.

Section 5.06    Insurance. As it concerns the Transferred Assets, Seller has secured and shall maintain, at Seller's sole expense, the insurance so identified in Schedule 3.12 for the period described therein.

Section 5.07    Restrictive Covenants.   As a condition and material inducement to Purchaser's willingness to enter into this Agreement and purchase the Transferred Assets, and in particular the Inventory, and to protect the value of the Inventory and Transferred Assets, Seller hereby covenants and agrees as follows:  For a period (the "**Restrictive Period**") commencing on the Closing Date and ending on the second (2nd) anniversary of the Closing Date, neither Seller nor its Related Persons or their respective Affiliates shall directly or indirectly, own, control, operate, conduct, engage in, participate in, consult with, perform services for, or otherwise carry on, any heated product production, distribution, marketing or sales business or any other enterprise that competes with the Heating Products anywhere in the world (the "**Territory**").  During the Restrictive Period, neither Seller nor its Related Persons or their respective Affiliates shall, directly or indirectly, solicit any accounts of Purchaser related to the Heating Products for the purpose of attempting to interfere with or damage the business relationship between Purchaser, on the one hand, and any third party involved in the manufacturing, marketing, distribution or sale of the Heating Products. The Parties agree that a breach or threatened breach of any covenant set forth in this Section 5.07 could cause irreparable harm to Purchaser, that Purchaser's remedies at Law upon any such breach would be inadequate, and that, accordingly, upon any such breach or threatened breach Purchaser may seek a restraining order or injunction or both against the Seller, Seller's Affiliates or Related Persons, in addition to any other rights and remedies which are available at Law for breach of the covenant. If any provision of this Section 5.07 shall be determined to be invalid or unenforceable, such invalid or unenforceable term shall be deemed amended to allow as to such maximum time and territory and to such other extent as such court (or arbitral tribunal) may judicially determine or indicate to be reasonable.

Notwithstanding the foregoing, and for the avoidance of doubt, and provided Seller or its Related Persons and their Affiliates first obtains a commercially reasonable confidentiality agreement signed by the Third Party Purchaser, nothing shall restrict the Seller or its Related Persons and their Affiliates from (a) efforts to market and sell or otherwise assign patents or technological information to third parties ("**Third Party Purchaser**") in accordance with the License, and (b) following such sale or assignment of patents and/or technological information to the Third Party Purchaser, activities reasonably necessary to effectuate the intent of the sale or assignment of patents and/or technological information to the Third Party Purchaser.

## ARTICLE VI.
## CONDITIONS TO CLOSING

Section 6.01    Conditions to the Obligations of Each Party.  The obligations of the Parties to proceed with the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions, which may be waived in writing, in whole or in part, as to a Party by such Party:  no permanent judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction shall be in effect which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this

Agreement (each Party agreeing to use its reasonable commercial efforts, including appeals to higher courts, to have any judgment, injunction, order or decree lifted).

Section 6.02    Conditions to the Obligations of Purchaser.  The obligation of Purchaser to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Purchaser:

    (a)  Seller has performed all of its obligations and complied with all covenants, agreements, and conditions hereunder required to be performed by it at or prior to the Closing Date in all respects;

    (b)  Seller shall have paid in full all outstanding debts and secured the release of all Liens against the Transferred Assets.

    (c)  the representations and warranties of Seller contained in this Agreement (without regard to any materiality, material adverse effect or similar qualifiers)  are true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date); and

    (d)  all required Government Approvals have been obtained and are in form and substance satisfactory to Purchaser.

    (e)  Seller shall have secured consents of all third parties, if any, necessary for Seller to execute, deliver and perform this Agreement.

    (f)  Purchaser has received the documents from Seller set forth in Section 2.08.

Section 6.03    Conditions to the Obligations of Seller.  The obligation of Seller to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Seller:

    (a)  Purchaser has performed all of its obligations and complied with all covenants, agreements, and conditions hereunder required to be performed by it at or prior to the Closing Date in all respects;

    (b)  the representations and warranties of Purchaser contained in this Agreement (without regard to any materiality, material adverse effect or similar qualifiers) are true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date);

    (c)  All Governmental Approvals, if any, have been obtained and are in form and substance satisfactory to Seller; and

    (d)  Seller has received the documents from Purchaser set forth in Section 2. 09.

### ARTICLE VII.
### INDEMNIFICATION: LIMITATION OF WARRANTIES

Section 7.01    Survival.

    (a)  All the representations and warranties set forth in this Agreement, are as of the date of Closing and not thereafter. All representations and warranties shall survive the execution and delivery hereof and the Closing Date but shall terminate two (2) years after the Closing Date.

    (b)   No Party may make or assert any Claim under any representation or warranty of, or breach of covenant by, any other Party contained in this Agreement or in any agreement, instrument or other document delivered in connection herewith after the expiration of the survival period of such representation, warranty or covenant, except that any Claims made or asserted by a Party within the applicable time period prescribed above setting forth such Claim in reasonable detail (including a reasonable specification of the legal and factual basis for such Claim and the Loss



incurred) shall survive such expiration until such Claim is finally resolved and all obligations with respect thereto are fully satisfied.

Section 7.02      Indemnification.

(a) Subject to the provisions of this Article VII, Seller, from and after the Closing Date, shall indemnify, defend and hold harmless Purchaser and its Related Persons from and against any and all Loss or Claims that arise out of, relate to, or result from (i) any inaccuracy of any of the representations and warranties as of the date when made, or (ii) the breach of any of the covenants or agreements of Seller contained in this Agreement or any Ancillary Agreement; (iii) Claims arising from any manufacturing or product defects regarding the Inventory; (iv) any Bulk Sales Claims; (v) Liabilities; (vi) Transfer Taxes as provided in Section 2.06; or (vii) Claims arising from or related to the matters set forth in **Schedule 3.06**. Purchaser shall have the right to set off any Claim for indemnification from Seller against any payment of the Purchase Price to the extent that such Claim for indemnification: 1) has been agreed upon by the Parties; 2) has been determined by a non-appealable final order of a court with appropriate jurisdiction; or 3) relates to any Bulk Sales Claims. In addition, each calendar year, beginning with the calendar year of the Effective Date, Purchaser shall have the right to set off against the Purchase Price any Claims for indemnification, whose liability in the aggregate with any other Claims made during that same calendar year (excluding those Claims agreed to by the Parties, determined by a final order, or relating to Bulk Sales Claims, as set forth in preceding sentence) has been valued (in Purchaser's sole and absolute discretion) to be Twenty Thousand dollars ($20,000) or less. In the event that Purchaser is not entitled to a set off against the Purchase Price as provided in the preceding sentence, Purchaser shall be entitled to withhold from payment of the Purchase Price an amount equal to the value (as determined in Purchaser's sole and absolute discretion) of any Claim for indemnification (less any unused portion of the aggregate $20,000, which shall be offset against the Purchase Price as provided in the preceding sentence) and shall deposit such withholdings into escrow. Any sums deposited into escrow shall only be released in accordance with: 1) a written agreement of the Parties; or 2) a non-appealable final order of a court with appropriate jurisdiction. The Parties agree to execute all escrow instructions necessary, or reasonably requested by escrowholder, to ensure the escrowed funds are released from escrow in accordance with this Section 7.02(a). All escrow costs shall be shared equally by the Parties.

(b) Subject to the provisions of this Article VII, Purchaser, from and after the Closing Date, shall indemnify, defend and hold harmless Seller and its Related Persons from and against any and all Losses and Claims that arise out of, relate to, or result from the breach of any of Purchaser's (i) representations and warranties as of the date when made, (ii) covenants or agreements contained in this Agreement; and (iii) Purchaser's handling, distribution and/or sale of Inventory as of and after the Delivery Date, unless related to or arising from Claims arising from any defects in the Inventory not caused by Purchaser.

(c) The indemnification obligations of the parties set forth in this Agreement shall survive the termination of this Agreement and the consummation of the purchase and sale of the Transferred Assets.

(d) Any indemnification payment made pursuant to this Section 7.02 shall be treated as an adjustment to the Purchase Price for Tax purposes unless otherwise required by applicable Law.

Section 7.03    THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE 7 SHALL BE ENFORCEABLE REGARDLESS OF WHETHER THE LIABILITY IS BASED UPON PAST, PRESENT OR FUTURE ACTS, CLAIMS OR LEGAL REQUIREMENTS (INCLUDING ANY PAST, PRESENT OR FUTURE FRAUDULENT TRANSFER ACT, PRODUCTS LIABILITY, OR OTHER LEGAL REQUIREMENT) AND REGARDLESS OF WHETHER ANY PERSON (INCLUDING THE PERSON FROM WHOM INDEMNIFICATION IS SOUGHT) ALLEGES OR PROVES THE SOLE,



CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE PERSON SEEKING INDEMNIFICATION OR THE SOLE OR CONCURRENT STRICT LIABILITY IMPOSED UPON THE PERSON SEEKING INDEMNIFICATION.

Section 7.04    Certain Limitations.  Notwithstanding anything in this Agreement to the contrary:

(a)  Except in the event of fraud, no Related Person of Seller shall have any personal liability to Purchaser or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Seller in this Agreement and no Related Person of Purchaser shall have any personal liability to Seller or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Purchaser in this Agreement; and

Section 7.05    Procedures for Indemnification.

(a)  Whenever a Claim shall arise for indemnification under Section 7.02(a) or Section 7.02(b) of this Agreement, the Person entitled to indemnification (the "**Indemnified Party**") shall promptly notify in writing the Party from which indemnification is sought (the "**Indemnifying Party**") of such Claim and, when known, the facts constituting the basis of such Claim, and shall provide the Indemnifying Party a reasonable opportunity to cure the Claim (a "reasonable opportunity" shall in no event be longer than thirty (30) days).  In the event of a Claim for indemnification resulting from or in connection with a Claim by a third party, the Indemnified Party shall give such written notice thereof to the Indemnifying Party not later than ten (10) Business Days prior to the time any response to the third party Claim is required, if possible, and in any event within fifteen (15) Business Days following receipt of notice thereof; provided, that failure to timely notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability it may have to the Indemnified Party, except to the extent that the Indemnifying Party has been actually prejudiced by such failure.  Following receipt of notice of any such third party Claim, and unless counsel to the Indemnifying Party shall have reasonably determined that the assumption of such defense by the Indemnifying Party would be inappropriate due to a conflict of interest, the Indemnifying Party shall have the option, at its sole cost and expense, to assume the defense of such matter and to retain counsel to defend any such Claim or legal proceeding.  The Indemnifying Party shall be liable for and pay all costs related to the defense against such third party Claim incurred by the Indemnified Party (including reasonable and documented fees and expenses of counsel employed by the Indemnified Party but excluding, for the avoidance of doubt, any amounts paid by the Indemnified Party in settlement of such Claim without the express written consent of the Indemnifying Party) for any period during which the Indemnifying Party has not assumed the defense of such third party Claim and has agreed that it is obligated to indemnify the Indemnified Party against such Claim.  The Indemnifying Party shall conduct the defense of any third party Claim actively and diligently and in good faith.  The Indemnified Party shall have the option of joining the Indemnifying Party's defense of such Claim (which shall be at the sole cost and expense of the Indemnified Party) with its own counsel and counsel for each Party shall, to the extent consistent with such counsel's professional responsibilities, cooperate with the other Party and any counsel designated by that Party.

(b)  If (i) notice is given to the Indemnifying Party of the commencement of any third party legal proceeding and the Indemnifying Party does not, within thirty (30) days after the Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such legal proceeding; (ii) the Indemnifying Party fails to conduct the defense of such third party Claim actively and diligently and in good faith (in the reasonable determination of the Indemnified Party) or (iii) the Indemnifying Party reasonably determines in good faith that joint representation would be inappropriate because of a conflict in interest, then in any such event the Indemnified Party shall (upon notice from the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such third party Claim, and the Indemnifying Party shall



reimburse the Indemnified Party for the costs of defending against such third party Claim (including reasonable and documented attorneys' fees and expenses but excluding, for the avoidance of doubt, any amounts paid by the Indemnified Party in settlement of such Claim without the express written consent of the Indemnifying Party) and shall remain otherwise responsible for any liability with respect to amounts arising from or related to such third party Claim. The Indemnifying Party may elect to participate in such legal proceedings, negotiations or defense at any time at its own expense.

(c)   In effecting the settlement or compromise of, or consenting to the entry of any judgment with respect to, any third party Claim, the Indemnifying Party, or the Indemnified Party, as the case may be, shall act in good faith, shall consult with the other Party and shall enter into only such settlement or compromise or consent to the entry of any judgment as the other Party shall consent, such consent not to be unreasonably withheld, conditioned or delayed. An Indemnifying Party shall not be liable for any settlement, compromise or judgment not made in accordance with the preceding sentence.

## ARTICLE VIII.
## MISCELLANEOUS

Section 8.01    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, or by nationally recognized overnight courier service, or sent via facsimile or email (return receipt requested) at the addresses (or at such other address for a Party as shall be specified by like notice) set forth below. If delivered personally, notice shall be deemed received when delivered, and if delivered  by nationally recognized overnight courier service, or sent via facsimile or email (return receipt requested) shall and deemed received by the Party 48 hours after mailing, or sending the facsimile or e-mail.

(a)   If to the Seller, to:

Schawbel Technologies, LLC.

67 Bedford Street, Suite 400 W

Burlington MA 01803
Attention: William Schawbel
Facsimile:
Email: bill@schawbeltech.com

b)   If to Purchaser, to:

Heat Factory, USA, Inc.

1958 Kellogg Ave.

Carlsbad, CA 92008
Attention: David Treptow
Facsimile: 760-893-8301
Email:  dave@heatfactoryusa.com

with a copy to:

Murtaugh Meyer Nelson & Treglia LLP

2603 Main Street, 9th Fl.

Irvine, CA 92614

Attention: Michelle Generaux
Facsimile: 949-794-4099

Exhibit A, Page 79

Email: mgeneraux@mmnt.com

Section 8.02    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.03    Assignment.  Neither this Agreement nor any of the Parties' rights or obligations hereunder shall be assignable by any Party without the prior written consent of the other Party, and any such assignment without such consent shall be void and ineffective.

Section 8.04    Costs of Collection.  In the event that Purchaser shall fail to pay any installment of the Cash Purchase Price when due, interest on such payment, calculated at an annual compounded rate of fifteen percent (15%), shall accrue and be payable by Purchaser and Seller also shall be entitled to reimbursement by Purchaser of all costs incurred by Seller in collecting from Purchaser (including all reasonable fees of counsel to Seller).

Section 8.05    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement and any Claim, controversy or dispute arising under or in relation to this Agreement or the relationship of the Parties shall be governed by and construed in accordance with the Laws of the Commonwealth of Massachusetts, without regard to any conflict of Laws principles thereof that would require or permit the application of the Law of another jurisdiction. Each of the Parties hereto acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in respect of any litigation directly or indirectly arising or relating to this Agreement or the transactions contemplated by this Agreement. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  This consent to jurisdiction is being given solely for purposes of this Agreement and the transactions contemplated hereunder, and is not intended to, and shall not, confer consent to jurisdiction with respect to any other dispute in which a Party to this Agreement may become involved. Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action, or proceeding by the mailing of a copy thereof in the manner specified by the provisions of Section 9.01.

Section 8.06    Counterparts.  This Agreement may be executed in two (2) or more counterparts, and by facsimile, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 8.07    Amendments.  This Agreement may not be amended, waived or modified except by an instrument in writing signed on behalf of each of Purchaser and Seller.

Section 8.08    Entire Agreement.  This Agreement and the Ancillary Agreements and the Schedules constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement.  No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party.  Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

Section 8.09    No Waivers.  Except as otherwise expressly provided in this Agreement, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by any Party and no course of dealing between the Parties, shall constitute a waiver of any such right, power or remedy. No waiver by a Party of any default, misrepresentation, or breach of warranty or covenant under this Agreement, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant under this Agreement or affect in any way any

rights arising by virtue of any prior or subsequent such occurrence.  No waiver shall be valid unless in writing and signed by the Party against whom such waiver is sought to be enforced.

Section 8.10    Attorney Fees and Costs.  In the event of any controversy, Claim or dispute between the parties to this Agreement, arising out of or relating to this Agreement, its enforcement or interpretation, or any breach of any provision of this Agreement, the prevailing party, in addition to its other remedies, shall be entitled to recover from the losing party the prevailing party's reasonable expenses, attorney fees, and costs, including those incurred on appeal and for enforcement of an award or judgment.

Section 8.11    Severability.  If any provision of this Agreement is determined by a Court of competent jurisdiction to be unenforceable, the remaining provisions shall continue in full force and effect.

Section 8.12    Successors.  This Agreement shall be binding upon and inure to the benefit of the heirs, and permitted successors and assigns of the parties of the Agreement.

*[signatures on next page]*



IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized Representative as of the Effective Date.

**SELLER:**

Schawbel Technologies LLC.

By:_____

Name:

Title:

**PURCHASER:**

Heat Factory, USA, Inc.

By: _David Treptow_                 7-19-17

Name:  David Treptow

Title: President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized Representative as of the Effective Date.

**SELLER:**

Schawbel Technologies LLC.

By: _____

Name:

Title:  C.E.O.


**PURCHASER:**

Heat Factory, USA, Inc.


By: _____

Name:  David Treptow

Title: President

Asset Purchase Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Schedule A | Inventory | x |
| Schedule A-1 | Inventory True-Up Value | x |
| Schedule B | UPC Codes | x |
| Schedule C | Certifications | x |
| Exhibit 2.08(a) | Assignment of Intangible Assets | x |
| Exhibit 2.08(c) | Seller's Authority | x |
| Exhibit 2.08(e) | Seller's Bill of Sale | x |
| Exhibit 2.08(f) | Letters from President of Schawbel Corporation | x |
| Exhibit 2.09(c) | Purchaser's Authority | x |
| Schedule 3.06 | Inventory Claims | x |
| Schedule 3.12 | Seller's Insurance | x |
| Schedule 4.03(c) | Purchaser Governmental Approvals | x |

Schedules and Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC Asset Purchase Agreement

Buyer          Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753

Exhibit A, Page 84

Asset Purchase Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Schedule A | Inventory | x |
| Schedule A-1 | Inventory True-Up Value | x |
| Schedule B | UPC Codes | x |
| Schedule C | Certifications | x |
| Exhibit 2.08(a) | Assignment of Intangible Assets | x |
| Exhibit 2.08(c) | Seller's Authority | x |
| Exhibit 2.08(e) | Seller's Bill of Sale | x |
| Exhibit 2.08(f) | Letters from President of Schawbel Corporation | x |
| Exhibit 2.09(c) | Purchaser's Authority | x |
| Schedule 3.06 | Inventory Claims | x |
| Schedule 3.12 | Seller's Insurance | x |
| Schedule 4.03(c) | Purchaser Governmental Approvals | x |

Schedules and Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Asset Purchase Agreement

_____     _____
Buyer                        Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753