# EXHIBIT B

1  ALLEN MATKINS LECK GAMBLE
      MALLORY & NATSIS LLP
2  TIMOTHY M. HUTTER (BAR NO. 267949)
   DAVID E. ARON (BAR NO. 306419)
3  One America Plaza
   600 West Broadway, 27th Floor
4  San Diego, California 92101-0903
   Phone:  (619) 233-1155
5  Fax:  (619) 233-1158
   E-Mail:  thutter@allenmatkins.com
6           daron@allenmatkins.com

7  Attorneys for Defendant
   SCHAWBEL TECHNOLOGIES, LLC,
8  a Massachusetts limited liability company

9

10          **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

11                       **NORTH COUNTY DIVISION**

12  HEAT FACTORY USA, INC., a California        Case No. 37-2018-00002727-CU-BC-NC
    corporation,
13                                               Judge Ronald F. Frazier
                  Plaintiff,                     Department N-29
14
         v.                                      Complaint Filed January 18, 2018
15
    SCHAWBEL TECHNOLOGIES, LLC, a               **ANSWER TO COMPLAINT FOR:**
16  Massachusetts limited liability company;    1)  **BREACH OF CONTRACT**
    and DOES 1 through 50,                      2)  **FRAUD**
17                                               3)  **NEGLIGENT MISREPRESENTATION**
                  Defendants.                    4)  **EXPRESS INDEMNITY**
18                                               5)  **INTENTIONAL INTERFERENCE**
                                                     **WITH PROSPECTIVE ECONOMIC**
19                                                   **ADVANTAGE**
                                                 6)  **DECLARATORY RELIEF**
20
                                                 **IMAGED FILE**
21
                                                 TRIAL:     February 8, 2019
22

23

24

25

26

27

28

Defendant Schawbel Technologies, LLC ("Schawbel"), for itself alone, hereby answers the Complaint of Heat Factory USA, Inc. ("Plaintiff"). Schawbel answers by admitting, denying and alleging as follows:

## GENERAL DENIAL

Pursuant to the provisions of California Code of Civil Procedure Section 431.30(d), Schawbel files this general denial to said Complaint, and answering each and all of the allegations of the Complaint, Schawbel denies, generally and specifically, each and every allegation thereof. Schawbel further denies, generally and specifically, that Plaintiff has been damaged in any sum, or at all, by reason of any alleged act or omission on the part of Schawbel, or on the part of any of Schawbel's agents, servants or employees.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.     That the Complaint, and each cause of action contained therein, fails to state facts sufficient to constitute a cause of action against Schawbel, and there do not exist facts sufficient to satisfy the elements of the claims alleged by the Complaint.

## SECOND AFFIRMATIVE DEFENSE

### (No Cause in Fact or Proximate Cause)

2.     No act or omission of Schawbel alleged in the Complaint was the cause in fact or proximate cause of Plaintiff's damages, if any.

## THIRD AFFIRMATIVE DEFENSE

### (Performance and Discharge)

3.     Schawbel has performed and discharged any and all obligations and legal duties arising out of the matters alleged in the Complaint, except those matters as to which performance has been excused.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874350.01/SD
943500<sub></sub>

Exhibit B, Page 668

## FOURTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

4. Plaintiff failed to exercise reasonable care and diligence to avoid loss and minimize or mitigate the alleged damages, if any, that the Plaintiff claims to have suffered. The Plaintiff's alleged damages are therefore barred, in whole or in part, because Plaintiff has failed to mitigate its damages, if any, as required by law.

## FIFTH AFFIRMATIVE DEFENSE

### (Failure to Plead with Particularity)

5. Plaintiff's claims for fraud and negligent misrepresentation should be dismissed for failure to plead the alleged fraud or misrepresentation with the requisite particularity.

## SIXTH AFFIRMATIVE DEFENSE

### (Acquiescence)

6. The Plaintiff, by its conduct and/or the conduct of its agents, has acquiesced to the conduct of Schawbel, and is therefore barred from maintaining this action.

## SEVENTH AFFIRMATIVE DEFENSE

### (Consent)

7. The Plaintiff consented to and approved all of the acts and omissions about which the Plaintiff now complains. Accordingly, the Plaintiff is barred from pursuing this action.

## EIGHTH AFFIRMATIVE DEFENSE

### (Justification)

8. The conduct of Schawbel in regard to the matters alleged in the Complaint was justified, and by reason of the foregoing, the Plaintiff is barred from any recovery thereon.

## NINTH AFFIRMATIVE DEFENSE

### (Actions in Good Faith)

9. Schawbel acted in good faith in any and all interactions with the Plaintiff and did not directly or indirectly perform any acts whatsoever which would constitute a violation of any rights of the Plaintiff or any obligation owed to the Plaintiff.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874350.01/SD
9435008v1

-3-
ANSWER TO COMPLAINT

Exhibit B, Page 669

## TENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

10.     Plaintiff engaged in careless, negligent, and other wrongful conduct, and should therefore be barred from recovering any relief against Schawbel by the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Laches)

11.     Each and every claim for relief and allegation set forth in the Complaint is barred by the doctrine of laches.

## TWELFTH AFFIRMATIVE DEFENSE

### (Estoppel)

12.     Plaintiff is estopped from asserting the claims described in the Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Plaintiff's Breach)

13.     Plaintiff is barred from any recovery against Schawbel due to Plaintiff's own material breaches and failure to perform its obligations.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Third Parties)

14.     Without admitting that Plaintiff suffered any losses or damages, the damages sought by the Complaint were caused, in whole or in part, by third parties, and not by Schawbel.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Waiver, Excuse, and Release)

15.     Any purported obligation alleged in the Complaint which Schawbel may have owed to Plaintiff has been excused, released, or waived.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Offset)

16.     Each and every allegation and claim for relief set forth in the Complaint must be offset by amounts owed by, or claims against, Plaintiff.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874350.01/SD
945009v1

# SEVENTEENTH AFFIRMATIVE DEFENSE

## (Damages Speculative and Indeterminable)

17.     Without admitting that Plaintiff was in any way damaged, the damages, if any, of Plaintiff are speculative, uncertain, and not capable of determination by any finder of fact.

# EIGHTEENTH AFFIRMATIVE DEFENSE

## (Reservation of Additional Affirmative Defenses)

18.     Schawbel alleges that it presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, defenses available. Schawbel reserves the right to assert additional affirmative defenses in the event discovery or an investigation indicates that it would be appropriate.

WHEREFORE, Schawbel prays for an award as follows:

1.      That Plaintiff take nothing by reason of its Complaint;

2.      That an award be entered in favor of Schawbel and against Plaintiff and that the Complaint be dismissed with prejudice in its entirety;

3.      That Schawbel be awarded costs of suit herein; and

4.      For such other and further relief as the Court may deem just and proper.

Dated: August 20, 2018

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP


By: _____
TIMOTHY M. HUTTER
DAVID E. ARON
Attorneys for Defendant
SCHAWBEL TECHNOLOGIES, LLC,
a Massachusetts limited liability company

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874350.01/SD
9435008v1

1  ALLEN MATKINS LECK GAMBLE
     MALLORY & NATSIS LLP
2  TIMOTHY M. HUTTER (BAR NO. 267949)
   DAVID E. ARON (BAR NO. 306419)
3  One America Plaza
   600 West Broadway, 27th Floor
4  San Diego, California 92101-0903
   Phone: (619) 233-1155
5  Fax: (619) 233-1158
   E-Mail: thutter@allenmatkins.com
6        daron@allenmatkins.com

7  Attorneys for Defendant and Cross-Complainant
   SCHAWBEL TECHNOLOGIES LLC,
8  a Massachusetts limited liability company

9

10          **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

11                      **NORTH COUNTY DIVISION**

| | |
|---|---|
| 12  HEAT FACTORY USA, INC., a California corporation, | Case No. 37-2018-00002727-CU-BC-NC |
| 13                Plaintiff, | Judge Ronald F. Frazier Department N-29 |
| 14         v. | Complaint Filed January 18, 2018 |
| 15  SCHAWBEL TECHNOLOGIES, LLC, a | **SCHAWBEL TECHNOLOGIES LLC'S** |
| 16  Massachusetts limited liability company; and DOES 1 through 50, | **CROSS-COMPLAINT FOR:** **1) BREACH OF CONTRACT** **(ASSET PURCHASE AGREEMENT)** |
| 17                Defendants. | **2) BREACH OF CONTRACT** **(LICENSE AGREEMENT)** |
| 18 | **3) PATENT INFRINGEMENT** **(35 U.S.C. § 281)** |
| 19  SCHAWBEL TECHNOLOGIES LLC, a Massachusetts limited liability company, | **4) DECLARATORY JUDGMENT** **(28 U.S.C. § 2201 - ASSET PURCHASE** **AGREEMENT)** |
| 20                Cross-Complainant, | **5) DECLARATORY JUDGMENT** **(28 U.S.C. § 2201 - LICENSE** **AGREEMENT)** |
| 21         v. | |
| 22  HEAT FACTORY USA, INC., a California | **IMAGED FILE** |
| 23  corporation; and ROES 1 through 20, inclusive, | |
| 24                Cross-Defendants. | TRIAL:    February 8, 2019 |
| 25 | |

26

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT                    Exhibit B, Page 672

1    Cross-Complainant, Schawbel Technologies LLC ("Schawbel") brings this Cross-

2    Complaint against Cross-Defendant, The Heat Factory USA, Inc. ("Heat Factory"), to recover

3    money damages resulting from Heat Factory's failure to pay all amounts owed pursuant to an

4    Asset Purchase Agreement (the "APA") between the parties.  As a result of Heat Factory's failure

5    to pay the amounts due under the APA, Schawbel had the right to terminate a separate Exclusive

6    Patent License Agreement (the "License Agreement") between the parties.  Schawbel terminated

7    the License Agreement on January 31, 2018, based upon Heat Factory's breach of the APA.  In

8    addition, Schawbel brings this Cross-Complaint to recover money damages resulting from Heat

9    Factory's failure to pay royalty payments owed pursuant to the License Agreement.  Schawbel

10    provided a separate notice of the termination of the License Agreement on July 10, 2018, for

11    failure to make royalty payments due under the License Agreement.  Because Heat Factory

12    disputes that the conditions necessary for termination of the License Agreement have been

13    satisfied for either of its independent breaches of the License Agreement, Schawbel further seeks a

14    declaration from this Court that the License Agreement is terminated.  Finally, Schawbel seeks

15    monetary and injunctive relief against Heat Factory arising from Heat Factory's continued

16    violation of Schawbel's patent rights following the termination of the License Agreement with

17    respect to 19 U.S. Patents owned by Schawbel, as set forth further below.  Schawbel further

18    alleges as follows:

19                                                  **PARTIES**

20        1.       Schawbel is now and at all times mentioned herein was, a Massachusetts limited

21    liability company duly organized and existing under and by virtue of the laws of the

22    Commonwealth of Massachusetts.[1]

23        2.       Schawbel is informed and believes and thereupon alleges that Heat Factory USA,

24    Inc. ("Heat Factory"), is and was at all times relevant hereto a corporation organized under the

25    laws of the state of Nevada, authorized to do business and doing business in California.

26

27    ─────────────────

28    [1]   Schawbel had a previous principal place of business located at 2400 District Avenue,
          Burlington, Massachusetts, as referenced in the APA and License Agreement.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v.1

3.     The true names and capacities, whether individual, corporate, associate, or otherwise, of cross-defendants named herein as Roes 1 through 20, inclusive, are unknown to Schawbel, who therefore sues said cross-defendants by such fictitious names. Schawbel is informed and believes and thereon alleges that each of the cross-defendants designated herein as a Roe is legally responsible in some manner for the acts, omissions, and events alleged herein and proximately caused damages and injury as herein alleged. Schawbel will seek leave to amend this Cross-Complaint to show the true names and capacities of such fictitiously named cross-defendants when the same have been ascertained.

4.     Schawbel is informed and believes and thereupon alleges that at all times mentioned herein, each of the cross-defendants was and now is the agent, servant, employee, partner, principal, representative, and/or alter ego of each of the remaining cross-defendants and was acting within the course and scope of their authority as such agent, servant, employee, partner, principal, representative, and/or alter ego with the permission and consent of the remaining cross-defendants.

## JURISDICTION AND VENUE

5.     The United States District Courts have jurisdiction over this action: pursuant to 28 U.S.C. §§ 1331 and 1338(a), which confers subject matter jurisdiction over claims relating to patents; pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between the parties and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and pursuant to 28 U.S.C. § 2201.

6.     The District Court for the District of Massachusetts may exercise personal jurisdiction over Heat Factory because, as described in further detail below, the APA and License Agreement were negotiated in Massachusetts, Heat Factory contracted to do business in Massachusetts, and Heat Factory sells goods in Massachusetts.

7.     Alternatively, the District Court for the Southern District of California may exercise personal jurisdiction over Heat Factory because Heat Factory's principal place of business is located in Carlsbad, California.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

8. Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Schawbel's claims occurred in the District of Massachusetts. In addition, pursuant to Section 8.05 of the APA, and Section 12.8 of the License Agreement, the parties agreed that both agreements are governed by the laws of the Commonwealth of Massachusetts.

9. Alternatively, venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1391(b)(1) because the Cross-Defendant resides in Carlsbad, which is within the Southern District of California pursuant to 28 U.S.C. § 84(d).

## GENERAL ALLEGATIONS

### THE ASSET PURCHASE AGREEMENT

10. Schawbel is the owner of certain United States and international patents related to the design of heated insoles and related heating products.

11. Previously, Schawbel was in the business of manufacturing, marketing, distributing and selling heated insoles and related heating products under the trademarked business name of ThermaCELL. These products incorporate patented technology set forth in the claims of a series of patents issued to Schawbel in the United States and internationally.

12. Heat Factory is in the business of warmer technology, accessories, and manufacturing, marketing, and sale of hand warmers, body warmers, foot warmers, and other heated products.

13. Upon information and belief, Heat Factory products, including products which incorporate the patented technology referenced herein, are sold in Massachusetts.

14. On July 18, 2017, Schawbel and Heat Factory executed the APA.

15. Pursuant to the terms of the APA, Schawbel agreed to sell to Heat Factory certain heated insoles, battery packs, and related heating products it had in inventory as further detailed on Schedule A of the APA (the "Inventory"). Included in the Inventory are products which incorporate, *inter alia*, the technology claimed in the Patents. A true and accurate copy of the APA and Schedule A is attached as Exhibit 1 hereto.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

-4-

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT    Exhibit B, Page 675

16. Pursuant to Section 2.02 of the APA, Heat Factory agreed to pay Schawbel $3,700,000 (the "Purchase Price") for the Inventory according to the following schedule:

| | |
|---|---|
| $300,000 | Payable on or before October 10, 2017 |
| $450,000 | Payable on or before November 10, 2017 |
| $500,000 | Payable on or before December 10, 2017 |
| $600,000 | Payable on or before January 10, 2018 |
| $600,000 | Payable on or before February 10, 2018 |
| $550,000 | Payable on or before March 10, 2018 |
| $550,000 | Payable on or before April 10, 2018 |
| $150,000 | Payable on or before May 10, 2018 |

17. Heat Factory failed to make timely or complete payment on December 10, 2017, and failed to make any payment on January 10, 2018, pursuant to the terms of the APA.

18. As of the date of this Cross-Complaint, Heat Factory also has not made any of the scheduled payments due between February 10, 2018, and May 10, 2018, totaling $1,850,000, as required under 2.02 of the APA.

19. Pursuant to Section 8.10 of the APA, the prevailing party in any lawsuit arising under the APA is entitled to recover its attorneys' fees and costs from the other party.

## THE EXCLUSIVE PATENT LICENSE AGREEMENT

20. On July 18, 2017, Schawbel and Heat Factory also executed the License Agreement.

21. Pursuant to the terms of the License Agreement, Schawbel agreed to provide an exclusive license to Heat Factory of certain patents, technological information, and general know-how (the "Patents").[2]

---

[2] The Schawbel patents at issue in this matter include the following U.S. Patents: 8,850,716, 8,869,428, 8,869,429, 9,101,177, 9,179,734, 9,314,064, 9,538,806, 9,538,807, 9,548,618, 9,549,586, and 9,572,397, and the following U.S. design patents: D717504, D722222, D724013, D734012, D737769, D772546, D794813 and D801624. Each of these patents is included in the subject transaction, as referenced on Exhibit C to the License Agreement.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

Exhibit B, Page 676

22.     The parties specifically identified the Patents in Exhibit C to the License Agreement.  The series of Patent claims relates to heated insole technology for footwear, including the heated insoles, heated shoes incorporating the insoles, battery packs, Wifi and Bluetooth technology to be utilized in conjunction with and as part of the heated insoles and other related technology.  A true and accurate copy of the License Agreement and Exhibit C is attached hereto as Exhibit 2.

23.     According to Section 2.1(a)(i) of the License Agreement, Schawbel also granted Heat Factory the exclusive right to make and sell so-called "Products," which, "absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents."

24.     According to Section 3.1 of the License Agreement, beginning on January 1, 2018, Heat Factory was required to remit monthly royalty payments to Schawbel, which were calculated as a percentage of net sales of Inventory and new products using the technology claimed in the Patents.

25.     According to Section 3.2 of the License Agreement, Heat Factory guaranteed an aggregate minimum royalty payment totaling $300,000 to be payable monthly, commencing on January 15, 2018 and continuing until June 15, 2018 (the "Minimum Royalty").

26.     Heat Factory agreed to pay Schawbel the Minimum Royalty according to the following schedule:

| $50,000  | Payable on January 15, 2018  |
| $100,000 | Payable on February 15, 2018 |
| $150,000 | Payable on March 15, 2018    |
| $200,000 | Payable on April 15, 2018    |
| $250,000 | Payable on May 15, 2018       |
| $300,000 | Payable on June 15, 2018      |

Throughout this Cross-Complaint, wherever the term "Patent" is used, it shall refer to each of these U.S. Patents. *See also* Tables 1 and 2, *infra.*

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

27. Heat Factory paid only the first $50,000 Minimum Royalty Payment due on January 15, 2018. To date, it has not paid any portion of the Minimum Royalty Payments due between February 15 and June 15, 2018, leaving a total unpaid balance of $250,000 on the Minimum Royalties due under the License Agreement.

28. Section 3.4 of the License Agreement provides that if any Minimum Royalty is not paid within three days of the applicable due date, after five days' written notice to Heat Factory, the unpaid Minimum Royalty shall be considered an "Overdue Payment" and shall bear interest of 15% running from the applicable due date.

29. Pursuant to Section 9.4(a) of the License Agreement, Schawbel may terminate the License Agreement as a result of Heat Factory's failure to make any Minimum Royalty payment, and each Overdue Payment constitutes an independent default of the agreement.

30. In addition to the Minimum Royalty payment, pursuant to the terms of the License Agreement, Heat Factory was required to remain current in its payments to Schawbel under the terms of the APA.

31. Pursuant to Section 9.4(a) of the License Agreement, Schawbel may terminate the License Agreement as a result of Heat Factory's failure to pay pursuant to the terms of the APA.

32. Section 9.4(a) provides that Schawbel may immediately terminate the License Agreement for Heat Factory's failure to make any required payment, be it an APA payment or a Minimum Royalty payment, after 30 days' written notice of default.

33. In addition to the termination provisions for any one required payment, Section 9.4(a) also provides that, "if [Heat Factory] has two (2) or more Overdue Payments and/or APA Nonpayments within any consecutive twelve (12) months period, [Schawbel] shall be entitled to terminate [the License Agreement] effective immediately upon written notice . . . ."

34. Pursuant to Section 9.6 of the License Agreement, "upon termination . . . all Royalties and other payments accrued and due to [Schawbel] as of the termination date shall become immediately due and payable within thirty (30) calendar days."

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

Exhibit B, Page 678

35. Also pursuant to Section 9.6, upon termination of the License Agreement, Heat Factory "shall cease, and shall cause its Affiliates to cease, all production, use and Sales of Productions upon such termination," except as set forth in Section 9.7.

36. Section 9.7 permits Heat Factory to "complete and sell any work-in-progress and [I]nventory of Products on hand or ordered that exist as of the effective date of termination," however, this right is expressly conditioned upon Heat Factory's agreement to pay Schawbel "the applicable Royalty or other amounts due on such Net Sales in accordance with the terms and conditions" of the License Agreement. In short, if Heat Factory fails to pay all amounts due under the License Agreement, then the License Agreement is not only automatically terminated, but Heat Factory also forfeits the right to complete and sell any new products or Inventory.

37. The Parties also agreed that the prevailing party in any lawsuit arising under the License Agreement is entitled to recover its attorneys' fees and costs from the other party.

## FIRST CAUSE OF ACTION

## (BREACH OF CONTRACT – ASSET PURCHASE AGREEMENT)

38. Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Cross-Complaint as if fully set forth herein.

39. Heat Factory entered into the APA with Schawbel to purchase the Inventory.

40. Schawbel delivered the Inventory to Heat Factory in accordance with the terms of the APA and has at all times performed the other terms of the APA in the manner specified by the APA, except insofar as such performance was excused, waived, and/or prevented by Heat Factory's own non-performance, material breaches, or other actions or conduct.

41. According to the terms of the APA, Heat Factory was required to pay the Purchase Price according to the schedule of payments as set forth in Section 2.02.

42. Heat Factory was required to pay Schawbel $500,000 on or before December 10, 2017 (the "December Payment").

43. Heat Factory failed to remit the entire December Payment to Schawbel pursuant to the terms of the APA.

44. Instead, Heat Factory untimely paid only $352,477.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

45. On December 11, 2017, Schawbel demanded payment for the December Payment.

46. As of the date of this filing, Schawbel has not received the December Payment as required under the terms of the APA.

47. Heat Factory was required to pay Schawbel $600,000 on or before January 10, 2018 (the "January Payment").

48. Heat Factory failed to remit the January Payment to Schawbel on January 10, 2018.

49. On January 13, 2018, Schawbel demanded the January Payment.

50. As of the date of this filing, Schawbel has not received the January Payment.

51. As a result of Heat Factory's failure to make full payment according to the terms of the APA, Heat Factory owes Schawbel approximately $747,000, as indicated in the December 11, 2017, and January 13, 2018, default notices (the "Outstanding APA Default Amount"), plus interest, costs, and attorneys' fees.

52. Heat Factory has breached the APA by failing and refusing to pay to Schawbel the Outstanding APA Default Amount.

53. According to Section 2.02 of the APA, additional Purchase Price payments, totaling $1,850,000, were due on February 10, 2018; March 10, 2018; April 10, 2018; and May 10, 2018 (the "Additional Payments Due").

54. Heat Factory's failure to pay all or any of the Additional Payments Due has resulted in additional breaches of the APA, for which Schawbel will be entitled to recovery.

55. As a result of Heat Factory's non-payment and breaches of the terms of the APA, Schawbel has suffered damages and will continue to suffer damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

### (BREACH OF CONTRACT – LICENSE AGREEMENT)

56. Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Cross-Complaint as if fully set forth herein.

57. Heat Factory entered into the License Agreement with Schawbel to make, use, and sell the Inventory and Products, and to use Schawbel's patents, technological information and

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

Exhibit B, Page 680

1  know-how in doing so, pursuant to the terms of the license provided through the License

2  Agreement.

3       58.    Heat Factory has in fact made, used, and sold the Inventory and Products, and used

4  Schawbel's Patents, technological information and know-how in accordance with the terms of the

5  License Agreement.

6       59.    Schawbel has at all times performed the terms of the License Agreement in the

7  manner specified by the License Agreement, except insofar as such performance was excused,

8  waived, and/or prevented by Heat Factory's own non-performance, material breaches, or other

9  actions or conduct..

10      60.    According to the terms of the License Agreement, Heat Factory was required to

11  make Minimum Royalty payments according to the schedule of payments as set forth in Section

12  3.2.

13      61.    Heat Factory was required to pay Schawbel $50,000 on or before February 15,

14  2018 (the "February Minimum Royalty"), with a grace period up to February 18, 2018.

15      62.    Heat Factory failed to remit the February Minimum Royalty to Schawbel pursuant

16  to the terms of the License Agreement.

17      63.    On February 20, 2018, Schawbel gave written notice to Heat Factory that it had not

18  paid the February Minimum Royalty.

19      64.    Heat Factory failed to remit the February Minimum Royalty to Schawbel within

20  five days of Schawbel's written notice.

21      65.    Heat Factory also failed to remit the February Minimum Royalty to Schawbel,

22  together with interest thereon, within 30 days of Schawbel's written notice.

23      66.    On July 10, 2018, Schawbel provided written notice to Heat Factory that, as a result

24  of its failure to pay the February Minimum Royalty and failure to cure that failure within 30 days,

25  the License Agreement was terminated pursuant to Section 9.4(a).

26      67.    As of the date of this filing, Schawbel has not received the February Minimum

27  Royalty as required under the terms of the License Agreement.

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

-10-

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 681

68.     As of the date of this filing, Schawbel has also not received any other Minimum Royalty payments that were required under the License Agreement, including the payments that were due in March, April, May, and June 2018.

69.     As a result of Heat Factory's failure to make payment according to the terms of the License Agreement, Heat Factory owes Schawbel at least $250,000 in unpaid Minimum Royalties as of the date of this Cross-Complaint, plus interest, costs, and attorneys' fees.

70.     As a result of Heat Factory's non-payment and breaches of the terms of the License Agreement, Schawbel has suffered damages and will continue to suffer damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (PATENT INFRINGEMENT – 35 U.S.C. § 281 – THE LICENSE AGREEMENT)

71.     Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Cross-Complaint as if fully set forth herein.

72.     As the parties acknowledged and agreed in the License Agreement, Schawbel is the owner of the Patents.

73.     As set forth above, pursuant to the transfer provisions of the APA, Heat Factory acquired from Schawbel a substantial amount of Inventory, including thousands of ThermaCELL heated insoles and related products that incorporate the technology claimed in the Patents, including: (1) Heated Insoles; (2) Heated Insoles ProFLEX; (3) ProFLEX Replacement Batteries; (4) Heated Insoles ProFLEX HD (Heavy Duty); (5) ProFLEX XB Battery Packs, (6) Hand Warmers; and (7) Pocket Warmers (*see* APA Schedules A and A-1 for these and other infringing products). Each of these products is the subject matter of one or more claims of the Patents, as listed in Tables 1 and 2. True and accurate copies of the 19 patents referenced in Tables 1 and 2 are attached hereto as Exhibits 3-21.

**Table 1**

| U.S. Patent No. | Title | Claims Asserted | Infringing Product |
|---|---|---|---|
| 8,850,716 | Heated Insole Remote Control System | 1-16 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

| | U.S. Patent No. | Title | Claims Asserted | Infringing Product |
|---|---|---|---|---|
| | | | | 3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| | 8,869,428 | Heated Insole with Removable and Rechargeable Battery | 1-25 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br>5. ProFLEX XB Battery Packs |
| | 8,869,429 | Heated Insole with Removable and Rechargeable Battery | 1-12 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br><br>5. ProFLEX XB Battery Packs |
| | 9,101,177 | Remove Control Wireless Heated Insole Systems | 1-15 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br><br>5. ProFLEX XB Battery Packs |
| | 9,179,734 | Heated Insole with Removable and Rechargeable Battery | 1-28 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br><br>5. ProFLEX XB Battery Packs |
| | 9,314,064 | Heated Insole with Removable Heating Assembly (continuation of No. 8,869,428) | 1-15 | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>3. ProFLEX Replacement Battery<br>4. ProFLEX HD Heated Insoles<br><br>5. ProFLEX XB Battery Packs |
| | 9,538,806 | Shoe with Heated Insole | 1-21 | 1. Heated Insoles ProFLEX |
| | 9,538,807 | Assembly for Inclusion in a Heated Insole | 1-17 | 1. Heated Insoles ProFLEX |
| | 9,548,618 | Heated Insoles | 1-14 | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| | 9,549,586 | Battery for use with Heated Insole | 1-14 | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| | 9,572,397 | Heated Insoles with Removable Assembly (continuation of No. 8,869,428) | 1-11 | 1. Heated Insoles ProFLEX<br>2. ProFLEX XB Battery Pack<br>3. ProFLEX Replacement Battery |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 683

874351.01/SD
9435012v1

**Table 2**

| U.S. Patent No. | Title | Claims Asserted | Infringing Product |
|---|---|---|---|
| D719,504 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D722,222 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D724,013 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D734,012 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D737,769 | Battery pack for an Insole | Claim | 1. ProFLEX XB Battery Pack<br>2. ProFLEX Replacement Battery |
| D772,546 | Insole | Claim | 1.Heated Insoles<br>2. ProFLEX Heated Insoles<br>4. ProFLEX HD Heated Insoles |
| D794,813 | Heat Pack | Claim | 6. Hand Warmers<br>7. Pocket Warmers |
| D801,624 | Heat Pack | Claim | 6. Hand Warmers<br>7. Pocket Warmers |

74. According to Section 9.4(a) of the License Agreement, because Heat Factory failed to make two required payments under the APA within the previous 12 months, Schawbel was entitled to immediately terminate the License Agreement.

75. According to Section 9.4(a) of the License Agreement, because Heat Factory failed to make Minimum Royalty payments under the License Agreement when due and payable, Schawbel also had the right, independent of the termination based on the APA non-payments, to immediately terminate the License Agreement after providing notice.

76. On January 31, 2018, Schawbel delivered a letter to Heat Factory exercising its rights to terminate the License Agreement pursuant to Section 9.4(a) (the "APA Non-Payment Termination Notice"). A true and accurate copy of the APA Non-Payment Termination Notice is attached hereto as Exhibit 22.

77. On July 10, 2018, Schawbel delivered a letter to Heat Factory exercising its rights to terminate the License Agreement pursuant to Section 9.4(a) (the "Royalty Non-Payment

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 684

874351.01/SD
9435012v1

1  Termination Notice"). A true and accurate copy of the Royalty Non-Payment Termination Notice

2  is attached hereto as Exhibit 23.

3      78.    As a result of the termination of the License Agreement, Heat Factory was required

4  to cease all use of the Patents. Further, as a result of the termination, pursuant to Section 9.6 of

5  the License Agreement, Heat Factory also was obligated to "cease . . . all production, use and

6  Sales of Products. . . . ."

7      79.    As a result of the termination of the License Agreement, pursuant to Section 9.6, all

8  outstanding royalties and other payments became immediately due and payable within thirty (30)

9  days.

10     80.    Heat Factory has not paid any outstanding royalties or other payments due within

11 thirty days of the dates of either Termination Notice. Further, upon information and belief, Heat

12 Factory has no intention of paying the royalties due Schawbel under the License Agreement and,

13 as such, Heat Factory has forfeited any right it may have had under Section 9.7 of the License

14 Agreement to continue sales of work-in-progress and Inventory on hand upon termination of the

15 agreement.

16     81.    As a result of the termination of the License Agreement, Heat Factory no longer

17 has any right or authority to use any of the Patents, including the right to continue selling any of

18 the above-referenced products from Inventory that are clearly covered by one or more of the

19 Patents.

20     82.    Nevertheless, despite the termination of the License Agreement and its refusal to

21 remit the requisite royalties as required under Section 9.7 of the License Agreement to continue

22 sales, on information and belief, Heat Factory continues to sell and to offer to sell, without

23 limitation and at the very least, the following products: (1) ProFLEX Heated Insoles; (2) ProFLEX

24 XB Battery Packs; and (3) ProFLEX Replacement Batteries, as indicated in advertisements on the

25 internet, including at the following links:

26     https://www.zulily.com/search?q=Heat+Factory&ref=brandex;

27     https://www.zulily.com/p/thermacell-hand-warmer-heat-packs-5675-51872038.html;

28     https://www.papaswarehouse.com; and

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v.1

-14-
SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT          Exhibit B, Page 685

1  https://www.papaswarehouse.com/collections/thermacell-heated-insoles

2  A true and accurate copy of the website print outs as accessed on August 20, 2018, are attached

3  hereto as Exhibit 24.

4      83.    Upon information and belief, Heat Factory infringes the claims of the Patents listed

5  in Table 1, by virtue of the manufacture, sale and/or offer for sale of the products listed in Table 1.

6      84.    Upon information and belief, Heat Factory infringes the claims of Schawbel's U.S.

7  design patents listed in Table 2, by virtue of the manufacture, sale and/or offer for sale of the

8  products listed in Table 2.

9      85.    Through its conduct, Heat Factory has infringed upon and continues to infringe one

10  or more of the Patents and Schawbel's rights therein.

11      86.    Pursuant to 35 U.S.C. § 283, Schawbel is entitled to an injunction to prevent Heat

12  Factory's continued violation of Schawbel's rights under the Patents.

13      87.    Pursuant to 35 U.S.C. § 284, Schawbel is entitled to an award of damages adequate

14  to compensate it for Heat Factory's infringement, but in no event less than a reasonable royalty for

15  Heat Factory's infringing use of the Patents, together with interest and costs.

16      88.    Heat Factory's infringement of the Patents is knowing, deliberate, willful and

17  without justification in that Heat Factory has been notified by Schawbel of the termination of the

18  License Agreement, but Heat Factory nevertheless continues to cause to be manufactured, and to

19  sell or offer for sale, infringing Products and Inventory which incorporate the patented technology.

20  Schawbel is therefore entitled to recover up to three times the amount found or assessed as

21  damages.  Schawbel is also entitled to recover its reasonable attorneys' fees.

22  **FOURTH CAUSE OF ACTION**

23  **(DECLARATORY JUDGMENT – TERMINATION OF THE LICENSE AGREEMENT**

24  **BASED ON APA NONPAYMENTS)**

25      89.    Schawbel realleges and incorporates by reference the allegations contained in the

26  foregoing paragraphs of this Cross-Complaint as if fully set forth herein.

27      90.    According to the terms of the License Agreement, Heat Factory was required to

28  remain current on payments required by APA.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

91.     As set forth above, Heat Factory failed to make required payments pursuant to the terms of the APA on December 10, 2017, and January 10, 2018.

92.     As a result of the APA Non-Payment Termination Notice sent to Heat Factory on January 31, 2018, the License Agreement was terminated by Schawbel.

93.     As a result of the termination, Heat Factory was required to cease all use of the Patents.

94.     As a result of the termination of the License Agreement, pursuant to Section 9.6, all outstanding royalties and other payments became immediately due and payable within thirty (30) days.

95.     Heat Factory disputes that the conditions necessary for termination of the License Agreement have been satisfied.

96.     Heat Factory also continues to use Schawbel's Patents and continues to cause to be manufactured and/or to sell Products and Inventory incorporating the patented technology without authorization to do so, as set forth above.

97.     Schawbel has been harmed will continue to be harmed by Heat Factory's continued use of the Patents granted pursuant to the License Agreement, and by Heat Factory's continued unauthorized manufacture and/or sale of Products and Inventory incorporating the patented technology.

98.     An actual controversy exists between Schawbel and Heat Factory concerning the termination of the License Agreement and the parties' rights and obligations upon such termination.

99.     For these reasons, Schawbel requests that the Court issue a declaratory judgment (a) that the License Agreement is terminated, (b) that Heat Factory no longer has any right to use Schawbel's Patents, (c) that Heat Factory no longer has any right to use or sell any Products and Inventory incorporating the patented technology, and (4) that all outstanding royalty amounts as of January 31, 2018 are immediately due and payable within thirty (30) days from the Termination Notice.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 687

## FIFTH CAUSE OF ACTION

## (DECLARATORY JUDGMENT - TERMINATION OF THE LICENSE AGREEMENT BASED ON MINIMUM ROYALTY NONPAYMENT)

100.    Schawbel realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Cross-Complaint as if fully set forth herein.

101.    According to the terms of the License Agreement, Heat Factory was required to make Minimum Royalty payments.

102.    As set forth above, Heat Factory failed to make the February Minimum Royalty payment pursuant to the terms of the License Agreement on February 15, 2018, or within the three-day grace period.

103.    After notice was given on February 20, 2018, Heat Factory failed to make the February Minimum Royalty payment with interest pursuant to the terms of the License Agreement.

104.    As set forth in the Royalty Non-Payment Termination Notice sent to Heat Factory on July 10, 2018, the License Agreement was terminated by Schawbel.

105.    As a result of the termination, Heat Factory was required to cease all use of the Patents.

106.    As a result of the termination of the License Agreement, pursuant to Section 9.6, all outstanding royalties and other payments became immediately due and payable within thirty (30) days.

107.    Heat Factory continues to use Schawbel's Patents and continues to cause to be manufactured and/or to sell Products and Inventory incorporating the patented technology without authorization to do so, as set forth above.

108.    Schawbel has been harmed will continue to be harmed by Heat Factory's continued use of the Patents granted pursuant to the License Agreement, and by Heat Factory's continued unauthorized manufacture and/or sale of Products and Inventory incorporating the patented technology.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP
874351.01/SD

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

109. An actual controversy exists between Schawbel and Heat Factory concerning the termination of the License Agreement and the parties' rights and obligations upon such termination.

110. For these reasons, Schawbel requests that the Court issue a declaratory judgment (a) that the License Agreement is terminated, (b) that Heat Factory no longer has any right to use Schawbel's Patents, (c) that Heat Factory no longer has any right to use or sell any Products and Inventory incorporating the patented technology, and (4) all outstanding royalty amounts are immediately due and payable within thirty (30) days from the July 10, 2018, Royalty Non-Payment Termination Notice.

**WHEREFORE**, Schawbel hereby prays for judgment as follows:

A. On Count I, enter judgment in the total amount due to Schawbel as a result of Heat Factory's breach of the APA, plus such amounts as the Court determines that Schawbel is owed for interest, reasonable attorneys' fees and costs;

B. On Count II, enter judgment in the total amount due to Schawbel as a result of Heat Factory's breach of the License Agreement, plus such amounts as the Court determines Schawbel is owed for interest, reasonable attorneys' fees and costs;

C. On Count III, enter judgment in an amount sufficient to compensate Schawbel for the damages it has suffered as a result of Heat Factory's patent infringement, with such amount being no less than a reasonable royalty for Heat Factory's infringing use of the Patents, an award of up to three times the amount assessed as damages, plus such amounts as the Court determines that Schawbel is owed for interest, reasonable attorneys' fees and costs;

D. On Count III, enter an order preliminarily and permanently enjoining Heat Factory from continuing to infringe upon Schawbel's patent rights and from continuing to sell or offer for sale any Product and Inventory;

E. On Count III, award Schawbel its reasonable attorneys' fees and costs pursuant to the prevailing party provision in the License Agreement;

F. On Count IV, enter a declaratory judgment that (1) the License Agreement has been terminated, (2) that Heat Factory no longer has any right to use the Patents, (3) that Heat Factory

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 689

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

1 no longer has any right to use or sell any Products or Inventory, and (4) that all outstanding royalty

2 amounts as of January 31, 2018 are due and payable within thirty (30) days from the APA Non-

3 Payment Termination Notice;

4      G.     On Count V, enter a declaratory judgment that (1) the License Agreement has been

5 terminated, (2) that Heat Factory no longer has any right to use the Patents, (3) that Heat Factory

6 no longer has any right to use or sell any Products or Inventory, and (4) that all outstanding royalty

7 amounts are due and payable within thirty (30) days from the Royalty Non-Payment Termination

8 Notice; and

9      H.     Award Schawbel any further relief as the Court may deem just and proper.

10

11 Dated: August 20, 2018

               ALLEN MATKINS LECK GAMBLE
               MALLORY & NATSIS LLP

12

13                By:

14                     TIMOTHY M. HUTTER
                    DAVID E. ARON

15                     Attorneys for Defendant and Cross-
                    Complainant SCHAWBEL

16                     TECHNOLOGIES LLC, a Massachusetts
                    limited liability company

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD
9435012v1

-19-
SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 690

# TABLE OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| Exhibit 1 | APA and Schedule A | 21 - 55 |
| Exhibit 2 | License Agreement and Exhibit C | 56 - 108 |
| Exhibit 3 | U.S. Patent No. 8,850,716 | 109 - 115 |
| Exhibit 4 | U.S. Patent No. 8,869,428 | 116 - 141 |
| Exhibit 5 | U.S. Patent No. 8,869,429 | 142 - 167 |
| Exhibit 6 | U.S. Patent No. 9,101,177 | 168 - 175 |
| Exhibit 7 | U.S. Patent No. 9,179,734 | 176 - 201 |
| Exhibit 8 | U.S. Patent No. 9,314,064 | 202 - 236 |
| Exhibit 9 | U.S. Patent No. 9,538,806 | 237 - 263 |
| Exhibit 10 | U.S. Patent No. 9,538,807 | 264 - 290 |
| Exhibit 11 | U.S. Patent No. 9,548,618 | 291 - 301 |
| Exhibit 12 | U.S. Patent No. 9,549,586 | 302 - 328 |
| Exhibit 13 | U.S. Patent No. 9,572,397 | 329 - 367 |
| Exhibit 14 | U.S. Patent No. D719,504 | 368 - 374 |
| Exhibit 15 | U.S. Patent No. D722,222 | 375 - 384 |
| Exhibit 16 | U.S. Patent No. D724,013 | 385 - 391 |
| Exhibit 17 | U.S. Patent No. D734,012 | 392 - 399 |
| Exhibit 18 | U.S. Patent No. D737,769 | 400 - 406 |
| Exhibit 19 | U.S. Patent No. D772,546 | 407 - 415 |
| Exhibit 20 | U.S. Patent No. D794,813 | 416 - 426 |
| Exhibit 21 | U.S. Patent No. D801,624 | 427 - 437 |
| Exhibit 22 | APA Non-Payment Termination Notice | 438 |
| Exhibit 23 | Royalty Non-Payment Termination Notice | 439 |
| Exhibit 24 | Website print outs as accessed on August 20, 2018 | 440 - 450 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

874351.01/SD

-20-

SCHAWBEL TECHNOLOGIES LLC'S CROSS-COMPLAINT

Exhibit B, Page 691

# EXHIBIT 1

ASSET PURCHASE AGREEMENT

by and between

Schawbel Technologies LLC.

as Seller

and

Heat Factory, USA, Inc.

as Purchaser

dated as of July 18 , 2017

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") dated as of July _18_, 2017 (the "**Effective Date**") is made and entered into by and between Schawbel Technologies LLC, a Massachusetts limited liability company ("**Seller**") on one hand, and Heat Factory, USA, Inc., a Nevada corporation ("**Purchaser**") on the other hand. The Seller and Purchaser are collectively referred to as "**Parties**" and individually referred to as a "**Party**."

## RECITALS

Seller is in the business ("**Business**") of manufacturing, marketing, distributing and selling certain heated insoles, hand warmers, and related heating products (collectively "**Heating Products**") under the trademarked brand name of ThermaCELL ("**Brand**").

Seller is the owner of certain patents, technological information, and general know-how used in the manufacturing of the Heating Products.

Seller's rights to use and market the Heating Products under the Brand derive from that certain Transitional Trademark License dated July 2, 2014, by and between Seller and Schawbel Corporation, a Massachusetts corporation ("**Brand License**")

Seller has certain Heating Products in inventory, as set forth in **Schedule A** attached hereto and incorporated herein by reference ("**Inventory**").

Seller owns one hundred percent (100%) of the Inventory. The Inventory is currently stored by Seller in warehouses located in 6975 Pacific Circle Mississauga, ON L5T 2H3 Canada and 1100 Thorndale Ave, Elk Grove Village, IL 60007 (collectively "**Seller's Warehouses**").

Seller also owns certain Universal Product Codes associated with the Heating Products, as set forth in **Schedule B** attached hereto and incorporated herein by reference ("**UPC Codes**").

Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Inventory, UPC Codes and other related assets on the terms and subject to the conditions as provided in this Agreement;

Purchaser will market, distribute, and resell the Inventory under the Brand.

Additionally, Seller desires to license to Purchaser, and Purchaser desires to license from Seller, the above referenced patents, technological information, and general know-how so that Purchaser can manufacture, market, distribute, and sell additional heating products under Purchaser's own brand name. The Parties agreement regarding the license is fully set forth in that certain licensing agreement of even date ("**License**").

Accordingly, in consideration of the foregoing and the mutual promises made in this Agreement and of the mutual benefits to be derived from such promises, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION

Section 1.01    _Definitions_.    For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"**Affiliate**" with respect to either Party shall mean any corporation or other legal entity other than that Party in whatever country organized, controlling, controlled by or under common control with that

Party. The term "control" shall mean (i) in the case of Licensee, direct or indirect ownership by Licensee or a relative of Licensee of fifty percent (50%) or more of the voting securities or membership interests having the right to elect directors or otherwise direct management and policies, and (ii) in the case of Licensor, the power, direct or indirect, to elect or appoint fifty percent (50%) or more of the directors or trustees, or to cause direction of management and policies, whether through the ownership of voting securities, by contract or otherwise

"Agreement" means this Asset Purchase Agreement.

"Allocation Statement" has the meaning set forth in Section 2.10.

"Authorizations" has the meaning set forth in 3.10.

"Brand" has the meaning set forth in the recitals.

"Brand License" has the meaning set forth in the recitals.

"Bulk Sale Claims" has the meaning set forth in Section 3.14.

"Bulk Sale Notice" has the meaning set forth in 2.15.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York or in the city of New York are authorized or required by Law or other governmental action to close.

"Cash Purchase Price" has the meaning set forth in Section 2.02.

"Certifications" refer to those certifications identified on **Schedule C**.

"Charter Documents" means with respect to any Person, the certificate or articles of incorporation, organization or formation and by-laws, the limited partnership agreement, the partnership agreement or the operating or limited liability company agreement, equity holder agreements and other organizational and governance documents of such Person.

"Claim" means any demand, claim, action, legal proceeding (whether at Law or in equity) or arbitration, obligations, or reckonings of any kind or nature whatsoever, for compensatory or exemplary and punitive damages, or declaratory, equitable or injunctive relief, whether based on contract, tort, or other theories of recovery provided for by the common or statutory law, ascertained or unascertained, known or unknown, patent or latent, suspected or claimed.

"Closing" has the meaning set forth in Section 2.07.

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986.

"Confidential Information" has the meaning set forth in Section 5.05.

"Contract" means any contract, lease, option (including any option to purchase real property), license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other legally binding arrangement.

"Delivery Date" has the meaning set forth in Section 2.12.

"Effective Date" has the meaning set forth in the introductory paragraph to this Agreement.

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, Canada, or any state, county, city, province or other political subdivision or similar governing entity where the Heating Products are sold.

"**Governmental Authority Approvals**" means a permit, certification, order, decree or any other form of approval issued by a Governmental Authority.

"**Heating Products**" has the meaning set forth in the recitals.

"**Indemnified Party**" has the meaning set forth in Section 7.05(a).

"**Indemnifying Party**" has the meaning set forth in Section 7.05(a).

"**Inspection Period**" has the meaning set forth in Section 2.14(a).

"**Inventory**" has the meaning set forth in the recitals.

"**Inventory Secured Taxes**" has the meaning set forth in 3.11(a).

"**Laws**" means all laws, statutes, rules, regulations and ordinances, and any other pronouncements having the effect of law, of any Governmental Authority.

"**Liabilities**" has the meaning set forth in Section 2.05.

"**License**" means the Exclusive License Patent Agreement between the Seller and the Purchaser of even date.

"**Lien**" means any security interest, pledge, mortgage, lien, charge, encumbrance, conditional sale agreement, title retention contract, right of first refusal, option to purchase, proxy, voting trust or voting agreement or any similar interest.

"**Loss**" or "**Losses**" means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, Taxes, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any Claim, default or assessment).

"**Party**" or "**Parties**" means Purchaser, on the one hand, and Seller, on the other hand.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"**Pre-Closing Orders**" has the meaning set forth in Section 2.13.

"**Purchase Price**" has the meaning set forth in Section 2.02.

"**Purchaser**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Purchaser's Warehouse**" has the meaning set forth in Section 2.11.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, Representatives, attorneys, accountants, investment bankers, Affiliates or Representatives of (i) any such Person or (ii) any Affiliate of such Person.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, counsel, accountants, financial advisers or consultants of such Person.

"**Restrictive Period**" has the meaning set forth in Section 5.07.

"**Schedule A-1 Value**" has the meaning set forth in 2.14(a).

"**Seller**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Seller's Insurance**" has the meaning set forth in Section 3.12.

"**Seller's Warehouses**" has the meaning set forth in the recitals.

"**Senior Financing**" has the meaning set forth in Section 2.03.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, profits, franchise, withholding, franchise, margin, environmental (including taxes under Code Section 59A), documentary, stamp, transfer, ad valorem, personal property (tangible and intangible), real property, employment, payroll, sales and use, social security, disability, occupation, property, severance, excise and other taxes (or other charges, fees, levies or other assessments in the nature of a tax), including any interest, penalty or addition thereto whether disputed or not.

"**Tax Return**" means any return, report, declaration, information return, statement or other document filed or required to be filed with any Taxing Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

"**Taxing Authority**" means, with respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

"**Territory**" has the meaning set forth in Section 5.07.

"**Third Party Purchaser**" has the meaning set forth in Section 5.07.

"**Transfer Taxes**" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, gross receipts, excise, and conveyance Taxes and other similar Taxes, duties, fees or charges.

"**Transferred Assets**" has the meaning set forth in Section 2.01.

"**UPC Codes**" has the meaning set forth in the recitals.

Section 1.02    Construction.

(a) All Article, Section, Subsection, Schedule and Exhibit references used in this Agreement are to Articles, Sections, Subsections, Schedules and Exhibits to this Agreement unless otherwise specified. The Exhibits and Schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b) If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "includes" or "including" shall mean "includes without limitation" or "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular Section or Article in which such words appear. Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder. Unless this context otherwise requires, any reference to an agreement or contract shall include any amendment, supplement or other modification thereto. Any reference to any Governmental Authority shall include any successor in function to such Governmental Authority. Currency amounts referenced herein are solely in U.S. Dollars.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d) Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that in the event an ambiguity of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and



no presumption shall arise favoring any Party by virtue of the authorship of any provisions of this Agreement.

## ARTICLE II.
## PURCHASE AND SALE AND CLOSING

Section 2.01    Purchase and Sale. Effective as of the Closing Date, Seller sells, assigns, and transfers to Purchaser, and Purchaser purchases from Seller, on the terms and conditions specified in this Agreement, all of Seller's rights, title, and interest in and to only the following (collectively the "**Transferred Assets**"):

    (a)  One hundred percent (100%) of all direct and indirect right and title to and in the Inventory, free and clear of all Liens, Claims, encumbrances and other interests; and

    (b)  One hundred percent (100%) of all direct and indirect right and title to and in the UPC Codes, free and clear of all Liens, Claims, encumbrances and other interests.

Section 2.02    Purchase Price. The purchase price for the Transferred Assets to be paid by Purchaser to Seller shall be $3,700,000 (the "**Purchase Price**"). The Purchase Price shall be payable by Purchaser to Seller as follows:

    (i)    $300,000 payable on or before October 10, 2017;

    (ii)   $450,000 payable on or before November 10, 2017;

    (iii)  $500,000 payable on or before December 10, 2017;

    (iv)   $600,000 payable on or before January 10, 2018;

    (v)    $600,000 payable on or before February 10, 2018;

    (vi)   $550,000 payable on or before March 10, 2018;

    (vii)  $550,000 payable on or before April 10, 2018; and

    (viii) $150,000 payable on or before May 10, 2018

Section 2.03    Security. To secure Purchaser's payment of the Purchase Price Purchaser grants to Seller as of the Closing Date a perfected lien on (a) the Inventory and (b) all accounts receivable arising from sales of the Inventory. Seller's liens on the Inventory and accounts receivable shall be subordinate and junior only to any liens held by any third party lender that has lent money to Purchaser, directly or indirectly, in relation to the purchase, handling and sale of the Inventory, including a business line-of-credit, which may also be used for other legitimate business purposes ("**Senior Financing**"). Notwithstanding the foregoing, the value of the Senior Financing shall not exceed the Purchase Price. Purchaser and Seller shall execute all instruments and documents reasonably required to evidence such liens and the perfection thereof and the subordination of such liens as provided immediately above no later than thirty (30) days after the Effective Date. Purchaser shall provide notice to Seller of any default on the Senior Financing.

Section 2.04    Retained Assets. The Transferred Assets shall not include, and Purchaser shall not acquire an interest in, any and all assets not specified in Section 2.01, including but not limited to the assets of Seller listed below ("**Retained Assets**"):

    (a)  All of Seller's cash or cash equivalents existing as of the Closing Date, including any line(s) of credit;

    (b)  Prepaid taxes, refunds, and deposits and earned revenue;

    (c)  All accounts receivable existing as of the Closing Date, but excluding an accounts receivable for Pre-Closing Orders (as further described in Section 2.13);



Section 2.05    No Assumption of Liabilities. Subject to the terms and conditions of Section 2.12, Purchaser does not assume and will not become responsible for any liability of Seller of any kind, character or description whatsoever, whether actual or contingent, known or unknown, intentional or unintentional, and whether statutory, in contract, tort, warranty or otherwise and whether with respect to the Business, the Transferred Assets, or otherwise arising prior to the Closing Date (collectively "**Liabilities**").

Section 2.06    Taxes. Seller shall pay in a timely manner all sales and other Transfer Taxes, if any, levied on the Transferred Assets due to the sale to Purchaser under this Agreement, and shall release, indemnify, defend, and hold harmless Purchaser with respect to such Taxes. Seller shall file all necessary documentation and Tax Returns with respect to such Taxes.

Section 2.07    Closing. The Closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Seller at 10:00 A.M. local time, on the Effective Date, or on such other date and at such other time and place as the Parties mutually agree in writing. All actions listed in Section 2.08, 2.09 or Section 2.10 that occur on the Closing Date shall be deemed to occur simultaneously at the Closing.

Section 2.08    Closing Deliveries by Seller to Purchaser. At the Closing, Seller shall deliver, or shall cause to be delivered, to Purchaser the following:

(a) a duly executed assignment of the intangible portion of the Transferred Assets by Seller to Purchaser, in form attached and incorporated as **Exhibit 2.08(a)**, together with such documents endorsed for transfer or executed in blank as are necessary to transfer the Transferred Assets;

(b) a certificate of good standing with respect to Seller dated no more than three (3) days before the Closing, issued by the Secretary of State of Seller's formation;

(c) a duly executed certificate in form attached and incorporated as **Exhibit 2.08(c)** by a manager of Seller, (i) certifying due authorization of the resolutions granting authority to execute and deliver this Agreement and the other agreements and instruments contemplated hereby and authorizing the consummation of the transactions contemplated hereby; and (ii) identifying the name and title and bearing the signatures of the officers of Seller authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby, duly executed by Seller;

(d) Recorded UCC-3s, mortgage releases and termination statements or any other documents necessary to deliver the Transferred Assets to Purchaser free and clear of all Liens, Claims, encumbrances and other interests;

(e) a duly executed Bill of Sale selling the tangible portion of the Transferred Assets to Purchaser in the form attached and incorporated as **Exhibit 2.08(e)**;

(f) the letters from the President of Schawbel Corporation, attached as Exhibit 2.08(f); and

(g) any other agreement or instrument reasonably requested by Purchaser that is required to effect the transactions contemplated by this Agreement.

Section 2.09    Closing Deliveries by Purchaser to Seller. At the Closing, Purchaser shall deliver, or shall cause to be delivered, to Seller the following:

(a) a duly executed assignment of the Transferred Assets by Seller to Purchaser, referred to in Section 2.08(a);

(b) a certificate of good standing with respect to Purchaser dated no more than three (3) days before the Closing, issued by the Secretary of State of Purchaser's incorporation;



(c) a true and correct copy of the resolutions of Purchaser's Board of Directors in form attached hereto and incorporated as **Exhibit 2.09(c)** granting authority to execute and deliver this Agreement and instruments contemplated hereby and authorizing the consummation of the transactions contemplated hereby; and

(d) any other agreement or instrument reasonably requested by Seller that is required to effect the transactions contemplated by this Agreement.

Section 2.10  Purchase Price Allocation.

(a) Within ninety (90) days after the Closing Date, Purchaser shall prepare and deliver to Seller a draft of a statement (the "**Allocation Statement**") setting forth its proposed allocation of the Purchase Price among the Transferred Assets. If within fifteen (15) days after Seller's receipt of the draft Allocation Statement, Seller shall not have objected in writing to such draft Allocation Statement, the draft Allocation Statement shall become the Allocation Statement. In the event that Seller objects in writing within such 15-day period, Seller and Purchaser shall negotiate in good faith to resolve the dispute. If Seller and Purchaser are unable to reach an agreement within thirty (30) days after Purchaser's receipt of Seller's written objection, the dispute shall be resolved and the Allocation Statement shall be determined by an independent, nationally recognized accounting firm mutually selected by the Parties. The Allocation Statement, as agreed upon by Purchaser and Seller and/or determined under this Section 2.10, shall be final and binding upon the Parties. Each of Seller and Purchaser shall bear all fees and costs incurred by it in connection with the determination of the Allocation Statement, except that the Parties shall each pay one-half (50%) of the fees and expenses of the accounting firm.

(b) The Allocation Statement will be prepared in accordance with Section 1060 of the Code and the rules and Treasury Regulations promulgated thereunder. Purchaser and Seller also shall allocate and report any adjustments to the Purchase Price (including any adjustment to the Purchase Price under the true-up process set forth in Section 2.14) in accordance with Treasury Regulations Section 1.1060-1(e), and any allocations made as a result of such adjustments shall become part of the Allocation Statement.

(c) The Parties agree to report the allocation of the Purchase Price (including the amount of any assumed liabilities) among the Transferred Assets in a manner consistent with the Allocation Statement and agree to act in accordance with the Allocation Statement in the preparation and filing of all Tax returns (including filing Form 8594 with their respective federal income tax returns for the taxable year that includes the Closing Date and any other forms or statements required by the Code, Treasury Regulations, the Internal Revenue Service or any applicable state or local Governmental Authority) and in the course of any Tax audit, Tax review or Tax litigation relating thereto; provided, however, that (i) Purchaser's cost for such assets may differ from the total amount allocated hereunder to reflect the inclusion in the total cost of items (for example, capitalized acquisition costs) not included in the amount so allocated, and (ii) the amount realized by Seller may differ from the total amount allocated hereunder to reflect transaction costs that reduce the amount realized for federal income tax purposes.

(d) The Parties will promptly inform one another of any challenge by any Governmental Authority to any allocation made pursuant to this Section 2.10 and agree to consult and keep one another informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.11  Transportation of Inventory After Closing. Purchaser shall be responsible for arranging transportation of the Inventory from Seller's Warehouses to Purchaser's warehouses ("**Purchaser's Warehouse**"), and shall be solely responsible for all costs and expenses associated therewith.

(a) For purposes of removing and transporting the Inventory from Seller's Warehouses, Seller shall grant Purchaser and/or Purchaser's moving company with sufficient access to Seller's Warehouses to inspect, pack and remove the Inventory, provided that Purchaser shall provide at least 24 hours verbal or written notice in advance of any visit.

(b) Purchaser shall have all Inventory removed from Seller's Warehouses within 20 Business Days after the Closing Date.

Section 2.12    Risk of Loss. Seller has all risk of loss or damage to the Transferred Assets prior to Purchaser commencing the packing of the Inventory for removal at Seller's Warehouses ("**Delivery Date**"). From and after the Delivery Date, Purchaser has all risk of loss and damage to the Transferred Assets.

Section 2.13    Pre-Closing Orders.

(a) Prior to Closing, Seller has taken certain orders for some of the items in the Inventory, but has not shipped the items or billed the order ("**Pre-Closing Orders**"). Following Closing Seller shall use reasonable efforts to provide Purchaser with a list of Pre-Closing Orders and whatever relevant information is in the possession of Seller regarding the customers and Pre-Closing Orders.

(b) Purchaser may, but is not obligated to, fulfill any of the Pre-Closing Orders. Purchaser shall notify Seller in writing of which Pre-Closing Order Purchaser will fulfill. All accounts receivable arising from any of the Pre-Closing Orders that Purchaser fulfills shall be belong solely to Purchaser.

(c) Purchaser shall have no liability for any of Seller's Pre-Closing Orders which Purchaser is unable to fulfill as a result of insufficient information from Seller, or which Purchaser chooses, in its sole and absolute discretion, not to fulfill. For any such orders Seller agrees to release, indemnify, and hold Purchaser harmless for any liability related to or arising from such Pre-Closing Orders.

Section 2.14    True-Up.

(a) Purchaser shall have forty-five (45) days from the Closing Date ("**Inspection Period**") to fully inspect the delivered Inventory. Within such forty-five days period, Purchaser shall provide written notice to Seller of any items of Inventory that either: 1) were not delivered, or 2) were delivered but arrived damaged and such damage was incurred prior to the Delivery Date. "Damage" shall be assessed in Purchaser's reasonably exercised discretion. To the extent such undelivered/damaged items have an aggregate value, based on Schedule A-1 ("**Schedule A-1 Value**"), of $67,000 or more, the Purchase Price shall be adjusted downward by such aggregate value, and the Purchaser shall be entitled to offset such aggregate value against any payments due on the Purchase Price.

(b) The Purchase Price shall be further adjusted downward by, and Purchaser may deduct from the payments otherwise due pursuant to Section 2.02, all credit balances and defect deductions attributable to the sale of Heating Products by Seller prior to the Effective Date and all cash rebates awarded by Seller in relation to sale of Heating Products consummated prior to the Effective Date to the extent Purchaser is required to honor such items.

Section 2.15    Purchaser shall comply, at its sole cost and expense, with the provisions of any applicable "bulk sales," bulk transfer" or similar Laws in connection with the consummation of the transactions contemplated by this Agreement ("**Bulk Sale Notice**"), including the provisions set forth in Illinois Administrative Code Section 130.1701 and Illinois Unemployment Insurance Act, Section 2600.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser that the following representations and warranties are true and correct as of the Closing Date:

Section 3.01    Organization and Qualification.  Seller is a limited liability company duly formed, validly existing and in good standing under the laws of Massachusetts.  Seller is duly qualified or licensed to carry on the Business as now conducted and duly qualified to conduct business in each other jurisdiction or country where the actions required to be performed by it under this Agreement makes such qualification or licensing necessary.

Section 3.02    Authority.  Seller has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized by all necessary proceedings on the part of Seller.  This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles regardless of whether considered in a proceeding at Law or in equity.

Section 3.03    No Conflicts: Consents and Approvals.  The execution and delivery by Seller of this Agreement does not, and the performance by Seller of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Charter Documents of Seller;

(b)    violate or result in a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which Seller is a party or by which it is bound, or to which any of its assets are subject;

(c)    (i) violate or breach any writ, judgment, order or decree applicable to Seller. (ii) violate any Law, (iii) require any consent, approval or clearance by, or any filing or registration with, any Governmental Authority or (iv) require the consent or approval of any third party; and

(d)    violate the Brand License.

Section 3.04    Ownership of Transferred Assets.  Seller owns one hundred percent (100%) of the Transferred Assets directly, free and clear of all Liens, Claims, encumbrances and other interests.

Section 3.05    Transferred Assets.

(a)    Seller has good and marketable title to the Transferred Assets and will convey the same to Purchaser free and clear of all Liens, Claims, interests and encumbrances.

(b)    Purchaser's use of the Brand and the resale of the Inventory under the Brand will not violate the Brand License.

**Section 3.06**    Inventory. Except as set forth in **Schedule 3.06**, there have been no manufacturing or product defect Claims made or pending or, to Seller's actual knowledge, threatened (whether or not covered by insurance), related to the Heating Products or the items of the Inventory. Except as set forth in Schedule 3.06, none of the Claims set forth in **Schedule 3.06** resulted in Seller paying any sums, or otherwise settling with, the respective claimant. None of the Claims were tendered to any of Seller's insurers. To the actual knowledge of Seller, each item of Inventory was manufactured or made in compliance will all applicable Laws and the Certifications, as such Laws and Certifications were in effect

as of the time of manufacture. Each item of the Inventory was in Seller's inventory or in transit as of the effective date of the termination of the Brand License.

Section 3.07    Intellectual Property.

(a)    The Transferred Assets and Inventory, as used by Seller, do not infringe, misappropriate or otherwise violate the intellectual property rights of any third party.

(b)    Seller has not received any written charge, complaint, Claim, demand or notice alleging any such infringement, misappropriation or other violation (including any Claim that Seller must license or refrain from using any intellectual property of any third party).

(c)    To the actual knowledge of Seller, no third party has infringed upon, misappropriated or otherwise violated any Intellectual Property of Seller.

Section 3.08    No Brokers.  Seller does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Purchaser or any of its Affiliates are or could become liable or obligated. Seller will indemnify and hold Purchaser harmless from any and all Claims, suits, and actions for brokerage or other commissions, and from and against all expenses of any character, including reasonable attorney fees incurred by the other by reason of any Claim by any finder, broker, or other person claiming to have been engaged by, or on behalf of, Seller, or with whom Seller is claimed to have made any agreement for compensation

Section 3.09    Compliance with Laws; Litigation.  The Transferred Assets are in conformity with all applicable federal, state and local laws, ordinances and regulations, and Seller has received no notice of alleged noncompliance. There is no litigation pending or threatened (whether or not covered by insurance), nor any order, injunction, or decree outstanding nor any proceeding, or governmental investigation existing or pending, involving Transferred Assets or the Heating Products, nor is there any basis for any such litigation. No event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any complaint, Claim, action, suit, litigation, proceeding or governmental or administrative investigation involving or relating to the Transferred Assets.

Section 3.10    Licenses and Rights.  Seller possesses all franchises, licenses, easements, permits and other authorizations (collectively, "**Authorizations**") from all Governmental Authority or regulatory authorities and from all other persons or entities that are necessary to use the Transferred Assets in the manner presently done by Seller in and at all locations and places where it is presently operating, and Seller has not received any notice that any Governmental Authority or regulatory authority is considering or intends to cancel, terminate, modify or not renew such Authorizations

Section 3.11    Tax Matters As to the Transferred Assets.

(a)    All Taxes due and owing by Seller or its Affiliates (whether or not shown on any tax return), that if unpaid could be secured against the Transferred Assets ("**Inventory Secured Taxes**"), have been paid and Seller does not have any liability for such Inventory Secured Taxes.

(b)    As of the date of the Closing Date, there is no written Claim or assessment pending or, threatened against Seller or its Affiliates for any alleged deficiency in Inventory Secured Taxes, and there is no audit or investigation with respect to any liability of Seller or its Affiliates for Inventory Secured Taxes. Neither Seller nor or its Affiliates have waived any statute of limitations with respect to Inventory Secured Taxes or agreed to any extension of time with respect to any Inventory Secured Tax assessment or deficiency.

(c)    With respect to Inventory Secured Taxes, Seller has withheld (and timely paid to the appropriate Governmental Authority) proper and accurate amounts for all periods through the date hereof in compliance with all Tax withholding provisions of applicable federal, state, local and foreign Laws .

Section 3.12   Insurance. Seller maintains the policies of insurance identified on **Schedule 3.12** (collectively "**Seller's Insurance**"). Seller has provided Purchaser with complete copies of the policies for Seller's Insurance. There is no Claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed. There is no threatened termination of, or announced pending material premium increase with respect to, any such policies or bonds. Seller shall maintain such insurance through the Delivery Date. For a period of twelve (12) months following the Closing Date, Seller will maintain the CGL coverage, and associated umbrella, in an amount and substantially similar to the policies identified in Section 3.12, and which shall each continue to provide coverage for Products-Completed Operations Liability.

Section 3.13   Solvency. Immediately after giving effect to all of the transactions contemplated by this Agreement, Seller will be able to pay all its debts and will own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities). No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Seller.

Section 3.14   Bulk Sale Claims: There exist no actual third party Claims and, to the actual knowledge of Seller, Seller has not been made aware of any third party Claims which could be made in response to the Bulk Sales Notice ("**Bulk Sale Claims**").

Section 3.15   Disclosure. No representation or warranty of the Seller in this Agreement (including the exhibits and schedules hereto) or in any other agreement, instrument, certificate, or other document delivered by the Seller in connection with this Agreement or any of the other transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not false or misleading. There is no fact that Seller has not disclosed to the Purchaser in writing that materially adversely affects, or (so far as Seller can now foresee) is reasonably likely to affect materially and adversely, the Transferred Assets or the ability of Seller to perform its obligations under this Agreement or to consummate any of the transactions contemplated hereby.

Section 3.16   No Material Change. There has been no material adverse change in the Transferred Assets since April 15, 2017 through Closing.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants that the following representations and warranties are true and correct as of the Closing Date:

Section 4.01   Organization and Qualification. Purchaser is a corporation company duly formed, validly existing and in good standing under the Laws of the State of Nevada. Purchaser is duly qualified or licensed to do business in each other jurisdiction where the actions required to be performed by it hereunder makes such qualification or licensing necessary, except as would not, in the aggregate, have a material adverse effect on its ability to consummate the transactions hereunder or otherwise perform its obligations hereunder.

Section 4.02   Authority. Purchaser has all requisite corporate power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Purchaser of this Agreement and the performance by Purchaser of its obligations hereunder have been duly and validly authorized by all corporate action on behalf of Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable against Purchaser in

accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

Section 4.03    No Conflicts; Consents and Approvals.  The execution and delivery by Purchaser of this Agreement does not, and the performance by Purchaser of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

    (a)   conflict with or result in a violation or breach of any of the terms, conditions or provisions of its Charter Documents;

    (b)   violate or result in a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which Purchaser is a party, except for any such violations or defaults (or rights of termination, cancellation or acceleration) which would not, impair Purchaser's ability to perform its obligations hereunder; and

    (c)   assuming all required filings, approvals, consents, authorizations, clearances and notices set forth in Schedule 4.03(c) (collectively, the "**Purchaser Governmental Approvals**") have been made, obtained or given, (i) violate any Law applicable to Purchaser, (ii) violate or breach any writ, judgment, order or decree applicable to Purchaser, (iii) require the consent, clearance or approval of any Governmental Authority under any applicable Law. except where any such violation or breach or the failure to obtain any such consent, clearance or approval would not impair Purchaser's ability to perform its obligations hereunder or (iv) to the knowledge of Purchaser require the consent or approval of any other third party.

Section 4.04    Litigation.    There are no Claims pending or threatened in writing, before any Governmental Authority or any arbitrator, that would, in the aggregate, impair Purchaser's ability to perform its obligations hereunder.  Purchaser is not subject to any judgment, decree, injunction, rule or order of any Governmental Authority or any arbitrator that prohibits the consummation of the transactions contemplated by this Agreement or would impair Purchaser's ability to perform its obligations hereunder.

Section 4.05    Compliance with Laws.  Purchaser is not in violation of any Law, except for violations that would not, in the aggregate, impair Purchaser's ability to perform its obligations hereunder.

Section 4.06    Brokers.  Purchaser does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or its Affiliates could become liable or obligated. Purchaser will indemnify and hold Seller harmless from any and all Claims, suits, and actions for brokerage or other commissions, and from and against all expenses of any character, including reasonable attorney fees incurred by the other by reason of any Claim by any finder, broker, or other person claiming to have been engaged by, or on behalf of, Purchaser, or with whom Purchaser is claimed to have made any agreement for compensation.

Section 4.07    Disclosure. No representation or warranty of the Purchaser in this Agreement (including the exhibits and schedules hereto) or in any other agreement, instrument, certificate, or other document delivered by the Purchaser in connection with this Agreement or any of the other transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not false or misleading. As it concerns the Transferred Assets, there is no fact that the Purchaser has not disclosed to the Seller in writing that materially adversely affects, or (so far as Purchaser can now foresee) is reasonably likely to affect materially and adversely, the business or condition (financial or otherwise) of Purchaser or the ability of Purchaser to perform its obligations under this Agreement or to consummate any of the transactions contemplated hereby.

Section 4.08    Sawyer Termination. As of Closing, and until termination of the Agreement, Purchaser shall have no business relationship with Sawyer Products, Inc., other than in the normal course of business of selling

Heat Factory USA, Inc. branded products. To Purchaser's actual knowledge, as of the Closing, Sawyer Products, Inc. has no claims against Purchaser.

## ARTICLE V.
## COVENANTS

Section 5.01    Public Announcements.  Prior to the Closing Date, neither Party shall issue any press release, disclose the Purchase Price or make any public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party, except as may be required by applicable Law or any listing agreement with a national securities exchange or quotation system. Notwithstanding the foregoing, Purchaser may disclose the Purchase Price and this Agreement for purposes of complying with the Bulks Sales Notice or to secure commercial financing secured by the Inventory. After the Closing Date, the Parties may issue a press release or make a public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party provided, however, that neither Party shall, without the prior written consent of the other Party, disclose publicly any of the financial terms of this Agreement.

Section 5.02    Expenses and Fees.  Except as expressly provided otherwise in this Agreement, all costs and expenses, including attorney's fees, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.

Section 5.03    Further Assurances.  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at any Party's request and without further consideration, the other Party shall execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such information and take such other actions and execute and deliver such other documents as such Party may reasonably request in order to consummate the transaction contemplated in this Agreement, including but not limited to the transfer, registration, or assignment of the UPC Codes. As it regards the transfer, registration, or assignment of the UPC Codes, Purchaser shall be solely responsible for any expense or costs incurred. For all other further assurances, neither Seller nor Purchaser shall be required to undertake any action that is likely to result in a material expense for Party unless the requesting Party agrees to reimburse the Party for such expense.

Section 5.04    Financing Cooperation:  Seller shall provide Purchaser with such cooperation and information as Purchaser reasonably may request, from time to time, in refinancing or modifying any Senior Financing that is secured against the Transferred Assets provided, however, that to the extent such cooperation requires Seller to incur out of pocket costs, including without limitation compensation of employees and/or consultants, Purchaser shall promptly reimburse Seller for such reasonable costs upon receipt of an invoice requesting such reimbursement.

Section 5.05    Confidentiality.  Each Party has furnished and will continue to furnish to the other Party certain information relating, directly or indirectly, to Purchaser, Seller and Transferred Assets, which is either non-public, confidential or proprietary in nature. Such information, together with all analyses, compilations, data, studies or other documents containing or based in whole or in part on any such furnished information is hereinafter referred to as "**Confidential Information**." The terms of this Agreement shall be deemed to be Confidential Information. Subject to the requirements of applicable Laws or any order of a Governmental Authority, each of the Parties hereby agrees to (i) treat the Confidential Information as confidential and use the same standard of care in handling such information as they use with respect to their own confidential information, but in no event less than a reasonable standard of care, (ii) prior to Closing, use the Confidential Information solely in connection with the consummation of the transactions contemplated by this Agreement, and (iii) transmit the Confidential Information only to those Representatives who need to know the Confidential Information; provided that each Party may use Confidential Information, as required, in filings, submissions and other

correspondence to obtain Seller Governmental Approvals, Seller Third Party Consents, Purchaser Government Approvals and Purchaser Third Party Consents. Notwithstanding any other provisions hereof, after the Closing, (x) each Party agrees to maintain the confidentiality of and not to disclose to any other Person any of the Confidential Information it received from the other Party, and (y) each Party may disclose Confidential Information pursuant to its obligations under Law for purposes of filing tax returns, financial reporting, as required in connection with regulatory compliance, or in any action a Party may have to enforce its rights against the other Party relating to the transactions contemplated by this Agreement,.

Section 5.06 <u>Insurance</u>. As it concerns the Transferred Assets, Seller has secured and shall maintain, at Seller's sole expense, the insurance so identified in <u>Schedule 3.12</u> for the period described therein.

Section 5.07 <u>Restrictive Covenants</u>. As a condition and material inducement to Purchaser's willingness to enter into this Agreement and purchase the Transferred Assets, and in particular the Inventory, and to protect the value of the Inventory and Transferred Assets, Seller hereby covenants and agrees as follows: For a period (the "**Restrictive Period**") commencing on the Closing Date and ending on the second (2nd) anniversary of the Closing Date, neither Seller nor its Related Persons or their respective Affiliates shall directly or indirectly, own, control, operate, conduct, engage in, participate in, consult with, perform services for, or otherwise carry on, any heated product production, distribution, marketing or sales business or any other enterprise that competes with the Heating Products anywhere in the world (the "**Territory**"). During the Restrictive Period, neither Seller nor its Related Persons or their respective Affiliates shall, directly or indirectly, solicit any accounts of Purchaser related to the Heating Products for the purpose of attempting to interfere with or damage the business relationship between Purchaser, on the one hand, and any third party involved in the manufacturing, marketing, distribution or sale of the Heating Products. The Parties agree that a breach or threatened breach of any covenant set forth in this <u>Section 5.07</u> could cause irreparable harm to Purchaser, that Purchaser's remedies at Law upon any such breach would be inadequate, and that, accordingly, upon any such breach or threatened breach Purchaser may seek a restraining order or injunction or both against the Seller, Seller's Affiliates or Related Persons, in addition to any other rights and remedies which are available at Law for breach of the covenant. If any provision of this <u>Section 5.07</u> shall be determined to be invalid or unenforceable, such invalid or unenforceable term shall be deemed amended to allow as to such maximum time and territory and to such other extent as such court (or arbitral tribunal) may judicially determine or indicate to be reasonable.

Notwithstanding the foregoing, and for the avoidance of doubt, and provided Seller or its Related Persons and their Affiliates first obtains a commercially reasonable confidentiality agreement signed by the Third Party Purchaser, nothing shall restrict the Seller or its Related Persons and their Affiliates from (a) efforts to market and sell or otherwise assign patents or technological information to third parties ("**Third Party Purchaser**") in accordance with the License, and (b) following such sale or assignment of patents and/or technological information to the Third Party Purchaser, activities reasonably necessary to effectuate the intent of the sale or assignment of patents and/or technological information to the Third Party Purchaser.

**ARTICLE VI.**
**CONDITIONS TO CLOSING**

Section 6.01 <u>Conditions to the Obligations of Each Party</u>. The obligations of the Parties to proceed with the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions, which may be waived in writing, in whole or in part, as to a Party by such Party: no permanent judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction shall be in effect which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this

Agreement (each Party agreeing to use its reasonable commercial efforts, including appeals to higher courts, to have any judgment, injunction, order or decree lifted).

Section 6.02    Conditions to the Obligations of Purchaser.  The obligation of Purchaser to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Purchaser:

(a)   Seller has performed all of its obligations and complied with all covenants, agreements, and conditions hereunder required to be performed by it at or prior to the Closing Date in all respects;

(b)   Seller shall have paid in full all outstanding debts and secured the release of all Liens against the Transferred Assets.

(c)   the representations and warranties of Seller contained in this Agreement (without regard to any materiality, material adverse effect or similar qualifiers) are true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date); and

(d)   all required Government Approvals have been obtained and are in form and substance satisfactory to Purchaser.

(e)   Seller shall have secured consents of all third parties, if any, necessary for Seller to execute, deliver and perform this Agreement.

(f)   Purchaser has received the documents from Seller set forth in Section 2.08.

Section 6.03    Conditions to the Obligations of Seller.  The obligation of Seller to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Seller:

(a)   Purchaser has performed all of its obligations and complied with all covenants, agreements, and conditions hereunder required to be performed by it at or prior to the Closing Date in all respects;

(b)   the representations and warranties of Purchaser contained in this Agreement (without regard to any materiality, material adverse effect or similar qualifiers) are true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date);

(c)   All Governmental Approvals, if any, have been obtained and are in form and substance satisfactory to Seller; and

(d)   Seller has received the documents from Purchaser set forth in Section 2. 09.

## ARTICLE VII.
## INDEMNIFICATION: LIMITATION OF WARRANTIES

Section 7.01    Survival.

(a)   All the representations and warranties set forth in this Agreement, are as of the date of Closing and not thereafter. All representations and warranties shall survive the execution and delivery hereof and the Closing Date but shall terminate two (2) years after the Closing Date.

(b)   No Party may make or assert any Claim under any representation or warranty of, or breach of covenant by, any other Party contained in this Agreement or in any agreement, instrument or other document delivered in connection herewith after the expiration of the survival period of such representation, warranty or covenant, except that any Claims made or asserted by a Party within the applicable time period prescribed above setting forth such Claim in reasonable detail (including a reasonable specification of the legal and factual basis for such Claim and the Loss

incurred) shall survive such expiration until such Claim is finally resolved and all obligations with respect thereto are fully satisfied.

Section 7.02    Indemnification.

(a)    Subject to the provisions of this Article VII, Seller, from and after the Closing Date, shall indemnify, defend and hold harmless Purchaser and its Related Persons from and against any and all Loss or Claims that arise out of, relate to, or result from (i) any inaccuracy of any of the representations and warranties as of the date when made, or (ii) the breach of any of the covenants or agreements of Seller contained in this Agreement or any Ancillary Agreement; (iii) Claims arising from any manufacturing or product defects regarding the Inventory; (iv) any Bulk Sales Claims; (v) Liabilities; (vi) Transfer Taxes as provided in Section 2.06; or (vii) Claims arising from or related to the matters set forth in **Schedule 3.06**. Purchaser shall have the right to set off any Claim for indemnification from Seller against any payment of the Purchase Price to the extent that such Claim for indemnification: 1) has been agreed upon by the Parties; 2) has been determined by a non-appealable final order of a court with appropriate jurisdiction; or 3) relates to any Bulk Sales Claims. In addition, each calendar year, beginning with the calendar year of the Effective Date, Purchaser shall have the right to set off against the Purchase Price any Claims for indemnification, whose liability in the aggregate with any other Claims made during that same calendar year (excluding those Claims agreed to by the Parties, determined by a final order, or relating to Bulk Sales Claims, as set forth in preceding sentence) has been valued (in Purchaser's sole and absolute discretion) to be Twenty Thousand dollars ($20,000) or less. In the event that Purchaser is not entitled to a set off against the Purchase Price as provided in the preceding sentence, Purchaser shall be entitled to withhold from payment of the Purchase Price an amount equal to the value (as determined in Purchaser's sole and absolute discretion) of any Claim for indemnification (less any unused portion of the aggregate $20,000, which shall be offset against the Purchase Price as provided in the preceding sentence) and shall deposit such withholdings into escrow. Any sums deposited into escrow shall only be released in accordance with: 1) a written agreement of the Parties; or 2) a non-appealable final order of a court with appropriate jurisdiction. The Parties agree to execute all escrow instructions necessary, or reasonably requested by escrowholder, to ensure the escrowed funds are released from escrow in accordance with this Section 7.02(a). All escrow costs shall be shared equally by the Parties.

(b)    Subject to the provisions of this Article VII, Purchaser, from and after the Closing Date, shall indemnify, defend and hold harmless Seller and its Related Persons from and against any and all Losses and Claims that arise out of, relate to, or result from the breach of any of Purchaser's (i) representations and warranties as of the date when made, (ii) covenants or agreements contained in this Agreement; and (iii) Purchaser's handling, distribution and/or sale of Inventory as of and after the Delivery Date, unless related to or arising from Claims arising from any defects in the Inventory not caused by Purchaser.

(c)    The indemnification obligations of the parties set forth in this Agreement shall survive the termination of this Agreement and the consummation of the purchase and sale of the Transferred Assets.

(d)    Any indemnification payment made pursuant to this Section 7.02 shall be treated as an adjustment to the Purchase Price for Tax purposes unless otherwise required by applicable Law.

Section 7.03    THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE 7 SHALL BE ENFORCEABLE REGARDLESS OF WHETHER THE LIABILITY IS BASED UPON PAST, PRESENT OR FUTURE ACTS, CLAIMS OR LEGAL REQUIREMENTS (INCLUDING ANY PAST, PRESENT OR FUTURE FRAUDULENT TRANSFER ACT, PRODUCTS LIABILITY, OR OTHER LEGAL REQUIREMENT) AND REGARDLESS OF WHETHER ANY PERSON (INCLUDING THE PERSON FROM WHOM INDEMNIFICATION IS SOUGHT) ALLEGES OR PROVES THE SOLE,

CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE PERSON SEEKING INDEMNIFICATION OR THE SOLE OR CONCURRENT STRICT LIABILITY IMPOSED UPON THE PERSON SEEKING INDEMNIFICATION.

Section 7.04    Certain Limitations.  Notwithstanding anything in this Agreement to the contrary:

(a)  Except in the event of fraud, no Related Person of Seller shall have any personal liability to Purchaser or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Seller in this Agreement and no Related Person of Purchaser shall have any personal liability to Seller or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Purchaser in this Agreement; and

Section 7.05    Procedures for Indemnification.

(a)  Whenever a Claim shall arise for indemnification under Section 7.02(a) or Section 7.02(b) of this Agreement, the Person entitled to indemnification (the "**Indemnified Party**") shall promptly notify in writing the Party from which indemnification is sought (the "**Indemnifying Party**") of such Claim and, when known, the facts constituting the basis of such Claim, and shall provide the Indemnifying Party a reasonable opportunity to cure the Claim (a "reasonable opportunity" shall in no event be longer than thirty (30) days).  In the event of a Claim for indemnification resulting from or in connection with a Claim by a third party, the Indemnified Party shall give such written notice thereof to the Indemnifying Party not later than ten (10) Business Days prior to the time any response to the third party Claim is required, if possible, and in any event within fifteen (15) Business Days following receipt of notice thereof; provided, that failure to timely notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability it may have to the Indemnified Party, except to the extent that the Indemnifying Party has been actually prejudiced by such failure.  Following receipt of notice of any such third party Claim, and unless counsel to the Indemnifying Party shall have reasonably determined that the assumption of such defense by the Indemnifying Party would be inappropriate due to a conflict of interest, the Indemnifying Party shall have the option, at its sole cost and expense, to assume the defense of such matter and to retain counsel to defend any such Claim or legal proceeding.  The Indemnifying Party shall be liable for and pay all costs related to the defense against such third party Claim incurred by the Indemnified Party (including reasonable and documented fees and expenses of counsel employed by the Indemnified Party but excluding, for the avoidance of doubt, any amounts paid by the Indemnified Party in settlement of such Claim without the express written consent of the Indemnifying Party) for any period during which the Indemnifying Party has not assumed the defense of such third party Claim and has agreed that it is obligated to indemnify the Indemnified Party against such Claim.  The Indemnifying Party shall conduct the defense of any third party Claim actively and diligently and in good faith.  The Indemnified Party shall have the option of joining the Indemnifying Party's defense of such Claim (which shall be at the sole cost and expense of the Indemnified Party) with its own counsel and counsel for each Party shall, to the extent consistent with such counsel's professional responsibilities, cooperate with the other Party and any counsel designated by that Party.

(b)  If (i) notice is given to the Indemnifying Party of the commencement of any third party legal proceeding and the Indemnifying Party does not, within thirty (30) days after the Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such legal proceeding; (ii) the Indemnifying Party fails to conduct the defense of such third party Claim actively and diligently and in good faith (in the reasonable determination of the Indemnified Party) or (iii) the Indemnifying Party reasonably determines in good faith that joint representation would be inappropriate because of a conflict in interest, then in any such event the Indemnified Party shall (upon notice from the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such third party Claim, and the Indemnifying Party shall

reimburse the Indemnified Party for the costs of defending against such third party Claim (including reasonable and documented attorneys' fees and expenses but excluding, for the avoidance of doubt, any amounts paid by the Indemnified Party in settlement of such Claim without the express written consent of the Indemnifying Party) and shall remain otherwise responsible for any liability with respect to amounts arising from or related to such third party Claim. The Indemnifying Party may elect to participate in such legal proceedings, negotiations or defense at any time at its own expense.

(c) In effecting the settlement or compromise of, or consenting to the entry of any judgment with respect to, any third party Claim, the Indemnifying Party, or the Indemnified Party, as the case may be, shall act in good faith, shall consult with the other Party and shall enter into only such settlement or compromise or consent to the entry of any judgment as the other Party shall consent, such consent not to be unreasonably withheld, conditioned or delayed. An Indemnifying Party shall not be liable for any settlement, compromise or judgment not made in accordance with the preceding sentence.

## ARTICLE VIII.
## MISCELLANEOUS

Section 8.01  Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, or by nationally recognized overnight courier service, or sent via facsimile or email (return receipt requested) at the addresses (or at such other address for a Party as shall be specified by like notice) set forth below. If delivered personally, notice shall be deemed received when delivered, and if delivered  by nationally recognized overnight courier service, or sent via facsimile or email (return receipt requested) shall and deemed received by the Party 48 hours after mailing, or sending the facsimile or e-mail.

(a)  If to the Seller, to:

Schawbel Technologies, LLC.

67 Bedford Street, Suite 400 W

Burlington MA 01803
Attention: William Schawbel
Facsimile:
Email: bill@schawbeltech.com

b)  If to Purchaser, to:

Heat Factory, USA, Inc.

1958 Kellogg Ave.

Carlsbad, CA 92008
Attention: David Treptow
Facsimile: 760-893-8301
Email:  dave@heatfactoryusa.com

with a copy to:

Murtaugh Meyer Nelson & Treglia LLP

2603 Main Street, 9th Fl.

Irvine, CA 92614

Attention: Michelle Generaux
Facsimile: 949-794-4099

Section 8.02     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.03     Assignment.   Neither this Agreement nor any of the Parties' rights or obligations hereunder shall be assignable by any Party without the prior written consent of the other Party, and any such assignment without such consent shall be void and ineffective.

Section 8.04     Costs of Collection.   In the event that Purchaser shall fail to pay any installment of the Cash Purchase Price when due, interest on such payment, calculated at an annual compounded rate of fifteen percent (15%), shall accrue and be payable by Purchaser and Seller also shall be entitled to reimbursement by Purchaser of all costs incurred by Seller in collecting from Purchaser (including all reasonable fees of counsel to Seller).

Section 8.05     Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement and any Claim, controversy or dispute arising under or in relation to this Agreement or the relationship of the Parties shall be governed by and construed in accordance with the Laws of the Commonwealth of Massachusetts, without regard to any conflict of Laws principles thereof that would require or permit the application of the Law of another jurisdiction. Each of the Parties hereto acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in respect of any litigation directly or indirectly arising or relating to this Agreement or the transactions contemplated by this Agreement. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  This consent to jurisdiction is being given solely for purposes of this Agreement and the transactions contemplated hereunder, and is not intended to, and shall not, confer consent to jurisdiction with respect to any other dispute in which a Party to this Agreement may become involved. Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action, or proceeding by the mailing of a copy thereof in the manner specified by the provisions of Section 9.01.

Section 8.06     Counterparts.  This Agreement may be executed in two (2) or more counterparts, and by facsimile, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 8.07     Amendments.  This Agreement may not be amended, waived or modified except by an instrument in writing signed on behalf of each of Purchaser and Seller.

Section 8.08     Entire Agreement.  This Agreement and the Ancillary Agreements and the Schedules constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement.  No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party.  Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

Section 8.09     No Waivers.  Except as otherwise expressly provided in this Agreement, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by any Party and no course of dealing between the Parties, shall constitute a waiver of any such right, power or remedy. No waiver by a Party of any default, misrepresentation, or breach of warranty or covenant under this Agreement, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant under this Agreement or affect in any way any

rights arising by virtue of any prior or subsequent such occurrence. No waiver shall be valid unless in writing and signed by the Party against whom such waiver is sought to be enforced.

Section 8.10    Attorney Fees and Costs. In the event of any controversy, Claim or dispute between the parties to this Agreement, arising out of or relating to this Agreement, its enforcement or interpretation, or any breach of any provision of this Agreement, the prevailing party, in addition to its other remedies, shall be entitled to recover from the losing party the prevailing party's reasonable expenses, attorney fees, and costs, including those incurred on appeal and for enforcement of an award or judgment.

Section 8.11    Severability. If any provision of this Agreement is determined by a Court of competent jurisdiction to be unenforceable, the remaining provisions shall continue in full force and effect.

Section 8.12    Successors. This Agreement shall be binding upon and inure to the benefit of the heirs, and permitted successors and assigns of the parties of the Agreement.

*[signatures on next page]*



IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized Representative as of the Effective Date.

**SELLER:**

Schawbel Technologies LLC.

By:_____
Name:
Title:

**PURCHASER:**

Heat Factory, USA, Inc.

By: _____  7-19-17
Name:  David Treptow

Title: President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized Representative as of the Effective Date.

**SELLER:**

Schawbel Technologies LLC.

By: _____

Name:

Title: C.E.O.

**PURCHASER:**

Heat Factory, USA, Inc.

By: _____

Name: David Treptow

Title: President

## Asset Purchase Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Schedule A | Inventory | x |
| Schedule A-1 | Inventory True-Up Value | x |
| Schedule B | UPC Codes | x |
| Schedule C | Certifications | x |
| Exhibit 2.08(a) | Assignment of Intangible Assets | x |
| Exhibit 2.08(c) | Seller's Authority | x |
| Exhibit 2.08(e) | Seller's Bill of Sale | x |
| Exhibit 2.08(f) | Letters from President of Schawbel Corporation | x |
| Exhibit 2.09(c) | Purchaser's Authority | x |
| Schedule 3.06 | Inventory Claims | x |
| Schedule 3.12 | Seller's Insurance | x |
| Schedule 4.03(c) | Purchaser Governmental Approvals | x |

Schedules and Exhibits to Heat Factory. USA, Inc. /Schawbel Technologies, LLC Asset Purchase Agreement

_____ _____
Buyer                          Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

Asset Purchase Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Schedule A | Inventory | x |
| Schedule A-1 | Inventory True-Up Value | x |
| Schedule B | UPC Codes | x |
| Schedule C | Certifications | x |
| Exhibit 2.08(a) | Assignment of Intangible Assets | x |
| Exhibit 2.08(c) | Seller's Authority | x |
| Exhibit 2.08(e) | Seller's Bill of Sale | x |
| Exhibit 2.08(f) | Letters from President of Schawbel Corporation | x |
| Exhibit 2.09(c) | Purchaser's Authority | x |
| Schedule 3.06 | Inventory Claims | x |
| Schedule 3.12 | Seller's Insurance | x |
| Schedule 4.03(c) | Purchaser Governmental Approvals | x |

Schedules and Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Asset Purchase Agreement

_____     _____
Buyer                        Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753

## SCHEDULE A

## INVENTORY

See attached list which is incorporated herein by reference.

Schedules and Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC, Asset Purchase Agreement

Buyer          Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

# SCHEDULE A
## INVENTORY

See attached list which is incorporated herein by reference.

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753

# SCHEDULE A

| | On Hand | Calculated Avg | Asset Value |
|---|---|---|---|
| HW-18MEN-DUMMY (Heated Insoles 18ProFLEX Dummy) | 0.00 | 0.00 | 0.00 |
| HW20-12MEN-D (Heated Insoles ProFLEX Display (4L 6XL 2XXL 6XB)) | 0.00 | 644.22 | 0.00 |
| HW20-12MEN-D(CA) (Heated Insoles ProFLEX Display (4L 6XL 2XXL 6XB)) | 0.00 | 649.38 | 0.00 |
| HW20-12MEN-DUMMY (Heated Insoles ProFLEX Dummy Display) | 0.00 | 0.00 | 0.00 |
| HW20-12MEN-DUMMY (CA) (Heated Insole ProFlex Dummy display) | 0.00 | 0.00 | 0.00 |
| HW20-12MWY-D (Heated Insole ProFLEX Display (2S, 2M, 2L, 4XL, 2XXL, 6XB)) | 0.00 | 654.75 | 0.00 |
| HW20-12MWY-D(CA) (Heated Insoles ProFLEX Sidekick Display (2S, 2M, 2L, 4XL, 2XXL,... | 0.00 | 690.26 | 0.00 |
| HW20-18MEN-D (Heated Insole ProFLEX Display (6L, 9XL, 3XXL, 9XB)) | 0.00 | 968.54 | 0.00 |
| HW20-18MEN-D(CA) (Heated Insole ProFLEX Display (6L, 9XL, 3XXL, 9XB)) | 0.00 | 994.67 | 0.00 |
| HW20-18MWY-D (Heated Insoles ProFLEX Sidekick Display (3S, 3M, 3L, 6XL, 3XXL, 9XB)) | 1.00 | 998.80 | 998.80 |
| HW20-18MWY-D(CA) (Heated Insoles ProFLEX Sidekick Display (3S, 3M, 3L, 6XL, 3XXL,... | 0.00 | 1,007.78 | 0.00 |
| HW20-L (Heated Insoles ProFLEX - Large) | -429.00 | 46.68 | -20,026.27 |
| HW20-L-06 (Heated Insoles ProFLEX - Large (6 HW20-L/Case)) | 1,439.00 | 278.78 | 401,164.36 |
| HW20-L-06 (CA) (Heated Insoles ProFLEX - Large (6 HW20-L/Case)) | 176.00 | 291.90 | 51,374.40 |
| HW20-L-06(AU) (Heated Insoles ProFLEX - Large (6 HW20-L/Case)(AU)) | 0.00 | 260.88 | 0.00 |
| HW20-L (CA) (Heated Insoles ProFLEX - Large) | -100.00 | 46.07 | -4,607.05 |
| HW20-M (Heated Insoles ProFLEX - Medium) | 368.00 | 46.57 | 17,136.05 |
| HW20-M-06 (Heated Insoles ProFLEX - Medium (6 HW20-M/Case)) | 1,126.00 | 278.78 | 313,906.24 |
| HW20-M-06 (CA) (Heated Insoles ProFLEX - Medium (6 HW20-M/Case)) | 55.00 | 291.90 | 16,054.50 |
| HW20-M-06(AU) (Heated Insoles ProFLEX - Medium (6 HW20-M/Case) (AU)) | 0.00 | 260.88 | 0.00 |
| HW20-M (CA) (Heated Insoles ProFLEX - Medium) | -60.00 | 48.65 | -2,919.00 |
| HW20-NXC (Heated Insoles ProFLEX Display (3M 5L 8XL 2XXL 9XB)) | 0.00 | 0.00 | 0.00 |
| HW20-P-LXB (Heated Insoles ProFLEX Pack - 1L, 1XB) | 0.00 | 0.00 | 0.00 |
| HW20-P-LXB-03 (Heated Insoles ProFLEX Pack - 3L, 3XB) | 0.00 | 181.84 | 0.00 |
| HW20-P-MXB (Heated Insoles ProFLEX Pack - 1M, 1XB) | 0.00 | 0.00 | 0.00 |
| HW20-P-MXB-03 (Heated Insoles ProFLEX Pack - 3M, 3XB) | 0.00 | 163.53 | 0.00 |
| HW20-P-SXB (Heated Insoles ProFLEX Pack - 1S, 1XB) | 0.00 | 0.00 | 0.00 |
| HW20-P-SXB-03 (Heated Insoles ProFLEX Pack - 3S, 3XB) | 0.00 | 182.15 | 0.00 |
| HW20-P-XLXB (Heated Insoles ProFLEX Pack - 1XL, 1XB) | 0.00 | 0.00 | 0.00 |
| HW20-P-XLXB-03 (Heated Insoles ProFLEX Pack - 3XL, 3XB) | 0.00 | 182.25 | 0.00 |
| HW20-P-XXLXB (Heated Insoles ProFLEX Pack - 1XXL, 1XB) | 0.00 | 0.00 | 0.00 |
| HW20-P-XXLXB-03 (Heated Insoles ProFLEX Pack - 3XXL, 3XB) | 0.00 | 182.21 | 0.00 |
| HW20-S (Heated Insoles ProFLEX - Small) | 546.00 | 46.46 | 25,368.74 |
| HW20-S-06 (Heated Insoles ProFLEX - Small (6 HW20-S/Case)) | 521.00 | 278.78 | 145,244.32 |
| HW20-S-06 (CA) (Heated Insoles ProFLEX - Small (6 HW20-S/Case)) | 222.00 | 291.90 | 64,801.80 |
| HW20-S-06(AU) (Heated Insoles ProFLEX - Small (6 HW20-S/Case) (AU)) | 0.00 | 260.88 | 0.00 |
| HW20-S (CA) (Heated Insoles ProFLEX - Small) | 2.00 | 52.03 | 104.06 |
| HW20-XB (Heated Insoles ProFLEX - Battery Pack) | -284.00 | 14.29 | -4,058.36 |
| HW20-XB-06 (Heated Insoles ProFLEX - Battery Pack (6 HW20-XB/Case)) | 3,345.00 | 80.52 | 269,353.01 |
| HW20-XB-06 (CA) (Heated Insoles ProFLEX - Battery Pack (6 HW20-XB/Case)) | 1,089.00 | 78.26 | 85,220.16 |
| HW20-XB-06(AU) (Heated Insoles ProFLEX - Battery Pack (6HW20-XB/Case) (AU)) | 0.00 | 77.04 | 0.00 |
| HW20-XB-B2 (2-Pack ProFLEX Loose Batteries) | 3,364.00 | 7.68 | 25,835.52 |
| HW20-XB-B2 (CA) (2-Pack ProFLEX Loose Batteries) | 443.00 | 7.68 | 3,402.24 |
| HW20-XB (CA) (Heated Insoles ProFLEX - Battery Pack) | -42.00 | 13.50 | -567.00 |
| HW20-XB84365 (ProFLEX Battery Packs OUPC) | 413.00 | 14.29 | 5,901.77 |
| HW20-XL (Heated Insoles ProFLEX - X-Large) | -891.00 | 46.47 | -41,404.72 |

# SCHEDULE A

| | On Hand | Calculated Avg | Asset Value |
|---|---|---|---|
| HW20-XL-06 (Heated Insoles ProFLEX - X-Large (6 HW20-XL/Case)) | 839.00 | 251.08 | 210,659.35 |
| HW20-XL-06 (CA) (Heated Insoles ProFLEX - X-Large (6 HW20-XL/Case)) | 218.00 | 291.90 | 63,634.20 |
| HW20-XL-06(AU) (Heated Insoles ProFLEX - XLarge (6 HW20-XL/Case) (AU)) | 0.00 | 260.88 | 0.00 |
| HW20-XL (CA) (Heated Insoles ProFLEX - X-Large) | -83.00 | 46.62 | -3,869.54 |
| HW20-XXL (Heated Insoles ProFLEX - XX-Large) | -152.00 | 46.46 | -7,061.91 |
| HW20-XXL-06 (Heated Insoles ProFLEX - XX-Large (6 HW20-XXL/Case)) | 491.00 | 278.78 | 136,881.01 |
| HW20-XXL-06 (CA) (Heated Insoles ProFLEX - XX-Large (6 HW20-XXL/Case)) | 596.00 | 291.90 | 173,972.40 |
| HW20-XXL-06(AU) (Heated Insoles ProFlex - XXLarge (6 HW20-XXL/Case) (AU)) | 0.00 | 260.88 | 0.00 |
| HW20-XXL (CA) (Heated Insoles ProFLEX - XX-Large) | 14.00 | 49.10 | 687.44 |
| INSDISPLAY-MT (Empty Display) | 0.00 | 0.00 | 0.00 |
| INSDISPLAY-MT-P (Empty ProFlex displays) | 0.00 | 0.00 | 0.00 |
| INSLDISPLAY-DUMMY-GANDER (DUMMY DISPLAY) | 0.00 | 0.00 | 0.00 |
| INSLDISPLAY-MT-P(CA) (Empty Proflex display) | 0.00 | 0.00 | 0.00 |
| INSLDISPLAY-MT(CA) (Empty base model display CA) | 0.00 | 0.00 | 0.00 |
| PAK-3S3L (Heat Packs - 3 Hand Warmers (2 pack) and 3 Pocket Warmers (1 pack)) | 0.00 | 0.00 | 0.00 |
| PAK-BL (Heat Packs - Bluetooth Pocket Warmer (1 pack)) | -55.00 | 29.54 | -1,624.82 |
| PAK-BL-6 (Heat Packs - Bluetooth Pocket Warmer (1 pack) (6-L/Case) ) | 235.00 | 177.26 | 41,656.10 |
| PAK-BL-6(CA) (Heat Packs - Bluetooth Pocket Warmer (1 pack) (6-L/Case) ) | 0.00 | 0.00 | 0.00 |
| PAK-BL(CA) (Heat Packs - Bluetooth Pocket Warmer (1 pack) ) | 0.00 | 0.00 | 0.00 |
| PAK-L (Heat Packs - Pocket Warmer (1 pack)) | -2.00 | 20.71 | -41.42 |
| PAK-L-06 (Heat Packs - Pocket Warmer [1 pack] (6 PAK-L/Case)) | 5,002.00 | 124.26 | 621,548.52 |
| PAK-L-06(AU) (Heat Packs - Hand Warmers [1 pack] (6 PAK-L/Case) (AU)) | 0.00 | 127.92 | 0.00 |
| PAK-L-06(CA) (Heat Packs - Pocket Warmer [1 pack] (6 PAK-AL/Case)) | 1,509.00 | 121.68 | 183,615.12 |
| PAK-L-06NT | 405.00 | 124.26 | 50,325.30 |
| PAK-L (CA) (Heat Packs - Pocket Warmer (1 pack)) | 38.00 | 20.28 | 770.64 |
| PAK-P-1S1L (Heat Pack Bundle (1 Hand Warmer, 1 Pocket Warmer)) | 0.00 | 0.00 | 0.00 |
| PAK-P-1S1L-03 (Heat Pack Bundle (1 Hand Warmer, 1 Pocket Warmer) Case of 3) | 0.00 | 136.11 | 0.00 |
| PAK-S (Heat Packs - Hand Warmers (2 pack)) | -604.00 | 25.39 | -15,335.56 |
| PAK-S-06 (Heat Packs - Hand Warmers [2 pack] (6 PAK-S/Case)) | 4,114.00 | 152.33 | 626,685.62 |
| PAK-S-06 (CA) (Heat Packs - Hand Warmers [2 pack] (6 PAK-S/Case)) | 1,346.00 | 149.04 | 200,607.84 |
| PAK-S-06(AU) (Heat Packs - Hand Warmers [2 pack] (6 PAK-S/Case) (AU)) | 0.00 | 155.28 | 0.00 |
| PAK-S-06NT | 131.00 | 152.33 | 19,955.23 |
| PAK-S (CA) (Heat Packs - Hand Warmers (2 pack)) | -13.00 | 24.84 | -322.92 |
| PAK-S12L6-D (Heat Packs - 12 Hand Warmers (2 pack) 6 Pocket Warmers (1 pack)) | 0.00 | 0.00 | 0.00 |
| PFHD-12MEN-D (ThermaCELL Heated Insoles ProFLEX Heavy Duty Sidekick Display) | 0.00 | 692.04 | 0.00 |
| PFHD-12MEN-D(CA) (ProFLEX Heavy Duty Sidekick (4L, 6XL, 2XXL, 6XB)) | 0.00 | 0.00 | 0.00 |
| PFHD-12MWY-D (ThermaCELL Heated Insoles ProFLEX Heavy Duty Sidekick Display) | 0.00 | 0.00 | 0.00 |
| PFHD-12MWY-D(CA) (ProFLEX Heavy Duty Sidekick (2S, 2M, 2L, 4XL, 2XXL, 6XB)) | 0.00 | 0.00 | 0.00 |
| PFHD-18MEN-D (ThermaCELL Heated Insoles ProFLEX Heavy Duty Sidekick Display) | 0.00 | 0.00 | 0.00 |
| PFHD-18MEN-D(CA) (ProFLEX Heavy Duty Sidekick (6L, 9XL, 3XXL, 9XB)) | 0.00 | 0.00 | 0.00 |
| PFHD-18MWY-D (ThermaCELL Heated Insoles ProFLEX Heavy Duty Sidekick Display) | 0.00 | 0.00 | 0.00 |
| PFHD-18MWY-D(CA) (ProFLEX Heavy Duty Sidekick (3S, 3M, 3L, 6XL, 3XXL, 9XB)) | 0.00 | 0.00 | 0.00 |
| PFHD-L (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large ) | 544.00 | 48.81 | 26,551.08 |
| PFHD-L-6 (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large (6-L/Case) ) | 278.00 | 288.87 | 80,306.76 |
| PFHD-L-6(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large (6-L/Case) ) | 214.00 | 294.65 | 63,055.10 |
| PFHD-L-6(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large (6-L/Case... | 0.00 | 297.42 | 0.00 |



# SCHEDULE A

| | On Hand | Calculated Avg | Asset Value |
|---|---|---|---|
| PFHD-L(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large ) | -19.00 | 52.62 | -999.69 |
| PFHD-L(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Large ) | 0.00 | 49.57 | 0.00 |
| PFHD-M (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium ) | -41.00 | 48.27 | -1,978.97 |
| PFHD-M-6 (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium (6-M/Case ) | 84.00 | 289.01 | 24,277.08 |
| PFHD-M-6(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium (6-M/Case... | 74.00 | 294.65 | 21,804.10 |
| PFHD-M-6(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium (6-M/Cas... | 0.00 | 297.42 | 0.00 |
| PFHD-M(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium ) | -19.00 | 49.11 | -933.07 |
| PFHD-M(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Medium ) | 0.00 | 49.57 | 0.00 |
| PFHD-S (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small ) | 43.00 | 48.83 | 2,099.51 |
| PFHD-S-6 (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small (6-S/Case) ) | -7.00 | 293.22 | -2,052.54 |
| PFHD-S-6(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small (6-S/Case) ) | -1.00 | 294.65 | -294.65 |
| PFHD-S-6(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small (6-S/Case... | 0.00 | 297.42 | 0.00 |
| PFHD-S(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small ) | 86.00 | 49.11 | 4,223.41 |
| PFHD-S(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - Small ) | 0.00 | 49.57 | 0.00 |
| PFHD-XB (Heated Insoles ProFLEX Heavy Duty Battery Pack ) | -72.00 | 17.60 | -1,267.20 |
| PFHD-XB-6 (Heated Insoles ProFLEX Heavy Duty Battery Pack (6-XB/Case) ) | 1,240.00 | 98.03 | 121,561.71 |
| PFHD-XB-6(CA) (Heated Insoles ProFLEX Heavy Duty Battery Pack (6-XB/Case) ) | 385.00 | 92.46 | 35,597.10 |
| PFHD-XB-6(SWD) (Heated Insoles ProFLEX Heavy Duty Battery Pack (6-XB/Case) ) | 0.00 | 101.70 | 0.00 |
| PFHD-XB(CA) (Heated Insoles ProFLEX Heavy Duty Battery Pack ) | -13.00 | 15.41 | -200.33 |
| PFHD-XB(SWD) (Heated Insoles ProFLEX Heavy Duty Battery Pack ) | 0.00 | 0.00 | 0.00 |
| PFHD-XL (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large ) | 506.00 | 48.83 | 24,709.22 |
| PFHD-XL-6 (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large (6-XL/Case) ) | 696.00 | 289.78 | 201,687.12 |
| PFHD-XL-6(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large (6-XL/C... | 292.00 | 291.06 | 84,989.69 |
| PFHD-XL-6(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large (6-XL/... | 0.00 | 297.42 | 0.00 |
| PFHD-XL(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large ) | -25.00 | 50.94 | -1,273.45 |
| PFHD-XL(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - X-Large ) | 0.00 | 49.57 | 0.00 |
| PFHD-XXL (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large ) | -5.00 | 47.92 | -239.60 |
| PFHD-XXL-6 (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large (6-XXL/Ca... | 303.00 | 289.80 | 87,808.26 |
| PFHD-XXL-6(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large (6-XX... | 92.00 | 294.65 | 27,107.80 |
| PFHD-XXL-6(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large (6-X... | 0.00 | 297.42 | 0.00 |
| PFHD-XXL(CA) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large ) | 19.00 | 49.11 | 933.02 |
| PFHD-XXL(SWD) (Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) - XX-Large ) | 0.00 | 49.57 | 0.00 |
| QPUNASSEMBLED(CA) (QP components for display only, no shipping material) | 0.00 | 0.00 | 0.00 |
| SLSKIT (Custom Sales Kit) | 0.00 | 0.00 | 0.00 |
| THS-12DISP-G (Heated Insole Display (1M, 3L, 5XL, 3XXL, 3CC)) | 0.00 | 418.51 | 0.00 |
| THS-12MEN-D (Heated Insole Display(4L, 6XL, 2XXL, 3CC)) | 0.00 | 364.53 | 0.00 |
| THS-12MEN-D(CA) (Heated Insole Display (4L, 6XL, 2XXL, 3CC)) | 0.00 | 418.50 | 0.00 |
| THS-12MWY-D (Heated Insole Display (2S, 2M, 2L, 4XL, 2XXL, 3CC)) | 0.00 | 365.16 | 0.00 |
| THS-12MWY-D(CA) (Heated Insole Display (2S, 2M, 2L, 4XL, 2XXL, 3CC)) | 0.00 | 372.84 | 0.00 |
| THS-18MEN-D (Heated Insoles Display (6L, 9XL, 3XXL, 3CC)) | 0.00 | 538.90 | 0.00 |
| THS-18MEN-D(CA) (Heated Insole Display (6L, 9XL,3XXL,3CC)) | 0.00 | 608.23 | 0.00 |
| THS-18MEN-DUMMY (Heated Insoles 18Dummy Display (original)) | 0.00 | 0.00 | 0.00 |
| THS-18MWY-D (Heated Insole Display (3S, 3M, 3L, 6XL, 3XXL, 3CC)) | 0.00 | 537.89 | 0.00 |
| THS-18MWY-D (CA) (Heated Insole Display (3S, 3M, 3L, 6XL, 3XXL, 3CC)) | 0.00 | 563.81 | 0.00 |
| THS-DSG-18MEN-D (DSG Heated Insole Display (6L, 9XL, 3XXL, 3CC)) | 0.00 | 538.90 | 0.00 |
| THS01-12MEN-DUMMY (Heated Insole Dummy display (original)) | 0.00 | 0.00 | 0.00 |



# SCHEDULE A

| | On Hand | Calculated Avg | Asset Value |
|---|---|---|---|
| THS01-12MEN-DUMMY (CA) (Heated Insole Dummy display (original)) | 0.00 | 0.00 | 0.00 |
| THS01-GC (Base Model Wall Charger) | -20.00 | 2.34 | -46.80 |
| THS01-GC(CA) (Base Model Wall Charger(CA)) | 19.00 | 0.00 | 0.00 |
| THS01-L (Heated Insoles - Large) | 5.00 | 29.31 | 146.54 |
| THS01-L-02 (Rechargeable Heated Insoles (2 THS01-L/case)) | 0.00 | 63.68 | 0.00 |
| THS01-L-06 (Heated Insoles - Large (6 THS01-L/Case)) | -1.00 | 175.84 | -175.84 |
| THS01-L-06 (CA) (Heated Insoles - Large (6 THS01-L/Case)) | -1.00 | 182.92 | -182.92 |
| THS01-L-06(NOR) (ThermaCELL Heated Insoles - Large (6 THS01-L/Case)) | 0.00 | 187.98 | 0.00 |
| THS01-L-06(SWD) (ThermaCELL Heated Insoles - Large (6 THS01-L/Case) ) | 0.00 | 187.98 | 0.00 |
| THS01-L (CA) (Heated Insoles - Large) | 6.00 | 30.36 | 182.16 |
| THS01-L(NOR) (THS01-L(NOR)) | 0.00 | 31.33 | 0.00 |
| THS01-L(SWD) (ThermaCELL Heated Insoles - Large    ) | 0.00 | 31.33 | 0.00 |
| THS01-LCC (Heated Insoles - Large with Car Charger) | 0.00 | 34.61 | 0.00 |
| THS01-M (Heated Insoles - Medium) | 5.00 | 29.01 | 145.03 |
| THS01-M-06 (Heated Insoles - Medium (6 THS01-M/Case)) | 0.00 | 173.79 | 0.00 |
| THS01-M-06 (CA) (Heated Insoles - Medium (6 THS01-M/Case)) | -1.00 | 182.77 | -182.77 |
| THS01-M-06(NOR) (ThermaCELL Heated Insoles - Medium (6 THS01-M/Case)) | 0.00 | 187.98 | 0.00 |
| THS01-M-06(SWD) (ThermaCELL Heated Insoles - Medium (6 THS01-M/Case) ) | 0.00 | 187.98 | 0.00 |
| THS01-M-CA (converted THS01-M to THS01-M-CA - being sent to ABC) | 0.00 | 0.00 | 0.00 |
| THS01-M (CA) (Heated Insoles - Medium) | 6.00 | 30.33 | 181.96 |
| THS01-M(NOR) (THS01-M(NOR)) | 0.00 | 31.33 | 0.00 |
| THS01-M(SWD) (ThermaCELL Heated Insoles - Medium ) | 0.00 | 31.33 | 0.00 |
| THS01-MCC (Heated Insoles - Medium with Car Charger) | 0.00 | 37.79 | 0.00 |
| THS01-MEN-06 (Heated Insoles - Men's Flight (1L, 3XL, 2XXL)) ) | 0.00 | 190.44 | 0.00 |
| THS01-P-LCC (Heated Insoles Pack (1L, 1CC)) | 0.00 | 0.00 | 0.00 |
| THS01-P-LCC-03 (Heated Insoles Pack (3L, 3CC)) | 0.00 | 103.68 | 0.00 |
| THS01-P-MCC (Heated Insoles Pack (1M, 1CC)) | 0.00 | 33.90 | 0.00 |
| THS01-P-MCC-03 (Heated Insoles Pack (3M, 3CC)) | 0.00 | 107.14 | 0.00 |
| THS01-P-SCC (Heated Insoles Pack (1S, 1CC)) | 0.00 | 0.00 | 0.00 |
| THS01-P-SCC-03 (Heated Insoles Pack (3S, 3CC)) | 0.00 | 96.15 | 0.00 |
| THS01-P-XLCC (Heated Insoles Pack (1XL, 1CC)) | 0.00 | 0.00 | 0.00 |
| THS01-P-XLCC-03 (Heated Insoles Pack (3XL, 3CC)) | 0.00 | 102.48 | 0.00 |
| THS01-P-XXLCC (Heated Insoles Pack (1XXL, 1CC)) | 0.00 | 34.89 | 0.00 |
| THS01-P-XXLCC-03 (Heated Insoles Pack (3XXL, 3CC)) | 0.00 | 103.23 | 0.00 |
| THS01-RC (Remote Control) | -17.00 | 0.00 | 0.00 |
| THS01-RC(CA) (Remote Control (CA)) | 28.00 | 0.00 | 0.00 |
| THS01-S (Heated Insoles - Small) | 1,067.00 | 29.14 | 31,091.55 |
| THS01-S-06 (Heated Insoles - Small (6 THS01-S/Case)) | 172.00 | 173.93 | 29,916.61 |
| THS01-S-06 (CA) (Heated Insoles - Small (6 THS01-S/Case)) | 0.00 | 182.86 | 0.00 |
| THS01-S-06(NOR) (ThermaCELL Heated Insoles - Small (6 THS01-S/Case)) | 0.00 | 187.98 | 0.00 |
| THS01-S-06(SWD) (ThermaCELL Heated Insoles - Small (6 THS01-S/Case) ) | 0.00 | 187.98 | 0.00 |
| THS01-S (CA) (Heated Insoles - Small) | 2.00 | 30.55 | 61.10 |
| THS01-S(NOR) (THS01-S(NOR)) | 0.00 | 31.33 | 0.00 |
| THS01-S(SWD) (ThermaCELL Heated Insoles - Small ) | 0.00 | 31.33 | 0.00 |
| THS01-SCC (Heated Insoles - Small with Car Charger) | 0.00 | 37.79 | 0.00 |
| THS01-Wall Charger (Heated Insoles - Wall Charger) | 0.00 | 2.74 | 0.00 |

# SCHEDULE A

| | On Hand | Calculated Avg | Asset Value |
|---|---|---|---|
| THS01-XL (Heated Insoles - X-Large) | 10.00 | 28.95 | 289.47 |
| THS01-XL-02 (Rechargeable Heated Insoles (2 THS01-XL/case)) | 0.00 | 63.68 | 0.00 |
| THS01-XL-06 (Heated Insoles - X-Large (6 THS01-XL/Case)) | -1.00 | 21.38 | -21.38 |
| THS01-XL-06 (CA) (Heated Insoles - X-Large (6 THS01-XL/Case)) | 0.00 | 91.43 | 0.00 |
| THS01-XL-06(NOR) (ThermaCELL Heated Insoles - XLarge (6 THS01-XL/Case)) | 0.00 | 187.98 | 0.00 |
| THS01-XL-06(SWD) (ThermaCELL Heated Insoles - X-Large (6 THS01-XL/Case) ) | 0.00 | 187.98 | 0.00 |
| THS01-XL (CA) (Heated Insoles - X-Large) | 2.00 | 15.70 | 31.40 |
| THS01-XL(NOR) (THS01-XL(NOR)) | 0.00 | 31.33 | 0.00 |
| THS01-XL(SWD) (ThermaCELL Heated Insoles - X-Large ) | 0.00 | 31.33 | 0.00 |
| THS01-XLCC (Heated Insole w/Car Charger) | 0.00 | 37.79 | 0.00 |
| THS01-XXL (Heated Insoles - XX-Large) | 3.00 | 0.00 | 0.00 |
| THS01-XXL-02 | 0.00 | 58.02 | 0.00 |
| THS01-XXL-06 (Heated Insoles - XX-Large (6 THS01-XXL/Case)) | -1.00 | -1.16 | 1.16 |
| THS01-XXL-06 (CA) (Heated Insoles - XX-Large (6 THS01-XXL/Case)) | -4.00 | 182.78 | -731.13 |
| THS01-XXL-06(SWD) (ThermaCELL Heated Insoles - XX-Large (6 THS01-XXL/Case) ) | 0.00 | 187.98 | 0.00 |
| THS01-XXL (CA) (Heated Insoles - XX-Large) | 25.00 | 21.54 | 538.39 |
| THS01-XXL(NOR) (THS01-XXL(NOR)) | 0.00 | 0.00 | 0.00 |
| THS01-XXL(SWD) (ThermaCELL Heated Insoles - XX-Large ) | 0.00 | 31.33 | 0.00 |
| THS01-XXLCC (Heated Insoles XXL w/Car Charger) | 0.00 | 34.45 | 0.00 |
| THS01L-P-PAKS (Heated Insoles-Pack-Large with Hand Warmer ) | 0.00 | 0.00 | 0.00 |
| THS01L-P-PAKS-03 (Heated Insoles-Pack-Large with Hand Warmer (Case of 3) ) | 0.00 | 0.00 | 0.00 |
| THS01M-P-PAKS (Heated Insoles-Pack-Medium with Hand Warmer ) | 0.00 | 0.00 | 0.00 |
| THS01M-P-PAKS-03 (Heated Insoles-Pack-Medium with Hand Warmer (Case of 3) ) | 0.00 | 0.00 | 0.00 |
| THS01S-P-PAKS (Heated Insoles-Pack-Small with Hand Warmer) | 0.00 | 0.00 | 0.00 |
| THS01S-P-PAKS-03 (Heated Insoles-Pack-Small with Hand Warmer (Case of 3) ) | 0.00 | 0.00 | 0.00 |
| THS01XL-P-PAKS (Heated Insoles-Pack-XLarge with Hand Warmer ) | 0.00 | 0.00 | 0.00 |
| THS01XL-P-PAKS-03 (Heated Insoles-Pack-XLarge with Hand Warmer (Case of 3) ) | 0.00 | 0.00 | 0.00 |
| THS01XXL-P-PAKS (Heated Insoles-Pack-XXLarge with Hand Warmer ) | 0.00 | 0.00 | 0.00 |
| THS01XXL-P-PAKS-03 (Heated Insoles-Pack-XXLarge with Hand Warmer (Case of 3) ) | 0.00 | 0.00 | 0.00 |
| THSALL16-QP (Quarter Pallet Display All Product 16 ) | 0.00 | 2,495.72 | 0.00 |
| THSCC-1 (Heated Insoles - Car Charger) | 1,397.00 | 5.26 | 7,354.70 |
| THSCC-1-06 (Heated Insoles - Car Charger (6 TSCC-1/Case)) | 265.00 | 31.59 | 8,372.43 |
| THSCC-1-06 (CA) (Heated Insoles - Car Charger (6 TSCC-1/Case)) | 101.00 | 35.64 | 3,599.64 |
| THSCC-1 (CA) (Heated Insoles - Car Charger) | 16.00 | 2.53 | 40.48 |
| THSPAK-NXC (Heated Insoles Sidekick Display (3M, 6L, 9XL, 9PAK-S)) | 0.00 | 0.00 | 0.00 |
| THSPKXHD16-QP(CA) (Quarter Pallet Display w Heat Packs No HD 16 ) | 0.00 | 0.00 | 0.00 |
| THSXHD16-QP (Quarter Pallet Display No HD 16 ) | 0.00 | 2,135.53 | 0.00 |
| | 33,070.00 | | 4,533,109.41 |
| | 33,070.00 | | 4,533,109.41 |



## SCHEDULE A-1

## INVENTORY TRUE-UP VALUE


See attached list which is incorporated herein by reference.

Buyer          Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753

## SCHEDULE A-1

## INVENTORY TRUE-UP VALUE

See attached list which is incorporated herein by reference.

Schedules and Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Asset Purchase Agreement

_____      _____
Buyer              Seller

This is a disclosure schedule to the Asset Purchase Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

1725753

Schedule A-1
Inventory True-Up Values

| | Per Unit True-Up Value |
|---|---|
| Base Model Insoles | $25.89 |
| Base Model Car Charger | $4.21 |
| Base Model Loose Remotes | $0.03 |
| Base Model Wall Chargers | $2.19 |
| ProFLEX Insoles | $39.49 |
| ProFLEX XB Battery Packs | $11.41 |
| ProFLEX XB replacement batteries | $6.14 |
| ProFLEX HD Insoles | $40.93 |
| ProFLEX HD Battery Packs | $14.96 |
| Heat Packs - Small | $20.30 |
| Heat Packs - Large | $16.57 |
| Heat Packs - BLE | $23.63 |



# EXHIBIT 2

## EXCLUSIVE PATENT LICENSE AGREEMENT

This Agreement ("**Agreement**") is made as of the 18th day of July, 2017 ("**Effective Date**"), by and between Schawbel Technologies LLC., a Massachusetts limited liability company, with a principal place of business at 2400 District Avenue, Burlington, Massachusetts ("**Licensor**") and Heat Factory, USA, LLC. ("**Licensee**"), a Nevada corporation with a principal place of business at 1958 Kellogg Ave., Carlsbad, CA 92008, each referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

Licensor is in the business of manufacturing, marketing, distributing and selling those heating products set forth in **Appendix A** ("**Heating Products**").

Licensor and Licensee have entered into an Asset Purchase Agreement of even date ("**Asset Purchase Agreement**") providing for, among other things, the sale by Licensor to Licensee all of Licensor's finished Heating Products in inventory ("**Inventory**").

Licensee intends to resale the Inventory under Licensor's brand name ThermaCELL.

Licensor is the owner of certain patents, technological information, and general know-how used in the manufacturing of the Heating Products.

In addition to the resell of the Inventory, Licensee desires to manufacture, distribute, and sell new Heating Products under its own brand name. To that end Licensee desires to license certain patents, technological information, and general know-how from Licensor in exchange for royalty payments on the terms and conditions set forth in this Agreement. Licensor desires to grant such a license to Licensee.

Licensee has the capability to commercially manufacture, or have manufactured, distribute and sell the Heating Products and accordingly desires to license Licensor's patent rights, technological information, and general know-how.

Accordingly, for good and valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

## 1. DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings, unless the context unequivocally requires otherwise.

1.1    "**Agreement**" has the meaning set forth in the introductory paragraph.

1.2    "**Affiliate**" with respect to either Party shall mean any corporation or other legal entity other than that Party in whatever country organized, controlling, controlled by or under common control with that Party. The term "control" shall mean (i) in the case of Licensee, direct or indirect ownership by Licensee or a relative of Licensee of fifty percent (50%) or more of the voting securities or membership interests having the right to elect directors or otherwise direct management and policies, and (ii) in the case of Licensor, the power, direct or indirect, to elect or appoint fifty percent (50%) or more of the directors or trustees, or to cause direction of management and policies, whether through the ownership of voting securities, by contract or otherwise.

1.3    "**APA Nonpayment**" has the meaning set forth in Section 9.4.

1.4    "**Applicable Due Date**" has the meaning set forth in Section 3.4.

1.5    "**Asset Purchase Agreement**" means the Asset Purchase Agreement between Licensor and Licensee of even date.

1.6    "**Certifications**" refer to those certifications identified on **Appendix B**.



1.7　"**Claim**" shall mean any pending or issued claim of any Patent that has not been permanently revoked, nor held unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction that is unappealable or unappealed in the time allowed for appeal.

1.8　"**Defense Notice**" has the meaning set forth in Section 6.1.

1.9　"**Effective Date**" has the meaning set forth in the introductory paragraph.

1.10　"**Financing Capacity**" has the meaning set forth in Section 2.4(a).

1.11　"**General Know-How**" means Licensor's customer list, and unpatented technical information relating to Licensor's development, manufacturing, processing and quality control of the Heating Products and the Patents Rights, including without limitation know how, manuals, specifications, procedures, flow charts, apparatus plans, and any other information or documentation communicated as a result of Licensor's imparting directly to, or giving Licensee access to, the same. Notwithstanding the foregoing, General Know-How expressly excludes any Technological Information or Patent Rights.

1.12　"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, Canada, or any state, county, city, province or other political subdivision or similar governing entity where the Products are sold.

1.13　"**Heated Insole**" shall mean any heated, battery-operated, insole, other than the Products, that is manufactured, distributed, marketed, or sold by Licensee.

1.14　"**Heating Products**" has the meaning set forth in the recitals.

1.15　"**Improvements**" means all developments Licensee may make regarding or related to the Patent Rights, Technological Information, General Know-How, Products, and/or Process prior to the termination of this Agreement, whether or not patentable.

1.16　"**Infringement Claims**" has the meaning set forth in Section 6.1.

1.17　"**Initial Payment Date**" has the meaning set forth in Section 2.5.

1.18　"**Inventory**" has the meaning set forth in the recitals.

1.19　"**Laws**" or "**Law**" means all laws, statutes, rules, regulations and ordinances, and any other pronouncements having the effect of law, of any Governmental Authority.

1.20　"**Judgment of Infringement**" has the meaning set forth in Section 3.1(e).

1.21　"**Legal Expenses**" has the meaning set forth in Section 6.2.

1.22　"**License Territory**" shall mean the United States of America and Canada provided, however, that in the event there is no existing, uncured, Payment Default as of December 31, 2017, the License Territory shall expand to include all of the World.

1.23　"**Licensee**" has the meaning set forth in the introductory paragraph.

1.24　"**Licensee's Indemnitees**" has the meaning set forth in Section 7.1(b).

1.25　"**Licensee's Insurance**" has the meaning set forth in Section 7.2(a).

1.26　"**Licensor**" has the meaning set forth in the introductory paragraph.

1.27　"**Licensor's Indemnitees**" has the meaning set forth in Section 7.1(a).

1.28　"**Net Sales**" shall be calculated as set forth in this Section 1.26.

    (a)　Subject to the conditions set forth below, "Net Sales" shall mean:

        (i)　the gross amount billed or invoiced to the customer, or if no such bill or invoice is issued the amount of consideration received, whichever is greatest, by

2



Licensee and its Affiliates for or on account of Sales of Products, Inventory, or Heated Insoles in a given Reporting Period;

(ii)    less the following amounts, to the extent identified or separately stated on a bill or invoice, or subsequent invoice, or if not separately invoiced, on a pro rata dollar for dollar basis actually paid, credited, reduced, or otherwise incurred by Licensee and its Affiliates in effecting such Sales in that given Reporting Period:

(A)    amounts repaid or credited by reason of rejection, refund, or return of the Products or Heated Insoles;

(B)    allowances for damaged, obsolete, and defective goods;

(C)    customary trade and quantity discounts to the extent allowed and taken, including but not limited to promotional coupons, rebates, consumer or trade discount incentives;

(D)    amounts for freight charges or freight absorption, insurance, handling and shipping charges applicable to the Products or Heated Insoles;

(E)    any and all taxes, customs duties and other governmental charges levied on or measured by Sales, transportation or delivery of Products or Heated Insoles, whether paid by or on behalf of Licensee so long as Licensee's price is reduced thereby, but not franchise or income taxes of any kind whatsoever; and

(F)    if any of the deduction amounts set forth in Section 1.9(a)(ii) are incurred by Licensee after the Reporting Period in which the Net Sale is reported, Licensee may later report such amounts and take the deductions in a subsequent Reporting Period.

(b)    Specifically excluded from the definition of "Net Sales" are amounts attributable to any Sale of any Product or Heated Insole between or among Licensee and any Licensee Affiliate, and any use or sale of the Inventory prior to January 1, 2018.

(c)    No deductions shall be made for any commissions paid to any individuals.

(d)    Net Sales shall be deemed to have occurred and the applicable Product or Heated Insole "Sold" on the earlier of: 1) the date payment is received for the Sold Product or Heated Insole; or 2) the due date for full payment of the Sold Product or Heated Insole. In the event that more than one payment is made for a Sold Product or Heated Insole, each such partial payment made before the due date for full payment shall be deemed a separate Sale for purposes of calculating Net Sale in accordance with the preceding sentence.

(e)    No item of Inventory shall be Sold at a price that is lower than eighty percent (80%) of the item's value , as reflected on Schedule A-1 of the Asset Purchase Agreement, or for non-cash consideration (whether or not at a discount) without the prior written consent of Licensor, which consent shall not be unreasonably withheld. Without such prior written consent of Licensor, for purposes of calculating Net Sales the gross amount billed or invoiced for that item shall be deemed to be eighty percent (80%) of the item's value, as reflected on Schedule A-1 of the Asset Purchase Agreement.

1.29    "Notice of Intent Not to Prosecute" has the meaning set forth in Section 5.1.

1.30    "Notice of Sale" has the meaning set forth in Section 2.4(a).

1.31    Notice of Termination of Infringement Claims has the meaning set forth in Section 6.1.

1.32    "Offered Patent Rights" has the meaning set forth in Section 2.4(a).



1.33 **"Over Due Payment"** has the meaning set forth in Section 3.4.

1.34 **"Party"** has the meaning set forth in the introductory paragraph.

1.35 **"Parties"** has the meaning set forth in the introductory paragraph.

1.36 **"Patents"** has the meaning set forth in Section 1.35.

1.37 **"Patent Rights"** shall mean the U.S. Patents and U.S. Patent Applications or the equivalent of applications, including any division, continuation (including continuation-in-part) or any foreign patent application or Letters Patent or the equivalent thereof issuing thereon or reissue, reexamination or extension thereof, as identified in **Appendix C** (**"Patents"**), and any patents or applications currently owned or later owned by Licensor related to the Products or Process.

1.38 **"Payment Default"** has the meaning set forth in Section 9.4.

1.39 **"Payment Default Notice"** has the meaning set forth in Section 9.4.

1.40 **"Person"** means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

1.41 **"Process"** shall mean any process, method or service the use or performance of which, in whole or in part:

    (a)    absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents; or

    (b)    employs, is based upon or is derived from Technological Information or General Know-How.

1.42 **"Product"** shall mean any tangible property, article, device or composition, the manufacture, use, or sale of which, in whole or in part:

    (a)    absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents; or

    (b)    employs, is based upon or is derived from Technological Information or General Know-How.

1.43 **"Proposed Third Party Sale"** has the meaning set forth in Section 2.4.

1.44 **"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, Representatives, attorneys, accountants, investment bankers, Affiliates or Representatives of (i) any such Person or (ii) any Affiliate of such Person.

1.45 **"Reporting Period"** shall mean each month commencing on January 1, 2018. For clarification, the first Reporting Period shall commence on January 1, 2018 and end on January 31, 2018.

1.46 **"ROFR"** has the meaning set forth in Section 2.4.

1.47 **"Royalties"** has the meaning set forth in Section 3.1.

1.48 **"Sales Report"** has the meaning set forth in Section 4.2.

1.49 **"Sell"** (and **"Sale"** and **"Sold"** as the case may be) shall mean to sell or have sold, to lease or have leased, to import or have imported or otherwise to transfer or have transferred a Product, Inventory, or Heated Insole from Licensee or and Affiliate of Licensee to a third party in exchange for valuable consideration paid to Licensee or its Affiliate, in the form of cash or otherwise.

4



1.50    **"Technological Information"** shall mean the following items owned by Licensor as of the Effective Date:

    1.50.1  Bill of materials for the Heating Products;

    1.50.2  Testing software for the Heating Products;

    1.50.3  Drawings and designs related to the manufacturing of the Heating Products;

    1.50.4  Heating Product related proprietary software and firmware;

    1.50.5  Testing quality and durability processes for the Heating Products;

    1.50.6  Bluetooth software application applicable to the Heating Products; and

    1.50.7  Heating Product certifications and registrations.

1.51    **"Term"** has the meaning set forth in Section 9.1.

1.52    **"Transitional Services"** has the meaning set forth in Section 2.5.

## 2. LICENSE

2.1    Grant of License.

    (a)    Subject to the terms of this Agreement Licensor hereby grants to Licensee for the License Territory:

        (i)    an exclusive, royalty-bearing license of the Patent Rights to make, have made, use, have used, Sell and have Sold, Products; and

        (ii)    the exclusive royalty-free right to use Technological Information and General Know-How disclosed by Licensor to Licensee hereunder in accordance with this Agreement, provided, however, that such right shall be non-exclusive in relation to (y) any third party purchaser of Patent Rights pursuant to Section 2.4, and (z) any use of Technological Information and General Know-How unrelated to Heating Products and/or the Patent Rights.

    (b)    Scope of License. The license granted in Section 2.1(a) includes, but is not limited to, licenses to:

        (i)    the right to grant to any customer, user or consumer of Products the right to use, lease, and resell such purchased Products or Process in a method coming within the scope of Patent Rights;

        (ii)    the right to grant a reseller of Licensee the right to Sell (but not to make, have made, use or have used) such Products for or on behalf of Licensee in a manner consistent with this Agreement;

        (iii)    make, have made, use, export and import machines, tools, materials and other instrumentalities, insofar as such machines, tools, materials and other instrumentalities are involved in, incidental to or otherwise desirable for the development, manufacture, testing or repair of Products or Processes which are or have been made, used, leased, owned, sold, exported or imported by the Licensor;

        (iv)    combine and/or bundle such Products (as sold or leased) with any other product; and

        (v)    utilize a method or process involving the use of a Product or Process to manufacture (including associated testing) any other product.

5



2.2     No Retained Rights. Subject to the terms and conditions of this Agreement, including but not limited to Section 11.1 (Covenant not to Compete), any and all licenses granted hereunder are subject to the right of Licensor and its Affiliates to use and rely on and make use of the Patent Rights, Technological Information and General Know How in any manner Licensor should elect other than to grant another license thereof.

2.3     No Additional Rights. It is understood that nothing in this Agreement shall be construed to grant Licensee or any of its Affiliates a license, express or implied, under any patent owned solely or jointly by Licensor other than of the Patent Rights, Technological Information, and General Know-How expressly licensed in this Agreement.

2.4     Right of First Refusal. In the event that Licensor enters into an agreement with a third party, including an Affiliate of Licensor, the effect of which is to transfer ownership or control of the Patent Rights, whether through an outright sale of the Patent Rights, assignment of this Agreement, or a change in control of Licensor through stock sale (of 50% or more of stock), merger, or acquisition (a "**Proposed Third Party Sale**"), Licensee shall have the right, subject to the terms of this Section 2. 4, to acquire the Patent Rights being sold on the same terms and conditions as the Proposed Third Party Sale (the "**ROFR**").

　　(a)     Licensor shall promptly give Licensee written notice ("**Notice of Sale**") of the terms and conditions of the Proposed Third Party Sale; which Patent Rights (if less than all) are being sold ("**Offered Patent Rights**"); the purchase price; and terms of payment. Licensee shall have twenty four (24) business days from the date of the Notice of Sale to inform Licensor in writing of its election to match the terms and conditions, including without limitation price, of the Proposed Third Party Sale, and to provide reasonable evidence of Licensee's capacity to pay whatever consideration is provided for in the Proposed Third Party Sale ("**Financing Capacity**"). Should Licensee timely make such election and demonstrate its Financing Capacity, then Licensor shall sell the Offered Patent Rights to Licensee pursuant to the terms and conditions of the Proposed Third Party Sale, and such sale shall close no later than thirty (30) days following the date of Licensee's election to match the Proposed Third Party Sale. Failure by to close the within such thirty (30) period shall terminate Licensee's right of first refusal, unless the delay is caused by Licensor.

　　(b)     In the event that Licensee fails to exercise its right of first refusal as provided in this Section 2.4(a), then, Licensor may sell the Offered Patent Rights to the proposed purchaser on the terms set forth in the Notice of Sale. The Licensor may not, however, sell to any other person or entity, or at any other price or on any other terms and conditions, than those specified in the original Notice of Sale, without giving a new Notice of Sale in accordance with Section 2.4(a) and allowing Licensee a first right of refusal to the changed terms.

　　(c)     Any third party purchaser of the Offered Patent Rights shall take the Offered Patent Rights subject to the licenses provided in this Agreement, and shall be bound by the terms set forth in this Agreement.

2.5     Transitional Services. Licensor shall provide to Licensee certain research and development consulting services identified on **Schedule 2.5** (the "**Transitional Services**") to assist Licensee with its manufacturing, marketing and sale of Products and Process. Licensor shall provide all the Transitional Services on or before August 31, 2017. For the Transitional Services, Licensee shall pay to Licensor $500,000, payable in three (3) installments, the first of which in the amount of $125,000 shall be paid on

6



or before the tenth (10th) day following the Closing Date (the **"Initial Payment Date"**), the second installment, in the amount of $187,500, shall be paid on or before September 1, 2017, and the third installment, in the amount of $187,500, shall be paid on or before October 1, 2017. Licensor shall provide the Transitional Services in its capacity as an independent contractor. Licensor agrees that neither it nor its employees will become an employee, partner, agent, or principal of Licensee by virtue of providing the Transitional Services and agrees it and its employees are not entitled to the rights or benefits afforded to License's employees, including disability or unemployment insurance, workers' compensation, medical insurance, sick leave, or any other employment benefit. Licensor is responsible for providing, at its own expense, disability, unemployment, and other insurance, workers' compensation, training, permits, and licenses for its employees and subcontractors. Licensor shall provide the Transitional Services under this Agreement under the general direction of Licensee, but Licensor shall determine, in Licensor's sole discretion, the manner and means by which the Transitional Services are provided.

### 3. PAYMENTS AND ROYALTIES

3.1     Royalties. Commencing on January 1, 2018 and continuing and until this Agreement shall be terminated, and subject to the terms of this Agreement, Licensee shall pay Licensor a percentage of the Net Sales for each Reporting Period as follows (**"Royalties"**):

| Amount of Next Sales | Royalties |
|---|---|
| $0 to $4,999,999 million | 8% |
| $5 million to $9,999,999 million | 6% |
| $10 million to $14,999,999 million | 5% |
| $15 million and above | 4% |

(a) For clarification, no Royalties shall be due for any Sales made on or before December 31, 2017.

(b) When due, Royalties shall be calculated and paid monthly, and all payments due to Licensor under this Section 3.1 shall be due and payable by Licensee within thirty-five (35) days after the end of each Reporting Period in which the Royalty was earned, and shall be accompanied by a Sales Report as set forth in Section 4.2.

(c) In the event that a license granted by this Agreement becomes nonexclusive pursuant to the terms of this Agreement, the Royalties payable pursuant to this Section 3.1 shall be reduced to three and one half (3.5) percent of the Net Sales due and payable from on and after the date such license become nonexclusive.

(d) In the event any Patent Rights have expired or been found by a court of competent jurisdiction to be invalid or unenforceable, from and after the expiration or finding of invalidity or unenforceability, as the case may be, no Royalties will be due on the Net Sales for Products or Process that utilize such expired, invalid, or unenforceable Patent Rights.

3.2     Minimum/Advance on Royalty.

In any event, Licensee guarantees Licensor a total aggregate minimum royalty of $300,000, which shall be payable on the dates, and in the amounts, set forth below. On each of the dates set forth below, Licensee shall pay to Licensor the difference between the total aggregate Royalties actually paid to Licensor as of that date, pursuant to Section 3.1, and the aggregate minimum royalty amount set forth next to such date, all of which payments may be credited as provided in the following sentence but otherwise are nonrefundable. To the extent that Licensee's payment of the guaranteed $300,000 minimum royalty as set forth herein exceeds the actual Royalties due under Section 3.1, any such overpayment shall be deemed an advance payment on future Royalties owed to Licensor under Section 3.1.

Exhibit B, Page 735



| Date | Aggregate Minimum Royalties |
|------|------------------------------|
| January 15, 2018 | $50,000 |
| February 15, 2018 (an additional $50,000) | $100,000 |
| March 15, 2018 (an additional $50,000) | $150,000 |
| April 15, 2018 (an additional $50,000) | $200,000 |
| May 15, 2018 (an additional $50,000) | $250,000 |
| June 15, 2018 (an additional $50,000) | $300,000 |

3.3     Form of Payment. All payments due under this Agreement shall be drawn on a United States bank and shall be payable in United States dollars. Conversion of foreign currency to U.S. dollars shall be made at the conversion rate existing in the United States, as reported in The Wall Street Journal, on the last working day of the applicable Reporting Period. Such payments shall be without deduction of exchange, collection or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as permitted in the definition of Net Sales or as required by Law. Payments shall be made by wire transfer to Licensor as follows:

ABA #011500120

Account #1316446368

Bank Citizens Bank

One Citizens Drive, Riverside Rhode Island

3.4     Overdue Payments. If any payment due under this Agreement has not paid within three (3) days of the applicable due date ("**Applicable Due Date**"), Licensor shall provide five (5) days written notice to Licensee of such nonpayment. If the payment is not paid within the five (5) notice period, the unpaid payment shall be considered an "**Overdue Payment,**" and shall bear interest beginning on the Applicable Due Date. Interest shall be compounded annually at the rate of fifteen percent (15%), or if lesser, the maximum permitted by law. Any such Overdue Payment when made shall be accompanied by all interest so accrued. Said interest and the payment and acceptance thereof shall not preclude Licensor from exercising any other rights it may have as a consequence of the lateness of any payment.

3.5     Taxes. Licensor shall be solely responsible for, and shall pay in a timely manner, all taxes and fees due as a result of Licensee's remittance of any payments, including Royalties, under this Agreement.

3.6     Offset for Indemnification Under APA: In the event Licensee (a.k.a. "Purchaser" under the Assets Purchase Agreement) has any claim for indemnification against Licensor (a.k.a. "Seller" under the Assets Purchase Agreement), pursuant to Section 7.02(a) of Asset Purchase Agreement, and provided that Licensee has made all undisputed payments of the Purchase Price under the APA, Licensee shall have the right to offset any such owed indemnification against any payment of Royalties due under this Agreement until Licensee has been fully indemnified, to the extent that such claim for indemnification: 1) has been agreed to by the Parties; 2) has been determined by a final, non-appealable court order; or 3) relates to any Bulk Sales Claims. In addition, each calendar year, beginning with the calendar year of the Effective Date, Purchaser shall have the right to set off against any Royalties (provided Licensee has made all undisputed payments of the Purchase Price under the APA) any claims for indemnification, whose liability in the aggregate with any other claims made under the APA during that same calendar year (excluding those claims agreed to by the Parties, determined by a final order, or relating to Bulk Sales Claims, as set forth in preceding sentence) has been valued (in Licensee's sole and absolute discretion) to be Twenty Thousand dollars ($20,000) or less. In the event that Licensee is not entitled to a set-off against Royalties as provided in the preceding sentence, Licensee shall be entitled withhold from payment of Royalties an amount equal to the value of any claim for indemnification (as determined in Licensee's sole

Exhibit B, Page 736



and absolute discretion), less any unused portion of the aggregate $20,000, which shall be offset against Royalties as provided in the preceding sentence, and shall deposit such withholdings into escrow. Any sums deposited into escrow shall only be released in accordance with: 1) a written agreement of the Parties; or 2) a non-appealable final order of a court with appropriate jurisdiction. The Parties agree to execute all escrow instructions necessary, or reasonably requested by escrowholder, to ensure the escrowed funds are released from escrow in accordance with this Section 3.6. All escrow costs shall be shared equally by the Parties.

## 4   REPORTS AND RECORDS

4.1     Diligence Reports. Within one hundred twenty (120) days after the end of each calendar year, Licensee shall report in writing to Licensor with regard to the development and manufacturing of Products during such preceding twelve (12) months period, including without limitation the development of new Products, and the modification of extant Products. Notwithstanding the foregoing, as it regards the reporting of any development of Products, new Products, and the modification of extant Products, Licensee shall only be obligated to report the developments if Licensee intends to market the development within ten (10) months of the date of the report.

4.2     Sales Reports. Licensee shall report to Licensor the date of the first commercial sale of each Product in each country of the License Territory within thirty (30) days of each such occurrence. For each Reporting Period, Licensee shall prepare a sales report substantially the format outlined in **Appendix D** ("**Sales Report**"). Each Sales Report under this Section 4.2 shall be certified as correct by an officer of Licensee and shall contain at least the following information as may be pertinent to a royalty accounting hereunder for the Reporting Period being documented:

   (a)     the number of Products Sold by Licensee and its Affiliates in each country;

   (b)     the amounts billed, invoiced and received by Licensee and its Affiliates for each Product, in each country, and total billings or payments due or made for all Products;

   (c)     calculation of Net Sales for the applicable Reporting Period in each country, including an itemized listing of permitted offsets and deductions;

   (d)     total Royalties payable on Net Sales in U.S. dollars, together with the exchange rates used for conversion;

   (e)     any other payments due to Licensor under this Agreement.

   (f)     if no amounts are due to Licensor for any Reporting Period, the Sales Report shall so state.

Each Sales Report shall be submitted to Licensor within thirty-five (35) days of the end of the Reporting Period being documented in the Sales Report. Submission of the Sales Report shall be accompanied with payment of any Royalties due for the Reporting Period documented in the Sales Report.

4.3     Audit Rights. Licensee shall maintain, and shall cause each of its Affiliates to maintain, complete and accurate records relating to the rights and obligations under this Agreement and any amounts payable to Licensor in relation to this Agreement, which records shall contain sufficient information to permit Licensor and its representatives to confirm the accuracy of any payments and reports delivered to Licensor and compliance in all other respects with this Agreement. Licensee shall retain and make available, and shall cause each of its Affiliates to retain and make available, such records for at least two (2) years following the end of the calendar year to which they pertain, to Licensor and/or its representatives and upon at least fifteen (15) days' advance written notice, for inspection during normal business hours, to verify any reports and payments made and/or compliance in other respects under this Agreement. If Licensor does not notice and conduct a review of Licensee's records within the two year period, or timely conducts such a review but does not provide written notice to Licensee of any objections

9



or disputes regarding the reviewed documents within the two year period, Licensor shall be deemed to have accepted all information, Sales Report and Royalties calculations presented to it by Licensee during that period to which the records pertain, and will be deemed a waiver of Licensor's right to further challenge the accuracy or appropriateness of the same. Notwithstanding the foregoing, in the event this Agreement is terminated, the two (2) year audit period described above shall be reduced to six (6) months from the date of termination, after which, Licensor shall have no further rights to audit Licensee's records, and Licensor shall be deemed to have accepted all information, Sales Report and Royalties calculations presented to it by Licensee during the Term of this Agreement, and will be deemed a waiver of Licensor's right to further challenge the accuracy or appropriateness of the same.

Licensor shall bear all costs associated with such audits, unless the examination conducted by Licensor or its representatives pursuant to the provisions of this Section shows an underpayment of five percent (5%) or more in any payment due to Licensor hereunder, in which case Licensee shall bear the full cost of such audit and shall remit any amounts due to Licensor (including interest due in accordance with Section 3.4) within thirty (30) days of receiving notice thereof from Licensor.

## 5. PATENT PROSECUTION AND MAINTENANCE

5.1     Prosecution. Licensor shall be solely responsible for and, timely pay all sums required and necessary for (including attorney's fees), the preparation, filing, prosecution and maintenance of all patent applications and patents included in Patent Rights and Technological Information. Licensor shall provide Licensee with a list of all United States and foreign patents and patent applications now or hereafter included within the Patent Rights that are issued by the USPTO or any foreign patent office or equivalent and the dates upon which any filings or maintenance fees are due. Licensor shall supplement this list upon the issuance of any new patents in the future which are included within the Patent Rights. Licensor shall provide Licensee with written confirmation of payment of all maintenance fees each calendar quarter on the fifteenth (15th) day of the first month of each quarter. If, for any reason, Licensor fails to make a required maintenance fee payment, Licensee and/or any of its Affiliates may, in its sole discretion, make the required maintenance fee payment, in which case Licensor shall reimburse Licensee within ten (10) business days for all sums and expenses paid (including attorney's) by Licensee related to or arising from Licensee's payment of the maintenance fee. If Licensor fails to timely reimburse Licensee, Licensee may offset such amounts from future Royalties due to Licensor under this Agreement. Licensor hereby appoints Licensee and its Related Companies as Licensor's attorney-in-fact solely for the purpose of making any such maintenance fee payment.

Licensor shall be obligated to diligently prosecute all patent applications pending as of the Effective Date until Licensor provides written notice to Licensee of its decision not to continue the prosecution of a particular application ("**Notice of Intent Not to Prosecute**"). After giving the Notice of Intent Not to Prosecute, Licensor shall have no further obligation to continue the prosecution of the pending application so noticed. Licensor shall have no obligation to commence the filing and/or prosecution of any patent or claim applications not pending as of the Effective Date.

Licensee shall have the right, at its sole cost and expense, to continue the prosecution of any pending application for which Licensor provides a Notice of Intent Not to Prosecute. In the event Licensee assumes the prosecution of the pending application, Licensor shall assign 100% if all rights and interests in the pending application to Licensee. Licensor hereby appoints Licensee and its Related Companies as Licensor's attorney-in-fact solely for the purpose of making any such assignment.

5.2     Copies of Documents. With respect to any patent application or patent included in the Patent Rights, Licensor shall instruct the patent counsel prosecuting such Patent Right to (i) copy Licensee on all patent prosecution and maintenance documents that are received from or filed with the United States Patent and Trademark Office and foreign equivalent, as applicable; (ii) if requested by Licensee, provide Licensee with copies of draft submissions to the USPTO prior to filing; and (iii) give fair and reasonable consideration to the comments and requests of Licensee or its patent counsel.

10

5.3     Confidentiality of Prosecution and Maintenance Information. Licensee agrees to treat all information related to prosecution and maintenance of Patent Rights as Confidential Information in accordance with the provisions of **Appendix E**.

## 6. THIRD PARTY INFRINGEMENT AND LEGAL ACTIONS

6.1     Licensor Right to Prosecute. Within ten (10) days of learning of any: 1) infringement by any third party of any Claim of any Patent; 2) the unauthorized disclosure of any of the Technical Information or General Know-How to any person or entity (other than the Parties hereto and their employees); 3) any claim or suit alleging that the Patent Rights, Technological Information, or General Know-How infringe upon a third party's rights; or 4) any claim or suit alleging the Technical Information or General Know-How contains confidential information belonging to a third party (collectively "**Infringement Claims**"), the Party learning of any such Infringement Claims shall promptly notify the other Party in writing providing factual details thereof. Upon learning, from any source, of any Infringement Claims Licensor will protect the Patent Rights, Technical Information, and General Know-How from such infringement or disclosure, as the case may be. Licensor shall provide written notice to Licensee within one (1) month of learning of any such Infringement Claims whether Licensor intends to prosecute the alleged infringement or disclosure ("**Defense Notice**"). If Licensor provides such Defense Notice, Licensor shall, within two (2) months of the Defense Notice either (i) cause such infringement or disclosure to terminate, or (ii) initiate legal proceedings against the infringer, or defend against claims of infringement, as the case may be, and shall immediately provide notice to Licensee when it has accomplished the same ("**Notice of Termination of Infringement Claims**"). Licensor shall be solely responsible for all costs, expenses (including attorney's fees) and liabilities in connection with any such action and shall indemnify and hold Licensee harmless therefrom, regardless of whether Licensee is a party-plaintiff. Before commencing such action, Licensor shall consult with Licensee, concerning, among other things, the advisability of bringing suit, the selection of counsel and the jurisdiction for such action, and shall use reasonable efforts to accommodate the views of Licensee regarding the proposed action. Notwithstanding the foregoing, Licensor shall have the right to control and manage such suit, proceeding and/or settlement in Licensor's sole discretion, and without Licensee's prior consent or approval.

6.2     Licensee Right to Prosecute. In the event that Licensor fails to: 1) timely provide the Defense Notice; or 2) provide the Notice of Termination of Infringement Claims within 2 months of the Defense Notice, Licensee shall have the right, upon 5 days' notice to Licensor, to initiate or defend, as the case may be, legal proceedings against the infringer or disclosure, as the case may be. Before commencing such action, Licensee and, as applicable, any Affiliate, shall consult with Licensor, concerning, among other things, the advisability of bringing suit, the selection of counsel and the jurisdiction for such action, and shall use reasonable efforts to accommodate the views of Licensor regarding the proposed action. Notwithstanding the foregoing, Licensee shall have the right to control and manage such suit, proceeding and/or settlement in Licensee's sole discretion, and without Licensor's prior consent or approval. Licensor shall be solely liable for all costs, expenses (including reasonable attorney's fees) and liabilities in connection with any such action (collectively "**Legal Expenses**"), but Licensee shall be responsible for advancing the Legal Expenses, subject to the offset and reimbursement provisions set forth in this Section 6.2. In the event Licensee advances any Legal Expenses, Licensee may offset such Legal Expenses against any payments due to Licensor under this Agreement, including Royalties, until fully reimbursed.

6.3     Licensor and Licensee Joined as Party-Plaintiff. If Licensor or Licensee elects to commence an action as described in Sections 6.1 or 6.2 above, Licensor or Licensee, as the case may be, shall join the action if requested by the other Party, and if not so requested, shall have, in its sole discretion, the option to join such action as a party-plaintiff.

6.4     Notice of Actions; Settlement. Licensee and Licensor shall promptly inform the other Party of any action or suit relating to Patent Rights, Technical Information, and/or General Know-How.

11

Exhibit B, Page 739

6.5    Cooperation. Each Party agrees to cooperate reasonably in any action under Section 6 which is controlled by the other Party. Each Party shall bear its costs incurred as a cooperating party. Such controlling party shall keep the cooperating party informed of the progress of such proceedings and shall make its counsel available to the cooperating party. The cooperating party shall also be entitled to independent counsel in such proceedings but at its own expense, said expense to be reimbursed from any damages received by the controlling Party bringing suit in accordance with Section 6.6.

6.6    Recovery. Any award paid by third parties as the result of such proceedings (whether by way of settlement or otherwise) shall first be applied to reimbursement of any legal fees and expenses incurred by either Licensee or Licensor, including their Affiliates, and then the remainder shall be divided between the Parties as follows:

   (a)    If Licensor was the controlling party under Section 6.1:

          (i)    First, Licensor shall receive an amount equal to the royalties and other amounts that Licensee would have paid to Licensor if Licensee had Sold the infringing Products rather than the infringer;

          (ii)    Second, Licensee shall receive an amount equal to its lost profits or a reasonable royalty on the infringing sales, or whichever measure of damages the court shall have applied; and

          (iii)    Third, the balance, if any, remaining after Licensee and Licensor have been compensated under Sections 6.6(a)(i) and (ii) shall be shall be shared equally by the Parties.

   (b)    If Licensee was the controlling party under Section 6.2:

          (i)    First, Licensee shall receive an amount equal to its lost profits or a reasonable royalty on the infringing sales, or whichever measure of damages the court shall have applied;

          (ii)    Second, Licensor shall receive an amount equal to the royalties and other amounts that Licensee would have paid to Licensor if Licensee had Sold the infringing Products and Services rather than the infringer; and

          (iii)    Third, the balance, if any, remaining after Licensee and Licensor have been compensated under Sections 6.6(b)(i) and (ii) shall be shall be shared equally by the Parties.

6.7    Notice of Other Claims. Within ten (10) days of learning of any third-party claims, other than infringement or misappropriation, related to or arising from the: 1) Patent Rights; 2) Technological Information; 3) General Know-How; or 4) the Products, including product defect claims, the Party learning of any such claims shall promptly notify the other Party in writing providing factual details thereof.

## 7.    INDEMNIFICATION AND INSURANCE

7.1    Indemnification.

   (a)    Licensee shall indemnify, defend and hold harmless Licensor and its Affiliates and their respective members, managers, directors, officers, employees, and agents and their respective successors, heirs and assigns (the "**Licensor's Indemnitees**"), against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensor's Indemnitees or any one of them in connection with any claims, suits, actions, demands or judgments to the extent arising out of or relating to any Product made, used, or Sold by Licensee, unless such product liability theory arises from defects or information in the Patent Rights, Technical

12

Information, or General Know-How. For clarity, the indemnification set forth herein shall not apply to the Inventory. Licensee also shall indemnify, defend and hold harmless Licensor's Indemnitees, against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensor's Indemnitees or any one of them to the extent arising out of or relating to Licensee's prosecution of a pending patent application under Section 5.1.

(b)     Licensor shall indemnify, defend and hold harmless Licensee and its Affiliates and their respective members, managers, directors, officers, employees, and agents and their respective successors, heirs and assigns (the "**Licensee's Indemnitees**"), against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensee's Indemnitees or any one of them in connection with any claims, suits, actions, demands or judgments that to the extent arise out of, relate to, or result from (i) any inaccuracy of any of Licensor's representations and warranties set forth in this Agreement, as of the date when made; (ii) the breach of any of the covenants or agreements of Licensor contained in this Agreement; and (iii) Licensor's prosecution of Infringement Claims as set forth in Section 6.1.

(c)     The indemnifying party under this Section 7.1, agrees, at its own expense, to provide attorneys reasonably acceptable to the indemnified party to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought; provided, however, that any indemnified party shall have the right to retain its own counsel, at the expense of indemnifying party, if representation of such indemnified party by counsel retained by the indemnifying party would be inappropriate because of conflict of interests. The indemnifying party agrees to keep the indemnified party informed of the progress in the defense and disposition of such claim and to consult with indemnified party prior to any proposed settlement.

(d)     This Section 7.1 shall survive expiration or termination of this Agreement.

(e)     THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE 7.1 SHALL BE ENFORCEABLE REGARDLESS OF WHETHER THE LIABILITY IS BASED UPON PAST, PRESENT OR FUTURE ACTIONS OR OMISSIONS, CLAIMS OR LEGAL REQUIREMENTS.

7.2     Insurance.

(a)     Beginning at such time as any Product is being commercially distributed, sold, or otherwise transferred or by Licensee or an Affiliate, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than $2,000,000 per incident and $2,000,000 annual aggregate and naming the Licensor as an additional insured (**"Licensee's Insurance"**). Such commercial general liability insurance shall provide (i) product liability coverage and (ii) broad form contractual liability coverage for Licensee's indemnification under Section 7.1 of this Agreement. Before electing to self-insure all or part of the limits described above, (including deductibles or retentions which are in excess of $250,000 annual aggregate), Licensee shall obtain Licensor's consent, which shall not be unreasonably withheld, . The minimum amounts of insurance coverage required under this Section 7.2 shall not be construed to create a limit of Licensee's liability with respect to its indemnification under Section 7.1 of this Agreement.

(b)     Licensee shall provide Licensor with written evidence of Licensee's Insurance upon request of Licensor. Licensee shall provide Licensor with written notice at least fifteen

Exhibit B, Page 741



(15) days prior to the cancellation, non-renewal or material change in Licensee's Insurance. If Licensee does not obtain replacement insurance providing comparable coverage prior to the expiration of such fifteen (15) day period, Licensor shall have the right to terminate this Agreement. In the event Licensor intends to terminate this Agreement for Licensee's failure to maintain the necessary insurance, Licensor shall provide Licensee with written notice and a thirty (30) day period to cure. If at the end of the thirty (30) day period Licensee has failed to obtain the necessary insurance, effective retroactively to the date on which Licensee's Insurance terminated, Licensor may terminate Agreement with written notice, effective immediately.

(c)   Licensee shall maintain Licensee's Insurance beyond the expiration or termination of this Agreement during (i) the period that any such Product is being commercially distributed, sold, leased or otherwise transferred, or performed by Licensee or an Affiliate Licensee and (ii) a reasonable period thereafter which in no event shall be less than five (5) years.

(d)   This Section 7.2 shall survive expiration of termination of this Agreement.

## 8. WARRANTIES; LIMITATION OF LIABILITY

8.1   Licensor represents and warrants that the following representations and warranties are true and correct as of the Effective Date of this Agreement:

(a) Title to Patent Rights. Licensor is the sole owner of the Patent Rights, Technological Information, and General Know-How and has the authority to enter into this Agreement and license the Patent Rights, Technological Information, and General Know-How to Licensee. As of the Effective Date there are no liens or restrictions which will limit or otherwise affect the licenses and rights which are purported to be granted hereunder by it, except as otherwise imposed upon the Licensor by Law. Assignments from Schawbel Corporation to Licensor for Chinese patents SCHW-007/01CN and SCHA-008/01CN are attached hereto as **Exhibit 8.1(a)**. Within sixty (60) days following the Effective Date, Licensor shall provide a valid assignment from Schawbel Corporation to Licensor, dated after August 2014, for U.S. patent no. 9,549,618.

(b) Valid and Enforceable. All Patent Rights are valid and enforceable as of the Effective Date of this Agreement. All fees, including maintenance fees, for the patent applications and patents included in the Patent Rights have been timely paid.

(c) No Infringement. If used in full compliance with this Agreement, Licensee's use of the Patent Rights, Technological Information, and General Know-How will not result in infringement or trade secret misappropriation of a third party, or contravene any Laws. There is no litigation pending, or, to the actual knowledge of Licensor, threatened (whether or not covered by insurance). There is no order, injunction, or decree outstanding nor any proceeding, or governmental investigation existing, pending, involving Patent Rights, Technological Information, or General Know-How (including claims for infringement or misappropriation). To the actual knowledge of Licensor, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any complaint, claim, action, suit, litigation, proceeding or governmental or administrative investigation involving or relating to the Patent Rights, Technological Information, or General Know-How.

(d) Exclusion. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 8.1, INCLUDING BUT NOT LIMITED TO SECTIONS 8.1(A), (B) AND (C) REGARDING TITLE, VALIDITY, AND NONINGRINGEMENT OF THE PATENT RIGHTS, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE PATENT RIGHTS AND THE RIGHTS GRANTED HEREUNDER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER ISSUED OR

14



PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AND HEREBY DISCLAIMS THE SAME.

8.2     Limitation of Liability. Except in the event of fraud, no Related Person of Licensor shall have any personal liability to Licensee or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Licensor in this Agreement and no Related Person of Licensee shall have any personal liability to Licensor or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Licensee in this Agreement. In no event shall Licensor or any of its Related Person be liable to Licensee or any of its Affiliates and Related Persons for punitive damages arising out of this Agreement or the licenses granted hereunder.

8.3     All of Licensor's Patents: The Patent Rights include all patents and pending applications owned by Licensor, as of the Effective Date, that relate to the Heating Products.

8.4     Survival. All of the warranties and representations Licensor shall be true as of the Effective Date and shall survive the execution of this Agreement and shall terminate two (2) years following the termination of this Agreement.


[balance of page intentionally blank]



## 9. TERM AND TERMINATION

9.1     Term. The term of this Agreement ("**Term**") shall commence on the Effective Date and shall remain in effect until the earlier of:

    (a)     the date on which all issued patents and filed patent applications within the Patent Rights have expired or been abandoned,

    (b)     five (5) year after the Effective Date, subject to Section 9.2.

9.2.     Option to Extend. Unless the Term of this Agreement is terminated earlier in accordance Sections 9.1, 9.4 or 9.5, in the event Licensee has, prior to the termination of the initial five year Term, paid Licensor aggregate Royalties correlating to the aggregate Sales of Products in the amount of $50 million or more, Licensee may elect by written notice to Licensor delivered prior to termination of the initial 5-year Term to extend the Term of this Agreement by an additional four (4) years as to any licenses that are exclusive as of the date of such extension and for an additional two (2) years as to any licenses that are nonexclusive as of the date of such extension, on the same terms and conditions set for in this Agreement. In no event shall Licensee have the right to extend the Term of this Agreement more than once pursuant to this Section 9.2.

9.3     Termination of Exclusivity.

    (a) In the event that all or some of the Patent Rights are sold to a third party, not including an Affiliate of Licensor, in accordance with Section 2.4, on and after the effective date of such sale Licensee's licenses of the Patent Rights sold to such third party shall be nonexclusive, at the election of Licensor, exercised by written notice to Licensee.

    (b) If Licensee has not paid Licensor aggregate Royalties correlating to aggregate Sales of Products in the amount of  (i) $10 million  or more on or before December 31, 2019; (ii) $20 million or more on or before December 31, 2020; or  (iii) $35  million or more on or before December 31, 2021, at the election of Licensor, exercised by written notice to Licensee, all licenses granted under this Agreement shall be non-exclusive from the date of such notice to termination of this Agreement in accordance with its terms.

    (c) Notwithstanding anything to the contrary, including Sections 9.3(a) and (b), all licenses granted under this Agreement to Licensee shall remain exclusive to Licensee for the two (2) years following the Effective Date.

9.4     Licensor's Right to Terminate. In addition to Section 9.1, Licensor shall have the right to terminate this Agreement under any of the following circumstances:

    (a) Termination for Failure to Pay.  If the event of an Overdue Payment under this Agreement or a failure to pay timely any payment due from "Purchaser" to "Seller" under the Asset Purchase Agreement ("**APA Nonpayment**"), each such Overdue Payment and APA Nonpayment shall be a default of this Agreement ("**Payment Default**"). Licensor shall provide thirty (30) days written notice of the default ("**Payment Default Notice**") to Licensee, and Licensor shall have the right to immediately terminate this Agreement at the expiration of the thirty (30) day notice period, unless Licensee has made such payments, and any interest due, as set forth in Section 3.4, or the comparable provision in the Asset Purchase Agreement. Notwithstanding the above, if Licensee has two (2) or more Overdue Payments and/or APA Nonpayments within any consecutive twelve (12) months period, Licensor shall be entitled to terminate this Agreement effective immediately upon written notice to Licensee.

    (b) Termination for Insurance and Insolvency.

        (i) Insurance.  Licensor shall have the right to terminate this Agreement in accordance with Section 7.2(b) if Licensee fails to maintain the insurance required by Section 7.2.

16



(ii) <u>Insolvency and other Bankruptcy Related Events</u>. Licensor shall have the right to terminate this Agreement immediately upon written notice to Licensee with no further notice obligation or opportunity to cure if Licensee: (i) shall make an assignment for the benefit of creditors; or (ii) or shall have a petition in bankruptcy filed for or against it.

(c) <u>Termination for Non-Financial Default</u>. If Licensee or any of its Affiliates shall default in the performance of any of its obligations under this Agreement not otherwise covered by the provisions of <u>Sections 9.4</u>, and if such default has not been cured within sixty (60) days after notice by Licensor in writing of such default, Licensor may immediately terminate this Agreement, and/or any license granted hereunder with respect to the country or countries in which such default has occurred, at the end of said sixty (60) days cure period.

9.5     <u>Licensee's Right to Terminate</u>. In addition to <u>Section 9.1</u>, Licensee shall have the right to terminate this Agreement under any of the following circumstances:

(a) <u>Termination for Judgment Related to Patent Rights, Technological Information, or General Know-How.</u> If any legal action is commenced by a third party alleging patent, trademark, or copyright infringement or misappropriation as a result of Licensee's manufacture and/or sale of Products, which, if proven, would impair (in Licensee's reasonable judgment) Licensor's ability to use and/or enjoy certain Patent Rights, Technological Information, and/or General Know-How, Licensee may immediately terminate the license of Patent Rights, Technological Information, or General Know-How so impaired. Furthermore, in the event that the Patent Rights, Technological Information, or General Know-How impaired by the legal action materially impact, in the reasonable judgment of Licensee, Licensee's use and enjoyment of other Patent Rights, Technological Information, or General Know-How, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(b) <u>Termination for Transfer of Control of Patent Rights, Technological Information, or General Know-How.</u> If Licensor enters into an agreement with a third party, the effect of which is to transfer ownership or control of the Patent Rights, Technological Information, or General Know-How, whether through an outright sale of the same, an assignment of this Agreement, or a change in control of Licensor through stock sale (of 50% or more of stock), merger, or acquisition, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(c) <u>Termination for Licensor's Failure to Comply with ROFR.</u> If Licensor fails to comply with the terms of <u>Section 2.4,</u> and such failure has not been cured within fifteen (15) days after notice by Licensee in writing of such failure, Licensee may immediately terminate this Agreement, and/or any license granted hereunder.

(d) <u>Termination for Assignment</u>. If Licensor assigns this Agreement, without the prior written consent of Licensee, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(e) <u>Termination for Non-Financial Default</u>. If Licensor shall default in the performance of any of its obligations under this Agreement, including but not limited to any representation and warranty set forth in <u>Section 8</u>, and if such default has not been cured within sixty (60) days after notice by Licensee in writing of such default, Licensee may immediately terminate this Agreement, and/or any license granted hereunder with respect to the country or countries in which such default has occurred, at the end of said sixty (60) days cure period.

(f) <u>Licensor's Breach of Non-Compete</u>. Licensee shall have the right to terminate this Agreement in accordance with <u>Section 11.1</u>.

9.6     <u>Effects of Termination of Agreement</u>. Upon termination of this Agreement or any of the licenses hereunder for any reason, final Sales Reports in accordance with <u>Section 4</u> shall be submitted to Licensor

17



and all Royalties and other payments accrued or due to Licensor as of the termination date shall become immediately due and payable within thirty (30) calendar days. Licensee shall cease, and shall cause its Affiliates to cease, all production, use and Sales of Products upon such termination, subject to Section 9.11. The termination or expiration of this Agreement or any license granted hereunder shall not relieve Licensee and its Affiliates of obligations arising before such termination or expiration.

9.7    Inventory. Upon termination of this Agreement, Licensee and Licensee Affiliates may complete and sell any work-in-progress and inventory of Products on hand or ordered that exist as of the effective date of termination provided that (i) Licensee pays Licensor the applicable Royalty or other amounts due on such Net Sales in accordance with the terms and conditions of this Agreement, and (ii) Licensee and Affiliates shall complete and sell all work-in-progress and inventory of Products within six (6) months after the effective date of termination if such termination is for two (2) or more Overdue Payment, and otherwise within eighteen (18) months; provided, however, there shall be no such post-termination completion and sales period if such termination is for a breach of Section 7.2 and Licensee immediately upon such termination shall cease and shall cause its Affiliates to cease all production, use and Sale of Products.

9.8    Perpetual License of General Know-How. Upon the termination of this Agreement, provided termination is not for two (2) or more Overdue Payments, the license of the General Know-How, but not Patent Rights or Technological Information, granted by Licensor to Licensee under this Agreement shall, as of the effective date of the termination, become a perpetual, irrevocable, non-exclusive, and royalty-free license to Licensee of the General Know-How only. Such perpetual license shall not in any respect grant Licensee any rights with respect to, or allow Licensee the use of, the Patent Rights and/or the Technological Information.

## 10. COMPLIANCE WITH LAW

10.1    Compliance. Licensee shall have the sole obligation for compliance with, and shall ensure that any Affiliates comply with, all government statutes and regulations applicable to Licensee's use of the Patent Rights, Technological Information, and General Know-How and any applicable laws and regulations of any other country applicable to Licensee's use of the Patent Rights, Technological Information, and General Know-How. Licensee agrees that it shall be solely responsible for obtaining any necessary licenses to export, re-export, or import Products covered by Patent Rights, Technological Information, General Know-How, and/or Confidential Information. Licensee shall indemnify and hold harmless Licensor for any breach of Licensee's obligations under this Section 10.1.

10.2    Patent Numbers. Licensee shall cause all Products sold in the United States to be marked with all applicable U.S. Patent Numbers to the full extent required by United States law. Licensee shall similarly cause all Products shipped to or sold in any other country to be marked in such a manner as to conform with the patent laws and practices of such country.

## 11. FUTURE ACTS

11.1    Competitive Products, Covenant to Not Compete. During the Term of this Agreement, and while the licenses granted hereunder are exclusive to Licensee, and in order to protect the value of the licenses granted under this Agreement, neither Licensor nor its Affiliates or Related Persons (or any of them) shall manufacture, have manufactured, distribute, have distributed, market, have marketed, or sell, or have sold, any product that is competitive with the Heating Products. In the event Licensor or its Affiliates or Related Persons manufactures, has manufactured, distributes, has distributed, or sells, or has sold, any such competing product, such an event shall be a default by Licensor under this Agreement and Licensee may terminate this Agreement if such default has not been cured within ninety (90) days after notice by Licensee in writing of such default. Furthermore, from and after Licensor's default, no Royalties shall be due or shall accrue on any Net Sales so long as Licensor is in breach of the covenant set forth in this Section 11.1. In addition, the Parties agree that a breach or threatened breach of any covenant set forth in

18

Exhibit B, Page 746



this Section 11.1 could cause irreparable harm to Licensee, that Licensee's remedies at Law upon any such breach would be inadequate, and that, accordingly, upon any such breach or threatened breach Licensee may seek a restraining order or injunction or both against the Licensor or its Affiliates or Related Persons, in addition to any other rights and remedies which are available at Law for breach of the covenant. If any provision of this Section 11.1 shall be determined to be invalid or unenforceable, such invalid or unenforceable term shall be deemed amended to allow as to such maximum time and territory and to such other extent as such court (or arbitral tribunal) may judicially determine or indicate to be reasonable.

Notwithstanding the foregoing, such provision shall not apply, provided Licensor or its Related Persons and their Affiliates first obtains a confidentiality agreement signed by the Third Party Purchaser, to Licensor's efforts to: (i) market and sell, or otherwise assign, such Patent Rights pursuant to Section 2.4 to a third-party purchaser ("**Third Party Purchaser**"), or (ii) following such sale or assignment of such Patent Rights to the Third Party Purchaser, activities reasonably necessary to effectuate the intent of the sale or assignment of the Patent Rights to the Third Party Purchaser..

11.2  Licensee's Rights to Market. Subject to the terms and conditions of this Agreement, Licensee and its Affiliates shall be free to commercialize, develop, market and sell Products and Heated Insoles in its sole judgment, and sell such Products and Heated Insoles at any price determined by the Licensee and/or its Affiliates in its sole and absolute discretion, except to the extent any such obligation is otherwise imposed upon by Law.

11.3  Licensee's Improvements. Any and all rights to any Improvements made by Licensee shall belong solely to Licensee and Licensor shall have no rights, legal or equitable, in such Improvements.

## 12. MISCELLANEOUS

12.1  Entire Agreement. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings pertaining to the Patent Rights and Technology.

12.2  Notices. Any notices, reports, waivers, correspondences or other communications required under or pertaining to this Agreement shall be in writing and shall be delivered by hand, or sent by a reputable overnight mail service (e.g., Federal Express), or by first class mail (certified or registered), or by facsimile confirmed by one of the foregoing methods, to the other party. Notices will be deemed effective (a) three (3) business days after deposit, postage prepaid, if mailed, (b) the next day if sent by overnight mail, or (c) the same day if sent by facsimile and confirmed as set forth above or delivered by hand. Unless changed by a writing delivered to the other Party, notices to the Parties shall be directed as follows:

Schawbel Technologies, LLC

67 Bedford Street, Suite 400W

Burlington MA 01803

Attn: William Schawbel

Email: bill@schawbeltech.com

Tel No: 617-281-2557

Fax No.

Heat Factory, USA, Inc.

1958 Kellogg Ave.

Carlsbad, CA 92008

Exhibit B, Page 747



Attn: David Treptow

Email: Dave@heatfactroyusa.com

Tel No: 760-893-8300

Fax No. 760-893-8301

12.3    Amendment; Waiver.  This Agreement may be amended and any of its terms or conditions may be waived only by a written instrument executed by an authorized signatory of each of the Parties or, in the case of a waiver, by the Party waiving compliance. The failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect its rights at a later time to enforce the same.  No waiver by either Party of any condition or term shall be deemed as a further or continuing waiver of such condition or term or of any other condition or term.

12.4    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties hereto and their respective permitted successors and assigns.

12.5    Assignment.  Neither Licensee nor Licensor may assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other Party. Notwithstanding the foregoing, Licensor may assign its rights to receive Royalties under Section 3 to its Affiliate or a purchaser of Patent Rights.

12.6    Force Majeure.  Neither Party shall be responsible for delays resulting from causes beyond the reasonable control of such Party, including without limitation fire, explosion, flood, war, sabotage, strike or riot, provided that the nonperforming Party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

12.7    Public Announcements.  Neither Party shall issue any press release, or make any public statement with respect to this Agreement or any of the transactions contemplated hereby, prior to the Closing Date, without the prior written consent of the other Party, except as may be required by applicable Law or any listing agreement with a national securities exchange or quotation system. Notwithstanding foregoing, Licensee shall have the right to record a memorandum of this Agreement for purposes of recording the licenses set forth herein with the United States Patent and Trademark Office, such memorandum shall not disclose any of the financial terms of this Agreement. After the Closing Date, the Parties may issue a press release or make a public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party provided, however, that neither Party shall, without the prior written consent of the other Party, disclose publicly any of the financial terms of this Agreement.

12.8    Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, excluding with respect to conflict of laws, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted.

12.10    Severability.  If any provision(s) of this Agreement are or become invalid, are ruled illegal by any court of competent jurisdiction or are deemed unenforceable under then current applicable law from time to time in effect during the term hereof, it is the intention of the parties that the remainder of this Agreement shall not be effected thereby.  It is further the intention of the parties that in lieu of each such provision which is invalid, illegal or unenforceable, there be substituted or added as part of this Agreement a provision which shall be as similar as possible in economic and business objectives as intended by the parties to such invalid, illegal or enforceable provision, but shall be valid, legal and enforceable.

12.11    Survival.  In addition to any specific survival references in this Agreement, Sections 5.3, 9.6, 9.7 and 9.8 shall survive termination or expiration of this Agreement.

Exhibit B, Page 748



12.11   Interpretation.  The parties hereto are sophisticated, have had the opportunity to consult legal counsel with respect to this transaction and hereby waive any presumptions of any statutory or common law rule relating to the interpretation of contracts against the drafter.

12.12   Headings.  All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

12.13   Counterparts.  This Agreement may be executed in two (2) or more counterparts, and by facsimile, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

12.14   Attorney Fees and Costs.  In the event of any controversy, claim or dispute between the parties to this Agreement, arising out of or relating to this Agreement, its enforcement or interpretation, or any breach of any provision of this Agreement, the prevailing party, in addition to its other remedies, shall be entitled to recover from the losing party the prevailing party's reasonable expenses, attorney fees, and costs, including those incurred on appeal and for enforcement of an award or judgment.

*[signatures on next page]*

Exhibit B, Page 749



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

SCHAWBEL TECHNOLOGIES LLC.

HEAT FACTORY, USA, INC.

BY: _____

BY: _____

   Name:

   Name: David Treptow   7-19-17

TITLE: _____

TITLE: President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

**SCHAWBEL TECHNOLOGIES LLC.**

**HEAT FACTORY, USA, INC.**

BY: _Wile Scherbel_

BY: _____

Name: 

Name: David Treptow

TITLE: _C.C.O_

TITLE: President

## Exclusive Patent Licensing Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Appendix A | Heating Products | x |
| Appendix B | Certifications | x |
| Appendix C | Patents | x |
| Schedule 2.5 | Transitional Services | x |
| Appendix D | Sales Report | x |
| Appendix E | Confidentiality Terms and Conditions | x |
| Exhibit 8.1(a) | Patent Assignments | x |

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Exclusive Patent Licensing Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Appendix A | Heating Products | x |
| Appendix B | Certifications | x |
| Appendix C | Patents | x |
| Schedule 2.5 | Transitional Services | x |
| Appendix D | Sales Report | x |
| Appendix E | Confidentiality Terms and Conditions | x |
| Exhibit 8.1(a) | Patent Assignments | x |

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Appendix A

### HEATING PRODUCTS

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Appendix A
## HEATING PRODUCTS

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____      _____
Purchaser        Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**APPENDIX A**

HEATING PRODUCTS

- ThermaCELL Heated Insoles
- ThermaCELL Heated Insoles - Car Charger
- ThermaCELL Heated Insoles ProFLEX
- ThermaCELL Heated Insoles ProFLEX - Battery Pack
- ThermaCELL Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth®)
- ThermaCELL Heated Insoles ProFLEX Heavy Duty - Battery Pack
- ThermaCELL Heat Packs Hand Warmers
- ThermaCELL Heat Packs Pocket Warmer
- ThermaCELL Heat Packs Bluetooth® Pocket Warmer

**Appendix B**

**CERTIFICATIONS**

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

Exhibit B, Page 757

**Appendix B**

**CERTIFICATIONS**

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Certifications

### Heated Insoles (THS01)

#### US
Power supply UL certified
Car charger UL certified
Battery UR certified and UN DOT 38.3 certified
FCC Class B. Remote is FCC Licensed.
CEC Compliant
Prop 65 compliant

#### Canada
Power Supply cUL Certified
Car charger UL certified
Battery UR certified and UN DOT 38.3 certified
ICES Class B. Remote is ICES Licensed.

#### Europe
Power Supply CE certified
Car charger CE certified
Battery CE Certified
Power Supply, remote and insoles – CE certified
Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning to RED), ROHS, ErP, Packaging and Packaging Waste

#### Russia
Power Supply EAC certified
Car Charger EAC certified

#### India
Remote Certified

### Heated Insoles ProFLEX (HW20)

#### US
Power supply UL certified
Battery UR certified and UN DOT 38.3 certified
FCC Class B. Remote is FCC Licensed.
Mag 141 is CEC Compliant
Prop 65 compliant

#### Canada
Power Supply cUL Certified
Battery UR certified and UN DOT 38.3 certified
ICES Class B. Remote is ICES Licensed.

#### Europe
Power Supply CE certified
Battery CE Certified
Power Supply, remote and insoles – CE certified
Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning to RED), ROHS, WEEE

### Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) (PFHD)

#### US
Power supply UL certified
Battery UR certified and UN DOT 38.3 certified
Insole is FCC Licensed.
MAG 143 is CEC Compliant
Prop 65 compliant

#### Canada
Power Supply cUL Certified
Battery UR certified and UN DOT 38.3 certified
Insole is ICES Licensed.

#### Europe
Power Supply CE certified
Battery CE Certified

Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning to RED), ROHS

### Heat Packs - Hand Warmers (2 pack) (PAK-S)

#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Tested for Class B
CEC Energy Efficient compliant
Prop 65 compliant

#### Canada
Power supply is cUL certified
ICES Tested for Class B
CEC Energy Efficient

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 14 compliant
Directives Applied for CE: Low Voltage, EMC, ROHS

### Heat Packs - Pocket Warmer (1 pack) (PAK-L)

#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Tested for Class B
CEC Energy Efficient compliant
Prop 65 compliant

#### Canada
Power supply is cUL certified
ICES Tested for Class B
CEC Energy Efficient

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 14 compliant
Directives Applied for CE: Low Voltage, EMC, ROHS

### Heat Packs - Bluetooth Pocket Warmer (1 pack) (PAK-BL)

#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Licensed for BT
CEC compliant

#### Canada
Power supply is cUL certified
ICES Licensed for BT

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 22 compliant

## Appendix C
## PATENTS

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Appendix C

## PATENTS

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

# Appendix C

| Docket Reference | Title | Application Number | Filing Date | Status | Patent Number | Issue Date |
|---|---|---|---|---|---|---|
| SCHW-001/01CA | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 2930858 | 4/9/2014 | Published | | |
| SCHW-001/01EP | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14866929 | 4/9/2014 | Published | | |
| SCHW-001/01US | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/248861 | 4/9/2014 | Granted | 8869428 | 10/28/2014 |
| SCHW-001/01US-2 | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/511528 | 10/10/2014 | Granted | 9179734 | 11/10/2015 |
| SCHW-001/02US | SHOE WITH A HEATED INSOLE | 14/248891 | 4/9/2014 | Granted | 9538806 | 1/10/2017 |
| SCHW-001/02US-2 | SHOE WITH A HEATED INSOLE | 15/345687 | 11/8/2016 | Published | | |
| SCHW-001/03US | BATTERY FOR USE WITH A HEATED INSOLE | 14/248915 | 4/9/2014 | Granted | 9549586 | 1/24/2017 |
| SCHW-001/04US | ASSEMBLY FOR INCLUSION IN A HEATED INSOLE | 14/248934 | 4/9/2014 | Granted | 9538807 | 1/10/2017 |
| SCHW-001/05US | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/285118 | 5/22/2014 | Granted | 8869429 | 10/28/2014 |
| SCHW-002/00CAD | INSOLE | 156951 | 6/3/2014 | Granted | 156951 | 6/26/2015 |
| SCHW-002/00IND | INSOLE FOR FOOTWEAR | 263667 | 6/25/2014 | Granted | 263667 | 4/9/2015 |
| SCHW-002/00USD | INSOLE | 29/487518 | 4/9/2014 | Granted | D734012 | 7/14/2015 |
| SCHW-002/01CADIV | INSOLE | 161639 | 3/20/2015 | Granted | 161639 | 6/26/2015 |
| SCHW-002/01EUD | INSOLE | 2460501 | 5/8/2014 | Granted | 002460501-0001-0004 | 6/26/2014 |
| SCHW-002/01RUD | INSOLE (WHOLE AND PARTS) | 2014502050 | 5/26/2014 | Granted | 94566 | 7/7/2015 |
| SCHW-002/01USD | INSOLE | 29/529475 | 6/8/2015 | Granted | D772546 | 11/29/2016 |
| SCHW-003/00IND | INSOLE FOR FOOTWEAR | 263668 | 6/25/2014 | Granted | 263668 | 4/9/2015 |
| SCHW-003/00USD | INSOLE | 29/487520 | 4/9/2014 | Granted | D722222 | 2/10/2015 |
| SCHW-003/01CAD | INSOLE | 156952 | 6/3/2014 | Granted | 156952 | 6/26/2015 |
| SCHW-004/00IND | BATTERY PACK FOR AN INSOLE OF FOOTWEAR | 263669 | 6/25/2014 | Granted | 263669 | 4/9/2015 |
| SCHW-004/00USD | BATTERY PACK FOR AN INSOLE | 29/487523 | 4/9/2014 | Granted | D724013 | 3/10/2015 |
| SCHW-004/01CAD | BATTERY PACK FOR AN INSOLE | 156527 | 5/8/2014 | Granted | 156527 | 3/4/2015 |
| SCHW-004/01EUD | BATTERY PACK FOR AN INSOLE | 2460238 | 5/8/2014 | Granted | 002460238-0001-0003 | 6/16/2014 |
| SCHW-004/01RUD | BATTERY PACK FOR AN INSOLE, BOTTOM PART FOR A BATTERY PACK OF INSOLE AND A CONNECTOR FOR BATTERY PACK | 2014502049 | 5/26/2014 | Granted | 93958 | 5/26/2015 |
| SCHW-005/00USD | BATTERY PACK FOR AN INSOLE | 29/487528 | 4/9/2014 | Granted | D719504 | 12/16/2014 |
| SCHW-005/01CAD | BATTERY PACK FOR AN INSOLE | 156528 | 5/8/2014 | Granted | 156528 | 3/4/2015 |
| SCHW-006/00USD | BATTERY PACK FOR AN INSOLE | 29/487530 | 4/9/2014 | Granted | D737769 | 9/1/2015 |
| SCHW-006/01CAD | BATTERY PACK FOR AN INSOLE | 156529 | 5/8/2014 | Granted | 156529 | 3/4/2015 |
| SCHW-007/01AU | HEATED INSOLE REMOTE CONTROL SYSTEM | 2012369199 | 2/6/2012 | Granted | 2012369199 | |
| SCHW-007/01CA | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 2869619 | 2/6/2012 | Published | | |
| SCHW-007/01CN | HEATED INSOLE REMOTE CONTROL SYSTEM | 201280069099X | 2/6/2012 | Allowed | | |
| SCHW-007/01EP | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 12868182 | 2/6/2012 | Published | | |
| SCHW-007/01HK | HEATED INSOLE REMOTE CONTROL SYSTEM | 15100071 | 1/6/2015 | Published | | |
| SCHW-007/01IN | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 7249/DELNP/2014 | 2/6/2012 | Published | | |
| SCHW-007/01RU | HEATED SHOE INSOLE REMOTE CONTROL SYSTEM | 2014132454 | 2/6/2012 | Granted | 2597584 | 8/22/2016 |
| SCHW-007/01UA | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | a2014 09690 | 2/6/2012 | Granted | 111527 | 5/10/2016 |
| SCHW-007/01US | HEATED INSOLE REMOTE CONTROL SYSTEM | 13/166351 | 6/22/2011 | Granted | 8850716 | 10/7/2014 |
| SCHW-007/02US | HEATED INSOLE REMOTE CONTROL SYSTEMS | 14/466477 | 8/22/2014 | Granted | 9101177 | 8/11/2015 |
| SCHW-008/01AU | HEATED INSOLES | 2012362389 | 12/27/2012 | Granted | 2012362389 | 3/9/2017 |
| SCHW-008/01CA | HEATED INSOLES | 2861600 | 12/27/2012 | Allowed | | |
| SCHW-008/01CN | HEATED INSOLES | 201280065577X | 12/27/2012 | Allowed | | |
| SCHW-008/01EP | HEATED INSOLES | 12821353 | 12/27/2012 | Published | | |
| SCHW-008/01HK | HEATED INSOLES | 15100230 | 12/27/2012 | Published | | |
| SCHW-008/01IN | HEATED INSOLES | 6371/DELNP/2014 | 12/27/2012 | Published | | |
| SCHW-008/01RU | HEATED INSOLES | 2014127752 | 12/27/2012 | Granted | 2600439 | 9/28/2016 |
| SCHW-008/01UA | A CHARGING SYSTEM FOR A HEATED INSOLE FOR SHOES | a201408621 | 12/27/2012 | Granted | 112278 | 8/10/2016 |

# Appendix C

| Docket Reference | Title | Application Number | Filing Date | Status | Patent Number | Issue Date |
|---|---|---|---|---|---|---|
| SCHW-008/01US | HEATED INSOLES | 13/728336 | 12/27/2012 | Granted | 9548618 | 1/17/2017 |
| SCHW-010/02CA | HEATED PACKS | 2959132 | 7/1/2015 | Published | | |
| SCHW-010/02EP | HEATED PACKS | 15836668 | 7/1/2015 | Pending | | |
| SCHW-010/02US | HEATED PACKS | 15/506500 | 2/24/2017 | Pending | | |
| SCHW-012/01US | ASSEMBLY | 14/568516 | 12/12/2014 | Granted | 9314064 | 4/19/2016 |
| SCHW-012/01WO | HEATED INSOLE WITH REMOVABLE HEATING ASSEMBLY | PCT/US2015/062458 | 11/24/2015 | Published | | |
| SCHW-013/01US | HEATED INSOLE WITH REMOVABLE ASSEMBLY | 14/719819 | 5/22/2015 | Granted | 9572397 | 2/21/2017 |
| SCHW-013/01WO | HEATED INSOLE WITH REMOVABLE ASSEMBLY | PCT/US2016/032891 | 5/17/2016 | Published | | |
| SCHW-017/00CAD | HEAT PACK | 163521 | 7/23/2015 | Granted | 163521 | 7/5/2016 |
| SCHW-017/00EPD | HEAT PACK | 2741934 | 7/23/2015 | Granted | 002741934-0001-0002 | 12/14/2015 |
| SCHW-017/00USD | HEAT PACK | 29/533210 | 7/15/2015 | Pending | | |

## SCHEDULE 2.5

## TRANSITIONAL SERVICES

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## SCHEDULE 2.5
## TRANSITIONAL SERVICES

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Schedule 2.5

**Transitional Services**

The timetable of the transition should not exceed one hundred twenty days with most tasks completed within sixty days based on resource availability from HF.

Tasks categorized by days estimated for completion:

A. 0 – 30 Days
- ❖ Transition account management, contracts, terms and conditions, promotions, rebates, shipping requirements, unique SKUs, marketing, etc.
- ❖ Provide historical customer data file from QuickBooks for 2016.
- ❖ Deliver electronically all designs, art files, and marketing collateral relating to product and packaging.
- ❖ Make agreed upon modifications to the internet site to reflect the business transaction. Determine date to redirect URL.
- ❖ Transition all digital assets for commerce and customer service to HF.
- ❖ Transition software support contract to HF.
- ❖ Transition customer service to HF. This will include a one day on site training session and all related training documentation. Will provide introduction to OnBrand.

B. 0 – 60 Days
- ❖ Provide account and sales introduction to all major existing customers. Schedule meetings with critical buyers and participate in such meetings.
- ❖ Introduction to Independent Sales Representative Groups and transition account management as required by HF. Terminate Independent Sales Representative Agreements as required for those not being utilized going forward.
- ❖ Introductions to Pro Staffers and transition to HF as required.
- ❖ Provide details of all key historical marketing activities, assets, trade shows, etc.
- ❖ Provide introduction to third party resources that assisted in the design, development, and production of the heated products included in the transaction to include engineers, factory management, and SATRA testing personnel.
- ❖ Provide detailed flow chart of current product design process.

C. 0 – 90 Days
- ❖ Provide introduction to third party resources to review future product concepts.
- ❖ Provide introductions and facilitate the relationships between HF and the key product suppliers, factories and certifications, provide electronic copies of BOM's, manufacturing and final product testing and related engineering documents.
- ❖ Assist with the transfer of product certifications in the USA and other countries during the transition.

D. 0 – 120 Days
- ❖ Manage third party PR and social media for a period of four months. This includes the draft and execution of a completed partnership announcement and management of the PR placement of such an announcement. Third party fees to be paid by HF. Transition third party resources to HF if required.

# APPENDIX D
## SALES REPORTS

See attached exemplar which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____    _____
Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## APPENDIX D

## SALES REPORTS

See attached exemplar which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____        _____
Purchaser              Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|--|----------|------------|-------|------------|
| M110 | os | 55796 | NOV 17 14 | 160.00 | | 0.9000 | 144.00 |
| M110 | os | 56738 | DEC 18 14 | 40.00 | | 0.6900 | 27.60 |
| M110 | os | 56939 | DEC 10 14 | 130.00 | | 0.2500 | 32.50 |
| | M110 | | Mossy Oak Footwarmers | 330.00 | | | 204.10 |
| | | STYLE SUBTOTAL M110 | | 330.00 | | | 204.10 |
| M110BX | os | 56720 | DEC 18 14 | 8.00 | | 27.5000 | 220.00 |
| | M110BX | | Mossy Oak Footwarmers BOX | 8.00 | | | 220.00 |
| | | STYLE SUBTOTAL M110BX | | 8.00 | | | 220.00 |
| M111 | os | 54953 | OCT 2 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55177 | OCT 17 14 | 1128.00 | | 3.1200 | 3,519.36 |
| M111 | os | 55298 | OCT 27 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 55344 | OCT 29 14 | 24.00 | | 3.2400 | 77.76 |
| M111 | os | 55425 | OCT 31 14 | 288.00 | 3.00 | 3.2400 | 905.13 |
| M111 | os | 55427 | OCT 31 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55488 | NOV 5 14 | 144.00 | | 3.2400 | 466.56 |
| M111 | os | 55546 | NOV 7 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55789 | NOV 17 14 | 72.00 | | 3.1200 | 224.64 |
| M111 | os | 55917 | NOV 19 14 | 96.00 | | 2.2300 | 214.08 |
| M111 | os | 55955 | NOV 21 14 | 144.00 | | 3.1200 | 449.28 |
| M111 | os | 56074 | NOV 21 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 56083 | NOV 24 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 56209 | NOV 28 14 | 48.00 | | 3.1200 | 149.76 |
| M111 | os | 56303 | DEC 3 14 | 24.00 | | 3.2400 | 77.76 |
| M111 | os | 56304 | DEC 3 14 | 12.00 | | 3.2400 | 38.88 |
| M111 | os | 56553 | DEC 11 14 | 48.00 | | 2.2300 | 107.04 |
| M111 | os | 56738 | DEC 18 14 | 12.00 | | 3.3800 | 40.56 |
| M111 | os | 56766 | DEC 19 14 | 72.00 | | 3.2080 | 230.98 |
| | M111 | | Mossy Oak Footwarmers 5 pk | 2,472.00 | | | 7,718.58 |
| | | STYLE SUBTOTAL M111 | | 2,472.00 | | | 7,718.58 |
| M202-SK | Lg/XL | 55682 | NOV 13 14 | 36.00 | | 10.6800 | 384.48 |
| M202-SK | Lg/XL | 55796 | NOV 17 14 | 7.00 | | 11.8500 | 82.95 |
| M202-SK | Lg/XL | 55916 | NOV 19 14 | 252.00 | | 10.5700 | 2,663.64 |
| M202-SK | Lg/XL | 56357 | DEC 4 14 | 12.00 | | 10.6800 | 128.16 |
| M202-SK | Lg/XL | 56362 | DEC 4 14 | 12.00 | | 10.6800 | 128.16 |
| M202-SK | Med/Lg | 56738 | DEC 18 14 | 6.00 | | 11.1300 | 66.78 |
| M202-SK | Lg/XL | 56738 | DEC 18 14 | 6.00 | | 11.1300 | 66.78 |
| M202-SK | Lg/XL | 56896 | DEC 30 14 | 12.00 | | 11.8000 | 141.60 |
| M202-SK | Med/Lg | 56939 | DEC 10 14 | 1.00 | | 10.0000 | 10.00 |
| M202-SK | Lg/XL | 56939 | DEC 10 14 | 2.00 | | 10.0000 | 20.00 |
| M202-SK | Med/Lg | 56940 | DEC 31 14 | 5.00 | | 10.0000 | 50.00 |
| | M202-SK | | Mossy OAk Heavy Wt Socks | 351.00 | | | 3,742.55 |
| | | STYLE SUBTOTAL M202 | | 351.00 | | | 3,742.55 |

Page 1

Exhibit B, Page 769

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|---|----------|------------|-------|------------|
| M205-GRY-SK | Lg/XL | 55023 | OCT 9 14 | 72.00 | | 13.4700 | 969.84 |
| M205-GRY-SK | Lg/XL | 55344 | OCT 29 14 | 12.00 | | 12.9300 | 155.16 |
| M205-GRY-SK | Lg/XL | 55488 | NOV 5 14 | 36.00 | | 12.9300 | 465.48 |
| M205-GRY-SK | Lg/XL | 56355 | DEC 4 14 | 12.00 | | 15.5000 | 186.00 |
| M205-GRY-SK | Lg/XL | 56559 | DEC 11 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Lg/XL | 56720 | DEC 18 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Med/Lg | 56720 | DEC 18 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Lg/XL | 56779 | DEC 19 14 | 6.00 | | 15.0000 | 90.00 |
| | M205-GRY-SK | Mossy Oak Acrylic Sock 2 pk | | 156.00 | | | 2,117.58 |

| | STYLE SUBTOTAL M205 | | | 156.00 | | | 2,117.58 |
|---|---|---|---|---|---|---|---|

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|---|----------|------------|-------|------------|
| M205 BULK-GRY-SK | Lg/XL | 56163 | NOV 26 14 | 36.00 | | 12.8000 | 460.80 |
| M205 BULK-GRY-SK | Lg/XL | 56303 | DEC 3 14 | 12.00 | | 12.9300 | 155.16 |
| M205 BULK-GRY-SK | Lg/XL | 56304 | DEC 3 14 | 12.00 | | 12.9300 | 155.16 |
| | M205 BULK-GRY-SK | Mossy Oak Acrylic Sock Bulk | | 60.00 | | | 771.12 |

| | STYLE SUBTOTAL M205 BULK | | | 60.00 | | | 771.12 |
|---|---|---|---|---|---|---|---|

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|---|----------|------------|-------|------------|
| M206-O-SK | Lg/XL | 54953 | OCT 2 14 | 12.00 | | 11.0200 | 132.24 |
| M206-O-SK | Lg/XL | 55298 | OCT 27 14 | 24.00 | | 11.0200 | 264.48 |
| M206-O-SK | Med/Lg | 55298 | OCT 27 14 | 12.00 | | 11.0200 | 132.24 |
| M206-O-SK | Lg/XL | 55329 | OCT 29 14 | 12.00 | | 11.8000 | 141.60 |
| M206-O-SK | Lg/XL | 55488 | NOV 5 14 | 36.00 | | 11.0200 | 396.72 |
| M206-O-SK | Med/Lg | 55798 | NOV 17 14 | 36.00 | | 10.4740 | 377.06 |
| M206-O-SK | Lg/XL | 55916 | NOV 19 14 | 192.00 | | 10.4700 | 2,010.24 |
| M206-O-SK | Lg/XL | 56303 | DEC 3 14 | 12.00 | | 10.5800 | 126.96 |
| M206-O-SK | Lg/XL | 56304 | DEC 3 14 | 12.00 | | 10.5800 | 126.96 |
| M206-O-SK | Med/Lg | 56692 | DEC 17 14 | 12.00 | | 11.8000 | 141.60 |
| M206-O-SK | Med/Lg | 56831 | DEC 23 14 | -36.00 | | 10.4740 | -377.06 |
| M206-O-SK | Lg/XL | 56896 | DEC 30 14 | 12.00 | | 11.8000 | 141.60 |
| | M206-O-SK | Mossy Oak Mid Calf Sock | | 336.00 | | | 3,614.64 |

| | STYLE SUBTOTAL M206 | | | 336.00 | | | 3,614.64 |
|---|---|---|---|---|---|---|---|

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|---|----------|------------|-------|------------|
| M250 | os | 55293 | OCT 27 14 | 240.00 | | 7.1000 | 1,704.00 |
| M250 | os | 55526 | NOV 7 14 | 456.00 | | 7.7200 | 3,520.32 |
| M250 | os | 55531 | NOV 7 14 | 12.00 | | 8.1300 | 97.56 |
| M250 | os | 55533 | NOV 7 14 | 72.00 | 5.00 | 8.1300 | 556.09 |
| M250 | os | 55534 | NOV 7 14 | 72.00 | | 8.1300 | 585.36 |
| M250 | os | 55535 | NOV 7 14 | 24.00 | | 8.1300 | 195.12 |
| M250 | os | 55536 | NOV 7 14 | 24.00 | | 7.0290 | 168.70 |
| M250 | os | 55544 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | os | 55545 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | os | 55546 | NOV 7 14 | 36.00 | | 8.1300 | 292.68 |
| M250 | os | 55547 | NOV 7 14 | 48.00 | | 7.8100 | 374.88 |
| M250 | os | 55548 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | os | 55553 | NOV 10 14 | 624.00 | | 7.1000 | 4,430.40 |
| M250 | os | 55586 | NOV 10 14 | 12.00 | | 8.9500 | 107.40 |
| M250 | os | 55708 | NOV 13 14 | 12.00 | | 8.2500 | 99.00 |
| M250 | os | 55709 | NOV 13 14 | 12.00 | | 8.2500 | 99.00 |

Page 2

Exhibit B, Page 770

SALES BY ITEM: Extreme Detail
   Invoice Date Range From OCT 1 14 to DEC 31 14
   Selected Styles Only, M110 - M353BX

JAN 28 15

13:45

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| M250 | os | 55756 | NOV 14 14 | 24.00 | | 8.1300 | 195.12 |
| M250 | os | 55796 | NOV 17 14 | 7.00 | | 9.8500 | 68.95 |
| M250 | os | 55916 | NOV 19 14 | 576.00 | | 7.7200 | 4,446.72 |
| | M250 | | Mossy OakFlat Footbed Men's | 2,359.00 | | | 17,784.78 |
| | STYLE SUBTOTAL M250 | | | 2,359.00 | | | 17,784.78 |
| M251 | os | 55293 | OCT 27 14 | 240.00 | | 7.1000 | 1,704.00 |
| M251 | os | 55329 | OCT 29 14 | 12.00 | | 8.2500 | 99.00 |
| M251 | os | 55535 | NOV 7 14 | 12.00 | | 8.1300 | 97.56 |
| M251 | os | 55546 | NOV 7 14 | 24.00 | | 8.1300 | 195.12 |
| M251 | os | 55553 | NOV 10 14 | 408.00 | | 7.1000 | 2,896.80 |
| M251 | os | 56090 | NOV 24 14 | 72.00 | | 7.1000 | 511.20 |
| M251 | os | 56185 | NOV 28 14 | 12.00 | | 8.2500 | 99.00 |
| | M251 | | Mossy OakFlat Footbed Ladies | 780.00 | | | 5,602.68 |
| | STYLE SUBTOTAL M251 | | | 780.00 | | | 5,602.68 |
| M353 | os | 54974 | OCT 3 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55018 | OCT 8 14 | 320.00 | | 0.4500 | 144.00 |
| M353 | os | 55023 | OCT 9 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 55145 | OCT 15 14 | 8.00 | | 18.4500 | 147.60 |
| M353 | os | 55282 | OCT 27 14 | 1280.00 | | 0.4400 | 563.20 |
| M353 | os | 55298 | OCT 27 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55606 | NOV 10 14 | 15000.00 | | 0.2200 | 3,300.00 |
| M353 | os | 55653 | NOV 12 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 55752 | NOV 13 14 | 3840.00 | | 0.3500 | 1,344.00 |
| M353 | os | 55796 | NOV 17 14 | 160.00 | | 0.7300 | 116.80 |
| M353 | os | 55913 | NOV 19 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55917 | NOV 19 14 | 4480.00 | | 0.3500 | 1,568.00 |
| M353 | os | 55980 | NOV 19 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56069 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56070 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56071 | NOV 22 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56073 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56074 | NOV 21 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56079 | NOV 21 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56080 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56081 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56082 | NOV 24 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56083 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56085 | NOV 24 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56201 | NOV 28 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56334 | DEC 3 14 | 200.00 | | 0.4400 | 88.00 |
| M353 | os | 56410 | DEC 5 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56444 | DEC 8 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 56603 | DEC 12 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56680 | DEC 11 14 | 3840.00 | | 0.3500 | 1,344.00 |
| M353 | os | 56782 | DEC 22 14 | 120000.00 | | 0.2700 | 32,400.00 |
| M353 | os | 56943 | DEC 1 14 | 40.00 | | 0.3300 | 13.20 |
| M353 | os | 57004 | DEC 1 14 | 280.00 | | 0.3300 | 92.40 |
| | M353 | | Mossy Oak Mini Size Warmers | 158,088.00 | | | 44,318.00 |

Exhibit B, Page 771

| TEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|-----|------|---------|---|----------|-----------|-------|------------|
| | | STYLE SUBTOTAL M353 | | 158,088.00 | | | 44,318.00 |
| M353BX | os | 54935 | OCT 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 55228 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 55234 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 55236 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 55237 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 55245 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56015 | NOV 21 14 | 16.00 | | 18.4500 | 295.20 |
| M353BX | os | 56213 | DEC 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56223 | DEC 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56310 | DEC 3 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56344 | DEC 4 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56348 | DEC 4 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56423 | DEC 8 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56448 | DEC 8 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56545 | DEC 11 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | os | 56719 | DEC 18 14 | 8.00 | | 18.4500 | 147.60 |

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| | M353BX | Mossy Oak Mini Size Warmers Box 40 pai | | 66.00 | | | 2,509.20 |

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| | | STYLE SUBTOTAL M353BX | | 136.00 | | | 2,509.20 |

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| | | TOTAL | | 185,176.00 | | | 88603.23 |

Print sideways to Show Customer

Exhibit B, Page 772

## APPENDIX E

See attached Confidentiality Terms and Conditions which are incorporated herein by reference

Purchaser     Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

# APPENDIX E

See attached Confidentiality Terms and Conditions which are incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____     _____
Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

Exhibit B, Page 774

## CONFIDENTIALITY TERMS AND CONDITIONS

1.     Definition of Confidential Information. "Confidential Information" shall mean any information, including but not limited to data, techniques, protocols or results, or business, financial, commercial or technical information, disclosed by one Party (each a "Discloser" as applicable) to the other Party (each a "Recipient" as applicable) and identified as confidential at the time of disclosure (the "Purpose"). Licensor's Confidential Information shall also include all information disclosed by Licensor to Licensee in connection with the Patent Rights that was not general known to the public or to other persons and that was the subject of efforts are reasonably under the circumstances to maintain its secrecy. Capitalized terms used in this Appendix that are not otherwise defined herein have the meanings ascribed in the Agreement to which this Appendix is attached and made a part thereof.

2.     Exclusions. "Confidential Information" under this Agreement shall not include any information that (i) is or becomes publicly available through no wrongful act of Recipient; (ii) was known by Recipient prior to disclosure by Discloser, as evidenced by tangible records; (iii) becomes known to Recipient after disclosure from a third party having an apparent bona fide right to disclose it; (iv) is independently developed or discovered by Recipient without use of Discloser's Confidential Information, as evidenced by tangible records; or (v) is disclosed to another party by Discloser without restriction on further disclosure. The obligations of confidentiality and non-use set forth in this Agreement shall not apply with respect to any information that Recipient is required to disclose or produce pursuant to applicable law, court order or other valid legal process provided that Recipient promptly notifies Discloser prior to such required disclosure, discloses such information only to the extent so required and cooperates reasonably with Discloser's efforts to contest or limit the scope of such disclosure.

3.     Permitted Purpose. Recipient shall have the right to, and agrees that it will, use Discloser's Confidential Information solely for the Purpose as described in the Agreement, except as may be otherwise specified in a separate definitive written agreement negotiated and executed between the parties.

4.     Restrictions. For the term of the Agreement and a period of three (3) years thereafter (and indefinitely with respect to any individually identifiable health information disclosed by Licensor to Licensee, if any), each Recipient agrees that: (i) it will not use such Confidential Information for any purpose other than as specified herein, including without limitation for its own benefit or the benefit of any other person or entity; and (ii) it will use reasonable efforts (but no less than the efforts used to protect its own confidential and/or proprietary information of a similar nature) not to disclose such Confidential Information to any other person or entity except as expressly permitted hereunder. Recipient may, however, disclose Discloser's Confidential Information only on a need-to-know basis to its and its Affiliates employees, staff members and agents ("Receiving Individuals") who are directly participating in the Purpose and who are informed of the confidential nature of such information, provided Recipient shall be responsible for compliance by Receiving Individuals with the terms of this Agreement and any breach thereof. Each party further agrees not to use the name of the other party or any of its Affiliates or any of their respective trustees, directors, officers, staff members, employees, students or agents in any advertising, promotional or sales literature, publicity or in any document employed to obtain funds or financing without the prior written approval of the party or individual whose name is to be used, in the case of Licensor such approval to be given by the Public Affairs Department. This Section 4 shall survive termination or expiration of this Agreement.

5.     Ownership. All Confidential Information disclosed pursuant to this Agreement, including without limitation all written and tangible forms thereof, shall be and remain the property of the Discloser. Upon termination of this Agreement, if requested by Discloser, Recipient shall return or destroy at Discloser's discretion all of Discloser's Confidential Information, provided that Recipient shall be entitled to keep one copy of such Confidential Information in a secure location solely for the purpose of determining Recipient's legal obligations hereunder.

6.    No License. Nothing in this Agreement shall be construed as granting or conferring, expressly or impliedly, any rights by license or otherwise, under any patent, copyright, or other intellectual property rights owned or controlled by Discloser relating to Confidential Information, except as specifically set forth in that certain Patent Licensing Agreement dated July  18  , 2017 ("Agreement").

7.    Remedies. Each party acknowledges that any breach of the Confidentiality Terms and Conditions by it may cause irreparable harm to the other party and that each party is entitled to seek injunctive relief and any other remedy available at law or in equity.

8.    General. These Confidentiality Terms and Conditions, along with the Agreement, contain the entire understanding of the parties with respect to the subject matter hereof, and supersede any prior oral or written understandings between the parties relating to confidential treatment of information. These Confidentiality Terms and Conditions shall survive any expiration or termination of this Agreement.


Heat Factory, USA, Inc.                          Schawbel Technologies LLC


By: _____            By: _____
Name:  David Treptow   7-18-17              Name:
Title: President                                 Title:

6.    No License.  Nothing in this Agreement shall be construed as granting or conferring, expressly or impliedly, any rights by license or otherwise, under any patent, copyright, or other intellectual property rights owned or controlled by Discloser relating to Confidential Information, except as specifically set forth in that certain Patent Licensing Agreement dated July  18 , 2017 ("Agreement").

7.    Remedies.  Each party acknowledges that any breach of the Confidentiality Terms and Conditions by it may cause irreparable harm to the other party and that each party is entitled to seek injunctive relief and any other remedy available at law or in equity.

8.    General.  These Confidentiality Terms and Conditions, along with the Agreement, contain the entire understanding of the parties with respect to the subject matter hereof, and supersede any prior oral or written understandings between the parties relating to confidential treatment of information.  These Confidentiality Terms and Conditions shall survive any expiration or termination of this Agreement.


Heat Factory, USA, Inc.                    Schawbel Technologies LLC


By: _____          By: _____
Name:  David Treptow                       Name:
Title: President                                  Title:    C : E . O

# EXHIBIT 8.1(a)
## PATENT ASSIGNMENTS

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**EXHIBIT 8.1(a)**

**PATENT ASSIGNMENTS**

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

# 转 让 证 明

我/我们（转让人），中国发明专利申请＿＿＿＿＿＿＿＿＿（基于国际申请 PCT/US2012/071797、国际申请日 2012 年 12 月 27 日）的申请人，现将此专利申请的所有权益于＿＿＿年＿＿月＿＿日转让给下面列出的受让人：

受让人名称：＿＿＿＿＿肖贝尔科技有限责任公司＿＿＿＿＿
　　地址：＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿＿
　签字日期：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

转让人名称：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　地址：＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿＿
　签字日期：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

## Assignment

I/we (Assignor(s)), the owner(s) of the Chinese application＿＿＿＿＿＿

(based on international application PCT/US2012/071797 which filed on (day)27 (month)

12 (year) 2012 ), hereby assign, on (day)＿(month)＿(year)＿＿, all my/our rights

and interests in the said invention application to the Assignee(s) as follows:

Assignee:＿＿＿＿＿＿SCHAWBEL TECHNOLOGIES LLC＿＿＿＿＿

Address:＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿August 20 2014＿＿＿＿＿＿＿＿

Assignor:＿＿＿＿＿＿THE SCHAWBEL CORPORATION＿＿＿＿＿

Address:＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿8/20/14＿＿＿＿＿＿＿＿

# 转 让 证 明

我/我们（转让人），中国发明专利申请＿＿＿＿＿＿＿＿＿＿（基于国际申请 PCT/US2012/023986、国际申请日 2012 年 2 月 6 日）的申请人，现将此专利申请的所有权益于＿＿＿年＿＿月＿＿日转让给下面列出的受让人：

受让人名称：＿＿＿＿＿＿肖贝尔科技有限责任公司＿＿＿＿＿＿
　　地址：＿＿＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿

转让人名称：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　地址：＿＿＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿


## Assignment

I/we (Assignor(s)), the owner(s) of the Chinese application＿＿＿＿＿＿＿

(based on international application PCT/US2012/023986 which filed on (day)6 (month) 2 (year) 2012 ), hereby assign, on (day)___(month)___(year)____, all my/our rights and interests in the said invention application to the Assignee(s) as follows:


Assignee:＿＿＿＿＿＿＿＿SCHAWBEL TECHNOLOGIES LLC＿＿＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿＿August 20. 2014＿＿＿＿＿＿


Assignor:＿＿＿＿＿＿＿＿THE SCHAWBEL CORPORATION＿＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿＿8 20 14＿＿＿＿＿＿＿＿

# EXHIBIT 3



US008850716B2

(12) **United States Patent**   (10) **Patent No.:** **US 8,850,716 B2**
Whitehead et al.                 (45) **Date of Patent:** **Oct. 7, 2014**

(54) **HEATED INSOLE REMOTE CONTROL SYSTEMS**

(75) Inventors: **Ian Whitehead**, Concord, MA (US);
**James K. Lynch**, Bedford, MA (US)

(73) Assignee: **Schawbel Technologies LLC**, Bedford, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 643 days.

(21) Appl. No.: **13/166,351**

(22) Filed: **Jun. 22, 2011**

(65) **Prior Publication Data**
US 2012/0159811 A1     Jun. 28, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/427,509, filed on Dec. 28, 2010.

(51) **Int. Cl.**
*A43B 7/02* (2006.01)
*A43B 3/00* (2006.01)
*A43B 7/04* (2006.01)

(52) **U.S. Cl.**
CPC ................ *A43B 3/0015* (2013.01); *A43B 7/02* (2013.01); *A43B 7/04* (2013.01)
USPC ........................................................ **36/2.6**

(58) **Field of Classification Search**
CPC .......... A43B 7/04; A43B 7/02; A43B 3/0015; A43B 3/0005
USPC .............................................................. 36/2.6
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,882,106 | A | * | 3/1999 | Galli | 362/259 |
| 5,956,866 | A | * | 9/1999 | Spears | 36/2.6 |
| 7,985,502 | B2 | * | 7/2011 | Abe et al. | 429/200 |
| 8,510,969 | B2 | * | 8/2013 | Luo | 36/2.6 |
| 2007/0039201 | A1 | | 2/2007 | Axinte | |
| 2008/0016715 | A1 | | 1/2008 | Vickroy | |
| 2008/0083720 | A1 | * | 4/2008 | Gentile et al. | 219/211 |
| 2008/0197126 | A1 | | 8/2008 | Bourke | |
| 2009/0013554 | A1 | * | 1/2009 | Macher et al. | 36/2.6 |
| 2010/0192406 | A1 | * | 8/2010 | Au | 36/2.6 |

FOREIGN PATENT DOCUMENTS

CN     201976877 U     9/2011

* cited by examiner

*Primary Examiner* — Ted Kavanaugh
(74) *Attorney, Agent, or Firm* — Brown Rudnick LLP

(57) **ABSTRACT**

A remote control wireless heated insole system in which address data identifying specific insoles to be heated is provided. Once the heating process is initiated, periodic repeated control signals are generated to cause heating of the insoles.

**16 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2

INSOLE HEATER FUNCTIONAL BLOCK DIAGRAM

Exhibit B, Page 785



**FIG. 3A**

**FIG. 3B**
**(PRIOR ART)**

# HEATED INSOLE REMOTE CONTROL SYSTEMS

## RELATED APPLICATIONS

This application is based on Provisional Patent Application Ser. No. 61/427,509, filed Dec. 28, 2010, the contents of which are incorporated herewith and the priority of which is claimed.

## BACKGROUND OF THE INVENTION

### Field of the Invention

The present invention relates to a remotely controlled heated insole for footwear and to an improved method of control of such heated insoles that provides a more reliable means of ensuring that the temperature desired by the user is realized.

## BRIEF DESCRIPTION OF THE INVENTION

The present invention is directed to heating insoles of footwear, and improving the ability to realize desired temperatures through wireless control signals. Heated insoles are intended to aid a user in withstanding cold weather by providing supplementary heat in the case where normal body heating is not enough or when additional heat is desired to be more comfortable. When an extremity of the body starts to become cold, the body's natural physiological response of vasoconstriction occurs in which the nervous system restricts blood flow to the cold extremity in an effort to keep the rest of the body warm. It is well known that frostbite and other cold related injuries occur first in fingers and toes due to vasoconstriction and keeping these extremities warm will help insure survival or at minimum a more pleasurable outdoor experience.

Heated insoles are a key component to preventing injury in cold weather and are well known to hunters and outdoorsmen as standard survival gear while in the woods or forest. A problem exists however in the control of such insoles as often the insole temperature needs to be adjusted to accommodate different conditions and comfort levels. Standard temperature adjustment methods require the user needs to remove his or her boot to gain access to the insole in order to make desired adjustments. Not only is this procedure time consuming but removing the user's foot from the boot to gain access to the insole exposes the foot to the cold conditions. This adjustment procedure undoubtedly lowers the foot temperature even further thereby further increasing risk or injury.

An improved method of control has been developed however utilizing a hand held remote control system which employs a transmitter unit external to the insole and a receiver unit located within the insole assembly inside the boot. The desired heat adjustment is then performed by the user selecting a heat setting on the hand held remote unit which is then wirelessly transmitted to the receiver unit located within the heated insole assembly. Although this improved method of control is an improvement, the design requirements for a proper fitting heated insole yields conditions not optimum for wireless control as will be pointed out in the following discussion.

Heated insoles are placed in a shoe with its bottom surface against the bottom of the shoe and the upper surface against the user's foot when in use. Antenna placement within the insole is positioned parallel to the ground surface and also to the foot placed above it. A problem exists in the prior art

however in which this restrictive antenna positioning tends to prohibit the reception of information transmitted from the hand held unit to the receiver unit due to the signal grounding effect produced by the earth's surface on the bottom and the user's foot on top of the antenna. This grounding effect is often severe enough that it inhibits information from the transmitter to the receiver unit, therefore preventing any heating adjustments to be made.

Additionally, the location of the RF receiver, inside shoes, adjacent to the ground requires special consideration to overcome signal loss. Prior art radio controlled insoles include the wire antenna along the midline of the insole. This has been problematic because signal strength is affected. The inventors realized that much of the transmitted signal is blocked by the ground from reaching the receiver antenna located in the insole. The foot and body of the wearer also tend to block the signal. One improvement of this invention for the receiver antenna is to locate it more advantageously for signal reception, for instance, near the outer margin of the insole. Reception is materially improved with such an antenna.

The present invention includes a heated insole device that uses radio frequency communication with an improved transmission system to control the desired insole temperature. The present invention uses a standard frequency of 433 Megahertz but may be used with other frequencies, such as the common 2.4 Gigahertz.

As described above, the manufacturing of an insole product requires that the device itself be relatively flat and fit within a standard shoe or boot. This requirement forces the necessary power source, control methods and communication means to all exist within the confines of the shoe and lie in a flat plane parallel to the earth's surface. Although this space limitation is achievable with good design practice, radio communication suffers largely due to the horizontal orientation of the antenna, its proximity to the earth and the person standing above it. Furthermore, transmission at the frequencies described above is dictated by governing authorities to be a limited transmission of a just a few seconds per hour, so the notion of continuous transmission, if even in the power budget, would be prohibited.

The present invention also discloses a system and method of communication that helps to ensure that user commands are more effectively transmitted by providing a plurality of transmissions at specific spaced intervals of time. By providing discrete, timed transmissions after the user temperature control has been initiated, the probability of transmissions coinciding with the user taking a step and lifting his foot off the ground is increased. The timed control signal may be initiated by the remote or may be controlled by a microprocessor within the insole. With the foot off the ground, the distance between the horizontally placed antenna within the insole and the earth's surface is greatly increased, thus increasing the reception range for the insole. A secondary action that occurs while a foot is in the air is that the pressure of the person wearing the shoe is relieved from the insole, decompressing the foam some measurable amount between the antenna and the person. This decompression although small, tends to increase the transmission success thus providing a better user experience.

For example, it is well known that an adult person walks at a rate of three miles per hour, which equates to four feet per second with a stride length of about eighteen inches. This stride and pace suggests approximately 2.6 steps to be taken every second.

Since bipedal humans alternate feet while walking, this suggests that each foot is lifted off the ground every 1.3 seconds or approximately once per second.

3

Knowing that each foot is off the ground once per second for almost a second, allows more robust communication by providing transmissions that occur while the foot position is in the air and not on the ground surface. Transmissions every half second will insure some of the broadcasted signal will be simultaneous with the foot being in the air, thus delivering the intended command to the insole device. Other time periods may be chosen in accordance with prevailing governmental regulation.

For skiers or snowboarders who use this invention, the position of the foot also shifts from purely horizontal to some vertical orientation, such as when a skier uses edges or a boarder shifts positions. Still further, the heating operation may occur while the user is in a lift chair which also alters the orientation of the sole.

Transmitting the sequence of coded signals periodically for a short period of time after the initiation of the process to heat the insole increases the ability of the user to more effectively communicate the heating instructions to the insole.

The instant invention includes a battery powered electrically heated pair of insoles that are in radio communication with a key fob R/F transmitter. The battery is a lithium ion polymer battery and is provided with a self-contained conventional protective circuit. The transmitter sends out an encoded signal to be received and decoded by a unique pair of insoles. The insole has an on/off switch. This switch may be placed in the on position before the insole is placed inside the shoe.

When the switch is placed in the on position, the insole does not produce heat, but the R/F system in the insole is ready to receive commands from the key fob transmitter. Each insole has an on/off switch and may have a unique code permitting selected insoles to be heated. When both switches are on, both insoles will respond to the key fob transmitter. The user may utilize the key fob transmitter to select among; no heat, medium heat, and high heat by pressing the appropriate button on the key fob transmitter. Settings other than discrete may be used.

When a heat setting is selected on the key fob transmitter, the RF receiver in the insole detects the signal and, if intended for a specific insole, activates the process therein. The microprocessor senses the temperature near the heater, and if the temperature is too low for the selected setting, current flows from the battery to the heater until a thermistor reaches a predetermined temperature. The thermistor generates a signal which is sent to the microprocessor. The microprocessor controls the flow of current to achieve and maintain the desired temperature until the user selects another setting. Other methods of controlling the heat in the insole may be employed.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of the transmitter unit;
FIG. 2 is a block diagram of the electronic circuit within the insole; and
FIGS. 3A and 3B are partial sectional views of the insole showing the location of the antenna in the present invention and in the prior art.

DETAILED DESCRIPTION

FIG. 1 is a block diagram showing the transmitter 10 of this invention. The transmitter comprises an integrated circuit S14010 which is connected to a plurality of push buttons 12, 14 and 16. The push buttons generate signals to cause high, medium and no heat conditions, respectively, to be generated

4

within the insole. The user selects a push button to be activated in order to control the temperature within the insole.

An LED 18 may be connected to the transmitter to indicate that the transmitter is transmitting and/or to indicate that the transmitter is on and capable of transmitting. An antenna 19 connected to the transmitter wirelessly transmits electronic signals generated in transmitter 10 to the electrical circuit within the insole.

The transmitter 10 decodes the user command by determining which of the push buttons is selected, and the transmitter provides a burst of four packets of information or electrical signals with each packet consisting of an address and data. The packet length, by example, is 120 ms in length and the entire four packets takes approximately 512 ms to transmit. To ensure the command is received properly, the four packet sequence is repeated every 15 seconds over the next minute for a total of 20 packets. This is within current FCC regulations.

Referring to FIG. 2, there is shown an electrical circuit located within the insole. Transmitted data packets are received and decoded through receiver 24 and connected to microcontroller 26. The decoded signal is sent to the microcontroller for processing, which creates a control signal for heater control 28 to achieve the desired temperature condition for the insole. Additionally, the address data identifies the insole to be controlled. The heater control 28 is connected to heater assembly 30 located within the insole to heat the insole to a desired temperature. The heater assembly also includes a temperature sensing device such as a thermistor to determine the real time temperature of the heated insole to determine if further heating is required under control of microcontroller 26.

The microcontroller 26 and heater assembly 30 are powered by a 4.2 volt lithium ion polymer battery 32 having an internal safety circuit 34.

The lithium battery 32 is recharged by using an external DC charger 22 connected to input jacks 36 located within the insole. The charging is thus controlled outside of the insoles. A voltage limiter 38 is connected to the output of the external charging input to ensure that the voltage supplied to recharge battery 32 is maintained below a certain level. Battery charging is achieved by using the external charger to control voltage and current to the batteries, and the voltage limiter 38 provides fine voltage control to optimize battery charging. An LED 23 is provided with the external DC charger 22 to display the battery status so it can be determined when the battery has been sufficiently charged, and the external charger may be unplugged from the insoles. A three volt regulator circuit 42 is provided to ensure that the microcontroller and heater assembly properly operate. The control circuit for the system shown in FIG. 2 includes voltage regulator 42 to control the voltage at microcontroller 36.

Locating the protective circuit 34 within the battery is an improvement over having a protective circuit outside of the lithium battery. Providing the protective circuit within the lithium battery is important because if the battery leads short circuit, a hazard will be prevented by having the protective circuit therein. If the protective circuit is remote from the lithium battery, damage from such short circuit to the battery will not be prevented.

In normal use, the user sets the on/off switch 44 to the on position in the insole to allow the battery voltage to control the electronic circuitry therein. The microcontroller 26 receives a command signal from RF receiver 24 and decodes the information to see if the unique address matches that of the insole. If such a match is found, the microcontroller then determines from the command signal the heat setting which is desired.

Exhibit B, Page 788

Once such heat setting is decoded, the microcontroller 26 then commands the control circuit 28 to turn on the heater and maintain a desired heating set point. This continues until the user switches the on/off switch to off or the battery power is exhausted. Additionally, there is a heat control (No Heat) in the transmitter which also can turn off the heating unit.

The instant invention includes a battery powered electrically heated pair of insoles that are in radio communication with the key fob R/F transmitter 8 (see FIG. 1). The transmitter 10 sends out an encoded signal that may be received and decoded by a unique pair of insoles. When the switch in the insole is on, the insole does not produce heat, but the R/F system in the insole is ready to receive commands from the key fob transmitter. Each insole has its own on/off switch. When both switches are on, both insoles may respond to the key fob transmitter depending on the address data. The user may utilize the key fob transmitter 8 to select among; no heat, medium heat, and high heat by pressing the appropriate button on the key fob transmitter 8.

When a heat setting is selected on the key fob transmitter 8, the RF receiver 24 in the insole detects the signal and activates microprocessor 26. The microprocessor 26 senses the state of a temperature measuring thermistor located near the heater, and if the temperature is too low for the selected setting, current flows from the battery 32 to the heater 30 until the thermistor reaches a desired temperature. Then, the microprocessor 26 reduces the flow of current to keep the predetermined temperature. The temperature is maintained until the user selects another setting.

The location of the RF receiver, inside shoes, adjacent to the ground requires special consideration to overcome signal loss. Prior art radio controlled insoles locate the wire antenna 40 along the midline of the insole (see FIG. 3b). This has been problematic because signal strength is not sufficient. Much of the transmitted signal is blocked by the ground from reaching the receiver antenna located in the insole. The foot and body of the wearer also tend to block the signal. The receiver antenna 42 of this invention is located near the outer margin of the insole (see FIG. 3a).

When the user is ready to recharge the batteries, the insoles may be removed from the shoes and the switches are placed in the off position. In the alternative, the charging jacks may be available from outside the footwear by suitable protective waterproofing of such jacks.

It should be understood that the preferred embodiment was described to provide the best illustration of the principles of the invention and its practical application to thereby enable one of ordinary skill in the art to utilize the invention in various embodiments and with various modifications as are suited to the particular use contemplated. All such modifications and variations are within the scope of the invention as determined by the appended claims when interpreted in accordance with the breadth to which they are fairly legally and equitably entitled.

The invention claimed is:

1. An improved system for remotely causing an insole of an item of footwear to be heated, said system comprising:

a remote transmitter transmitting a wireless control signal initiating a process to increase the temperature in said insole to adjust the temperature of a heating element in said insole, said wireless control signal comprising a series of electronic signals,

an electronic circuit contained within said insole,

said electronic circuit comprising

a receiver contained to receive said wireless control signal, a microprocessor,

said microprocessor comprising means to sense a real time temperature of said insole,

said microprocessor generating control signals to cause said heating element in said insole to be adjusted to achieve said desired temperature, said system automatically generating periodic repeated control signals upon initiating said process to control heating of said insole in response to said control signal.

2. An improved system according to claim 1, wherein said periodic signals are initiated by a single control signal generated in said transmitter.

3. An improved system according to claim 2, wherein said single control signal is triggered by a switch in said transmitter.

4. An improved system according to claim 3, wherein said switch is depressed once to initiate said heating process.

5. An improved system according to claim 1, wherein said periodic signals are generated by said microprocessor upon receipt of said control signal from said remote transmitter.

6. An improved system according to claim 1, wherein said periodic signals are generated for less than a five minute total period of time.

7. An improved system according to claim 5, wherein said periodic signals are generated for less than a two minute total period of time.

8. An improved system according to claim 6, wherein said periodic signals are generated approximately every fifteen seconds.

9. An improved system according to claim 1, wherein said insole comprises a flat rechargeable ion lithium battery, said electronic circuit further comprising a voltage regulator connected to said lithium battery to regulate the voltage of said lithium battery.

10. An improved system according to claim 9, wherein said electronic circuit in said insole further comprising a voltage limiter connected to said lithium battery.

11. An improved system according to claim 1, further comprising housing means in said insole for said lithium battery, said housing means enabling said lithium battery to be easily removed from said insole, and a replacement lithium battery to be placed in said housing to provide power for said insole.

12. An improved system according to claim 1, further comprising an antenna in said electronic circuit, said antenna located in the periphery of said insole.

13. An improved system according to claim 1, wherein said wireless control signal comprises unique insole identification data and control data, said insole to be heated identified by said insole identification data.

14. An improved system according to claim 13, wherein said unique insole identification data comprises data to identify more than one insole to be heated.

15. An improved system according to claim 1, further comprising heated insoles powered by ion lithium polymer batteries, said batteries having safety circuits located within said battery, and safety circuits located between battery poles and connecting wires.

16. An improved system according to claim 15, wherein said batteries comprise input jacks connected to recharging sources outside of said insoles.

* * * * *

# EXHIBIT 4



US008869428B1

(12) **United States Patent**  
Zsolcsak et al.

(10) Patent No.: **US 8,869,428 B1**  
(45) Date of Patent: ***Oct. 28, 2014**

(54) **HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY**

(71) Applicant: **Schawbel Technologies LLC**, Bedford, MA (US)

(72) Inventors: **Veronica M. Zsolcsak**, Newburyport, MA (US); **Micha Eizen**, Lake Forest, CA (US); **Thomas John William Bayes**, Rothwell (GB); **Ian Nicholson Whitehead**, Concord, MA (US)

(73) Assignee: **Schawbel Technologies LLC.**, Bedford, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/248,861**

(22) Filed: **Apr. 9, 2014**

**Related U.S. Application Data**

(60) Provisional application No. 61/947,913, filed on Mar. 4, 2014, provisional application No. 61/911,835, filed on Dec. 4, 2013.

(51) **Int. Cl.**
| | |
|---|---|
| *A43B 7/04* | (2006.01) |
| *A43B 13/38* | (2006.01) |

(52) **U.S. Cl.**
CPC .. *A43B 7/04* (2013.01); *A43B 13/38* (2013.01)

USPC ............................................................. 36/2.6

(58) **Field of Classification Search**
CPC ............. A43B 7/04; A43B 7/02; A43B 7/025
USPC ..................................................... 36/2.6, 137
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,360,633 | A | * | 12/1967 | Weisberger .................. 219/211 |
| 3,800,133 | A | * | 3/1974 | Duval ........................... 362/103 |
| 4,507,877 | A | | 4/1985 | Vaccari et al. |
| 4,823,482 | A | | 4/1989 | Lakic |
| 4,894,931 | A | | 1/1990 | Senee et al. |
| 4,910,881 | A | | 3/1990 | Baggio et al. |
| 5,041,717 | A | | 8/1991 | Shay, III et al. |
| 5,230,170 | A | | 7/1993 | Dahle |
| 5,495,682 | A | | 3/1996 | Chen |
| 5,623,772 | A | | 4/1997 | Sunderland et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2515992 Y | 10/2002 |
| DE | 20317143 U1 | 4/2004 |

(Continued)

*Primary Examiner* — Ted Kavanaugh
(74) *Attorney, Agent, or Firm* — Robert J. Tosti

(57) **ABSTRACT**

A heated insole for a shoe has an insole body and a battery. The insole body has a battery-receiving portion. The battery is configured to be removable from and insertable into the battery-receiving portion while the insole is disposed within the shoe.

**25 Claims, 17 Drawing Sheets**



## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,956,866 | A | 9/1999 | Spears |
| 6,701,639 | B2 | 3/2004 | Treptow et al. |
| 6,841,757 | B2 | 1/2005 | Marega et al. |
| 6,865,825 | B2 | 3/2005 | Bailey, Sr. et al. |
| 8,074,373 | B2 | 12/2011 | Macher et al. |
| 2003/0114902 | A1 | 6/2003 | Prescott |
| 2005/0126049 | A1* | 6/2005 | Koenig .......................... 36/141 |
| 2009/0013554 | A1 | 1/2009 | Macher et al. |
| 2010/0192406 | A1 | 8/2010 | Au |
| 2013/0174451 | A1 | 7/2013 | Kremer et al. |
| 2013/0181662 | A1 | 7/2013 | Shapiro |
| 2013/0244074 | A1 | 9/2013 | Kremer et al. |

### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | 10352050 A1 | 12/2004 | | |
| DE | 102008029727 * | 12/2009 | ............... | A43B 7/04 |
| DE | 102008029727 A1 | 12/2009 | | |
| EP | 2215918 A2 | 8/2010 | | |
| WO | 2006/111823 A1 | 10/2006 | | |
| WO | WO 2006111823 A1 * | 10/2006 | | |
| WO | 2008/006731 A1 | 1/2008 | | |
| WO | WO 2008006731 A1 * | 1/2008 | | |
| WO | 2008/069524 A1 | 6/2008 | | |
| WO | WO 2008069524 A1 * | 6/2008 | ............... | A43B 7/04 |
| WO | 2013101920 A1 | 7/2013 | | |

* cited by examiner



FIG.1A

FIG.1B

FIG.1C

Exhibit B, Page 793



FIG.2A



FIG.2B

Exhibit B, Page 794

14

64

62

66



FIG.3A

64

14

67

66

62



FIG.3B

21   19   21

14

17        66



FIG.3C

Exhibit B, Page 795



FIG.3D



FIG.3E



FIG.3F



FIG.4A



FIG.4B



300

12

12

14

220

28

210

8

FIG.5



**FIG.6**



FIG.7



FIG.8

Exhibit B, Page 800



FIG.9A



FIG.9B



FIG.9C

Exhibit B, Page 801



FIG.10



**FIG.11**



**FIG.12**



FIG.13A



FIG.13B

Exhibit B, Page 804



FIG.14



**FIG.15**



FIG.16



FIG.17



46

12

FIG.18

# HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY

## RELATED APPLICATIONS

This application claims the benefit of and priority to U.S. Provisional Application Nos. 61/947,913, filed Mar. 4, 2014, and 61/911,835, filed Dec. 4, 2013, which are both incorporated by reference herein.

## TECHNICAL FIELD

This application relates to insoles such as heated insoles that include a battery.

## BACKGROUND

Several occupations require employees to endure harsh weather conditions during the winter months. To name a few, soldiers, construction workers, agricultural workers, and law enforcement officers must routinely spend several hours outdoors despite cold, snowy or icy conditions. Others happily brave cold weather in order to enjoy activities such as skiing, hiking, snowshoeing, and sledding. Further, many must bear freezing temperatures after a snowstorm to shovel their car out and to clear accumulated snow from their driveway and/or sidewalk.

Regardless of whether one is exposed to cold weather conditions for work, fun, or chores, most accessorize with coats, boots, hats, and gloves to make the cold weather bearable. In addition to those accessories, heated insoles for shoes have recently been introduced in order to provide heat directly to a wearer's feet. Known heated insoles include electronics located between an insole's layers. The heated insoles include an internal heating pad coupled to an internal battery. The internal battery, due its size, has a limited battery life (e.g., 3-4 hours). In order to charge the electronics, one must connect the heated insole to an electrical power source. This requirement is a hassle for those who desire warmth in excess of the battery life. One must remove the heated insole from the shoe, plug in the insole to recharge its internal battery, wait for the insole's internal battery to recharge, and then re-introduce the insole into the shoe prior to continuing with their activity.

## SUMMARY

A battery-powered insole, according to the invention, allows a user to easily remove and replace a battery without having to remove the insole from the shoe, and the user does not have to wait for the insole to recharge.

According to certain aspects, an insole of the invention includes an insole body having a battery-receiving portion and a battery. The battery-receiving portion is configured such that the battery is removable from and insertable into the insole body while the insole is disposed within a shoe. In certain embodiments, the battery-receiving portion of the insole is a frame. The frame may be part of a heating assembly that provides heat to a wearer's foot when powered by the battery. The heating assembly is typically located within the insole and delivers heat to at least the forefoot portion of the shoe. The heating assembly may include a heating member and a connector, in addition to the frame. The connector of the heating assembly may be operably coupled to the frame, and functions to transfer energy from the battery to the heating member. The heating member may include a heater panel and a conductive ribbon that transfers energy along a length of the insole to the heater panel. The heating assembly may further include a circuit coupled to the connector. The circuit allows one to adjust the level of energy being transferred from the battery to the heating member. In certain embodiments, the circuit is adjustable from a remote control.

A benefit of the present invention is that the battery may be easily inserted into and removed from the insole. The removable and insertable battery is preferably designed to mate-fit with the frame of the insole. In certain embodiments, the battery is configured to fit within the frame while being directly removable from a surface of the insole. Ideally, a surface of the battery, when the battery is disposed within the frame, is substantially flush with a surface of the frame and/or insole. This prevents the removable battery from being disruptive or uncomfortable to a user wearing the insole. The battery formed as part of a battery pack, which includes a body that encloses a battery cell. In addition, the battery may be rechargeable.

As discussed above, the frame may include a connector that provides energy transfer from the battery to the heating member. Preferably, the connector is configured to pivot to accommodate movement of the battery into and out of the frame. The pivoting movement advantageously allows the battery to mate-fit within the frame while also allowing one to insert the battery into and remove the battery from the insole while the insole is disposed within a shoe.

The insole of the invention may be an independent item that is separate from a shoe that the insole is being used with. In such case, the insole is insertable and removable from the shoe. Alternatively, the insole of the invention can be built within or incorporated into the shoe itself (i.e. not designed for easy removal). Thus, the invention also includes a shoe having an insole that is configured to receive a removable battery such that the battery may be inserted into and removed from the insole with the insole disposed within the shoe.

Some aspects of the invention include a battery with a cushion portion that is substantially flush with a surface of the insole. In addition, the battery, when disposed within the insole, may be removable from the insole without removing the insole from the shoe. In certain embodiments, the battery is directly removable from a surface of the insole. The battery may include a connector portion that mates with a connector of the insole in order to provide energy transfer. The battery may be a battery pack, which includes a body that encloses a battery cell. The battery may include a base portion that mates within a frame of the insole. The cushion portion (such as a foam cushion) may be coupled to the base portion. When the battery is installed in the insole, the cushion portion forms a surface of the insole, and provides comfort to a user wearing a shoe with the insole disposed therein. In addition, the battery may be rechargeable.

Aspects of the invention further include assemblies for inclusion in insoles. An assembly for inclusion in an insole may include a heating member and a frame with a connector. The assembly may be incorporated into an insole to form a heated insole. The assembly is for use in conjunction with a battery. The frame is designed to receive the battery, which couples to the connector. In certain embodiments, the connector pivots to connect and decouple from the battery. The connector places the battery in electrical communication with the heating member for energy transfer. The heating member may include a heater panel coupled to a conductive ribbon. A circuit may be included to adjust a level of energy transmitted from the battery to the heating member. The circuit may be operated by a remote control. In certain embodiments, the assembly, when included in an insole, is configured to provide direct removal of the battery from a surface of the insole. In

3

addition, the assembly, when included in an insole, preferably allows one to remove the battery from the insole when it is disposed within a shoe. The above-described assembly can also be incorporated directly into a sole of a shoe.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A illustrates a perspective view of an insole of the invention.

FIG. 1B illustrates a top view of the insole of FIG. 1A.

FIG. 1C illustrates a bottom view of the insole of FIG. 1A.

FIG. 2A illustrates a perspective view of a frame of an insole of the invention.

FIG. 2B illustrates a top view of a frame of the insole of FIG. 2A.

FIG. 3A illustrates a perspective view of a battery of the invention.

FIG. 3B illustrates a side view of the battery of FIG. 3A.

FIG. 3C illustrates a front view of the battery of FIG. 3A.

FIG. 3D illustrates a top view of a battery of the invention, according to another embodiment.

FIG. 3E illustrates a rear view of the battery of FIG. 3D.

FIG. 3F illustrates a side view of the battery of FIG. 3D.

FIGS. 4A and 4B illustrate an insole of the invention disposed within a shoe.

FIG. 5 provides a partially transparent view of a heated insole 300 according to certain embodiments.

FIG. 6 illustrates an exploded view of a heated insole according to certain embodiments.

FIG. 7 illustrates an insulation layer of an insole of the invention.

FIG. 8 illustrates a water-proofing layer of an insole of the invention.

FIGS. 9A, 9B and 9C illustrate a configuration that allows bending of a heating assembly.

FIG. 10 illustrates a layout of a heating assembly of the invention according to certain embodiments.

FIG. 11 illustrates a frame of a heating assembly according to certain embodiments.

FIG. 12 depicts a rivet used to connect a circuit to the frame of FIG. 11.

FIGS. 13A and 13B illustrate a connector of the invention.

FIG. 14 illustrates a transparent side view of the connector of FIGS. 13A and 13B.

FIG. 15 illustrates an exploded view of a battery of the invention.

FIG. 16 illustrates the coupling between a battery and a connector of the frame.

FIG. 17 illustrates a battery magazine of the invention.

FIG. 18 illustrates enlarged prospective view of a heel portion of an insole of the invention, and shows a connector positioned at an incline.

## DETAILED DESCRIPTION

While the invention is described herein as pertaining to heated insoles, concepts of the present invention are also applicable to other insoles that may require battery power. For example, the structure and configuration of the present insoles with removable and insertable batteries can be applied in insoles having a vibrating mechanism (e.g. massaging insoles). In addition, the invention is described in reference to one insole and shows a left-footed insole, but it is understood that the invention could be used to form right-footed insoles or a pair of insoles (right-footed and left-footed insoles)

FIGS. 1A-1C illustrate views of an exemplary insole 100 according to the invention. As shown in FIGS. 1A-1C, the

4

insole 100 includes a body 28 that has a distal end 24 and a proximal end 26, and can be divided up into separate sections: a heel portion 2, a midfoot portion 4, and a forefoot portion 6. The heel portion 2 is typically thicker than the midfoot portion and forefoot portion 6 due to additional cushioning. The midfoot portion 4 may be designed to support the arch of one's foot and provides a transition between the heel portion 2 and the forefoot portion 6. The forefoot portion 6 corresponds to the ball of one's foot and toes. Preferably, the insole body 28 is shaped to conform to a foot (left or right) of a user. In addition, the insole body 28 may be shaped to fit within any type of shoes, including boots, tennis shoes, ski boots, sandals, slip-ons, etc. Ideally, the insole body 28 is flexible such that it flexes with the motion of one's foot while they walk.

The insole body 28 includes a top surface 10, a bottom surface 22, a side surface 8. The top surface 10 receives the foot of a wearer, and the bottom surface 22 rests against the sole (bottom frame) of the shoe. The top surface 10 or bottom surface 22 may be specially formed to conform to different types of feet and different types of shoes. In addition, the bottom surface 22 may rest or be designed to rest against another insole (i.e. for when the shoe has built-in insoles). The insole body 10 may be formed, at least in part, by a cushioned material to provide comfort to the user. Furthermore, the insole body 28 may be formed as part of the sole of a shoe. For instance, when the shoe, due to its structure, does not have an insole separate from the sole itself, which is often the case in slip-on shoes.

The insole body 28 of the insole 100 includes a frame 12 that is configured to receive a battery 14 disposed therein. Preferably, the frame 12 is positioned in the heel portion 2 of the insole 100, or in the arch segment of the insole 100. The top surface 20 of the frame is substantially flush or flush with a top surface 10 of the insole body 28. As shown in FIGS. 1A and 1B, the battery 14 is shown inserted in the frame 20. The top surface 30 of the battery 14 is substantially flush or flush with the top surfaces 10, 20 of the insole body 28 and frame 12, respectively. This flushness advantageously allows a user to comfortably rest his/her foot against the insole 100 without feeling differences among the multiple components. In addition, top surfaces 20, 30 of the frame 12 and battery 14 may be cushioned in the same manner as the insole body 28 to further prevent a wearer from feeling or being disrupted by the multiple components. For example, each component may be formed from a polymer or polymer foam. A preferred polymer or polymer foam is polyurethane. Alternatively, the components may be formed from different materials.

The frame 12 optionally includes a grasping region 18 that is shaped to allow a user to directly remove the battery 14 from the top surface 10 of the insole body 28. That is, one does not have to remove the battery 14 from an enclosed battery compartment (i.e. with a lid for example), but can access the battery from the outer surface of the insole. As shown, the grasping region 18 is a recess within the frame 12 next to the battery 14. Preferably, the grasping region 18 is shaped to allow a wearer to partially insert one or more fingertips therein so that the wearer can use their fingertips to easily remove the battery 14. The grasping region 18 may be positioned anywhere within the frame 12, and is shown on a distal portion of the frame 12.

According to certain aspects, insoles 100 of the invention may be inserted and removed into one's shoes when one desires. In such aspect, the insole is a separate from the shoe. For removable insoles, the insole 100 may include a tab 16 that a user can pull to remove the insole 100 from the inside of a shoe. Alternatively, insoles 100 of the invention may be built into one's shoes (e.g. not designed for easy removal).

FIGS. 2A and 2B provide a close-up view of the frame 12 without a battery inserted therein. The frame 12 defines a recess 40 that is surrounding by sides 42 and bottom 44. The recess 40 of the frame 14 is sized and shaped to receive the battery 14. Preferably, the frame 12 snugly receives the battery 14 within the recess 40 to prevent unintended movement or removal of battery 14. The frame 12 further includes a connector 46. The connector 46 couples to the battery 14, and places the battery 14 in communication with a heating member (discussed hereinafter). In certain embodiments, the coupling between the connector 46 and the battery 14 is a mate-fit coupling (the particulars of which are described in more detail hereinafter). The connector 46 is preferably constructed out of an elastomeric material, which provides the ability to absorb deflection and stress. The connector 46 may pivot to assist in battery 14 insertion and removal (this function is described in more detail hereinafter). The pivoting capability and flexibility of the connector 46 allow it to maintain its mechanical integrity even when deflecting while bearing weight and other stresses.

In certain embodiments and as shown in FIG. 2A, the frame 12 may include a rigid portion 52 and a cushion portion 50. The cushion portion 50 provides comfort to the user, and the rigid portion 52 provides the needed structural support for the connector 46 and associated circuitry. The cushion portion 50 may be a polymeric foam.

In certain embodiments, the frame 12 of the insole 100 includes a battery indicator. The battery indicator may include light emitting diode (LED) that is associated with circuitry (such as circuit 210 shown in FIGS. 5 and 6) disposed within the insole. In one embodiment, the battery indicator emits a light when the battery 14 is inserted into the insole 100. The emitted light my indicate that battery 14 is fully connected and may appear as a single flash, a series of flashes over time, or the light may constantly be emitted while the battery is in place. Optionally, the battery indicator also emits a light to illustrate that the battery 14 is running low on charge. The low-battery light may appear as a single flash, a series of flashes over time, or constantly emitted light. Preferably, the light emitted to indicate that the battery is properly inserted or connected is different from the light emitted to indicate the battery is low on charge. For example, a green light may indicate the battery is properly inserted, and a red light may indicate the battery needs to be recharged. In addition, the battery indicator may also emit a light to illustrate that the battery 14 is defective, and should be discarded.

The battery indicator may be positioned anywhere on the insole 100. According to some embodiments, the battery indicator is positioned on the frame so that it is easily visible to a user while the insole is disposed within a shoe. FIG. 2B shows a battery indicator 27 positioned in the grasping region 18 of the frame 12. In this particular embodiment, the battery indicator 27 includes an LED in close proximity with an opening of the grasping region 18 of the frame 12. The frame 12 near the battery indicator 27 may include a reflective surface to further enhance the light emitted from the LED. The opening allows light emitted from an LED, which is associated with the internal circuitry of the insole, to be seen therethrough.

The battery 14 may be the battery itself (i.e. one or more battery cells) or a battery pack, which is a body that encloses one or more battery cells. Any suitable battery may be used for the battery or battery cell. Types of batteries include, for example, nickel cadmium, nickel-metal hydride, lead acid, lithium ion, lithium ion polymer batteries. The battery chosen ideally holds charge for more than 2, 3, 4 or 5 hours, and is rechargeable. In one aspect, the battery 14 is a battery pack, and such aspect is described hereinafter and shown in FIGS.

3A-3C. The battery can be inserted and removed from the insole (or sole) at the user's convenience.

FIGS. 3A-3D illustrate battery 14 as a battery pack according to certain embodiments. Preferably, the battery 14 is shaped to fit within the frame 12 such that the top surface of the battery 14 is substantially flush or flush with top surfaces of the frame 12 and insole body 28. In some embodiments, the battery 14 includes a lower body portion 62 and an upper body portion 64. The lower body portion 62 may be formed from a polymeric material, and the upper body portion 64 may be a polymeric form. The lower body portion 62 is designed to mate fit with the rigid portion 52 of the insole frame 12. The lower body portion 62 also includes a connector portion 66 that is designed to couple (i.e. mate-fit) to the connector 46 of the frame 12. In certain embodiments, the lower body portion 62 is also rigid to protect the battery cell disposed therein and to protect the coupling between the battery connector 66 and the frame connector 46. The lower body portion 62 may include a door or latch that allows one to remove the battery cell(s) disposed therein. The upper body portion 64 is coupled to the lower body portion 62. Preferably, the upper body portion 64 is cushioned to provide comfort to a user.

According to certain embodiments, the battery 14 includes a finger tab 67 that one can leverage with his/her finger to assist in removing the battery 14 from the frame 12. The finger tab 67 can extend from the lower body portion 62, and may be positioned on any side of the battery 14. Preferably, the finger tab 67 is on a side of the battery 14 that mates with the grasping region 18 of the frame 12. As shown in FIG. 3B, the finger tab 67 is positioned at the distal end of the lower body portion 62, which is opposite to the connector 66, and is level with the top of the lower body portion 62.

In preferred embodiments, the lower body portion 62 and the upper body portion 64 are designed to accommodate a raised finger tab 69, as shown in FIGS. 3D-3E. In such embodiment, one side (such as the distal end) of the lower body portion 62 may include a raised portion 70 from which the raised finger tab 69 extends. In addition, one side (such as the distal end) of the upper body portion 64 may include a cut-out 71 to accommodate the raised portion 70. The raised finger tab 69 further eases one's ability to remove the battery 14 with his/her fingertip.

A benefit of insoles of the invention is that the battery 14 may be removed from the insole 100 while the insole is disposed within a shoe. FIGS. 4A and 4B graphically illustrate an insole 100 of an invention disposed within a shoe 200. The insole 100 is placed within a shoe 200 such that the bottom surface of the insole rests against, for example, a sole of the shoe 200. The battery 14 of the insole 100 is positioned at the heel portion of the insole such that the battery 14 is accessible from the shoe opening 202. The battery 14 may be conveniently inserted into and removed from the shoe 200, while the insole 100 is disposed within the shoe, by simply reaching one's hand into the shoe opening 202 and grabbing the battery 14. This allows one to quickly replace a used battery for a charged battery, without having to remove the insole or wait for an internal battery of the insole to charge. In addition, the used battery may be recharged while the charged battery is being used. For example, the used battery may be charged in the charging magazine shown in FIG. 17.

As discussed above, insoles of the invention with removable batteries are particularly well-suited for use as heated insoles. FIG. 5 provides a partially transparent view of a heated insole 300 according to certain embodiments. The heated insole 300 (like insole 100) includes an insole body 28, and a frame 12 disposed in the heel portion of the insole, and a

7

8

battery **14** placed within the frame **12**. The surfaces of the battery **14**, frame **12**, and insole body **28** may be substantially flush with each other. The battery **14** may be removed directly from the surface of the insole body **28**. In addition, the battery **14** may be removed from the insole **300** while the insole **300** is disposed within a shoe. The heated insole **300** further includes a heating assembly **220**, which is described in more detail hereinafter. The heating assembly **220** is coupled to the battery **14** via the connector **46** (not shown in FIG. **5**) of the frame **12**. Optionally, the heating assembly **220** includes a circuit **210**. The heating assembly **220** extends from the heel portion to the forefoot portion of the insole body **28**. The heating assembly **220**, when powered by the battery **14**, provides heat to a wearer of shoe having the insole **300** disposed therein. In addition, the heating assembly **220** may be flexible such that it flexes in response to a wearer's movement.

FIG. **6** illustrates an exploded view of the components of the heated insole **300**. The main components of the insole body **28** include a top layer **302**, a heel cushion **306**, and a bottom layer **304**. The top layer **302** and the heel cushion **306** include openings **308, 310** (respectively). The openings **308, 310** are designed to receive the frame **12**. The frame **12** is designed to receive the battery **14**. The battery **14** includes a lower body portion **62** (e.g. a rigid body that encases a battery cell) and an upper body portion **64** (e.g. cushioned body).

The heated insole **300** further includes a heating assembly **220**. As shown in FIG. **6**, the heating assembly **220** includes the frame **12**, a ribbon cable **312**, and a heater panel **314**. As discussed above, the insole layers (top layer **302** and heel cushion **306**) include openings **308, 310** (respectively) that are shaped to receive the frame **12**. The frame **12** includes a connector **46** that electrically couples to a connector of the battery **14**, when the battery **14** is placed within the frame **12**. The heater panel **314** may be any desirable shape. As shown, the heater panel **314** is a flat, substantially rectangular shape designed to fit within the forefoot portion of the insole. The ribbon cable **312** (or other conductive material) delivers electric current from the battery **14**, when coupled to the connector **46**, to the heater panel **314**. Preferably and as shown, the ribbon cable **312** is coupled to a circuit **210**. In a preferred embodiment, the ribbon cable **312** has a first end that is soldered or otherwise electrically connected to circuit board **210** and a second end that is connected to the heater panel **314**. The circuit **210** is configured to adjust the level of energy transferred from the battery **14** to the heater panel **314**. For example, the circuit **210** may be programmed to provide certain heating levels, e.g., low, medium, and high. In some embodiments, the circuit **210** may be operably associated with a temperature sensor, and the circuit **210** delivers energy to maintain a certain threshold temperature level (such as body temperature) in response to readings transmitted from the temperature sensor. In certain embodiments, the circuit **210** may be controlled by a remote control (not shown). In such an embodiment, the circuit **210** includes a receiver that receives signal from a remote, decodes the signal, and then the circuit **210** executes the operation based on the signal. In embodiments that include a battery indicator **27**, the circuit **210** controls an LED of the battery indicator. For example, the circuit **210** may cause the LED to emit light as discussed in more detail above. In addition, the circuit **210** may cause the LED to emit light upon receipt of a signal from the remote control.

Remote control technology is generally known, and relies on sending a signal, such as light, Bluetooth (i.e. ultra-high frequency waves), and radiofrequency, to operate a device or circuit. Dominant remote control technologies rely on either infrared or radiofrequency transmissions. A radiofrequency remote transmits radio waves that correspond to the binary command for the button you're pushing. As applicable to the present insoles, the command may include high heat, low heat, medium heat, on, or off. A radio receiver on the controlled device (e.g. circuit **210** of heating assembly **220**) receives the signal and decodes it. The receiver then transmits the decoded signal to the circuitry, and the circuitry executes the command. The above-described concepts for radiofrequency remote controls are applicable for light and Bluetooth remote controls.

According to certain aspects, all electrical and electronic components (i.e. connector **46**, circuit **210**, ribbon cable **312**, and heater panel **314**) are completely coated or sealed with water proofing sealants, coatings, and water tight encapsulating means coating to enable the circuit to function well when exposed to moisture and water.

According to certain embodiments, the heated insole **300** further includes insulation and water-proofing. For example, the ribbon cable **312** and heater panel **314** may be sandwiched between an insulation layer **316** below (also shown in FIG. **7**) and a water-proofing layer **318** above (also shown in FIG. **8**). Water proofing layer **318** may be made of any of various woven or non-woven materials, which allow heat to pass there through. Insulation layer **316** supports the heater panel **314**, ribbon cable **312** and the circuit board **210**—all of which are placed on the top face of insulation layer **316**. The insulation layer **316** has a contact region **320** which abuts the frame **12**. The ribbon cable **312**, heater panel **314**, insulation layer **316** and water proofing layer **318** are aligned with the circuit board **210**. The circuit board **210** is attached to the frame **12** with a rivet that connects the circuit board **210** to the battery frame **12**. See, for example, FIGS. **11-12**. The rivet allows variation in the angle between the frame **12** and ribbon cable **312**/circuit board **210**/heater panel **314**.

According to certain aspects, the design of the heating assembly **220** is flexible in order to allow the heating assembly **220** to withstand the stress and pressure accompanied by movement of a wearer. In some embodiments, the underlying insulation layer **316** includes an opening **326** that allows the ribbon cable **312** to release an amount of longitudinal stress by protruding excess length thereof into the opening **326**. For example and as shown in FIG. **9A**, the opening **326** is a substantially rectangular slot or groove that is slightly wider than ribbon cable **312**. When the insole **300** is in its flat state, the ribbon cable **312** is laid flat in straight line between the heater **314** and the circuit board **210** without any excess length in the cable. When the insole **300** bends, the ribbon cable **312** and insulation **316** also bend (as shown in FIGS. **9B** and **9C**). Due to the ribbon cable's **312** fixed length, it needs room to move during bending or else buckling occurs. The slot **326** receives the excess ribbon cable **312**, thereby eliminating stress on the ribbon cable's **312** electrical connections due to the bending of the insole **300**. This helps to protect the ribbon cable **312** and its electrical connections from being torn or compromised by bending and sheering stresses. In certain embodiments, the heater panel **314** is attached to insulation layer **316** in a manner that allows slight movement of the heater panel **314** as the insole **300** bends. This relieves bending stress on the heater panel **314** caused by the bending of the insole **300**. For example, in one embodiment, the heater panel **314** is glued, riveted or otherwise connected at one end thereof to the underlying insulation layer **316**. The insulation layer **316** is preferably formed from a soft, pliable material, which allows some "give" when the heater panel **314** is pulled by ribbon cable **312** during bending.

Referring now to FIG. **7**, the insulation portion **316** has a contact region **320** that abuts the frame **12**. The contact region

320 is designed to be used interchangeably in right and left shoes. To that end, and as best shown in FIG. 7, the terminal end 350 of contact region 320 angles outwardly to create two different attachment ends. As shown, wall 350a emanates from a first corner 354a of the contact region 320 and angles outwardly. Wall 350b similarly emanates for a second corner 354b and angles outwardly. Walls 350a and 350b meet at apex 352. This geometry enables the insulation layer 316 and the heater 314 to be assembled in a range of angles so the same assembly would fit into left and right shoes with varying sizes. This geometry is described further in reference to FIG. 10.

FIG. 10 shows a bottom transparent view of an insole 300 according to an embodiment of the invention. As shown, an insole 300 is slightly angled from heel (proximal end 26) to toe (distal end 24). In order to substantially center the heater panel 314 in the forefoot portion 6 of the insole 300, the heater panel 314 must be somewhat offset with respect to the heel portion 2. As illustrated by the dotted line 44 in FIG. 10, if the ribbon cable 312 and heating element 314 would emanate from the frame 12 in a substantially linear manner—the heating element 314 would not be substantially centered in the forefoot portion 6, but rather it would be skewed to one side of the forefoot portion 6. However because, as shown, wall 350a abuts the frame 12 and because wall 350a is angled, the trajectory of the ribbon cable 312 and heating element 314 is slightly angled so as to position the heating element 314 in the general center of forefoot portion 6. As shown in FIG. 10, wall 350a is used as a contact surface in a left shoe. Wall 350b may be used as a contact surface of a right shoe. The angled terminal end 350 of the contact region 320, thus, allows the ribbon cable 312 and heating panel 314 to be used in any shoe.

The above-described features of the heating assembly 220 (e.g. flexibility and angled nature due to contact region) beneficially allow the heating assembly 220 to be incorporated in an insole or sole of a wide variety of shoes, including worker boots, tennis shoes, hiking boots, skiing shoes, snow shoes, etc. In addition, the above-described features allow one to use the same manufacturing process to produce heating assemblies for both right and left insoles.

FIG. 11 illustrates a close up view of the frame 12 that may be used in insoles of the invention. The frame 12 includes connector 46 and defines a recess 40 that is surrounding by sides 42. The recess 40 of the frame 14 is sized and shaped to receive the battery 14. The frame further includes extension member 370. The extension member 370 includes a rivet opening 462. A rivet associated with the circuit 210 (as shown in FIG. 6) may couple to the frame 12 via rivet opening 462. FIG. 12 illustrates a rivet 372 suitable for coupling the circuit 210 to the frame 12. Preferably, the rivet 372 is flexible such that it can deflect without breaking. A flexible rivet maintains the integrity of the connection between the frame 12 and the circuit board 210 despite bending of the insole 300. In certain embodiments, the rivet 372 is made from a technical grade elastomeric material.

As discussed above, the connector 46 of the frame 12 may, according to certain embodiments, pivot or rotate in order to connect to the battery as it is placed directly into the frame 12. This pivoting motion allows the battery 14 to snugly fit within the recess of the frame 12. Without the pivoting motion, the frame 12 and its recess may have to be larger than the battery in order to accommodate the lateral motion required to connect the battery 14 to the connector 26. FIG. 18 illustrates an enlarged view of the heel portion of an insole with the connector 46 positioned at an incline. The angle of the incline can vary depending on applications and the

amount of pivot one desires. In certain embodiments, the connector may be configured to rotate, for example, 10°, 20°, 30°, . . . , 80°, 90°.

FIGS. 13A and 13B illustrate an exemplary design of the connector 46. The connector 46 includes one or more hinges 510. The hinges mate with indents in the frame 12 (not shown). The hinge 510 allows the connector 46 to pivot/rotate upwardly in order to align with a battery 14 to be inserted. The connector may be formed from a polymer, plastic, rubber, and/or thermoplastic elastomeric material. The connector 46 is preferably constructed out of elastomeric material giving it the ability to absorb deflection and stress. The above-mentioned features of the connector 46 allow the connector 46 to maintain its mechanical integrity even while deflecting and being subjected to external stresses (e.g. pressure from a wearer's movement).

According to certain embodiments and as shown in FIG. 13A, the connector 46 includes one or more electrical contact housing members 512. Electrical contacts (best shown in FIG. 16) are housed inside of the housing members 512, and are accessible through openings 502. The electrical contact housing members 512 mate fit with a connector portion 66 of the battery 14. In particular embodiments, the connector portion 66 of the battery 14 defines a recess 19 that includes an internal separator 17. See, for example, FIG. 3C. When the battery 14 is coupled to the connector 46, the internal separator 17 is positioned between the electrical contact housing members 512. Thus, the internal separator 17 acts to guide the housing members 512 into place as the battery 14 coupled to the connector 46. Electrical contacts (as shown in FIG. 16) within the housing members 512 are then coupled to battery pins 21 that are positioned in the battery recess 19. When the contact points are coupled to the battery pins 21, energy from the battery 14 can be transferred to the heater panel 314 via the connector 46.

As further shown in FIG. 13A, the outer walls of the connector 46, which face the battery, may have angled geometry 504 to help guide the electrical contact housing members 512 into the battery recess 19. In certain embodiments, the connector 46 further includes one or more ridges 508 for water proofing. When the battery 14 is fully engaged with the connector 46, the ridges 508 prevent water from entering the battery recess 19 and disrupting the electrical connection.

FIG. 13B illustrates a back side of the connector 46, which is in communication with the heating assembly 220. The back side of the connector 46 may include one or more openings 520 or similar cutouts for allowing wires or similar conductors to pass out of the connector 46. Those conductors/wires are in electrical communication with the electrical contacts 537 (as shown in FIGS. 15 and 16) of the connector 46 and may be coupled to the circuit 210, ribbon cable 312, or both. The openings 520 are sealed with a water proof sealant to protect the wires from water or other elements. The back side of the connector 46 may also include a lip 522, which is used as a height gauge for the wires and sealant compound during the assembly of the connector 46. Lip 522 presents a physical barrier which limits the amount of sealant compound that may be introduced into the area there below. This prevents excessive build-up of sealant materials—which may prevent or limit movement of the connector 46.

FIG. 14 shows a side, transparent view of a connector 46. As shown, a structural recessed round cavity 518 inside of the connector 46 is filled with the sealant and keeps the sealant in place to help maintain any sealant that is introduced through openings 520 from loosening and compromising the water tight seal.

11

As discussed above, the insoles of the invention are designed to receive a battery 14. See, for example, FIGS. 3A-3C. In certain embodiments, the battery 14 may be a battery pack. A battery pack includes a body enclosing a battery cell. The body may be the lower body portion 62, as shown in FIGS. 3A-3C. FIG. 15 illustrates an exploded view of the lower body portion 62. As shown in FIG. 15, the lower body portion 62 of the battery pack includes a boxed portion 602. The boxed portion 602 defines a recess to receive the battery cell 604 and includes the connector portion 66 (which couples to the connector 46 of the frame 12). A battery cell 604 may be placed in the recess. The boxed portion 602 may include a locking ridge 608 or tab on the side opposite of the connector portion 66. Optionally, the locking ridge 608 meets with an indent in the frame 12, when the battery 14 is placed in the frame, in order to prevent undesirable movement of the battery 14 while still allowing the battery 14 to be removed from the frame upon application of upward force (e.g., manual removal). The battery cell 604 is enclosed in the boxed portion 602 via lid 606. The lid 606 may be permanently attached to the battery box 602 or the lid 606 may be removable to allow one to swap the battery cell 604. The lid 606 includes a finger tab 67 that one can leverage with his/her finger to assist in removing the battery 14 from the frame 12. When the lid 606 is removable, the finger tab 67 may also be used to remove the lid 606 from the boxed portion 602. When assembled, the pins 21 of the connector portion 66 are in electrical communication with the battery cell 604.

FIG. 16 provides a transparent view of the battery 14 coupled to the connector 46 of the frame, according to certain embodiments. As shown in FIG. 16, the pins 21 of the battery 14 enter the electrical contact housing members 512 of the connector 46, which places the pins 21 in electrical communication with the electrical contacts 537. Ideally and as shown, the inners walls of the recess 19 of the connector portion 66 include one or more slanted segments 540. The slanted segments press on the edges of the connector 46 when the battery is inserted all the way into the connector, this pressure forces the electrical contacts 537 to press against the pins 21, and maintain such contact.

FIG. 17 shows a battery magazine for charging and transporting batteries, according to certain embodiments. As shown in FIG. 17, the battery magazine is a frame 700 forming one or more recesses 702, each configured to receive a battery. The frame 700 of the magazine is configured to hold one or more connectors 746 (which are ideally the same as pivoting connector 46 of frame 12). The connectors 746 may be coupled to electrical cord that allows the connectors 746 to charge one or more batteries when the electrical wiring is plugged into an electrical outlet. In alternative embodiments, the battery magazine may include a USB socket that is coupled to the connectors 746. In such embodiments, a USB adaptor may be used to charge the batteries. The battery magazine may also include a circuit, such as a printed circuit board, disposed within the magazine and operably associated with the connectors 746. A function of the circuit includes monitoring charging of the battery to prevent under- or over-charging of the batteries. The circuit may be operably associated with one or more LEDs. In one embodiment, the battery magazine includes LEDs for each battery that the magazine is designed to receive. In this embodiment, the circuit can be configured to cause each LED to emit light in order to convey one or more functions with respect to one or more batteries in the magazine. The one or more functions may include, for example, showing the following: battery is connected, battery is charging, battery is malfunctioning, and battery is fully charged. The light emitted from the LED may

12

be same or different for each function. For example, the light may be a different color for the one or more functions, or the light may be emitted in the same or different manner (single pulse, series of pulses, or constant light) for the one or more functions.

Portions of the insole (such as the frame) and the battery (such as the lower body portion) may be formed from any suitable plastic, polymer, or polymeric blend. Suitable materials may include Polyethylene terephthalate (PET), Polyethylene (PE), High-density polyethylene (HDPE), Polyvinyl chloride (PVC), Polyvinylidene chloride (PVDC), Low-density polyethylene (LDPE), Polypropylene (PP), Polystyrene (PS), High impact polystyrene (HIPS), etc. The material of the frame and the battery may be the same or different. In addition, the material of the insole body and the layers of the insole may depend on the need of the insole (e.g. what activity will the insole be used for). These insole materials may be plastic, polymer, rubber, thermoplastic elastomeric material, leather, cotton, and polymer foams. Preferred polymer foams include polyurethane foams.

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting on the invention.

The invention claimed is:

1. An insole for a shoe, the insole comprising
an insole body including a heating member and a frame that receives a battery;
a battery configured to be removable from and insertable into the frame while the insole is disposed within the shoe; and
a connector operably associated with the frame, the connector pivots to connect to and disconnect from the battery and connects the battery to the heating member.

2. The insole of claim 1, wherein the battery is rechargeable.

3. The insole of claim 1, further comprising a circuit coupled to the connector, the circuit configured to adjust a level of the energy transmitted from the battery to the heating member.

4. The insole of claim 3, wherein the circuit is adjustable from a remote control.

5. The insole of claim 1, wherein the heating member delivers heat to at least a forefoot portion of the insole body.

6. The insole of claim 5, wherein the heating member comprises a conductive ribbon and a heater panel.

7. The insole of claim 1, wherein a surface of the battery, when the battery is disposed within the frame, is substantially flush with a surface of the insole.

8. The insole of claim 1, wherein the battery comprises a battery pack that encloses a battery cell.

9. An insole for a shoe, comprising
a heating member;
an insole body comprising a frame that is configured to receive a battery, the frame comprising a connector that pivots to connect to and disconnect from the battery; and
a battery configured to fit within the frame while being directly removable from a surface of the insole body, the battery, when disposed within the frame, is connected to the heating member via the connector.

10. The insole of claim 9, wherein the battery is rechargeable.

11. The insole of claim 9, wherein a surface of the battery, when the battery is disposed within the frame, is substantially flush with a surface of the insole body.

13

14

**12**. The insole of claim **9**, wherein the heating member is disposed within the insole body.

**13**. The insole of claim **9**, wherein the connector is coupled to a circuit that is disposed within the insole body and configured to adjust a level of energy transmitted from the battery to the heating member.

**14**. The insole of claim **13**, wherein the circuit is adjustable from a remote control.

**15**. The insole of claim **9**, wherein the heating member delivers heat to at least the portion of the insole body corresponding to the forefoot of a wearer.

**16**. The insole of claim **15**, wherein the heating member comprises a conductive ribbon and a heater panel.

**17**. The insole of claim **9**, wherein the battery comprises a battery pack that encloses a battery cell.

**18**. A heated insole for a shoe, comprising

an insole body comprising a frame and a connector;

a heating member disposed within the insole body and operably associated with the connector; and

a battery configured to fit within the frame and couple to the heating member via the connector, the battery being directly removable from a surface of the insole body and the connector pivots to connect to and disconnect from the battery.

**19**. The insole of claim **18**, wherein the battery is rechargeable.

**20**. The insole of claim **18**, wherein the frame is configured to receive the battery such that a surface of the battery is substantially flush with a surface of the insole body.

**21**. The insole of claim **18**, wherein the connector is configured to transmit energy from the battery to the heating member.

**22**. The insole of claim **21**, wherein the connector is coupled to a circuit that is disposed within the insole body and configured to adjust a level of energy transmitted from the battery to the heating member.

**23**. The insole of claim **22**, wherein the circuit is adjustable from a remote control.

**24**. The insole of claim **18**, wherein the heating member delivers heat to at least the portion of the insole body corresponding to the forefoot of a wearer.

**25**. The insole of claim **24**, wherein the heating member comprises a conductive ribbon and a heater panel.

* * * * *

# EXHIBIT 5



US008869429B1

(12) **United States Patent**
Zsolcsak et al.

(10) Patent No.: **US 8,869,429 B1**
(45) Date of Patent: **\*Oct. 28, 2014**

(54) **HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY**

(71) Applicant: **Schawbel Technologies LLC**, Bedford, MA (US)

(72) Inventors: **Veronica M. Zsolcsak**, Newburyport, MA (US); **Micha Eizen**, Lake Forest, CA (US); **Thomas John William Bayes**, Rothwell (GB); **Ian Nicholson Whitehead**, Concord, MA (US)

(73) Assignee: **Schawbel Technologies LLC.**, Bedford, MA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/285,118**

(22) Filed: **May 22, 2014**

**Related U.S. Application Data**

(63) Continuation of application No. 14/248,861, filed on Apr. 9, 2014.

(60) Provisional application No. 61/947,913, filed on Mar. 4, 2014, provisional application No. 61/911,835, filed on Dec. 4, 2013.

(51) **Int. Cl.**
*A43B 7/04* (2006.01)
*A43B 13/38* (2006.01)

(52) **U.S. Cl.**
CPC .. *A43B 7/04* (2013.01); *A43B 13/38* (2013.01)
USPC ......................................................... **36/2.6**

(58) **Field of Classification Search**
CPC ............. A43B 7/04; A43B 7/02; A43B 7/025
USPC .................................................. 36/2.6, 137
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,360,633 | A | * | 12/1967 | Weisberger | .................... 219/211 |
| 3,800,133 | A | * | 3/1974 | Duval | ......................... 362/103 |
| 4,507,877 | A | | 4/1985 | Vaccari et al. | |
| 4,823,482 | A | | 4/1989 | Lakic | |
| 4,894,931 | A | | 1/1990 | Senee et al. | |
| 4,910,881 | A | | 3/1990 | Baggio et al. | |
| 5,041,717 | A | | 8/1991 | Shay, III et al. | |
| 5,230,170 | A | | 7/1993 | Dahle | |
| 5,495,682 | A | | 3/1996 | Chen | |
| 5,623,772 | A | | 4/1997 | Sunderland et al. | |
| 5,956,866 | A | | 9/1999 | Spears | |
| 6,701,639 | B2 | | 3/2004 | Treptow et al. | |
| 6,841,757 | B2 | | 1/2005 | Marega et al. | |
| 6,865,825 | B2 | | 3/2005 | Bailey, Sr. et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2515992 Y | 10/2002 |
| DE | 20317143 U1 | 4/2004 |

(Continued)

*Primary Examiner* — Ted Kavanaugh

(74) *Attorney, Agent, or Firm* — Robert J. Tosti

(57) **ABSTRACT**

A heated insole for a shoe has an insole body and a battery. The insole body has a battery-receiving portion. The battery is configured to be removable from and insertable into the battery-receiving portion while the insole is disposed within the shoe.

**12 Claims, 17 Drawing Sheets**



(56)           **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,074,373 | B2 | 12/2011 | Macher et al. |
| 2003/0114902 | A1 | 6/2003 | Prescott |
| 2005/0126049 | A1 * | 6/2005 | Koenig .......................... 36/141 |
| 2009/0013554 | A1 | 1/2009 | Macher et al. |
| 2010/0192406 | A1 | 8/2010 | Au |
| 2013/0174451 | A1 | 7/2013 | Kremer et al. |
| 2013/0181662 | A1 | 7/2013 | Shapiro |
| 2013/0244074 | A1 | 9/2013 | Kremer et al. |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | 10352050 | A1 | 12/2004 | |
| DE | 102008029727 | A1 * | 12/2009 | .............. A43B 7/04 |
| EP | 2215918 | A2 | 8/2010 | |
| WO | WO 2006111823 | A1 * | 10/2006 | |
| WO | WO 2008006731 | A1 * | 1/2008 | |
| WO | WO 2008069524 | A1 * | 6/2008 | ............. A43B 7/04 |
| WO | 2013101920 | A1 | 7/2013 | |

* cited by examiner



FIG.1A

FIG.1B

FIG.1C

Exhibit B, Page 820



FIG.2A



FIG.2B



FIG.3A



FIG.3B



FIG.3C

Exhibit B, Page 822



FIG.3D



FIG.3E



FIG.3F



FIG.4A



FIG.4B

Exhibit B, Page 824



300

12

12

14

220

28

210

8

FIG.5

Exhibit B, Page 825



FIG.6