EDWARD G. FATES (BAR NO. 227809)
TIMOTHY M. HUTTER (BAR NO. 267949)
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158
E-Mail:  tfates@allenmatkins.com
            thutter@allenmatkins.com

Attorneys for Defendant and Cross-Complainant
SCHAWBEL TECHNOLOGIES LLC,
a Massachusetts limited liability company

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEAT FACTORY USA, INC., a California corporation, | Case No. 18-CV-01941-WQH (MSB) |
| Plaintiff, | **DECLARATION OF WILLIAM SCHAWBEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| SCHAWBEL TECHNOLOGIES, LLC, a Massachusetts limited liability company, | |
| Defendant. | |
| SCHAWBEL TECHNOLOGIES LLC, a Massachusetts limited liability company, | DATE:       February 29, 2019<br>CTRM:      14B (14th Fl., Suite 1480)<br>JUDGE:     William Q. Hayes |
| Cross-Complainant, | |
| v. | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |
| HEAT FACTORY USA, INC., a California corporation, | |
| Cross-Defendant. | |

I, William Schawbel, declare as follows:

1.     I am the Chief Executive Officer of defendant Schawbel Technologies LLC ("Schawbel").  I submit this declaration in support of Schawbel's Motion for Preliminary Injunction.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     Schawbel is the owner of certain United States and international patents related to the design of heated insoles and related heating products, and was, until approximately July, 2017, in the business of manufacturing, marketing, distributing and selling heated insoles and related heating products under the trademarked business name of ThermaCELL. These products incorporate patented technology set forth in the claims of a series of patents issued to Schawbel in the United States and internationally.  In total, Schawbel currently holds 54 patents related to heated insoles and related heating products.

3.     I met with David Treptow and other representatives of Heat Factory USA, Inc. ("Heat Factory") over the course of several months in 2016 and 2017.  I am informed and believe Heat Factory is in the business of warmer technology, accessories, and manufacturing, marketing, and sale of hand warmers, body warmers, foot warmers, and other heated products.  Heat Factory products, including products that now incorporate Schawbel's patented technology, are sold around the United States and Canada.

4.     In the course of building up Schawbel's brand utilizing its patents, Schawbel developed rigorous testing and quality standards, including the services of third-party testing companies.  Schawbel hired SATRA Technology Centre, an international independent footwear research and testing organization, to perform quality and production efficiency testing.  SATRA's testing included run and charge times, moisture resistance, and comfort levels at various user activity levels. Beyond baseline product development testing, Schawbel also hired SATRA for

1 post-production testing to ensure product consistency and quality. Schawbel
2 engineers also held an annual review meeting with SATRA and the manufacturers to
3 ensure continuous product improvements. In addition, Schawbel worked with
4 Global Safety Solutions, Inc. to comply with global electrical safety requirements.
5 During the course of its management of its operations, Schawbel consistently
6 exceeded industry standards for product testing and quality control, and developed a
7 reputation as an innovator and trusted supplier of quality products.

8      5.     Recognizing that technical products could be complex for consumers,
9 Schawbel invested money, time, and effort in establishing a strong customer service
10 program which included a phone number and email address staffed by trained
11 customer service representatives and maintained in-house customer service
12 resources for escalation and/or overflow. Schawbel also employed a third-party
13 consumer customer service provider, OnBrand24, which provided coverage to
14 consumers and retailers who needed assistance at any time, 24 hours a day, 365 days
15 a year. Schawbel also performed annual and as-needed refresher training about the
16 function of its products and troubleshooting for frequently asked questions.
17 Products also carried a one-year warranty, which Schawbel took seriously and made
18 significant efforts to track and honor while it was operating the business.

19      6.     On July 18, 2017, Schawbel and Heat Factory entered into an Exclusive
20 Patent License Agreement (the "License Agreement") in which Schawbel agreed to
21 provide a license to Heat Factory of certain patents, technological information, and
22 general know-how. The patents licensed under the License Agreement are
23 specifically identified in Appendix C to the License Agreement. A true and accurate
24 copy of the License Agreement, which I signed on Schawbel's behalf, is attached
25 hereto as <u>Exhibit 1</u>.

26      7.     Schawbel and Heat Factory also executed an Asset Purchase
27 Agreement ("APA") in which we agreed to sell to Heat Factory certain heated
28 insoles, battery packs, and related heating products it had in inventory as further

detailed on Schedule A of the APA (the "Inventory").  The Inventory included products that incorporate our patented technology.  A true and correct copy of the APA, which I signed on Schawbel's behalf, is attached hereto as <u>Exhibit 2</u>.

8.     Since entering into the License Agreement, Heat Factory has made, used, and sold Products covered by Schawbel's Patents.  Except for the first payment of $50,000 due on January 15, 2018, however, Heat Factory has not made any Minimum Royalty payments.

9.     As set forth more specifically in the License Agreement, we agreed to certain restrictions on our property rights in the Patents – including an agreement not to compete and provision of a right of first refusal in connection with the potential sale of the Patents.  We never would have agreed to these restrictions on Schawbel's rights as owner of the patents if Heat Factory did not agree to pay the Minimum Royalty and other amounts due under the License Agreement.  In fact, these limitations have been cited by potential purchasers or licensees of our intellectual property as concerns that are preventing consummation of new revenue-producing transactions for Schawbel.

10.    If not for Heat Factory's agreement to make the payments identified in the License Agreement, Schawbel would have continued to exercise all of its ownership rights in the patents and to explore other available options for maximizing the value of its patents.  In that regard, Schawbel would have taken steps to benefit, through brand recognition and enhanced market reputation, from its own marketing and sale of products containing Schawbel's patents.  Schawbel agreed not to undertake such activities, to the extent provided in the License Agreement, but only in exchange for Heat Factory's payment of royalties.

11.    We also bargained for provisions that allowed us to terminate the License Agreement in the event of non-payment by Heat Factory.  Even in that circumstance, if Heat Factory agreed to make royalty payments on inventory it had

1   in stock or under development, we planned to allow them to complete sales so long

2   as they agreed to pay appropriate royalties on those sales.

3       12.     Schawbel was fully committed to the success of the deal with Heat

4   Factory and made extensive efforts to support Heat Factory in its sales of our

5   products.  To begin with, we sold the Inventory to Heat Factory at a substantial

6   discount.  The book value of the Inventory was $4.4 million, but we sold it to Heat

7   Factory for $3.7 million.

8       13.     Based upon my experience with the sale of heated products, such as

9   those that are subject to the License Agreement, July is generally the beginning of

10  the busy selling season for heated products ahead of the upcoming fall and winter

11  outdoor sports season.  We expected that Heat Factory would need time to ramp up

12  prior to the prime sales season for winter heating products, which occurs between

13  July and September, including getting an internal sales team in place, forming

14  relationships with external independent sales representatives, and showing the

15  products at major industry trade shows.  For those reasons, we intended to execute

16  the License Agreement and APA in April or May 2017 at the latest, so Heat Factory

17  would have sufficient ramp-up time, including attending industry trade shows held

18  during the May through August months.  Due to the seasonal nature of the products

19  and the necessary lead time for manufacturing and shipping, the distribution and

20  shipping season for heated insoles concludes in or around December of a given year.

21      14.     Prior to the deal closing, Schawbel sent three high level managers,

22  including myself, from Boston to San Diego to attend two days of meetings with

23  Heat Factory to go through the steps for Heat Factory to maximize sales of

24  Schawbel products.  That meeting occurred in April 2017.  A true and correct copy

25  of our meeting agenda is attached hereto as Exhibit 3.  A month later, on May 25,

26  2017, we participated in a full-day conference call to discuss integration and a

27  detailed sales and marketing plan that had been prepared by Schawbel.  A true and

28

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

1   correct copy of email correspondence transmitting an agenda for the May 25

2   meeting, as well as the marketing and sales plan, is attached hereto as <u>Exhibit 4</u>.

3       15.    To assist Heat Factory in ramping up its production, and to allow Heat

4   Factory to secure financing from a third-party lender, Schawbel agreed to

5   subordinate its security interest in the Inventory.  It was my understanding at the

6   time that Heat Factory could not secure financing without using the Inventory as

7   collateral for the loan.

8       16.    Unfortunately, although Schawbel was ready to close the deal in

9   April 2017 as planned, the deal did not close until July 2017 due to Heat Factory's

10  delays.

11      17.    Even after the close, we remained committed to the success of the deal.

12  It was in our best interest to have Heat Factory succeed.  I attended key trade shows

13  with Heat Factory's owner, David Treptow, in July and August 2017, allowed Heat

14  Factory to use our trade show booth and other marketing materials at no cost, and

15  even used my personal airline miles to fly an important independent sales

16  representative to one of the trade shows to meet Mr. Treptow.  Certain transition

17  services were required and Schawbel was compensated under the APA for them, but

18  even as our transitional services were concluding, we offered to have our own sales

19  and customer services staff continue to assist Heat Factory at cost.  Heat Factory

20  declined our offer.

21      18.    We authorized and expected Heat Factory to provide customer service

22  and technical support through its own channels, but continued to maintain our

23  existing customer service telephone line and email (at our expense) through the

24  winter of 2017-2018.  We later learned that this was the only customer service

25  supporting the products as Heat Factory failed to establish any customer services for

26  our Products.

27      19.    For the 2017 season, we allowed Heat Factory to sell products to

28  retailers under our existing accounts in an effort to make the transition as seamless

1  as possible for retailers.  This included the use of our UPC codes, which were

2  provided to Heat Factory as part of the APA and allowed retailers to continue to sell

3  the products without significant changes in their computer systems.

4       20.    As required by the terms of the APA, Schawbel delivered to Heat

5  Factory the Inventory identified in Schedule A to the APA and Heat Factory

6  confirmed receipt of this Inventory.  I understand that since August 2017, Heat

7  Factory has had the Inventory in its possession or control.  After delivery, Schawbel

8  received notice from Heat Factory on August 30, 2017, that Heat Factory had

9  completed its inspection of the Inventory.  Heat Factory confirmed that no offset

10 was needed or requested due to non-delivery or damage to the Inventory.  Although

11 we had been in frequent communication regarding important sales and marketing

12 issues, Heat Factory's CEO David Treptow ceased all communications with me

13 during the critical selling months of September, October, and November 2017.

14      21.    In December 2017, Heat Factory made only a partial payment of the

15 amount due under the APA.  Instead of paying the full $500,000 required for that

16 month, Heat Factory paid only $352,477, leaving a balance of $147,523.  On

17 December 11, 2017, Schawbel sent a notice demanding full payment of the

18 December Payment (the "December Notice").  A true and accurate copy of the

19 December Notice is attached hereto as Exhibit 5.

20      22.    Heat Factory was required to pay Schawbel $600,000 on or before

21 January 10, 2018 (the "January Payment").  Heat Factory did not make the January

22 Payment.  On January 13, 2018, Schawbel sent a notice to Heat Factory demanding

23 the January Payment (the "January Notice").  A true and accurate copy of the

24 January Notice is attached hereto as Exhibit 6.

25      23.    To date, Heat Factory has not made the full payment due under

26 Section 2.02 of the APA in December 2017 and has not made any payments due for

27 the months from January through May 2018.  The total unpaid balance of the

28 Inventory purchase price under the terms of the APA is $2,597,523.

24.     On January 31, 2018, Schawbel terminated the License Agreement due to Heat Factory's non-payment under the APA.  A true and correct copy of the letter notifying Heat Factory of the termination is attached hereto as <u>Exhibit 7</u>.

25.     On February 6, 2018, Schawbel filed a Complaint in the United States District Court for the District of Massachusetts for breach of the APA due to Heat Factory's failure to pay the purchase price.  In response, Heat Factory admitted that it failed to make the APA Payments.  True and correct copies of our Complaint (without exhibits) and Heat Factory's Answer in the Massachusetts case are attached hereto as <u>Exhibits 8 and 9</u>, respectively.

26.     Pursuant to the schedule of royalty payments set forth in the License Agreement, Heat Factory was required to pay Schawbel $50,000 on or before February 15, 2018 (the "February Minimum Royalty"), with a grace period up to February 18, 2018.  Heat Factory failed to remit the February Minimum Royalty to Schawbel pursuant to the terms of the License Agreement.

27.     On February 20, 2018, Schawbel gave written notice to Heat Factory that it had not paid the Minimum Royalty payment due on February 15, 2018 (the "February Minimum Royalty").  A true and correct copy of the letter is attached hereto as <u>Exhibit 10</u>.

28.     Heat Factory failed to remit the February Minimum Royalty to Schawbel within five days of Schawbel's written notice, which caused the payment to be treated as an Overdue Payment and to accrue default interest.  Heat Factory also failed to remit the February Minimum Royalty to Schawbel, together with interest thereon, within 30 days of Schawbel's written notice.

29.     On July 10, 2018, Schawbel gave written notice to Heat Factory that its failure to pay the February Minimum Royalty, and failure to cure with interest within 30 days, constituted additional grounds for the termination of the License Agreement.  A true and correct copy of the July 10, 2018, notice is attached hereto as <u>Exhibit 11</u>.

30.     As of the date of this filing, Schawbel has not received the February Minimum Royalty as required under the terms of the License Agreement. As of the date of this filing, Schawbel also has not received any other Minimum Royalty payments that were required under the License Agreement, including the payments that were due in March, April, May, or June, 2018.

31.     Schawbel has complied with all conditions precedent to termination of the License Agreement.  Heat Factory nevertheless continues to make and sell covered Products, which directly infringes on Schawbel's patents.

32.     Although the License Agreement was properly terminated by Schawbel at the end of January 2018, the parties continued to discuss a possible resolution. Schawbel, therefore, agreed to temporarily forbear from enforcing the termination and allow Heat Factory to continue selling products while the parties negotiated. Heat Factory still did not make royalty payments, however, and the parties did not reach a resolution.  Accordingly, in September 2018, Schawbel sent a letter to Heat Factory confirming that the forbearance period and Schawbel's temporary agreement to allow Heat Factory to continue selling Schawbel products was terminated effective September 12, 2018.  A true and correct copy of the September 2018 letter is attached hereto as Exhibit 12.

33.     Due to the exclusive license granted under the License Agreement, Heat Factory is presently the only vendor of products utilizing Schawbel's technology.  Maintenance of the Patents has cost Schawbel approximately $200,000 since July 2017, and costs will continue to be incurred.

34.     Several members of my small remaining staff have reported to me that they have been contacted by customers stating that Heat Factory refused to respond to customer service requests in the second half of 2018.  Complaints about the lack of customer service for the Products have increased significantly in the last few months as more customers use their heated insoles during the winter months. Multiple reviewers on large retailer websites like Amazon have commented on the

1 lack of support, resulting in low satisfaction ratings for the Products.  True and
2 correct copies of sample online reviews are attached hereto as <u>Exhibit 13</u>.

3        35.     One customer informed us that Heat Factory told her that Heat Factory
4 was "no longer honoring [Schawbel's] warranty because [Schawbel] was no longer
5 reimbursing [Heat Factory] for [Heat Factory's] cost of the new product.  A true and
6 correct copy of that email contact is attached hereto as <u>Exhibit 14</u>.  Heat Factory's
7 ability to deduct such costs from the Purchase Price due under the APA was limited
8 to the provisions of section 2.14.  I am not aware of any specific claims made by
9 Heat Factory regarding rejected deductions from the Purchase Price.

10        36.     In addition, we have been notified that Heat Factory failed to make
11 required payments to renew UPC codes for Schawbel products.  This prevents Heat
12 Factory or any other company from selling Schawbel products today or in the future
13 using those UPC codes, because retailers will not accept products without valid,
14 operating UPC codes.  A true and correct copy of an email regarding the termination
15 of the UPC codes, including an explanation of the restrictions placed on Schawbel
16 due to Heat Factory's failure to maintain the UPC Codes, is attached hereto as
17 <u>Exhibit 15</u>.

18        37.     We also learned that the smart phone app used to control certain
19 Schawbel heated insoles from the customer's smart phone (via Bluetooth
20 technology) was not functional and could not be downloaded for a significant period
21 of time due to Heat Factory's failure to update it, effectively rendering such products
22 useless because they could not be activated without the app.

23        38.     Due to Heat Factory's continued non-payment under the APA and
24 License Agreement, Schawbel's relationship with a key manufacturer has been
25 destroyed and Schawbel has been unable to pay its creditors.  The manufacturer,
26 Union Footwear Technologies Co. ("Union"), has filed an action against Schawbel
27 in Massachusetts state court and is now seeking to further restrict Schawbel's use of
28 its patents.  Union is also represented by Heat Factory's former attorney in the

1  Massachusetts Action.  A true and correct copy of Union's recent motion is attached
2  hereto as <u>Exhibit 16</u>.

3      I declare under penalty of perjury under the laws of the United States of
4  America that the foregoing is true and correct.

5      Executed this 11th day of January 2019, at Burlington, Massachusetts.

6

7  _____

8        WILLIAM SCHAWBEL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF EXHIBITS

| **Exhibit** | **Description** | **Page No.** |
|---|---|---|
| Exhibit 1 | July 18, 2017, Exclusive Patent License Agreement | 14 - 39 |
| Exhibit 2 | Asset Purchase Agreement | 40 - 65 |
| Exhibit 3 | April 2017 Meeting Agenda | 66 - 67 |
| Exhibit 4 | Email correspondence transmitting agenda and material for meeting on May 25, 2017 | 68 - 80 |
| Exhibit 5 | December 11, 2017, Notice demanding full December APA payment | 81 - 82 |
| Exhibit 6 | January 13, 2018, Notice demanding January APA payment | 83 - 84 |
| Exhibit 7 | January 31, 2018, Letter notifying Heat Factory of termination | 85 - 86 |
| Exhibit 8 | Schawbel February 6, 2018, Complaint in the United States District Court for the District of Massachusetts | 87 - 102 |
| Exhibit 9 | Heat Factory's Answer to Massachusetts Complaint | 103 - 116 |
| Exhibit 10 | February 20, 2018, Notice of failure to pay minimum royalty payment | 117 - 119 |
| Exhibit 11 | July 10, 2018, Notice of failure to pay February minimum royalty and failure to cure | 120 - 121 |
| Exhibit 12 | September 2018 Letter terminating forbearance period and temporary agreement to sell | 122 - 123 |
| Exhibit 13 | Excerpted Amazon Reviews | 124 - 127 |
| Exhibit 14 | Customer email re Warranty | 128 - 129 |
| Exhibit 15 | Email regarding Termination of UPC codes | 130 - 132 |

1

**<u>Exhibit</u>**          **<u>Description</u>**                                              **<u>Page Nos.</u>**

Exhibit 16     Union Footwear Technologies Co. motion filed
               in Massachusetts state court............................................. 133 - 143

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28