UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEAT FACTORY USA, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>SCHAWBEL TECHNOLOGIES, LLC,<br><br>        Defendant. | Case No.: 18-cv-1941-WQH-MSB<br><br>**ORDER** |
| SCHAWBEL TECHNOLOGIES, LLC,<br><br>        Counter-Claimant,<br><br>v.<br><br>HEAT FACTORY USA, INC.,<br><br>        Counter-Defendant. | |

HAYES, Judge:

  The matter before the Court is the Motion for Preliminary Injunction filed by Defendant/Counter-Claimant Schawbel Technologies LLC. (ECF No. 14).

//

//

## I. Background

On August 21, 2018, this case was removed to this Court by Defendant/Counter-Claimant Schawbel Technologies, LLC (Schawbel). (ECF No. 1). Plaintiff/Counter-Defendant Heat Factory USA, Inc. (Heat Factory) filed a complaint against Schawbel alleging breach of contract, fraud, negligent misrepresentation, express indemnity, and intentional interference with prospective economic advantage. (Heat Factory Compl., ECF No. 1-2 at 3). Schawbel filed a counter-claim against Heat Factory alleging breach of contract and patent infringement. (Schawbel Counter-Claim, ECF No. 1-7 at 7).

On January 15, 2019, Schawbel filed a Motion for Preliminary Injunction. (ECF No. 14). On February 5, 2019, Heat Factory filed Opposition. (ECF No. 15). On February 12, 2019, Schawbel filed a Reply. (ECF No. 16). On March 29, 2019, the Court heard oral argument on the Motion. On April 2, 2019, Schawbel filed a Supplemental Declaration of William Schawbel. (ECF No. 19). On April 3, 2019, Heat Factory filed a Response to the Supplemental Declaration. (ECF No. 20). On April 4, 2019, the Court held an evidentiary hearing on Schawbel's claim of irreparable harm.

## II. Facts

Schawbel owns fifty-four United States patents related to the design of heated insoles and related heating products.[1] Heat Factory is in the business of selling heated insoles, hand warmers, and other heating products. On July 18, 2017, Schawbel and Heat Factory executed the Asset Purchase Agreement (APA). (APA, ECF No. 1-7 at 28). Under the APA, Schawbel agreed to sell to Heat Factory certain heated insoles, battery packs, and related heating products. (APA-Schedule A, ECF No. 1-7 at 53–59). The assets sold by Schawbel to Heat Factory in the APA were manufactured by Schawbel

---

[1] Nineteen of Schawbel's patents were licensed to Heat Factory and are implicated in this action. They are U.S. Patents: 8,850,716, 8,869,428, 8,869,429, 9,101,177, 9,179,734, 9,314,064, 9,538,806, 9,538,807, 9,548,618, 9,549,586, and 9,572,397, and the following U.S. design patents: D719,504, D722,222, D724,013, D734,012, D737,769, D772,546, D794,813 and D801,624. (ECF Nos. 1-2 at 44–45, 54; 1-4 at 7, 25–166; 1-5; 1-6 at 1–26).

utilizing using Schawbel's patented technology and previously sold by Schawbel under the brand name ThermaCELL. Heat Factory agreed to a purchase price of $3,700,000. (APA, ECF No. 1-7 at 33). The APA included the following schedule of payments:

    (i)     $300,000 payable on or before October 10, 2017;
    (ii)    $450,000 payable on or before November 10, 2017;
    (iii)   $500,000 payable on or before December 10, 2017;
    (iv)   $600,000 payable on or before January 10, 2018;
    (v)    $600,000 payable on or before February 10, 2018;
    (vi)   $550,000 payable on or before March 10, 2018;
    (vii)  $550,000 payable on or before April 10, 2018; and
    (viii) $150,000 payable on or before May 10, 2018

*Id.*

On July 18, 2017, Schawbel and Heat Factory also executed the Exclusive Patent License Agreement (License Agreement). (License Agmt., ECF No. 1-7 at 64). The License Agreement granted Heat Factory an exclusive license for "certain patents, technological information, and general know-how from [Schawbel] in exchange for royalty payments . . . ." *Id.* Under the License Agreement, Heat Factory was authorized to manufacture and distribute products utilizing Schawbel's patented technology under Heat Factory's brand name. The License Agreement provided for a schedule of royalty payments based on net sales to be paid by Heat Factory to Schawbel, beginning on January 1, 2018. *Id.* at 70. In the event net sales did not generate more than $300,000 in royalties for Schawbel, the License Agreement guaranteed Schawbel a minimum $300,000 in royalty payments. *Id.* The License Agreement contained a schedule requiring that Heat Factory make minimum royalty payments as follows:

| Date | Aggregate Minimum Royalties |
|---|---|
| January 15, 2018 | $50,000 |
| February 15, 2018 (an additional $50,000) | $100,000 |
| March 15, 2018 (an additional $50,000) | $150,000 |
| April 15, 2018 (an additional $50,000) | $200,000 |
| May 15, 2018 (an additional $50,000) | $250,000 |
| June 15, 2018 (an additional $50,000) | $300,000 |

*Id.* at 71.

In the event that Heat Factory failed to make payments under either the License Agreement or the APA, Schawbel was entitled to terminate the License Agreement after a single overdue payment[2] after a thirty-day notice period and opportunity to cure, or immediately following a second overdue payment within a twelve month period:

> 9.4 <u>Licensor's Right to Terminate</u>. In addition to <u>Section 9.1</u>, Licensor shall have the right to terminate this Agreement under any of the following circumstances:
>
> (a) <u>Termination for Failure to Pay</u>. If the event of an Overdue Payment under this Agreement or a failure to pay timely any payment due from "Purchaser" to 'Seller" under the Asset Purchase Agreement ("APA Nonpayment"), each such Overdue Payment and APA Nonpayment shall be a default of this Agreement ("Payment Default"). Licensor shall provide thirty (30) days written notice of the default ("Payment Default Notice") to Licensee, and Licensor shall have the right to immediately terminate this Agreement at the expiration of the thirty (30) day notice period, unless Licensee has made such payments, and any interest due, as set forth in <u>Section 3.4</u>, or the comparable provision in the Asset Purchase Agreement. Notwithstanding the above, if Licensee has two (2) or more Overdue Payments and/or APA Nonpayments within any consecutive twelve (12) months period, Licensor shall be entitled to terminate this Agreement effective immediately upon written notice to Licensee.

*Id.* at 79.

In the event the License Agreement was terminated, Section 9.6 and 9.7 of the License Agreement provide:

> 9.6 <u>Effects of Termination of Agreement</u>. Upon termination of this Agreement or any of the licenses hereunder for any reason, final Sales Reports in accordance with Section 4 shall be submitted to Licensor and all Royalties

---

[2] The License Agreement defined overdue payment:

> 3.4 <u>Overdue Payments</u>. If any payment due under this Agreement has not paid within three (3) days of the applicable due date ("Applicable Due Date"), Licensor shall provide five (5) days written notice to Licensee of such nonpayment. If the payment is not paid within the five (5) notice period, the unpaid payment shall be considered an "Overdue Payment," . . . .

(License Agmt., ECF No. 1-7 at 71).

and other payments accrued or due to Licensor as of the termination date shall become immediately due and payable within thirty (30) calendar days. Licensee shall cease, and shall cause its Affiliates to cease, all production, use and Sales of Products upon such termination, subject to Section 9.11. The termination or expiration of this Agreement or any license granted hereunder shall not relieve Licensee and its Affiliates of obligations arising before such termination or expiration.

9.7 Inventory. Upon termination of this Agreement, Licensee and Licensee Affiliates may complete and sell any work-in-progress and inventory of Products on hand or ordered that exist as of the effective date of termination provided that (i) Licensee pays Licensor the applicable Royalty or other amounts due on such Net Sales in accordance with the terms and conditions of this Agreement, and (ii) Licensee and Affiliates shall complete and sell all work-in-progress and inventory of Products within six (6) months after the effective date of termination if such termination is for two (2) or more Overdue Payment, and otherwise within eighteen (18) months; . . . .

*Id.* at 81.[3]

Section 3.6 of the License Agreement contains an offset provision, which states:

3.6 Offset for Indemnification Under APA: In the event Licensee (a.k.a. "Purchaser" under the Assets Purchase Agreement) has any claim for indemnification against Licensor (a.k.a. "Seller" under the Assets Purchase Agreement), pursuant to Section 7.02(a) of Asset Purchase Agreement, and provided that Licensee has made all undisputed payments of the Purchase Price under the APA, Licensee shall have the right to offset any such owed indemnification against any payment of Royalties due under this Agreement until Licensee has been fully indemnified, to the extent that such claim for indemnification: 1) has been agreed to by the Parties; 2) has been determined by a final, non-appealable court order; or 3) relates to any Bulk Sales Claims. In addition, each calendar year, beginning with the calendar year of the Effective Date, Purchaser shall have the right to set off against any Royalties (provided Licensee has made all undisputed payments of the Purchase Price under the APA) any claims for indemnification, whose liability in the aggregate with any other claims made under the APA during that same calendar year (excluding those claims agreed to by the Parties, determined by a final order, or relating to Bulk Sales Claims, as set forth in preceding

---

[3] Section 9.6 references a Section 9.11. Neither the APA nor the License Agreement contains a Section 9.11.

sentence) has been valued (in Licensee's sole and absolute discretion) to be Twenty Thousand dollars ($20,000) or less. In the event that Licensee is not entitled to a set-off against Royalties as provided in the preceding sentence, Licensee shall be entitled withhold from payment of Royalties an amount equal to the value of any claim for indemnification (as determined in Licensee's sole and absolute discretion), less any unused portion of the aggregate $20,000, which shall be offset against Royalties as provided in the preceding sentence, and shall deposit such withholdings into escrow. Any sums deposited into escrow shall only be released in accordance with: 1) a written agreement of the Parties; or 2) a non-appealable final order of a court with appropriate jurisdiction. The Parties agree to execute all escrow instructions necessary, or reasonably requested by escrowholder, to ensure the escrowed funds are released from escrow in accordance with this Section 3.6. All escrow costs shall be shared equally by the Parties.

*Id.* at 71–72.

In December 2017, Heat Factory made a payment of $352,477 of the $500,000 owed to Schawbel for inventory purchased under the APA. (Schawbel Decl., ECF No. 14-2 ¶ 21). On December 11, 2017, Schawbel sent a notice demanding the remaining $147,523. *Id.* On January 10, 2018, Heat Factory was required to make a $600,000 payment under the APA. *Id.* ¶ 22. Heat Factory did not make a January APA payment. On January 13, 2018, Schawbel sent a notice to Heat Factory demanding the January payment. *Id.* Heat Factory did not make any subsequent APA payments. The unpaid balance under the APA is $2,597,523. *Id.* ¶ 23.

On January 15, 2018, the first minimum royalty payment was due to Schawbel under the License Agreement. Heat Factory completed the first $50,000 minimum royalty payment. (Schawbel Decl., ECF No. 14-2 ¶ 8). On January 31, 2018, Schawbel sent notice to Heat Factory terminating the License Agreement pursuant to Section 9.4 based on Heat Factory's failure to make overdue December 2017 and January 2018 payments under the APA. *Id.* ¶ 24. On February 12, 2018, Heat Factory and Schawbel entered into a forbearance period during which Heat Factory was permitted to continue utilizing Schawbel's patents as "if the License Agreement were still in effect" while the parties negotiated a possible resolution. (Treptow Decl., Ex. A, ECF No. 15-1 at 13).

On February 15, 2018, Heat Factory's second minimum royalty payment of $50,000 was due under the License Agreement. (ECF No. 1-7 at 71). Heat Factory did not make a February minimum royalty payment. (Schawbel Decl., ECF No. 14-2 ¶ 30). On February 19, 2018, Schawbel gave written notice to Heat Factory that it had not made the February minimum royalty payment. (Schawbel Decl., Ex. 10, ECF No. 14-4 at 39). Heat Factory did not make any subsequent minimum royalty payments. *Id.* ¶ 30.

On July 10, 2018, Schawbel gave written notice to Heat Factory terminating the License Agreement, citing Section 9.4 of the License Agreement and Heat Factory's failure to make the February minimum royalty payment within the thirty-day notice period. (Schawbel Decl., Ex. 11, ECF No. 14-4 at 39).

On September 12, 2018, Schawbel terminated the forbearance period. (Schawbel Decl., Ex. 12, ECF No. 14-4 at 41).

Heat Factory is the only vendor currently utilizing Schawbel's patent. *Id.* ¶ 33. Schawbel has discussed its patented technology with at least four prospective business partners who "have expressed interest in buying the Patented Technology, licensing the Patented Technology, and/or entering into consulting contracts with Schawbel regarding the Patented Technology." Schawbel has not been able to find a buyer. (Suppl. Schawbel Decl., ECF No. 19 ¶ 3).

### III. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). The standard is substantially the same in a patent case. *See Abbott Labs. v. Andrx Pharm., Inc.*, 473 F.3d 1196, 1200–01 (Fed. Cir. 2007).

//
//
//

## IV. Discussion

### a. Success on the Merits

Schawbel contends that Schawbel validly terminated the License Agreement and that Heat Factory's continued manufacture and sale of products utilizing Schawbel's technology is infringing on its patent. (ECF No. 14-1). Schawbel asserts that Heat Factory failed to make certain payments under the APA and License Agreement, that Heat Factory was not entitled to withhold payment pursuant to the License Agreement's indemnity clause, Section 3.6, because Heat Factory had not obtained "a final, non-appealable court order," and that Schawbel validly terminated the License Agreement. (ECF No. 16 at 5). Specifically, Schawbel contends that Schawbel validly terminated the License Agreement by letter on January 31, 2018, pursuant to Section 9.4, based on Heat Factory's failure to complete the December 2017 and January 2018 APA payments, and again on July 10, 2018, pursuant to Section 9.4, based on Heat Factory's failure to make a February minimum royalty payment and failure to cure with interest within thirty days. (ECF No. 14-1 at 14–15). Schawbel contends that Heat Factory "is now actively infringing on Schawbel's patents by continuing to make and sell products covered by those patents." *Id.* at 19.

Heat Factory contends that Heat Factory was entitled to withhold payment to Schawbel because of certain alleged misrepresentations made by Schawbel during negotiations over the APA. Heat Factory contends that Heat Factory is entitled to offsets for indemnification under Section 3.6 of the License Agreement that are equal to or greater than the amount owed to Schawbel under the APA and the License Agreement. (ECF No. 15 at 6). Heat Factory asserts that there is sufficient evidence in the record to demonstrate that it will prevail in its claim for offsets under the APA and/or License Agreement. *Id.* At oral argument, Heat Factory asserted that it was entitled to withhold payment under Section 3.6 because it will obtain a court order if it prevails in this action.

To succeed on a patent infringement claim, the plaintiff must demonstrate that a valid patent exists and that infringement occurred. *Markman v. Westview Instruments, Inc.*,

8

517 U.S. 370, 384 (1996). In this case, the record establishes that Schawbel owns the patents licensed to Heat Factory under the License Agreement and that, absent the License Agreement, manufacture or sale of products utilizing Schawbel's patented technology constitutes patent infringement.[4] The likelihood of success on the merits of Schawbel's patent infringement claim hinges on the likelihood of success of Schawbel's fourth and fifth causes of action, which seek a declaratory judgment that Schawbel validly terminated the License Agreement in 2018. (Schawbel Compl., ECF No. 1-7 ¶ 89–110). If the License Agreement was properly terminated by Schawbel in 2018, Heat Factory's continued use of Schawbel's patented technology without a license constitutes patent infringement.

The Court interprets the plain meaning of the License Agreement. *See Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017) ("When contract language is unambiguous, it must be construed according to its plain meaning.").[5] Section 9.4 of the License Agreement contains termination procedures. Under Section 9.4, Schawbel was entitled to terminate the License Agreement for a single overdue payment owed under either the APA or the License Agreement after a thirty-day notice period and opportunity to cure, or immediately following a second overdue payment owed under either the APA or License Agreement within a twelve-month period. (License Agmt., ECF No. 1-7 at 79).

Section 3.6 of the License Agreement states that Heat Factory was entitled to withhold payment to Schawbel if the offset "1) has been agreed to by the Parties; 2) has been determined by a final, non-appealable court order; or 3) relates to any Bulk Sales Claims." *Id.* at 71. If none of those conditions was satisfied, Heat Factory was required

---

[4] Section 1.42 of the License Agreement defines the "products" to be made by Heat Factory pursuant to the License Agreement as "any tangible property, article, device or composition, the manufacture, use or sale of which, in whole or in part: absent the license granted hereunder would infringe, or is covered by, one or more Claims of the patents; or employs, is based upon or is derived from Technological Information or General Know-How." (License Agmt., ECF No. 1-7 at 67).

[5] Pursuant to Section 12.8 of the License Agreement, the Court interprets the contract under Massachusetts law. (ECF No. 1-7 at 83).

under the License Agreement to continue paying Schawbel royalties until it obtained a court order or deposit the disputed payments into an escrow account if the disputed amount was more than $20,000. *See* License Agmt., ECF No. 1-7 at 72. The record reflects that Heat Factory failed to make complete payments to Schawbel in December 2017, January 2018, and February 2018. Heat Factory does not have a final, non-appealable court order stating that it is entitled to an offset. Heat Factory did not deposit the disputed amounts into an escrow account.[6] Per the terms of the License Agreement, Heat Factory was not in compliance with the License Agreement when it failed to pay Schawbel in December 2017, January 2018, and February 2018. Heat Factory was provided notice of the termination in January 2018, February 2018, and July 2018. The Court concludes that Schawbel is likely to prevail on its claim that Schawbel validly terminated the License Agreement on January 31, 2018, pursuant to Section 9.4 for nonpayment of December 2017 and January 2018 payments owed under the APA. The Court concludes that Schawbel is also likely to prevail on its claim that Schawbel validly terminated the License Agreement on July 10, 2018, pursuant to Section 9.4 for nonpayment of the February 2018 royalty payment owed under the License Agreement. Consequently, the record establishes that Schawbel is likely to succeed on the merits of its patent infringement claim.

### b. Irreparable Harm

Schawbel contends that a preliminary injunction is necessary on the grounds that Heat Factory's ongoing use of Schawbel's patents "is depriving Schawbel of its ability to exercise its rights as the proper owner of the patents." (ECF No. 14-1 at 6–7). Schawbel asserts that Heat Factory's continued use of the patent is "preventing consummation of new revenue-producing transactions for Schawbel." *Id.* at 22.[7]

---

[6] On April 3, 2019, Heat Factory offered to deposit the disputed minimum royalty payments into an escrow account. (ECF No. 20 at 6). Heat Factory's April 2019 offer does not affect whether Schawbel successfully terminated the Licensing Agreement in 2018.

[7] Citing a handful of reviews on Amazon, Schawbel additionally contends that Heat Factory's alleged subpar customer service supports a finding of irreparable harm. The Court finds that Schawbel has

Heat Factory contends that any harms Schawbel may suffer are monetary and not irreparable. Heat Factory asserts that "the appropriate mode of compensation, in the event that Schawbel does prevail to one extent or another is an award of damages under the contracts." (ECF No. 15 at 6). Heat Factory contends that Schawbel's delay in seeking a preliminary injunction and willingness to enter into a forbearance period weighs against a finding of irreparable harm. *Id.* at 7.

A patent holder is not precluded from establishing irreparable harm because it chooses to license a patent instead of commercially exploiting the patent itself. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006) ("[S]ome patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so."); *see In re Berwyn E. Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) ("The essence of all property is the right to exclude and the patent property right is certainly not inconsequential."); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011) (noting as basis for finding irreparable harm "the fundamental nature of patents as property rights granting the owner the right to exclude"); *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 872 (D. Colo. 2014) ("The right to use one's property as one wishes—either to use the property to its own advantage, to exclude another from its use, or to sell, lease or transfer such property to another—is fundamental, and being excluded from the rights inherent in one's property constitutes irreparable injury."). A patent infringement plaintiff must provide specific facts demonstrating irreparable injury. *Robert Bosch*, 659 F.3d at 1149 (plaintiff can no longer rely on presumption of irreparable harm); *see High Tech Med. Instrumentation, Inc.*, 49 F.3d at 1556 (failing to establish irreparable harm in part because

---

provided insufficient factual evidence to support a finding of irreparable reputational damage or loss of customer goodwill.

plaintiff did not provide evidence that infringer's "activities have precluded it from licensing its patents or entering the market" or that plaintiff "needs an injunction to protect its right to refuse to exploit its invention commercially or to prevent others from doing so"); *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip. Corp.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (finding that unexcused fifteen month delay rebutted finding of irreparable harm).

In this case, Schawbel has demonstrated that it is likely to prevail on the merits of its patent infringement claim because it is likely to prevail on its claim that the License Agreement was validly terminated both in January 2018 and July 2018. This Court held an evidentiary hearing on irreparable harm and permitted the parties to file additional briefing on the topic. (ECF Nos. 19, 20).[8] Schawbel CEO William Schawbel testified that Schawbel "has been unable to pursue" opportunities to license the patents to prospective business partners "because of the dispute with Heat Factory over the termination of the License Agreement and this lawsuit." (Supplemental Schawbel Decl., ECF No. 19 ¶ 3). Schawbel states that since Schawbel sent notice to Heat Factory that it was terminating the License Agreement, he has discussed the patents with three prospective business partners.[9] *Id.* ¶ 5–13. One potential business partner expressed "concerns that it would be stepping into a dispute with Heat Factory over rights to the Patented Technology . . . ." *Id.* ¶ 7. A second "responded that the issues with Heat Factory would make the transaction too complicated and it declined to move forward." *Id.* ¶ 10. Schawbel states that based on discussions, a third company "would be very interested if we could offer a license covering the United States and Canada without the cloud caused by Heat Factory's refusal to

---

[8] Schawbel submitted the Supplemental Declaration of William Schawbel (ECF No. 19) and Mr. Schawbel was subject to cross examination at the evidentiary hearing.

[9] Schawbel indicates that a fourth potential business partner may be interested in the patent. (Suppl. Schawbel Decl., ECF No. 19). Schawbel has not provided evidence that Schawbel has discussed the patent with prospective business partner four since Schawbel attempted to terminate the License Agreement, however.

12

acknowledge the termination of the License Agreement." *Id.* ¶ 13. The record establishes that Schawbel and Heat Factory operate in a market where potential licensees are deterred by the existence of multiple licensees or the potential of even a single infringer. *See, e.g.*, *Port-a-Pour*, 49 F. Supp. 3d at 872 (finding irreparable harm because "[infringer]'s conduct made it impossible for [patent owner] to license its product line to anyone else because, according to [declarant], 'people don't want to invest money and find out there's sort of a left-handed licensee out there'"). This case is distinguishable from cases where courts found no irreparable harm because the patent holder previously licensed its patent to multiple licensees. *See, e.g.*, *T.J. Smith & Nephew Ltd.*, 821 F.2d at 648 (finding no irreparable harm in part because "[patent holder] had long licensed its patent to two licensees"). The record establishes that Heat Factory's asserted ongoing infringement has inhibited, and will continue to inhibit, Schawbel from exercising its rights as the patent holder to commercially exploit its patents by licensing its patents to a new licensee.

After Schawbel sent notice to Heat Factory in January 2018 that it was terminating the License Agreement, the parties entered into a forbearance period while the parties discussed a resolution, which continued until September 2018. On December 12, 2018, an early neutral evaluation conference was held in front of the Magistrate Judge. On January 15, 2019, Schawbel filed for a preliminary injunction in this Court. (ECF No. 14). While nearly a year passed between the time Schawbel first sent notice to Heat Factory that it was terminating the License Agreement and the filing of this Motion, the Court does not find that Schawbel's decision not to seek a preliminary injunction while the parties attempted a non-judicial resolution is the result of a lack of diligence by Schawbel or indicative of a lack of urgency. *See High Tech. Med.*, 49 F.3d at 1557 (delay excusable if there exists a "good explanation"); *see, e.g.*, *Advanced Commc'n Design, Inc. v. Premiere Retail Networks, Inc.*, 46 Fed. App'x 964, 984 (Fed. Cir. 2002) (declining to hold eight months the parties spent in settlement negotiations against the party seeking an injunction).

The Court finds that absent injunctive relief, Schawbel will suffer irreparable harm because it will be inhibited from exercising its right as the patent holder to commercially exploit its patents.

### c. Balance of Equities

Schawbel contends that the balance of equities tips in its favor because "Heat Factory has other unrelated products that it can continue to sell as it did before, but Schawbel's technology is completely tied up in this dispute." (ECF No. 14-1 at 24). Schawbel asserts "what remains of Schawbel's business will be threatened" if Heat Factory is not enjoined from continuing to use Schawbel's patent during the pendency of this litigation because of actions filed by Schawbel's creditors. *Id.*

Heat Factory contends that the balance of equities tips in its favor because Heat Factory will be unable to fill outstanding orders and will be forced to store remaining Schawbel products. (ECF No. 15 at 8–9). Heat Factory contends that an injunction should not issue because Schawbel will be made whole with monetary damages "plus the termination of the License Agreement and the freedom to market its intellectual property for sale or license to whomever it chooses" if Schawbel ultimately prevails. (ECF No. 15 at 8).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

Absent an injunction, the Court will allow Heat Factory to continue to manufacture products utilizing Schawbel's patent for the pendency of this litigation without a valid license agreement and without paying Schawbel royalties for the use of its patent. There is evidence in the record that Schawbel will have difficulty finding a new licensee as long as Heat Factory continues to manufacture products utilizing its patents. Any harm Heat Factory might sustain as a result of an injunction could have been avoided had Heat Factory acted in compliance with the License Agreement. The Court finds that the balance of

14

equities weighs in favor of a limited preliminary injunction. *See, e.g.*, *Port-a-Pour*, 49 F. Supp. 3d at 873 ("Moreover, I can give no weight to harm [defendant] might sustain by an injunction against selling infringing products."); *TM Comput. Consulting, Inc. v. Apothacare, LLC*, 2008 WL 4238913, at *9–10 (D. Or. 2008) (finding balance of harms favored licensor because licensee continued to misuse licensor's rights after termination of license and "grant of a preliminary injunction only will prevent defendants from doing what they are not authorized to do").

### d. Public Interest

Schawbel contends that the public interest is served by an injunction in this matter because it is in the public interest to ensure that parties are upholding their contractual obligations. (ECF No. 14-1 at 24). Schawbel also contends the public is confused about who is responsible for customer service and general maintenance of products utilizing Schawbel's intellectual property. (ECF No. 16 at 12).

Heat Factory contends that an injunction would not be in the public interest because "the public interest is served by preventing companies like Schawbel from profiting from overt misrepresentations, and by maintaining the *status quo ante* and allowing the continued sale of products to retailers and consumers, and the ordinary flow of business, unrestrained." (ECF No. 15 at 9).

The public interest is served by upholding contractual obligations and recognizing patent rights. Moreover, a limited injunction enjoining Heat Factory from manufacturing new products utilizing Schawbel's patents while allowing Heat Factory to fulfill existing orders with existing inventory significantly mitigates any harm the public may suffer as a result of this injunction. The Court finds that a limited injunction would not be contrary to the public interest.

### V. Scope of the Injunction

Schawbel contends that the Court should issue a broad injunction "ordering that Heat Factory may not use the Patents nor use or sell any Products or Inventory covered by the Patents." (ECF No. 14-1 at 25). Heat Factory contends that any injunction should be

15

18-cv-1941-WQH-MSB

narrow, and should not include the ThermaCELL products it purchased from Schawbel under the APA since Schawbel exhausted its patent rights when it sold the ThermaCELL products to Heat Factory. (ECF No. 20). [10]

Schawbel established that it will suffer irreparable harm in the absence of an injunction because it will be inhibited from exercising its right as the patent holder to commercially exploit its patents during the pendency of this litigation. Evidence in the record demonstrates that prospective licensees are deterred by the prospect of a competitor manufacturing infringing products for an indefinite period—months to perhaps years—while this litigation reaches a final resolution. Enjoining Heat Factory from manufacturing products utilizing Schawbel's patents will assure prospective licensees that the universe of products entering the market utilizing Schawbel's patents is limited to the products in existence as of the date of this Order.

With regard to existing inventory, the record is insufficient to conclude that sale of Heat Factory's existing inventory would deter prospective licensees in light of assurances that no new products utilizing Schawbel's patents will be manufactured by Heat Factory. Consequently, the record does not support a finding at this time that enjoining Heat Factory from sale of existing inventory is necessary to prevent irreparable harm. The Court declines to enjoin Heat Factory from sale of existing inventory.

## VI. Conclusion

The Motion for Preliminary Injunction filed by Defendant/Counter-Claimant Schawbel Technologies LLC (ECF No. 14) is GRANTED IN PART and DENIED IN PART. Heat Factory is HEREBY ENJOINED from further manufacture of products utilizing the patents at issue in this action until the Court directs otherwise.

---

[10] In response to the Supplemental Declaration of William Schawbel, Heat Factory raises for the first time the issue of whether Schawbel's patent rights over the ThermaCELL products may be exhausted by the "exhaustion rule." (ECF No. 20 at 5). This issue has not been fully briefed and its resolution is unnecessary at this point given the limited scope of the injunction.

IT IS FURTHER ORDERED that within ten days of the entry of this Order, the parties shall submit briefing on what, if any, bond Schawbel shall be required to obtain in connection with this injunction. Additionally, within ten days of the entry of this Order, Schawbel shall submit a proposed order specifying the terms of the injunction to opposing counsel and the Court's efile box.

Dated: April 23, 2019

*William Q. Hayes*
Hon. William Q. Hayes
United States District Court